## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| DARREN A. BRITTO, GABRIEL A. TAUSCHER, and SHAWN M. KROLL, | |
| Plaintiffs, | |
| CMMG, Inc. | |
| Plaintiff-Intervenor, | |
| v. | Case No. 2:23-cv-00019-Z |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | **[PROPOSED] COMPLAINT** |
| Defendant. | |

Plaintiff-Intervenor, by and through undersigned counsel, files this Complaint pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–06, alleging as follows.

### INTRODUCTION

1.     For more than a decade, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") authorized the public to use pistol stabilizing braces, a popular firearms accessory, without federal regulation.  During that time, ATF repeatedly issued letter rulings assuring manufacturers and the public that attaching a stabilizing brace would not alter the statutory or regulatory classification of a pistol or other firearm.

2.     As a result, millions of Americans have for years lawfully purchased stabilizing braces and pistols equipped with stabilizing braces from authorized, legitimate manufacturers with ATF's full knowledge and express approval.

3.     Then everything changed.  Frustrated with congressional inaction, the President of the United States ordered ATF to abandon a decade of practice under an established statutory

1

framework and "to treat pistols modified with stabilizing braces" as "subject to the National Firearms Act." President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3 (Apr. 8, 2021). This "change," the President said, would require an owner of a pistol equipped with a stabilizing brace to "pay a $200 fee and submit their name and other identifying information to the Justice Department" or face criminal penalties. *Ibid.* The President's express aim was to act "without having to go through the Congress." *Id.* at 2.

4.     On January 31, 2023, ATF responded with the Rule at issue in this case. Although the Rule purports to provide "factoring criteria" to "clarify" how ATF will determine whether any particular weapons configuration is subject to heightened regulation, Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"), attached as Ex. A, the Rule in effect vests ATF with unbounded discretion. And ATF has made clear exactly how it intends to exercise that discretion, estimating that, under the Rule, 99% of pistols equipped with stabilizing braces will now be deemed subject to National Firearms Act ("NFA") controls, Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis, at 21 (Jan. 2023) ("Regulatory Analysis"), attached as Ex. B. According to ATF, the "clarification" will result in the destruction or forfeiture of over 750,000 firearms and will cost the private sector somewhere between two and five billion dollars. *Id.* at 56–57, 62–67.

5.     The Rule thus represents an abrupt reversal of ATF's longstanding position that these items are not subject to NFA controls or heightened Gun Control Act, or "GCA" regulations. The reversal will require millions of Americans to choose between the loss of their lawful (and lawfully acquired) firearms, the loss of their privacy, and the risk of criminal penalties.

6.     Incredibly, ATF claims that this result was required all along. But a plain reading of the statutory language, paired with an understanding of Congress's purposes in enacting it, reveals

that a pistol or other firearm equipped with a stabilizing brace is excluded from the applicable definitions set forth in the NFA (as well as the GCA). Congress enacted the NFA to regulate "sawed-off guns" and other dangerous weapons favored by criminal "gangster[s]" for concealability and indiscriminate accuracy, and specifically left "without any restriction" "pistols and revolvers and sporting arms." H.R. Rep. No. 73-1780 (1934). The Rule, by contrast, regulates pistols and other firearms based on accessories designed as orthotics that make them *less* concealable, *more* accurate, and *less* dangerous, thereby undermining public safety. That approach is unambiguously foreclosed by the text, history, and purpose of the NFA and GCA.

7.     At a minimum, the statutes are grievously ambiguous. *See United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality) (applying rule of lenity to prevent NFA regulation of pistol sold with a shoulder stock and a 21-inch barrel); *id.* at 519 (Scalia, J., concurring); *Cargill v. Garland*, 57 F.4th 447, 469–71 (5th Cir. 2023) (applying rule of lenity to prevent NFA and GCA regulation of bump stocks). If the agency charged with administering the NFA and GCA believed *for years* that pistols equipped with stabilizing braces are not subject to heightened regulation and now holds the opposite, the statutes are at the very least ambiguous as applied to such weapons. Lenity thus demands that the Rule be set aside to protect CMMG and the individuals that initiated this suit from the threat of criminal liability imposed by administrative fiat.

8.     Finally, the Rule and its accompanying Adjudications are, in any event, arbitrary and capricious on multiple counts. The "standard" for determining whether a brace is designed and intended for shouldering is incoherent and unworkable, and ATF's Adjudications fail to provide any explanation or justification for those decisions.

9.     This Court should not let ATF's unlawful actions stand and must set aside the Rule and

3

Adjudications.

## **PARTIES**

10.    Plaintiff-Intervenor CMMG, Inc. ("CMMG") is a federally licensed firearms manufacturer and family business.  The company was established in 2002 to produce high quality firearms that can be afforded by everyone.

11.    Since its inception, the leaders of CMMG have affirmed their commitment to meet "every morning to pray for God's wisdom in managing" the company.  CMMG, *About CMMG*, https://cmmg.com/about (last visited Feb. 17, 2023).  Their daily prayer "give[s] thanks" for the ability "to produce quality products so that we have work for our hands" and opportunity to "serve our neighbors." *Ibid.*  It also recognizes that the work of CMMG "allows [it] to provide for [its] families and community, and the defense thereof." *Ibid.*

12.    Approximately half of CMMG's sales are stabilizing braces, products equipped with stabilizing braces, or products designed to be equipped with stabilizing braces.

13.    Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a Bureau within the Department of Justice and is responsible for the enforcement of the Rule.  28 U.S.C. § 599A(a)(1); 28 C.F.R. § 0.130(a)(1)–(3).

## **JURISDICTION AND VENUE**

14.    This Court has jurisdiction under 28 U.S.C. § 1331 because this civil action arises under the laws of the United States and challenges final agency action.  5 U.S.C. §§ 701–06.

15.    Plaintiff-Intervenor cannot seek another adequate remedy in court. *Id.* § 704.

16.    Venue is proper in this Court because Defendant is an agency of the United States, no real property is involved in this action, and at least one Plaintiff resides in this judicial district.  28 U.S.C. § 1391(e)(1).  Because jurisdiction over Plaintiffs' action "is premised on a federal question," Plaintiff-Intervenor's claim is "supplemental (or ancillary) for venue purposes."  7C

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1918 (3d ed. supp. Apr. 2022).

## STANDING

17.   CMMG is financially injured by ATF's unlawful Rule and Adjudications.  Declaration of Chris Reinkemeyer ¶¶ 11–17 ("Reinkemeyer Decl."), attached as Ex. G.

18.   CMMG manufactures and sells stabilizing braces and braced pistols.  *Id.* ¶ 3.

19.   Approximately 85% of CMMG's firearm sales revenues derive from sales of braced pistols.  *Id* ¶ 5.

20.   In 2022, CMMG's revenues from sales of braced pistols reached approximately $25 million for the year.  *Id.* ¶ 14.

21.   Since ATF published a draft of the Rule on the agency's website on January 13, 2023, CMMG's braced pistol sales ceased.  *Ibid.*

22.   CMMG has incurred approximately $800,000 in losses from returned product and cancelled orders since the Rule was announced.  *Id.* ¶ 17.

23.   CMMG has already invested time and labor to determine which, if any, of the guns in its inventory are covered by the Rule and Adjudications.  *Id.* ¶ 10.

24.   CMMG expects to expend thousands of dollars in materials, manufacturing time, and labor in order to convert affected stabilizing brace-related products into items not affected by the Rule.  *Ibid.*

25.   CMMG's reputation has also suffered as a result of many of its products unexpectedly triggering onerous federal firearms regulations.  *Id.* ¶ 20.

26.   These injuries are directly caused by ATF's unlawful Rule and Adjudications.  *Id.* ¶¶ 20–21.

27.   These injuries would be redressed by an order of this Court setting aside the Rule and

Adjudications.  *Id.* ¶ 21.

28.   These injuries are ongoing and irreparable.

## BACKGROUND

### THE NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT

29.   The Government regulates firearms primarily through two federal statutes:  the National Firearms Act ("NFA"), 26 U.S.C. §§ 5841–72, and the Gun Control Act ("GCA"), 18 U.S.C. §§ 921–31.

30.   Firearms carry with them a regulatory burden that corresponds to their classification under these two statutes.

31.   Because the NFA enumerates the specific "firearms" to which it applies, most guns—including rifles, shotguns, and pistols—are not NFA-regulated.  Those that are NFA-regulated are subject to burdensome tax and registration requirements backed by criminal penalties.

32.   The GCA regulates the business of importing, manufacturing, or dealing in firearms generally.  In addition, the GCA imposes heightened restrictions on the transportation, sale, and delivery of any "short-barreled rifle," "short-barreled shotgun," or "machinegun."  18 U.S.C. § 922(a)(4), (b)(4).

*Congress imposed restrictions on certain short-barreled guns.*

33.   In the late 1920s and early 1930s, organized crime was becoming "a major national problem."  *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002).

34.   "[T]he country struggled to control the violence wrought by 'gangsters, racketeers, and professional criminals.'"  *Bezet v. United States*, 276 F. Supp. 3d 576, 611 (E.D. La. 2017), *aff'd*, 714 F. App'x 336 (5th Cir. 2017).

35.   Congress thus enacted the NFA to regulate "weapons likely to be used for criminal purposes."  *Thompson/Ctr. Arms Co.*, 504 U.S. at 517 (plurality opinion).

36. Because these lawbreakers favored "machine gun[s]" and "sawed-off guns," H.R. Rep. No. 73-1780, Congress determined to regulate these "dangerous" weapons.

37. With respect to sawed-off guns, Congress believed that "a long gun with a shortened barrel is both dangerous, because its concealability fosters its use in illicit activity, and unusual, because of its heightened capability to cause damage." *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018) (cleaned up); *accord United States v. Marzzarella*, 614 F.3d 85, 95 (3rd Cir. 2010).

38. At the same time, however, Congress found these dangers did not accompany "pistols and revolvers and sporting arms," and thus declined to regulate those guns. H.R. Rep. No. 73-1780.

39. The result of these policy choices is the scheme in place today: the NFA and the GCA impose significant restrictions on short-barreled rifles, but generally do not impose significant regulatory burdens on pistols and other weapons that are not specifically enumerated in the statutes. *See United States v. Harris*, 959 F.2d 246, 261 (D.C. Cir. 1992) (referring to "a gun of some kind but not a firearm within the meaning of the statute"), *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001).

*A weapon is subject to varying restrictions and burdens based on its classification.*

40. <u>The NFA.</u> A weapon classified as a "firearm" under the NFA is subject to extensive federal regulation.

41. Reflecting Congress's desire to regulate dangerous sawed-off weapons, the NFA defines "firearm" to reach "a weapon *made from a rifle* if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(4) (emphasis added).

42. "Rifle" is in turn defined to mean "a weapon designed or redesigned, made or remade,

and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C. § 5845(c).

43.    Although the "made from a rifle" definition captures the principal evil Congress sought to address—criminals buying long guns and sawing them down—it creates a loophole where a criminal could buy a gun with a shortened barrel directly from a licensed manufacturer. This is because the definition's operative term "made" excludes "manufacturing . . . by one qualified to engage in such business under" the NFA. 26 U.S.C. § 5845(i).

44.    Congress thus defined "firearm" to also reach "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3). This provision reaches the original manufacturing omitted by the "made from a rifle" provision.

45.    Taken together, the NFA definition of "firearm" reaches all originally-manufactured short-barreled rifles and all short-barreled rifles "made from a rifle."

46.    Inclusion within the NFA's definition of a "firearm" carries significant legal and regulatory consequences.

47.    Anyone who makes an NFA firearm must submit an application to ATF with identifying information—including his fingerprints and a passport photo—and must pay a $200 tax. 26 U.S.C. § 5822; 27 C.F.R. §§ 479.61, 479.62; *see also* ATF Form 1 – Application to Make and Register a Firearm, https://www.atf.gov/firearms/docs/form/form-1-application-make-and-register-firearm-atf-form-53201.

48.    Anyone who transfers an NFA firearm must also submit an application to ATF with identifying information and must pay an additional $200 tax. 26 U.S.C. § 5812; 27 C.F.R.

§§ 479.66, 479.84.

49.   Anyone who receives an NFA firearm must provide ATF with his fingerprints and notify his local police department of the transfer.  26 U.S.C. § 5812; 27 C.F.R. §§ 479.84(c), 479.85.

50.   Anyone possessing an NFA firearm must register himself and his NFA firearm in a federal database.  26 U.S.C. § 5841; 28 C.F.R. § 0.131(d); 27 C.F.R. §§ 479.101, 479.102.

51.   Anyone who violates the NFA may be imprisoned for up to ten years and fined up to $10,000.  26 U.S.C. § 5871.

52.   <u>The GCA.</u>  A weapon classified as a short-barreled rifle under the GCA is subject to statutory rules governing its sale, delivery, and interstate transportation.

53.   Similar to the NFA's definition of "firearm," the GCA defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length" and as "any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches."  18 U.S.C § 921(a)(8).

54.   "Rifle" is in turn defined as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."  *Id.* § 921(a)(7).

55.   The GCA's rules applicable to short-barreled rifles and other firearms often turn on whether the relevant actor holds a federal firearms license ("FFL")—i.e., a license issued by the Attorney General "to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license."  18 U.S.C. § 923(c); *accord* 27 C.F.R. § 478.41.

56.   Individuals may "engage in the business of importing, manufacturing, or dealing in

firearms" only if they hold an FFL.  18 U.S.C. § 922(a)(1)(A).

57.   FFL holders may "sell or deliver" short-barreled rifles to unlicensed persons only "as specifically authorized by the Attorney General consistent with public safety and necessity."  18 U.S.C. § 922(b)(4); 27 C.F.R. § 478.98.

58.   Unlicensed individuals may "transport" short-barreled rifles "in interstate or foreign commerce" only "as specifically authorized by the Attorney General consistent with public safety and necessity."  18 U.S.C. § 922(a)(4); *see also* 27 C.F.R. § 478.28.

59.   Entities or individuals who sell, deliver, or transport short-barreled rifles without a required authorization from the Attorney General may be imprisoned for up to five years and fined up to $500,000.  18 U.S.C. §§ 924(a)(1)(B), (D); 3571(c)(3); 3559(a)(4).

60.   ATF allows—but does not require—parties to submit products for classification under the NFA and GCA.  *See* 27 C.F.R. § 478.92(c) (explaining that process is "voluntary").  When a party obtains such a classification, it is "authoritative" as to the classified product.  *See ibid.*  While ATF formally codified its classification process last year, the agency employed it "[f]or many years" prior to codification.  Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720, 27,733 (May 21, 2021) (Proposed Rule); *accord Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (explaining that parties are bound by ATF classification letters). ATF's classification letters thus carried enormous consequences in terms of the public's understanding of whether a firearm was or was not subject to the NFA and GCA.

## PISTOL STABILIZING BRACES

*Stabilizing braces are a popular accessory that help shooters fire pistols and other firearms more safely and accurately.*

61.   In 2012, manufacturers began developing pistol stabilizing braces to promote shooting inclusion for service-disabled military veterans.  *See* Rule, 88 Fed. Reg. at 6,479, 6,482–83.

62.   As the original Pistol Stabilizing Brace patent shows, these devices secure the pistol to a shooter's forearm in order to stabilize firing:[1]



63.   Through this design, braces are orthotic devices that allow users to more safely and accurately fire handguns.  *See* Report of Gabriel Hurst, Certified Prosthetist/Orthotist, at 1 (Sept. 7, 2021) ("Hurst Report"), attached as Ex. H.  Indeed, the brace design of one major arm brace manufacturer—"a strap and a cuff made of an elastomer material"—mimics well-established orthotic devices, such as "[t]he forearm crutch," which "has been in use for close to 70 years." *Id.* at 1–2.

64.   The novel stabilizing brace design has been remarkably successful in achieving its goal of allowing individuals with disabilities to safely fire weapons.

65.   Stabilizing braces are also popular with individuals that do not have physical disabilities and who use braces to "more safely use" "firearms," particularly "beginning shooters and shooters with less physical strength."  Comments of Richard Cicero, at 2 (Sept. 8, 2021), attached as Ex. F.

66.   Some of these able-bodied shooters may nevertheless have "loss of mobility, strength, sensation, and stability" such that they cannot use a firearm safely and effectively without a

---

[1]   *See* U.S. Patent No. 8,869,444 B2 (issued Oct. 28, 2014), https://patentimages.storage.googleapis.com/0e/ef/63/3020eaabf1d854/US8869444.pdf.

stabilizing brace.  *Id*. at 1.

67.   Stabilizing braces thus provide users of all stripes a more stable firing platform to increase safety and accuracy.

68.   All told, ***millions*** of Americans have purchased stabilizing braces to achieve safer and more accurate firing.  *See* Rule, 88 Fed. Reg. at 6,560 (estimating that there are "3 million 'stabilizing braces' and firearms with an attached 'stabilizing brace' currently in circulation"); William J. Krouse, *Handguns, Stabilizing Braces, and Related Components*, Cong. Res. Serv. (Apr. 19, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11763 ("there are between 10 and 40 million stabilizing braces and similar components already in civilian hands"); *accord* Comments of the National Shooting Sports Foundation, at 7 (filed Sept. 7, 2021) (noting that Congressional Research Service "estimate is more in line with [industry]'s estimate" derived from "the market and input from" companies);[2] Report of Todd D. Kendall, Ph.D, Compass Lexicon, at 24 (Sept. 7, 2021), attached as Ex. P.

*For more than a decade, ATF tells the public that stabilizing braces do not change the regulatory classification of pistols and other firearms*

69.   Before manufacturers brought the stabilizing brace to market, ATF concluded in a 2012 classification letter that attaching a stabilizing brace "would not alter the classification of a pistol or other firearm" and that "such a firearm *would not be* subject to NFA controls."  Rule, 88 Fed. Reg. at 6,479 (quoting Letter from ATF #2013-0172 (Nov. 26, 2012) (emphasis in original letter); *see also* FTB Letter 2013-0172 (Nov. 26, 2012), attached as Ex. I.  Furthermore, ATF recognized that a stabilizing brace differs from a shoulder stock because a "'brace,' when attached to a firearm, d[oes] 'not convert that weapon to be fired from the shoulder.'"  Rule, 88 Fed. Reg. at 6,479.

---

[2] https://www.regulations.gov/comment/ATF-2021-0002-181221.

70.   By determining that a brace-equipped pistol was not a short-barreled rifle designed and intended to be fired from the shoulder, ATF did not subject such weapons to the onerous controls of the NFA and GCA.

71.   As a result, an individual was free to use a stabilizing brace to more safely and accurately fire his gun without providing ATF with his fingerprints, 26 U.S.C. § 5812(a)(3); subjecting himself to registration in a federal database, *id.* 5841(b); obtaining a "specific[] authoriz[ation] by the Attorney General" before transferring the short-barreled rifle across state lines, 18 U.S.C. § 922(a)(4); and complying with other requirements.

72.   ATF repeatedly reaffirmed its position over the years.  Following its 2012 classification, ATF issued at least 17 classification letters opining that different stabilizing brace designs did not convert pistols into short-barreled rifles.  Rule, 88 Fed. Reg. at 6,502 & n.84.

73.   In 2014, ATF even ruled that "firing a pistol [equipped with a brace] from the shoulder would *not* cause the pistol to be reclassified."  FTB Letter 301737, at 1 (Mar. 5, 2014), attached as Ex. J.

74.   While ATF issued some classification letters finding that products changed a pistol's regulatory classification, those letters focused on whether the product in fact functioned as a brace. When these products did not secure the weapon to a shooter's arm with two elastomeric flaps and a strap, ATF determined that the firearm was a short-barreled rifle.

75.   For example, in 2014, ATF found that adding a "foam padded stabilizer tube"—i.e., a length of padding with no flaps or other mechanism to secure the weapon to the forearm—to a pistol "would result in the manufacture of a 'short-barreled rifle.'"  Rule, 88 Fed. Reg. at 6,485.



**2014 submission of Glock-type pistol with "foam padded stabilizer tube"**

76.   By contrast, ATF found that stabilizing braces like the ones sold by CMMG—i.e., that used two elastomeric flaps and a strap to wrap around the shooter's arm—did not change a pistol's regulatory classification under the NFA or GCA, exactly because they functioned as a brace and were not intended to be fired from the shoulder.

77.   For example, in 2015, ATF determined that attaching an adjustable stabilizing brace product to a pistol, subject to minor modifications, "would not be a 'short-barreled rifle.'"  *Id.* at 6,488; *see also* ATF Letter 304296 (Dec. 22, 2015), attached as Ex. K.



**2015 submission of "adjustable stabilizing brace"**

78.   ATF also issued an open letter in 2015 again asserting its position that a stabilizing brace "may be attached to a handgun without making a[n] NFA firearm."  ATF, Open Letter on the Redesign of "Stabilizing Braces," at 2 (Jan. 16, 2015), attached as Ex. L.

79.   ATF also took the same position in criminal prosecutions, advising courts that attaching

stabilizing braces to a weapon would not create a short-barreled rifle subject to additional regulation under federal statutes.  In a 2019 sentencing hearing, for example, the Government told a federal judge: "the type of device placed on the firearm is also dispositive of what type of firearm, whether it's a rifle or whether it is a pistol and so the ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA." Sentencing Hr'g Tr. at 38:9–15, *United States v. Kamali*, Case No. 18-cr-288, Dkt. # 110 (Sept. 24, 2019), attached as Ex. M.

80.    ATF's representations to the public were in accord.  In 2017, it issued a letter opining that it was "clear that stabilizing braces are ***perfectly legal accessories*** for large handguns or pistols."  *See* ATF Letter 5000, at 1 (Mar. 21, 2017) (emphasis added), attached as Ex. N.

81.    Of course, ATF did not say that it would accept without question that any item attached to the back of a pistol was a stabilizing brace.  But it stood by its prior classification letters finding that stabilizing braces that secured the shooter's arm to the weapon using two elastomeric flaps and a strap were not designed and intended to facilitate shoulder-firing.

82.    Unsurprisingly, ATF's classification decisions and its 2017 declaration that stabilizing braces were "perfectly legal accessories" led many law-abiding Americans to buy stabilizing braces in order to facilitate safer and more accurate shooting.  *See* Rule, 88 Fed. Reg. at 6,560 (explaining that "demand and production for 'stabilizing braces' . . . t[ook] off" in "2017").

83.    In 2020, ATF issued a Notice suggesting that ATF was considering a change in its approach to regulating stabilizing braces.  *See* Objective Factors for Classifying Weapons with "Stabilizing Braces," Notice, 85 Fed. Reg. 82,516 (Dec. 18, 2020).

84.    But two weeks later—after receiving a deluge of comments in opposition to the proposed change—ATF publicly withdrew that notice and clarified that it was not "chang[ing] any law,

regulation, or other legally binding requirement." Objective Factors for Classifying Weapons With "Stabilizing Braces"; Withdrawal of Guidance, Withdrawal, 85 Fed. Reg. 86,948 (Dec. 31, 2020).

85.   ATF's reaffirmance of the regulatory status quo reinforced the perception that stabilizing braces did not change the classification of the guns to which they were affixed.

86.   As many observed, ATF's position "created a thriving market for these stabilizing braces." Letter from the Honorable Mitch McConnell, et al. to the Honorable Merrick Garland at 2 (June 24, 2021), attached as Ex. O.

*ATF changes its mind.*

87.   Without any legislative change, the President of the United States ordered ATF to abandon a decade of practice under an established statutory framework and "to treat pistols modified with stabilizing braces" as "subject to the National Firearms Act." President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3.

88.   As a result, ATF initiated the rulemaking at issue in this case.

89.   On June 10, 2021, ATF issued a Notice of Proposed Rulemaking which attempted to reconcile ATF's previous classification letters by "assign[ing] point values" to "characteristics or features" that it considered probative of an intent to shoulder. *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," Notice of Proposed Rulemaking, 86 Fed. Reg. 30,826, 30,829 (June 10, 2021) ("Notice").

90.   The Notice would have subjected to heightened regulation many brace-equipped guns that the agency previously had determined were not an NFA "firearm" or a GCA "short-barreled rifle," but ATF also expressly found that some guns equipped with popular braces would still "be classified as a pistol with an attached 'stabilizing brace' accessory." *Id.* at 30,837.

91.   Because the overall effect of the proposal would have been to permit ATF to subject

more weapons to regulation as NFA firearms or GCA short-barreled rifles, ATF received significant pushback on its change, with "over 217,000 comments opposed to aspects of the rule" out of a total of 237,000.  Rule, 88 Fed. Reg. at 6,497.

92.    Many of these comments faulted the agency for using a point system that "w[as] not easily understood or applied" and which used terms that "were ambiguous and subject to interpretation," giving ATF too much discretion.  *Id.* at 6,513.

93.    Ultimately, ATF "agree[d] with commenters" and decided to scrap its worksheet and adopt a new approach.  *Ibid.*

### ATF'S RULE

94.    On January 31, 2023, ATF issued the Rule at issue in this case.

95.    The Rule immediately invalidates every prior stabilizing brace classification issued by ATF.  *Id.* at 6,480.[3]

96.    In their place, the Rule adopts a new regulatory definition of "rifle" that incorporates an amorphous multi-factor test.  *Id.* at 6,574–75 (to be codified at 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11).

97.    The test proceeds in two steps to determine whether a brace-equipped pistol is in fact a rifle.  First, ATF will assess whether the brace "provides surface area that allows the weapon to be fired from the shoulder."  *Id.* at 6,575.  Second, ATF will assess whether six "other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder."  *Ibid.*  These six factors are (1) weight and length, (2) length of pull, (3) sights or scope, (4) whether the

---

[3] Confusingly, the Rule first claims that "prior classifications are no longer valid as of January 31, 2023."  Rule, 88 Fed. Reg. at 6,480.  It then asserts that "prior classifications are no longer valid as of May 31, 2023."  *Id.* at 6,502, 6,512.  Given the felony consequences that attach to any misinterpreted ambiguity, Plaintiff-Intervenor has no choice but to assume the earlier date.

brace is necessary for the gun's cycle of operations, (5) marketing materials, and (6) information from "the general community."  *Ibid.*

98.   Although this test is nominally "dependent on the specific configuration of the firearm," *id.* at 6,507, ATF already predicts that it will encompass **99%** of all stabilizing braces, Regulatory Analysis at 21 ("there may be approximately 1 percent of 'stabilizing braces' that, when attached to the firearm, would not result in a firearm that is designed and intended to be fired from the shoulder").  ATF describes an example of an accessory that would not convert a pistol to a short-barreled rifle, Rule, 88 Fed. Reg. at 6,529–30 ("For example, an elastic strap that wraps around the shooter's wrist and buffer tube on an AR-type firearm is an attachment that does not provide surface area to shoulder fire a weapon."), but it does not point to a single firearm configuration or product actually in existence that would not trigger heightened regulation under the NFA and GCA.

99.   The market has responded in kind, with the largest online gun marketplace now requiring ***all*** guns equipped with stabilizing braces to be listed as short-barreled rifles.[4]

100.  By ATF's estimate, ***millions*** of Americans have been committing felony gun crimes—with ATF's full knowledge and express approval—for the past decade.  Rule, 88 Fed. Reg. at 6,560 (estimating "3 million 'stabilizing braces' and firearms with an attached 'stabilizing brace' currently in circulation").

101.  However, ATF's numbers understate the scope of the problem the Rule creates because the agency's estimate arbitrarily stops at 2020.  *See* Regulatory Analysis at 18 (estimating braces sold "between the years 2013 to 2020").  Indeed, CMMG sales between the years 2020 and 2023

---

[4] https://support.gunbroker.com/hc/en-us/articles/12595908898459-New-ATF-Stabilizing-Brace-Rule.

constitute approximately 81% of all its braced pistol sales even though CMMG had been in the braced pistol market since 2013.  Reinkemeyer Decl. ¶ 15.

102.  The Rule is effective immediately.  Rule, 88 Fed. Reg. at 6,478.

103.  Parties in possession of a brace-equipped gun have until May 31, 2023 to register their gun, destroy it, permanently modify it, or surrender it to ATF.  *Id.* at 6,480.  But to facilitate this "120-day registration period," ATF must rely on "its enforcement discretion" because the agency's position is that the millions of Americans in possession of these brace-equipped weapons have ***already*** committed the felony.  *Id.* at 6,480–81.

104.  "Notwithstanding the 120-day compliance period," however, "the rule is immediately effective in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA."  *Id.* at 6,481.

### THE RULE IS UNLAWFUL

105.  In ATF's single-minded quest "to treat pistols modified with stabilizing braces" as "subject to the National Firearms Act," President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3, it fails to heed the statutory text by which it is bound.

106.  The NFA and GCA's statutory definitions do not reach pistols equipped with stabilizing braces.  The statutes cover weapons manufactured as short-barreled rifles, 26 U.S.C. § 5845(a)(3), and "weapon[s] made from a rifle," *id.* § 5845(a)(4); *accord* 18 U.S.C. § 921(a)(8).  Contrary to the Rule, the statutes do ***not*** cover guns manufactured as weapons other than short-barreled rifles or short-barreled guns made from weapons other than rifles.

107.  The statutory purpose confirms this result.  Congress enacted the NFA (and later, the GCA) to regulate the shortening of long firearms in a manner that makes them more attractive to criminals because of their increased concealability and indiscriminate accuracy.  The Rule, by

contrast, regulates the lengthening of pistols and other short firearms through the attachment of accessories designed as orthotics that make these weapons *less* concealable, ***more*** accurate, and *less* dangerous, thereby undermining public safety.

108.  The Rule is thus unambiguously foreclosed by the text, history, and purpose of the NFA and GCA.

109.  The Rule also neglects the principal statutory definitions that enumerate the weapons covered by the NFA and subject to stricter controls under the GCA.

110.  ATF misapprehends the term "designed" as used in 26 U.S.C. § 5845(c) and 18 U.S.C. § 921(a)(7).  The Rule considers "***irrelevant***" evidence "that the 'stabilizing brace' makes firing a standard pistol more accurate or more enjoyable."  Rule, 88 Fed. Reg. at 6,557 (emphasis added). This is first and foremost directly contrary to ATF's approach through the last decade and up through enactment of the Notice.  But more importantly, "items which are principally used for non[-shouldering] purposes" are not "designed" for shouldering.  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 501 (1982).  Thus, ATF cannot read the term "designed" to exclude all evidence showing that a stabilizing brace is suitable for use as a brace.

111. ATF also misinterprets "intended" as used in 26 U.S.C. § 5845(c) and 18 U.S.C. § 921(a)(7).   ATF purports to divine intent from third-party marketing materials and "information."  Rule, 88 Fed. Reg. at 6,575.  But third parties' "opinion[s]" have no "conceivable relevance to the intent of the seller."  *Record Head Corp. v. Sachen*, 682 F.2d 672, 677 (7th Cir. 1982).  Thus, like its interpretation of "designed," the Rule's interpretation of "intended" violates the NFA.

112.  At the very least, the NFA is grievously ambiguous as applied to pistols equipped with stabilizing braces, as evidenced by ATF reading the statute to not cover these weapons for more

than a decade.  Under these circumstances, the rule of lenity requires excluding brace-affixed weapons from the scope of the NFA.  *See Thompson/Ctr. Arms Co.*, 504 U.S. at 517–18 (plurality) (applying rule of lenity to prevent NFA regulation of pistol sold with a shoulder stock and a 21-inch barrel); *id.* at 519 (Scalia, J., concurring); *Cargill*, 57 F.4th at 469–71 (applying rule of lenity to prevent NFA and GCA regulation of bump stocks).

113.  ATF's Rule also construes the statute in a way that would raise grave constitutional doubts under the Second Amendment.  With millions of stabilizing braces in circulation—even by ATF's conservative estimate—braced weapons are plainly in "common use" and thus protected by the Second Amendment.  *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128, 2143 (2022); *see Avitabile v. Beach*, 368 F. Supp. 3d 404, 411 (N.D.N.Y. 2019) (concluding that "at least 300,000 tasers and 4,478,330 stun guns owned by private citizens across the United States" constituted "common use"); *Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018) ("The Court finds that based on this magnitude of sales . . . [that] Defendant has failed to establish that nunchaku are not in common use.").  The doctrine of constitutional avoidance thus requires reading the NFA and the GCA to avoid placing onerous restrictions on these weapons.  *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001).

114.  The Rule is also hopelessly unworkable.  For example, the Rule says that ATF will first assess whether a brace "provides surface area that allows the weapon to be fired from the shoulder."  Rule, 88 Fed. Reg. at 6,575.

115.  But that inquiry raises an obvious question:  ***how much*** "surface area" "allows the weapon to be fired from the shoulder?"  ATF—without giving a reason—declines "to specify a quantifiable metric for what constitutes surface area that allows for shouldering of the weapon" and will not "attempt to precisely measure or quantify the surface area."  *Id.* at 6,529.

116. ATF's other factors fare no better. For example, ATF says that it will assess whether brace-affixed pistols have a weight, length, and length of pull that are "consistent with" "similarly designed rifles." *Id.* at 6,575.

117. But ATF does not provide a comprehensive list of "similarly designed rifles" and instead offers a handful of examples, leaving to regulated parties the impossible task of figuring out which rifles ATF will use as benchmarks from a population of at least "12,000 firearms." *Id.* at 6,514–19, 6,535–38 & n.103. ATF also ignores evidence that many pistols have physical characteristics similar to the "rifles" it identifies as examples. Even if an individual manages to guess right, he or she then has to figure out whether his or her braced weapon's features are "consistent with" those benchmarks—a term that is undefined.

118. ATF also advises parties that it will look at "marketing and promotional materials," as well as "[i]nformation demonstrating the likely use of the weapon in the general community." *Id.* at 6,575. But ATF does not commit itself to any kind of standard for how it will weigh or assess this information. Indeed, the Preamble credits some individuals' characterizations of a brace while writing off others as anecdotal and not even "relevant." *Id.* at 6,519. Elsewhere, it divines from generic anti-establishment marketing slogans an unstated intent "to avoid NFA controls." *Id.* at 6,544.

119. ATF's factors are little more than window dressing for the agency to reach its preferred outcome.

120. ATF's Rule is also unlawful because it relies on a deficient cost-benefit analysis that, *inter alia*, arbitrarily fails to consider all stabilizing braces sold in the last three years.

121. Finally, ATF's Rule is impermissibly retroactive in excess of its statutory authority under the GCA.

### ATF'S BRACE ADJUDICATIONS

122.  Along with the Rule, ATF also issued dozens of adjudications purporting to classify as short-barreled rifles common firearms and weapon platforms equipped with the most popular stabilizing braces in the United States ("the Adjudications").  *See* ATF, Common Weapon Platforms with Attached 'Stabilizing Brace' Designs that are Short-Barreled Rifles ("Platforms Adjudication"), attached as Ex. C; ATF, Commercially Available Firearms Equipped with a 'Stabilizing Brace' that are Short-Barreled Rifles ("Firearms Adjudication"), attached as Ex. D.

123.  These Adjudications contain no analysis and consist solely of photographs of brace-equipped firearms or weapons platforms labeled "Short-barreled Rifle."

124.  Like the underlying Rule, the Adjudications are completely untethered from the statutory text they purport to apply.

125.  The Adjudications are also unlawful because they were issued contemporaneously with the Final Rule, and do not at all explain the reasons for the agency's decisions.

126.  The Adjudications confirm that ATF believes its Rule will allow it to achieve whatever outcome it wants, regardless of the facts before the agency.  Take, for example, ATF's adjudication of the SB-Mini brace.  ATF has twice before issued preliminary classifications concluding that a pistol affixed with the SB-Mini is not a short-barreled rifle.  *See* Rule, 88 Fed. Reg. at 6,492 (preliminary classification letter in 2020); Notice, 86 Fed. Reg. at 30,835–38 (example application of worksheet).  Now, ATF says that it ***is*** a short-barreled rifle.  *See* Platforms Adjudication at 8. That ATF felt no need to even explain ***why*** use of the SB-Mini results in a short-barreled rifle demonstrates that the Rule and its factors are nothing more than a legal veneer for ATF to do whatever it wants.

## FIRST CLAIM FOR RELIEF
### (Rule – Ultra Vires)

127.  Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

128.  The APA authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

129.  The Rule is a final agency action that exceeds ATF's statutory authority.

130.  The Rule regulates pistols and other firearms equipped with stabilizing braces, even though the text, structure, history, and purpose of the NFA and GCA show that the statute does not regulate such weapons.

131.  The Rule misinterprets "designed" as used in 26 U.S.C. § 5845(c) and 18 U.S.C. § 921(a)(7) by, among other things, excluding from ATF's future classification decisions all evidence showing that a stabilizing brace functions as a stabilizing brace.

132.  The Rule misinterprets "intended" as used in 26 U.S.C. § 5845(c) and 18 U.S.C. § 921(a)(7) by, among other things, attributing third-party intent to firearms manufacturers, stabilizing brace manufacturers, commercial retailers and other sellers, and individual gun owners.

133.  At minimum, the NFA and GCA are grievously ambiguous as applied to stabilizing braces, and thus the Rule violates the rule of lenity.  *See Cargill*, 57 F.4th at 471.

134.  The Rule is invalid because it interprets the NFA and GCA in a way that encompasses millions of weapons—undoubtedly in common use—and thus raises grave constitutional problems under the Second Amendment.  *See Hersh v. United States*, 553 F.3d 743, 754–55 (5th Cir. 2008).

135.  The Rule is impermissibly retroactive in excess of ATF's statutory authority.

136. The Rule is invalid because it engages in impermissible hybrid rulemaking and adjudication.

## SECOND CLAIM FOR RELIEF
### (Rule – Arbitrary And Capricious)

137. Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

138. The APA authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

139. The Rule is arbitrary and capricious.

140. The factors adopted by the Rule are holistically arbitrary because they leave Plaintiff-Intervenor, "other regulated parties, and reviewing courts[,] guessing" at how to apply the ATF's purported standard and because they would confer unbounded discretion upon the agency and are otherwise inadequately explained. *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 25 (D.D.C. 2014).

141. The factors adopted by the Rule are individually arbitrary because they do not meaningfully "articulate[ ] the standards that [will] guide[ ] [ATF's] analysis" and because they are contrary to evidence in the record and otherwise inadequately explained. *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006).

142. The Rule's consideration of costs and benefits is arbitrary and capricious.

## THIRD CLAIM FOR RELIEF
### (Adjudications – Ultra Vires)

143. Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

144. The APA authorizes this Court to "hold unlawful and set aside agency action, findings,

and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

145.  The Adjudications are final agency actions that exceed ATF's statutory authority.

146.  The Adjudications subject to NFA regulation and heightened GCA regulation pistols equipped with stabilizing braces, even though the text, structure, history, and purpose of the NFA and GCA show that the statutes do not reach such weapons.

147.  The Adjudications misinterpret "designed" as used in 26 U.S.C. § 5845(c) and 18 U.S.C. § 921(a)(7), by excluding from consideration all evidence showing that a stabilizing brace functions as a stabilizing brace.

148.  The Adjudications misinterpret "intended" as used in 26 U.S.C. § 5845(c) and 18 U.S.C. § 921(a)(7), by attributing third-party intent to firearms manufacturers, stabilizing brace manufacturers, commercial retailers and other sellers, and individual gun owners.

149.  At minimum, the statutes and the Rule are grievously ambiguous as applied to stabilizing braces, and thus the Adjudications violate the rule of lenity.

150.  The Adjudications are invalid because they interpret the NFA and GCA in a way that encompasses millions of weapons—undoubtedly in common use—and thus raises grave constitutional doubts under the Second Amendment.  *See Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 174.

151.  The Adjudications are in excess of ATF's statutory authority under the Administrative Procedure Act because ATF impermissibly issued them contemporaneously with the Rule.

### FOURTH CLAIM FOR RELIEF
#### (Adjudications – Arbitrary And Capricious)

152.  Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint and

the paragraphs in the counts below as though set forth fully herein.

153.   The APA authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

154.  The Adjudications are arbitrary and capricious because they do not provide reasoned explanations.

**FIFTH CLAIM FOR RELIEF**
**(Rule and Adjudications – Unconstitutionally Vague)**

155.  Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

156.  The APA authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B).

157.  The Rule and statute are unconstitutionally vague on their face and as applied in the Adjudications.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff-Intervenor respectfully requests that this Court enter judgment in its favor and against Defendant, as follows:

A.  Declare unlawful and set aside ATF's Rule and Adjudications.

B.  Preliminarily and permanently enjoin ATF from enforcing the Rule and Adjudications.

C.  Grant such further and additional relief as this Court deems just and proper.

February 17, 2023

/s/ Dusty J. Stockard
Dusty J. Stockard
Texas Bar No.: 24028014
**STOCKARD, JOHNSTON, BROWN**
**NETARDUS & DOYLE, P.C.**
1030 N. Western
Amarillo, TX 79106
Tel: 806.372.2202
Fax: 806.379.7799
DStockard@sjblawfirm.com

Stephen J. Obermeier*
Thomas M. Johnson, Jr.*
Michael D. Faucette*
Jeremy J. Broggi*
Boyd Garriott*
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Tel: 202.719.7000
Fax: 202.719.7049
SObermeier@wiley.law
TMJohnson@wiley.law
MFaucette@wiley.law
JBroggi@wiley.law
BGarriott@wiley.law

*pro hac vice forthcoming*

*Counsel for Proposed Intervenor CMMG, Inc.*