# EXHIBIT E

**Before the Bureau of Alcohol, Tobacco, Firearms, and Explosives**
**Department of Justice**
**Washington, D.C.**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Factoring Criteria for Firearms With | ) | Docket No. ATF 2021R–08 |
| Attached "Stabilizing Braces" | ) | AG Order No. 5070–2021 |
| | ) | |

## COMMENTS OF SB TACTICAL AND THE
## FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC.

Stephen J. Obermeier
Megan L. Brown
Thomas M. Johnson, Jr.
Michael D. Faucette
Jeremy J. Broggi
**WILEY REIN LLP**
1776 K St. N.W.
Washington, DC  20006
(202) 719-7000
SObermeier@wiley.law
MBrown@wiley.law
TMJohnson@wiley.law
MFaucette@wiley.law
JBroggi@wiley.law

*Counsel for SB Tactical and the Firearms Regulatory Accountability Coalition, Inc.*

September 8, 2021

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

DISCUSSION ............................................................................................................... 4

I.    The Proposed Rule Exceeds ATF's Statutory Authority Under The National Firearms Act And The Gun Control Act ............................................................................................... 4

    A.    The Proposed Rule Departs From Congress's Focus On Shouldering. ................. 4

        1.    The Statutes Require ATF To Assess Shouldering .................................... 4

        2.    The Proposed Rule Assesses Grip, Not Shouldering. ............................... 5

        3.    The Proposed Rule Will Unlawfully Regulate Stabilizing Braces. .......... 12

    B.    The Proposed Rule Disfavors Firearms Congress Sought To Protect. ................ 15

    C.    The Proposed Rule Violates The Rule Against Retroactive Rulemaking. ........... 18

II.    The Proposed Rule Adopts "Factoring Criteria" That Are Otherwise Unlawful. ............ 21

    A.    Section I's "Prerequisites" Are Arbitrary. ............................................................. 22

        1.    Weapon Weight ....................................................................................... 22

        2.    Overall Length ........................................................................................ 25

    B.    Section II's "Accessory Characteristics" Are Arbitrary. ..................................... 26

        1.    Accessory Design ..................................................................................... 26

        2.    Rear Surface Area .................................................................................... 29

        3.    Adjustability ............................................................................................ 30

        4.    Stabilizing Support .................................................................................. 31

    C.    Section III's "Configuration Of Weapon" Factors Are Arbitrary. ...................... 36

        1.    Length of Pull ......................................................................................... 36

        2.    Attachment Method ................................................................................. 38

        3.    Modifications / Configuration ................................................................. 40

        4.    Peripheral Accessories ............................................................................ 41

    D.    The Scoring Scales In Section II And Section III Are Arbitrary. ......................... 43

    E.    The Adjudications Involving The SBA3 And Blade Are Arbitrary. .................... 46

III.    The Proposed Rule Relies On A Flawed Economic Justification .................................... 51

IV.    The Proposed Rule Raises Serious Constitutional Concerns .......................................... 57

    A.    The Proposed Rule Violates Due Process Because It Fails To Provide Persons With Fair Notice. ............................................................................................................. 58

    B.    The Proposed Rule Violates The Takings Clause Because It Dispossesses Owners Of Braced Firearms Without Compensation ......................................................... 60

CONCLUSION ............................................................................................................ 62

i

## INTRODUCTION

SB Tactical[1] and the Firearms Regulatory Accountability Coalition ("FRAC")[2] submit these comments in response to the Department of Justice ("the Department") proposal to amend Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regulations "to clarify when a rifle is 'intended to be fired from the shoulder.'"[3]  SB Tactical and FRAC are concerned that ATF will use this proceeding to unlawfully restrict stabilizing braces—orthotic devices that the Congressional Research Service estimates are used by millions of Americans to help them fire guns safely.[4]  Accordingly, SB Tactical urges the Department to withdraw the Proposed Rule or to amend it as set forth in these comments.

SB Tactical developed the original Pistol Stabilizing Brace® to promote shooting inclusion for service-disabled military veterans.[5]  Prior to bringing that device to market, SB Tactical obtained a ruling from ATF stating that attachment of the brace to a firearm "does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm."[6]  This ruling was significant because the National Firearms Act ("NFA"), 26 U.S.C. §§ 5841–5872, and the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921–931, subject certain weapons that are "intended to be fired from the shoulder" to heightened regulatory obligations,

---

[1] SB Tactical is the trade name for NST Global, LLC.

[2] FRAC is a non-profit association working to improve business conditions for the firearms industry by ensuring the industry receives fair and consistent treatment from firearms regulatory agencies.

[3] Factoring Criteria for Firearms With Attached "Stabilizing Braces," 86 Fed. Reg. 30826 (June 10, 2021) (hereinafter "Stabilizing Braces NPRM").

[4] William J. Krouse, *Handguns, Stabilizing Braces, and Related Components*, Congressional Research Service (Apr. 19, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11763.

[5] *The Company*, SB Tactical, https://www.sb-tactical.com/about/company/ (last visited September 8, 2021).

[6] Ex. 1 (FTB Letter 2013-0172 (Nov. 26, 2012)).

including registration in the National Firearms Registration and Transfer Record and payment of making and transfer taxes.

For the next several years, ATF fostered consumer demand for stabilizing braces. Specifically, the agency correctly and consistently ruled that new stabilizing brace designs from SB Tactical and its competitors did not facilitate shouldering and thus did not subject firearms to additional regulation.[7]  In 2014, ATF even ruled that "firing a pistol [equipped with a brace] from the shoulder would **not** cause the pistol to be reclassified."[8]  ATF explained that even though shouldering constituted misuse "not intended by the manufacturer" of the brace, "using the brace improperly does not constitute a design change" and ATF does "not classify weapons based on how an individual uses a weapon."[9]

The next year, ATF promulgated an "open letter" reaffirming that a stabilizing brace "may be attached to a handgun without making a[n] NFA firearm."[10]  However, this letter asserted—contrary to ATF's position the previous year—that "us[ing] a handgun stabilizing brace as a shoulder stock" "constitutes a 'redesign' of the device," subjecting the firearm to NFA regulation.[11]  Following a public outcry,[12] ATF quickly removed the open letter from its website and then, in a ruling issued in 2017, confirmed that the agency had returned to its previous position

---

[7]  Ex. 2 (FTISB Letter 302672 (Dec. 15, 2014)); Ex. 3 (FTISB Letter 303984 (Nov. 30, 2015)); Ex. 4 (FTISB Letter 304679 (Oct. 3, 2016)).  *But see* Ex. 5 (FTISB Letter 303907 (Jan. 21, 2016)).

[8]  Ex. 6 (FTB Letter 301737 (Mar. 5, 2014)); *see also* FTB Letter 99146.

[9]  Ex. 6 (emphasis omitted); *see also* FTB Letter 99146.

[10]  Ex. 7 (ATF, Open Letter on the Redesign of Stabilizing Braces (Jan. 16, 2015) (hereinafter "2015 Open Letter")) at 2.

[11]  *Id.*

[12]  *See, e.g.*, *ATF Straightens Out Stabilizing Brace Regulations*, American Rifleman (May 3, 2017),                 https://www.americanrifleman.org/content/atf-straightens-out-stabilizing-brace-regulations/.

by stating that "incidental, sporadic, or situational 'use' of an arm-brace (in its original approved configuration) equipped firearm from a firing position at or near the shoulder" would not "constitute 'redesign.'"[13]   With regulatory uncertainly thus removed, demand for firearms equipped with stabilizing braces increased.[14]

The Proposed Rule represents another about-face by ATF.  Earlier this year, President Biden instructed ATF to "treat pistols modified with stabilizing braces" as "subject to the National Firearms Act."[15]   Consistent with that directive, the Proposed Rule would amend the Code of Federal Regulations to provide that the term "rifle" includes a weapon "equipped with an accessory or component purported to assist the shooter stabilize the weapon while shooting with one hand, commonly referred to as a 'stabilizing brace,' that has objective design features and characteristics that facilitate shoulder fire, as indicated on" a worksheet to be promulgated with the Proposed Rule.[16]   The result is a regime that authorizes ATF to evaluate any weapon equipped with a stabilizing brace under a vague, multifactor, and discretionary standard that is arbitrary, capricious, promulgated in excess of statutory authority and contrary to constitutional right.  The Proposed Rule will have the practical and intended effect of dispossessing gun owners of stabilizing brace affixed firearms ATF has previously determined are lawful and which the evidence shows contribute to, rather than detract from, public safety.

---

[13]  Ex. 8 (FATD Letter 5000 (Mar. 21, 2017)).

[14]  Ex. 9 (Letter from the Honorable Mitch McConnell et al. to the Honorable Merrick Garland (June 24, 2021) ("McConnell Letter") (explaining "ATF's effective rescission in 2017 of its previous misapplication of the law, combined with its repeated letter rulings approving stabilizing braces, created a thriving market for these stabilizing braces" and that "demand over the last five years is surely attributable to ATF's classification letters and much publicized effective 2017 letter effectively rescinding its 2015 ruling against stabilizing braces")).

[15]  Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3 (Apr. 8, 2021).

[16]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30851.

**DISCUSSION**

I.   **The Proposed Rule Exceeds ATF's Statutory Authority Under The National Firearms Act And The Gun Control Act.**

The NFA and GCA impose heightened regulatory obligations on certain weapons that are "intended to be fired from the shoulder." The Proposed Rule purports to establish criteria that assess when these weapons are designed for shoulder fire. Many of these criteria, however, appear instead to have been developed in support of a non-statutory analysis about whether a weapon can be more easily fired with one hand or two hands. As a result, the Proposed Rule would unlawfully subject firearms that are not intended for shoulder fire to heightened regulatory obligations and, by doing so, would disfavor the larger firearms that Congress determined were safer and less likely to be used for criminal purposes than easily concealable firearms. In addition, the Proposed Rule would impose on current owners of stabilizing braces regulatory obligations that violate the rule against retroactive rulemaking.

A.   **The Proposed Rule Departs From Congress's Focus On Shouldering.**

1.   <u>The Statutes Require ATF To Assess Shouldering.</u>

Under the NFA, a "firearm" is subject to making and transfer taxes and must be registered in the National Firearms Registration and Transfer Record.[17] The NFA defines a "firearm" to include "a rifle having a barrel or barrels of less than 16 inches in length,"[18] and a "rifle," in relevant part, as a weapon that fires a "projectile through a rifled bore" and is "designed or redesigned, made or remade, and *intended to be fired from the shoulder*."[19]

---

[17] 26 U.S.C. §§ 5812, 5822, 5841, 5845.

[18] 26 U.S.C. § 5845(a)(3).

[19] 26 U.S.C. § 5845(c) (emphasis added). The GCA defines the term "firearm" more broadly than does the NFA. However, as the Stabilizing Braces NPRM acknowledges, the broader definition is not relevant to this proceeding because "a weapon classified as a 'firearm' under only the GCA is subject to interstate controls, but is not subject to making or transfer taxes, and need not be

4

In addition to NFA requirements, the GCA imposes specific restrictions on the transportation, sale, and delivery of any "short-barreled rifle."[20] The GCA defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length,"[21] and a "rifle," in relevant part, as a weapon that fires a "projectile through a rifled bore" and is "designed or redesigned, made or remade, and *intended to be fired from the shoulder*."[22] Thus, under both statutes, the relevant inquiry is shouldering.

### 2.    The Proposed Rule Assesses Grip, Not Shouldering.

The Proposed Rule purports to clarify when a weapon is "intended to be fired from the shoulder" but pursues a different analysis. The Proposed Rule operates by incorporating into the Department's regulations a worksheet entitled "Factoring Criteria for Rifled Barrel Weapons with Accessories commonly referred to as 'Stabilizing Braces,' ATF Worksheet 4999."[23] As the preamble explains, "ATF Worksheet 4999 has a point system assigning a weighted value to various characteristics of the fully assembled firearm as configured when submitted for classification."[24] A firearm that accumulates too many points "will be determined to be designed and intended to be fired from the shoulder."[25]

---

registered in the National Firearms Registration and Transfer Record as required by the NFA." 86 Fed. Reg. at 30827 (parenthetical omitted).

[20]  18 U.S.C. § 922(a)(4), (b)(4).

[21]  18 U.S.C. § 921(a)(8).

[22]  18 U.S.C. § 921(a)(7) (emphasis added). One result is that a GCA "short-barreled rifle" is also an NFA "firearm." But the converse is not necessarily true. The NFA definition of "firearm" includes—in addition to short-barreled rifles—certain additional categories of weapons that are subject to NFA requirements, such as "a machinegun" and "a destructive device." 26 U.S.C. § 5845(a)(6), (a)(8).

[23]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30851; *see also* 27 C.F.R. §§ 478.11, 479.11.

[24]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30829.

[25]  *Id.*; *see also id.* at 30851.

The problem with this approach is that the point system "abandon[s] the statutory text."[26] Rather than propose factors that assess shouldering, as required by the GCA and NFA, the agency proposes factors that would assess grip. Specifically, and as the preamble repeatedly explains, ATF Worksheet 4999 would operate by causing a firearm to accrue additional points based upon whether the agency believes that particular features make it "difficult" for an individual "to fire [the weapon] with one hand."[27]

The preamble never explains why the proposal shifts from the statutory focus on shouldering to an atextual assessment of grip. The grip test appears to originate from a misapplication of ATF's regulations—regulations wherein ATF sometimes defines a "pistol" as a

---

[26] *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1749 (2020); *see also, e.g.*, *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021) (setting aside agency action that "depart[s] from the statute's clear text" (quoting *Pereira v. Sessions*, 138 S. Ct. 2105, 2118 (2018))); *Massachusetts v. EPA*, 549 U.S. 497, 532–35 (2007) (holding agency action unlawful that "rests on reasoning divorced from the statutory text"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider").

[27] Stabilizing Braces NPRM, 86 Fed. Reg. at 30831; *see also id.* at 30827 ("whereas some accessories marketed as 'stabilizing braces' may make it easier for a person to fire a weapon with one hand and would not result in a determination that the firearm with the attached brace is a 'rifle,' there are other accessories also marketed as 'stabilizing braces' that may be attached to a weapon platform for the purpose of circumventing the GCA and NFA prohibitions"); *id.* at 30831 ("weapon weight" determines whether "the 'stabilizing brace' is in fact intended to assist one-handed fire"); *id.* ("The overall length of a weapon is relevant in classifying it as a 'rifle' or a 'pistol' because, as a firearm becomes excessive in length, it is increasingly difficult to fire with one hand."); *id.* at 30832–33 ("stabilizing support" measures effectiveness at "stabilizing one-handed firing" and providing "support in one-handed shooting"); *id.* at 30834 ("[c]ertain hand-stop attachments" are "an indication the weapon may not be intended to be fired with a single hand"); *id.* ("the presence of any secondary grip on a weapon with a 'stabilizing brace' accessory changes the classification from a one-handed to a two-handed weapon, thereby disqualifying it from being classified as a 'braced pistol'"); *id.* ("rifle type flip-up or back-up iron sights . . . are only partially usable when firing the weapon with one hand"); *id.* ("a sight would be incompatible with one-handed firing if it cannot be seen clearly when held at arm's length"); *id.* ("Firearms that incorporate or are designed to rest on bipod/monopod accessories generally are not designed and intended to be held and fired by a single hand."); *id.* ("any complete firearm . . . that weighs more than 120 ounces . . . will be considered too heavy to be fired with one hand").

weapon intended to be fired "when held in one hand."[28]  That definition may be of some utility here insofar as a weapon that is intended to be fired with one hand (a regulatory "pistol") cannot be intended to be fired from the shoulder (and thus cannot be a statutory "rifle").  But the agency errs when it concludes from that *sufficient* condition that it is *necessary* for a weapon to be a "pistol" in order to *not* be a "rifle."  Indeed, "there's actually a name for the logical trap-door through which [ATF] has fallen—it's called the fallacy of 'denying the antecedent,' and it refers to 'the incorrect assumption that if P implies Q then not-P implies not-Q.'"[29]

The falsity of ATF's logic is confirmed by other statutory provisions.  Unlike the Proposed Rule's assumption that any firearm that is not a "pistol" is a "rifle,"[30] the statutes recognize many firearms that are neither rifles nor pistols.[31]  (As did ATF itself in its original ruling stating that

---

[28]  27 C.F.R. §§ 478.11, 479.11.  *But see* 27 C.F.R. § 447.11(b) (defining "pistol" as "[a] hand-operated firearm having a chamber integral with, or permanently aligned with, the bore.").  The GCA regulates interstate commerce in "handguns" (a term ATF has defined to include "pistols"), but neither the GCA nor the NFA subjects handguns or pistols to the tax and registration requirements at issue in this proceeding.  The NFA uses "pistol" in the definition of "any other weapon" which, as the Stabilizing Brace NPRM makes clear, cannot encompass the weapons at issue in this proceeding.  86 Fed. Reg. at 30828–29; *accord United States v. Fix*, 4 F. App'x 324, 326 (9th Cir. 2001) ("the definition of 'any other weapon' in [26 U.S.C.] §§ 5845(a) and (e) expressly excludes weapons with a rifled bore.").

[29]  *In re Cumbes*s, 960 F.3d 1325, 1335 (11th Cir. 2020) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J., concurring)); *see also, e.g.*, *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 370 (D.C. Cir. 2013) ("An example of the logical fallacy 'denying the antecedent,' the State Petitioners' reasoning is invalid." (footnote omitted)); *TorPharm, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1329 (Fed. Cir. 2003) ("Ranbaxy, in arguing that the process is patentable only if the product is patentable, simply urges the logical fallacy of denying the antecedent."); *see also* n.28, *supra*.

[30]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30827; *see also id.* at 30831 (explaining that under ATF Worksheet 4999 the agency would classify a weapon as either a "rifle" or a "'braced' handgun" (capitalization altered)); *id.* at 30833 ("This section will be used to evaluate . . . the effectiveness of the brace in single-handed firing as opposed to firing from the shoulder").

[31]  *See* 26 U.S.C. § 5845 (discussing *inter alia*, in addition to pistols and rifles, revolvers, shotguns, machineguns, destructive devices (including bombs, grenades, rockets, missiles, mines), antique firearms, and any other weapons); 18 U.S.C. § 921 (discussing *inter alia*, in addition to pistols and

attachment of a brace to a weapon "does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol *or other firearm*."[32])  This confirms that ATF's substitution of its grip analysis for the statutory focus on shouldering will result in a rule that is wildly overinclusive.  ATF's new approach is like saying that all forms of transportation will be regulated as passenger cars unless they are proven to be motorcycles—sweeping up trucks, boats, and hot air balloons.

ATF's error is also confirmed by practical reality.  The Proposed Rule repeatedly equates two-handed fire with shoulder fire.[33]  That overlooks that many weapons are commonly fired with two hands without shouldering, again confirming that ATF's substitution of grip for shouldering "rests on reasoning divorced from the statutory text."[34]

Handguns provide a familiar example.  Shooters are typically trained to grip a handgun using "a two-handed hold whenever possible, applying pressure from front to rear with your strong hand and from side to side with your weak hand."[35]  This method, depicted in Figure 1, affords the shooter with the most control over a handgun because "[t]he two-handed hold is typically more stable than a one-handed hold."[36]

---

rifles, handguns, shotguns, short-barreled shotguns, muzzle loaders, machineguns, antique firearms, and handguns).

[32]  *See* Ex. 1 (FTB Letter 2013-0172 (Nov. 26, 2012) (emphasis added)).

[33]  *See* n.30, *supra*.

[34]  *Massachusetts*, 549 U.S. at 532; *State Farm*, 463 U.S. at 43 ("an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider").

[35]  *How To Use a Two-Handed Hold*, National Handgun Safety Course, https://www.handgunsafetycourse.com/handgun/studyGuide/How-To-Use-a-Two-Handed-Hold/601099_700077917/ (last visited Sept. 8, 2021).

[36]  *Id.*; *see also* Ex. 14 (Declaration of Richard ("Rick") Vasquez in Support of Comments of SB Tactical and FRAC (Sept. 8 2021)) (hereinafter "Vasquez Report") at ¶¶ 6(b), 6(e) (explaining that "[l]arge caliber handguns . . . can be fired in a variety of one or two-handed methods"); Stephen



Figure 1

Braced pistols are commonly fired using the same two-handed hold.  This method is depicted in Figure 2 using an Uzi Pro with an SBX-K brace.



Figure 2

In addition, braced pistols may be fired using other two-handed methods that do not involve shouldering.  For example, Figure 3 depicts a Black Aces Tactical firearm with an SBX brace and

---

P. Halbrook, *Firearms Law Deskbook* § 6:15 (Oct. 2020 ed.) (explaining that "pistols, with or without a fore grip, are also commonly fired with two hands").

9

fired from the hip.[37]  And Figure 4 depicts an AR-type pistol equipped with an SBA3 brace fired using a similar method.



Figure 3



Figure 4

Depending on a shooter's ability, he or she may need to use a brace with a two-handed firing technique.  Thousands of wounded warriors have been retrained to shoot in this fashion.[38] As one 100% combat-disabled retired Navy SEAL explained, employing "unconventional stances" "allow[s] those with limited mobility like myself to enjoy the types of weapons that I

---

[37]  ATF has previously determined that this precise configuration "is not a 'firearm' as defined by the NFA."  Ex. 10 (FTISB Letter 302492 (Oct. 28, 2014)).

[38]  Comments of Richard Cicero, Docket No. ATF 2021R–08, at 2 (filed Sept. 8, 2021) ("Cicero Comments"); *see also* Jim Shepherd, *A Debt We Can't Repay*, The Outdoor Wire (Nov. 4, 2019), https://www.theoutdoorwire.com/features/bb61c70b-6bcf-40dd-ba93-33745cd60a4a.

once shot."[39]   Figures 5 and 6 depict the training of wounded veterans in some of these shooting methods.[40]



Figure 5



Figure 6

---

[39] Ex. 11 (Letter from Capt. Tristan Rizzi, USN, Ret.); *see also* Ex. 12 (Letter from Sgt. Omar Avila, USA, Ret. ("My hands and arms were severely burned [in an IED explosion in Iraq] and everything I do post injuries requires a more unconventional approach. . . . SB Tactical's brace has been an exceptional tool[.]")).

[40] The comments filed by instructor Richard Cicero provide additional context for these images. *See* Cicero Comments.

As these examples all show, two-handed firing simply is not the same as shouldering.[41] Thus, just as it would be unreasonable for ATF to determine that the superior two-handed hold for firing a handgun transforms that handgun into an NFA firearm or GCA short-barreled rifle, it would similarly be unreasonable for ATF to adopt through this proceeding a rule that weights indicia that braced pistols may be fired with two hands as evidence that these braced pistols are NFA firearms or GCA short-barreled rifles.

In short, accepting ATF's atextual analysis would turn the statutory language on its head. The relevant provisions of the NFA and GCA impose heightened regulations only on "rifles" "intended to be fired from the shoulder."[42]  The Proposed Rule, by contrast, would assume that the heightened regulations apply and then would exempt only those weapons that are shown to be fired with one hand.  The end result would be a regulation that sweeps far more broadly than the statutes allow.

3.    <u>The Proposed Rule Will Unlawfully Regulate Stabilizing Braces.</u>

The extent of ATF's error is shown by examining proposed ATF Worksheet 4999.  Because ATF has departed from the statutory focus on shouldering, the worksheet contains numerous factors that are contrary to the NFA and GCA.

Begin with Section I of ATF Worksheet 4999.  Under Section I, two "prerequisites will be applied to determine if the firearm, without the attached 'stabilizing brace,' will even be considered

---

[41] Even the Stabilizing Braces NPRM itself cannot avoid acknowledging this point.  As the preamble explains, some weapons "do not incorporate a stock" to facilitate shouldering but "are not designed to be fired from one hand, like a pistol."  86 Fed. Reg. at 30828–29.  The preamble purports to limit this class of two-handed weapons to "firearms with a smooth bore that use shotgun ammunition."  *Id.*  But there is nothing inherent in the difference between a smooth or rifled bore that affects shouldering, or the number of hands used to fire the weapon.  Thus, the NPRM itself provides further acknowledgment that the grip test violates the statutes.

[42] 26 U.S.C. § 5845(a); 18 U.S.C. § 921(a)(7).

12

a suitable weapon for the brace."[43]   The first is "weapon weight."[44]   Under this prerequisite, "firearms weighing less than 64 ounces . . . *are not considered weapons suitable* for use with a 'stabilizing brace' accessory *because they are more easily held and fired with one hand* without the need for a 'stabilizing brace.'"[45]   The Proposed Rule erroneously treats this preliminary factor as dispositive even though, as explained above, grip is not the same as shouldering.

The same is true for the second prerequisite, "overall length."[46]   Under this preliminary factor, "firearms exceeding 26 inches in overall length are" immediately determined to be a rifle because ATF considers them "impractical and inaccurate to fire one handed, even with a 'stabilizing brace.'"[47]   As with weapon weight, overall length is treated as dispositive even though it wrongly departs from the statutory inquiry and even though a firearm exceeding 26 inches in overall length may be fired with two hands without shouldering the weapon.[48]

Section II of ATF Worksheet 4999 is replete with problems similar to Section I.   At a general level, Section II considers, among other things, whether a stabilizing brace provides enough "stabilizing support" "when firing with one hand."[49]   More specifically, Section II permits, for example, ATF to assign a dispositive number of points to "'cuff-type' braces" that allegedly

---

[43]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30831; *see also id.* at 30829 (explaining that prerequisites "will be applied to determine if the firearm will even be considered as a possible pistol or immediately determined to be a rifle").

[44]  *Id.* at 30831.

[45]  *Id.* (emphases added).

[46]  *Id.*

[47]  *Id.* at 30832.

[48]  *See* Section I.A.2, *supra*; Section II.A.2, *infra*.

[49]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30832–33; *see, e.g.*, *id.* at 30832 ("these later designs were far less effective at providing stabilizing support"); *id.* at 30833 ("These types of 'stabilizing braces' . . . are not effective to use as a 'stabilizing brace.'").

do "not provide the same support for singlehanded firing of large handguns,"[50] as well as to "split stock" designs that allegedly provide only "minimal support in one-handed shooting."[51]  Of course, "[t]he problem with this approach is that it adds requirements to the statute not found in the text."[52]  The statutory inquiry is whether the firearm is "intended to be fired from the shoulder."  Because the analysis called for under this factor is contrary to the statute, it is unlawful.

Section III of ATF Worksheet 4999 likewise misses the mark.  According to the preamble, the purpose of all the factors in Section III is to evaluate "the effectiveness of the brace in single-handed firing as opposed to firing from the shoulder."[53]  However, as explained above, many weapons that support double-handed firing are not intended to be fired from the shoulder, rendering the "one-handed" analysis incompatible with the statute.  Because ATF concedes that all of Section III is focused on this off-target analysis, Section III must be eliminated.

In addition, several individual Section III factors violate the statute.  Specifically, Section III would allow ATF to assign a dispositive number of points based on the presence of certain "peripheral accessories, often added by the end user, that indicate the weapon is not designed and intended to be held and fired by a single hand,"[54] including "[c]ertain hand stop attachments," certain types of "[i]nstalled sights," any "bipod/monopod accessories," and accessories that allegedly add too much "weight" to a firearm.[55]  Because these factors do not

---

[50] *Id.* at 30833.

[51] *Id.*

[52] *Council Tree Invs., Inc. v. FCC*, 863 F.3d 237, 242 (3d Cir. 2017); *see also Massachusetts*, 549 U.S. at 532–35 (setting aside agency action that "rests on reasoning divorced from the statutory text").

[53] Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[54] *Id.* at 30834.

[55] *Id.*

consider suitability for shouldering, they are contrary to the plain text of the statute and cannot be retained.

## B.    The Proposed Rule Disfavors Firearms Congress Sought To Protect.

In addition to the text, the "history and purpose" of the statutes show that the Proposed Rule is unlawful.[56]  As the preamble explains, Congress enacted the NFA "to regulate certain 'gangster' type weapons" that "were viewed as especially dangerous and unusual."[57]  Specifically, Congress believed that "a long gun with a shortened barrel is both dangerous and unusual, because its concealability fosters its use in illicit activity" and "because of its heightened capability to cause damage."[58]

These reasons do not apply to firearms equipped with stabilizing braces.  To begin with, there is no evidence that firearms equipped with stabilizing braces are more likely to be used for "illicit activity."  Millions of law-abiding Americans have purchased braces to add them to their own firearms, or purchased firearms with the braces already attached.[59]  Despite (or, perhaps,

---

[56] *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)) (brackets omitted).

[57] Stabilizing Braces NPRM, 86 Fed. Reg. at 30826–27; *see id.* at 30828 ("the purpose of the NFA is 'to regulate certain weapons likely to be used for criminal purposes'" (quoting *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992))).

[58] Stabilizing Braces NPRM, 86 Fed. Reg. at 30827 n.5 (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3rd Cir. 2010)); *see also Thompson/Center Arms Co.*, 504 U.S. at 517 (plurality) ("It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes . . . for example, . . . a concealable weapon"); *Bezet v. United States*, 276 F. Supp. 3d 576, 611 (E.D. La. 2017) ("Similarly to the GCA, the NFA was adopted by Congress to establish a nationwide system to regulate the sale, transfer, license, and manufacturing of certain 'dangerous weapons' such as 'machine guns, sawed-off shotguns, sawed-off rifles, and other firearms, other than pistols and revolvers, which may be concealed on the persons, and silencers.'" (quoting legislative history)), *aff'd*, 714 F. App'x 336 (5th Cir. 2017).

[59] Krouse, *supra* n.4 (explaining that "unofficial estimates suggest that there are between 10 and 40 million stabilizing braces and similar components already in civilian hands, either purchased as accessories or already attached to firearms made at home or at the factory.  Altering the

because of) the widespread ownership of stabilizing braces, there are virtually no crimes reported to have been facilitated with these braces.

Common sense explains the reason why. Shortening a long gun "fosters its use in illicit activity" because that gun is more easily "concealed."[60] But that reasoning does not apply when adding a brace to a pistol because, when a stabilizing brace is attached to a pistol, that gun becomes larger and thus more difficult to conceal.[61] Thus, unlike a sawed-off rifle, which becomes *more* suitable for committing crimes than an unmodified shotgun or rifle, a braced pistol becomes *less* suitable for committing crimes than an unbraced pistol.[62]

___

classification of firearms equipped with stabilizing braces would likely affect millions of owners.").

[60] *Marzzarella*, 614 F.3d at 95; *see also Thompson/Center Arms Co.*, 504 U.S. at 517 (plurality) ("It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes . . . for example, . . . a *concealable* weapon" (emphasis added)); *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018) ("many courts have explained that a long gun with a shortened barrel is . . . dangerous, because 'its *concealability* fosters its use in illicit activity'" (emphasis added)); *United States v. Gonzales*, No. 2:10-CR-00967, 2011 WL 5288727, at *3 (D. Utah Nov. 2, 2011) ("In enacting the National Firearms Act, Congress 'sought to regulate the sale, transfer, and license of machine guns, sawed-off shotguns, sawed-off rifles, and other firearms, other than pistols and revolvers, *which may be concealed on the persons*,' and silencers.'" (emphasis added) (quoting H.R. Rep. No. 75–2457, at 1 (1938))); *United States v. Amos*, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting) ("With its shorter barrel, a sawed-off shotgun can be *concealed* under a large shirt or coat." (emphasis added)); *cf. United States v. Dunford*, No. 2:19-cv-38, 2019 WL 5431614, at *2 (E.D. Tenn. Oct. 23, 2019) ("[R]ifles are long guns and are extremely difficult to conceal on one's person." (citation and quotations omitted)); *United States v. Manigan*, 592 F.3d 621, 629 (4th Cir. 2010) ("[A] drug trafficker is much more likely to utilize a handgun—as opposed to a rife or long gun—due to size and concealability.").

[61] Ex. 15 (Report of Daniel O'Kelly, Sept. 8, 2021 (hereinafter "O'Kelly Report")) at 2 (explaining that attaching a brace or stock makes "an already legally concealable pistol *less concealable* or *un-concealable*").

[62] The Stabilizing Braces NPRM identifies 19 deaths that "may" have involved braced pistols—nine in 2019 and 10 in 2021. 86 Fed. Reg. at 30828 n.9. To put that figure into context, the CDC reported 39,707 deaths from firearms in 2019 alone. *Firearm Violence Prevention*, CDC: Nat'l Ctr. for Inj. Prevention & Control, https://www.cdc.gov/violenceprevention/firearms/fastfact.html (last visited Sept. 8, 2021).

In addition to being more difficult to conceal, braced pistols are more accurate and thus less dangerous than unbraced pistols.[63]  The authors of the NFA believed that shortened long guns required additional regulation because, in addition to being more easily concealable, they possess a "somewhat indiscriminate accuracy" that makes them "useful for only violence against another person, rather than, for example, against sport game."[64]  By that same reasoning, the attachment of a stabilizing brace makes it less likely that a pistol will be used for violence, because stabilizing braces are designed to "improve accuracy by using the operator's forearm to provide stable support for the AR-type pistol."[65]

For these reasons, a rulemaking that is consistent with the statutory purposes of the NFA and the GCA will encourage, not discourage, the use of stabilizing braces.  But the Proposed Rule will have—and is intended to have[66]—the opposite effect.  By raising the specter that a braced pistol may become subject to NFA regulations, manufacturers and law-abiding citizens will

---

[63]  *See, e.g.*, *Miller v. Bonta*, No. 19-cv-1537, 2021 WL 2284132, at *4 (S.D. Cal. June 4, 2021) ("A less accurate rifle in the hands of a mass shooter may very well result in different victims, but not necessarily less victims.  On the other hand, in the self-defense context, which seems to be more common, taking accurate shots at attackers is vitally important for the innocent victim."), *stayed pending appeal*, No. 21-55608, 2021 WL 2659807, at *1 (9th Cir. June 21, 2021).

[64]  *Amos*, 501 F.3d at 531(McKeague, J., dissenting); *see also Cox*, 906 F.3d at 1185 ("a long gun with a shortened barrel is . . . unusual, 'because of its heightened capability to cause damage'" (quoting *Marzzarella*, 614 F.3d at 95)).

[65]  2015 Open Letter at 1; *see also id.* ("[T]he buffer tube forearm brace . . . result[s] in more accurate shooting without compromising safety or comfort." (citation omitted)); Stabilizing Braces NPRM, 86 Fed. Reg. at 30831 ("The AR-type pistol, a popular large handgun design, . . . is more difficult to manipulate and to keep on target, indicating the 'stabilizing brace' is . . . need[ed]").

[66]  When President Biden ordered this rulemaking, he instructed that "pistols modified with stabilizing braces . . . should be subject ot the National Firearms Act" because a stabilized pistol is "a hell of a lot more accurate" and, "[a]s a result, it's more lethal."  Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3 (Apr. 8, 2021).  *But see Miller*, 2021 WL 2284132, at *4 ("A less accurate rifle in the hands of a mass shooter may very well result in different victims, but not necessarily less victims.  On the other hand, in the self-defense context, which seems to be more common, taking accurate shots at attackers is vitally important for the innocent victim.").

become hesitant to use these braces, even though these braces make large pistols safer and less likely to be used in the commission of a crime.  The result will be an increase in the number of concealable and more dangerous weapons, undermining a primary purpose of the statutes.

### C.    The Proposed Rule Violates The Rule Against Retroactive Rulemaking.

Finally, the Proposed Rule exceeds ATF's authority for the additional reason that it would impose impermissibly retroactive regulatory obligations.  "Retroactivity is not favored in the law."[67]  Accordingly, "a statutory grant of legislative rulemaking authority will not . . . be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."[68]  Far from conveying such express power under the NFA, Congress expressly *prohibited* the Department from enacting retroactive regulations except in certain narrow circumstances that are not present here.[69]

The Proposed Rule violates that express prohibition.  Under the NFA, a covered "firearm" is subject to tax and registration requirements that must be fulfilled before the firearm is "ma[d]e" or "transferred."[70]  Under the Proposed Rule, by contrast, individuals who previously obtained weapons that were *not* classified as NFA firearms at the time they were made or transferred must

---

[67]  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[68]  *Id.*; *see also, e.g.*, *Nat'l Mining Ass'n v. Dep't of Lab.*, 292 F.3d 849, 860 (D.C. Cir. 2002) ("We find some of the challenged rules to be impermissibly retroactive as applied to claims that were pending on the regulations' effective date.").

[69]  26 U.S.C. § 7805(b); *see also United States v. Cash*, 149 F.3d 706, 707 (7th Cir. 1998) ("the Secretary cannot give retroactive application to tax regulations").

[70]  26 U.S.C. §§ 5812(a) ("A firearm shall not be transferred unless . . . any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form . . ."), 5822 ("No person shall make a firearm unless he has . . . paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form . . ."), 5841(b) ("Each . . .  maker shall register each firearm he . . .  makes.  Each firearm transferred shall be registered to the transferee by the transferor.").

18

either pay the tax and register the firearm now or give up possession of the weapon as configured.[71] That is "a paradigmatic case" of retroactivity, because the Proposed Rule would "impair rights a party possessed when he acted, increase a party's liability for past conduct, [and] impose new duties with respect to transactions already completed."[72]

Courts have held that agency rulemaking proceedings "violate[ ] the rule against retroactive rulemaking" when "a new rule is 'substantively inconsistent' with a prior agency practice and attaches new legal consequences to events completed before its enactment."[73] Here, the inconsistency with prior ATF practice is self-evident because the preamble to the Proposed Rule affirmatively states that "any maker or manufacturer who has received a classification prior to the effective date of the rule is encouraged to resubmit the firearm with the attached 'stabilizing brace' *to ensure that the prior classification is consistent with this new rule*,"[74] and ATF has previously assured the public that a stabilizing brace "may be attached to a handgun without making a[n] NFA firearm" but now contends the opposite.[75]

---

[71] Stabilizing Braces NPRM, 86 Fed. Reg. at 30843–44 (explaining that "current unlicensed possessors of a firearm equipped with a 'stabilizing brace' and a barrel length of less than 16 inches that would qualify as a 'short-barreled rifle' as indicated on the ATF Worksheet 4999 contained in this proposed rule would need to . . . submit . . . the $200 tax payment," modify the weapon, or give up possession).

[72] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 272, 280 (1994).

[73] *N.E. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 14–16 (D.C. Cir. 2011) (quoting *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010)); *see also Nat'l Mining Ass'n v. Dep't of Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999); *Rock of Ages Corp. v. Sec'y of Lab.*, 170 F.3d 148, 158–59 (2d Cir. 1999); *United States v. AMC Ent., Inc.*, 549 F.3d 760, 770 (9th Cir. 2008).

[74] Stabilizing Braces NPRM, 86 Fed. Reg. at 30829 (emphasis added).

[75] 2015 Open Letter at 2; *see also* McConnell Letter at 3 (explaining "ATF's effective rescission in 2017 of its previous misapplication of the law, combined with its repeated letter rulings approving stabilizing braces, created a thriving market for these stabilizing braces" and that "demand over the last five years is surely attributable to ATF's classification letters and much publicized effective 2017 letter effectively rescinding its 2015 ruling against stabilizing braces").

In addition, it is plain that the Proposed Rule would attach new legal consequences to events completed before its enactment. Unlike the bump stock rule, which "made clear that the possession of bump stocks would become unlawful only after the effective date" and thus that it would ostensibly penalize only future conduct,[76] the Proposed Rule leaves no doubt that it would attach legal consequences based on whether the NFA tax was paid and registration complete when the weapon was made or transferred.[77] Thus, the Proposed Rule attempts to unlawfully leverage a past act—the registration or nonregistration of the firearm, and the payment or nonpayment of making and transfer taxes—to determine future legal consequences.

In previous cases, ATF has recognized that it cannot impose retroactive taxes when it expands through regulatory action the class of weapons subject to the NFA. In 1981, ATF determined that "auto sears" were "machineguns" within the meaning of the NFA but affirmatively stated that "this ruling will not be applied to auto sears manufactured before November 1, 1981."[78] The Seventh Circuit subsequently affirmed an application of that ruling, stating that "the Secretary [could] not give retroactive application to tax regulations" but could enforce his determination with respect to "post-1981 transfers."[79]

Notions of fundamental fairness also prohibit ATF from criminalizing past conduct.[80] Millions of Americans purchased stabilizing braces in reliance on ATF's public assurances that

---

[76] *Guedes v. ATF*, 920 F.3d 1, 35 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020).

[77] Stabilizing Braces NPRM, 86 Fed. Reg. at 30843–44 ("Options for Affected Persons"); *see also id.* at 30845 (acknowledging "the NFA . . . requires registration and taxes to be paid *on the making and transfer* of NFA weapons") (emphasis added); *id.* at 30848 (same).

[78] *Cash*, 149 F.3d at 707 (citation omitted).

[79] *Id.*

[80] *See Landgraf*, 511 U.S. at 266 ("the antiretroactivity principle finds expression in several provisions of our Constitution").

20

attaching stabilizing braces to their weapons would not convert the weapons into NFA firearms subject to onerous tax and registration requirements.  Altering these settled expectations would thus not only violate the rule against retroactive rulemaking, it would also raise serious due process concerns.[81]  And these concerns are magnified here, where the record suggests that ATF's action may represent "potentially vindictive legislati[ve]" rulemaking that reflects "responsivity to political pressures" rather than expert judgment.[82]

Congress has authorized ATF to solve some retroactivity problems by "grandfathering" firearms that the agency ultimately determines are subject to the NFA.  However, ATF has determined in this proceeding that "grandfathering of existing firearms with an attached 'stabilizing brace' is problematic" and therefore unreasonable.[83]  Because Congress did not grant ATF authority to impose a retroactive rule, and because ATF has determined that grandfathering would be inappropriate, adopting the Proposed Rule would be unlawful.

## II.    The Proposed Rule Adopts "Factoring Criteria" That Are Otherwise Unlawful.

In addition to exceeding the Department's statutory authority, the Proposed Rule is arbitrary, capricious, and otherwise unlawful.  Many of its factoring criteria are vague— undermining the supposed purpose of the Proposed Rule, which is "to allow individuals or members of the firearms industry to evaluate whether a weapon incorporating a 'stabilizing brace' . . . will be considered a 'short-barreled rifle' or 'firearm' under the GCA and NFA"[84]—

---

[81]  *See* Section IV.A, *infra*.

[82]  *Landgraf*, 511 U.S. at 266; *see* Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298 (Apr. 8, 2021) (instructing ATF that "pistols modified with stabilizing braces . . . should be subject ot the National Firearms Act").

[83]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30847.

[84]  *Id.* at 30828; *see Office of Commc'n of the United Church of Christ v. FCC*, 779 F.2d 702, 707 (D.C. Cir. 1985) ("Rational decisionmaking . . . dictates that the agency simply cannot employ means that actually undercut its own purported goals."); *Achernar Broad. Co. v. FCC*, 62 F.3d

duplicative, or unrelated to their objectives.  Furthermore, the proposed scoring system is easily manipulable by the agency to achieve a predetermined result—as shown by the arbitrary adjudications contained in the preamble to the Proposed Rule.

> **A.    Section I's "Prerequisites" Are Arbitrary.**

Section I of ATF Worksheet 4999 is arbitrary, capricious, and contrary to law.  Under Section I, ATF will apply two prerequisites to determine if a firearm "will even be considered as a possible pistol or immediately determined to be a rifle."[85]

> **1.    Weapon Weight**

Under the first prerequisite, "firearms weighing less than 64 ounces . . . are not considered weapons suitable for use with a 'stabilizing brace' accessory because they are more easily held and fired with one hand."[86]  As explained above, this factor is contrary to the NFA and GCA because it replaces shouldering with grip.

In addition, the four-pound floor is arbitrary.  The attached orthotist report shows that many shooters benefit from stabilizing braces attached to weapons weighing less than four pounds.[87]  As that report explains and the literature confirms, individuals have varying amounts of body strength based on factors such as age, sex, ability, and other characteristics.[88]  Many of these individuals

---

1441, 1447 (D.C. Cir. 1995) ("Although the [agency] does not have to consider every alternative, its cursory rejection 'of an option that appears to serve precisely the agency's purported goals suggests a lapse of rational decisionmaking.'").

[85]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30829.

[86]  *Id.* at 30831.

[87]  Ex. 13 (Memorandum and Report from Gabriel Hurst, Supervisory Prosthetist/Orthotist (Sept. 7, 2021)) (hereinafter "Hurst Report").

[88]  *Id.* at 2; *see also, e.g.*, A.E.J. Miller et al., *Gender differences in strength and muscle fiber characteristics*, 66 Eur. J. of Applied Physiology & Occupational Physiology 254 (1993); Phil Bishop et al., *Sex difference in muscular strength in equally trained men and women*, 30 Ergonomics 675 (1987).

may need the stabilizing support that a brace provides, even for very light weapons.[89] The evidence shows this is particularly true for beginning[90] and disabled shooters.[91]

The preamble makes no effort to justify its contrary assertions. It contains no analysis or data showing the distribution of shooters that ATF believes can "easily" fire a "traditional" pistol with one hand. Nor does it consider relevant differences in body strength among male and female shooters, older and younger shooters, or disabled shooters. The latter omission is especially surprising in light of ATF's acknowledgment that stabilizing braces may useful in assisting "persons with disabilities and others lacking sufficient grip strength to control heavier pistols,"[92] and ATF's previous determinations that traditional pistols are appropriate platforms for stabilizing braces.[93] At a minimum, these are "important aspect[s] of the problem" that ATF must consider.[94]

---

[89] Hurst Report at 2–4.

[90] Cicero Comments at 2 (explaining that "beginning shooters . . . often require braces for weapons as light as 2 lbs"); O'Kelly Report at 4–5 ("Having been a shooting Range Instructor for decades, I have repeatedly noticed that new and inexperienced shooters universally prefer a pistol in a smaller caliber because it produces less recoil. These shooters shy away from those pistols in the larger calibers due to the accompanying increase in recoil, and for that reason, they are robbed of the benefits of larger and more powerful cartridges which are much more effective for personal defense. . . . There is actually a need for braces to be available for use on any and all pistols, in order to allow all shooters to learn marksmanship and to overcome the disadvantages of smaller pistols."); *id.* at 5 ("a common bad practice for a new shooter . . . is . . . 'limp-wristing'. . . . This problem of limp-wristing is solved by the use of a brace[.]").

[91] Hurst Report at 2–4; *see also* Ex. 11 (Letter from Capt. Tristan Rizzi, USN, Ret.); *see also* Ex. 12 (Letter from Sgt. Omar Avila, USA, Ret.); *BATFE Leadership Push Biden to Target Pistol Stabilizing Braces and Unfinished Receivers*, Nat'l Rifle Ass'n Inst. for Legis. Action (Nov. 16, 2020), https://www.nraila.org/articles/20201116/batfe-leadership-push-biden-to-target-pistol-stabilizing-braces-and-unfinished-receivers ("Pistol stabilizing braces . . . are particularly valuable for differently-abled shooters who may not have the use of two hands.").

[92] Stabilizing Braces NPRM, 86 Fed. Reg. at 30831; *see also id.* at 30827, 30829.

[93] Vasquez Report at ¶ 6(c).

[94] *See State Farm*, 463 U.S. at 43 ("an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem").

Relatedly, ATF's establishment of a four pound floor overlooks its acknowledgement in the NPRM that a principal purpose of a stabilizing brace is to help the shooter manage recoil, not weight alone.[95]  Specifically, ATF explains that the recoil produced by an AR15 pistol makes the AR15 pistol an appropriate platform for a brace.[96]  However, ATF ignores evidence showing "there are a number of pistols which weigh less than an AR15 pistol, yet produce more recoil than an AR15 pistol does."[97]  This includes the Desert Eagle, the Magnum Research BFR44MAG5, and the Magnum Research BFR—all of which weigh less than four pounds.[98]  In addition, because these pistols are lighter than an AR15 pistol, there is "more felt recoil within a given cartridge" and consequently "more need" rather than less "to reduce that recoil by using a brace to distribute it."[99]

The preamble also fails to explain how the pistol weights it recites justify the four-pound floor.  According to the preamble, "traditional unloaded 1911-type pistol[s]" weigh "just over 2 pounds" whereas "AR-type pistol[s]" weigh "approximately 5 to 7 pounds."[100]  Presumably, ATF selected four pounds because it sits approximately halfway between weights that ATF describes as "eas[y]" or "difficult" to manage.[101]  But that reasoning is circular because it merely restates the agency's premise—light weapons do not need a brace—as if it were a conclusion.[102]

---

[95]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30827.

[96]  *Id.*

[97]  O'Kelly Report at 4.

[98]  *Id.*

[99]  *Id.*; *see also* Hurst Report at 2–5.

[100]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30831.

[101]  *Id.*

[102]  *See, e.g.*, *Illinois. v. United States*, 666 F.2d 1066, 1073 (7th Cir. 1981) ("courts are no longer satisfied with bare administrative ipse dixits" (parentheses omitted)).

Furthermore, that reasoning fails to explain how ATF can derive a *four*-pound floor based upon the conclusion that weapons weighing *two* pounds do not need a brace.[103]

### 2.   Overall Length

Under the second prerequisite, "[f]irearms with an overall length of less than 12 inches are considered too short to indicate any need for a 'stabilizing brace'" and "firearms exceeding 26 inches in overall length" are considered too long because they purportedly "are impractical and inaccurate to fire one handed."[104]  Both criteria are unlawful.

ATF's assertion that braced firearms over 26 inches are too difficult to fire is contrary to the evidence.  As the attached orthotist report shows, braced firearms over 26 inches may be fired from the hip using two hands.[105]  In addition, ATF has historically recognized that weapons over 26 inches provide an appropriate platform for a brace,[106] and the preamble contains no evidence to the contrary.  Accordingly, the proposed 26-inch maximum would be arbitrary.

The proposed 12-inch minimum would likewise be arbitrary.  As explained above, ATF acknowledges both that a primary function of a stabilizing brace is to distribute recoil energy and that the recoil produced by an AR15 pistol makes the AR15 pistol an appropriate platform for a brace.[107]  However, ATF ignores evidence showing "that some pistols under 12 inches, (e.g., the Desert Eagle, S&W 460 XVR, Magnum Research BFR44MAG5, Magnum Research BFR, etc.)

---

[103]  *See, e.g.*, *Commc'ns & Control, Inc. v. FCC,* 374 F.3d 1329, 1335–36 (D.C. Cir 2004) (holding that a conclusion accompanied by "no explanation" is the epitome of "arbitrary and capricious" decision-making).

[104]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30831–32.

[105]  Hurst Report at 3.

[106]  Vasquez Report at ¶¶ 7(b)–(c).

[107]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30827.

have a recoil higher in foot pounds than some AR15 pistols."[108]  This shows that ATF's decision to exclude pistols under 12 inches is arbitrary.

**B.      Section II's "Accessory Characteristics" Are Arbitrary.**

Section II of ATF Worksheet 4999 is likewise arbitrary, capricious, and contrary to law. Under Section II, ATF analyzes factors that purport to show whether a stabilizing brace attached to a firearm has "the characteristics of a shoulder stock."[109]

1.      Accessory Design

Under the accessory design factor, ATF would assign one point to stabilizing braces that "incorporate one or more shoulder stock design features" and two points to braces "that are modified versions of known shoulder stock designs."[110]  These criteria are vague because the preamble does not define what qualifies as a "shoulder stock design feature" or a "known shoulder stock design."[111]

With respect to the first point, the proposal lists three examples of supposed stock features. But these examples—"adjustment levers," "sling mounts," and "hardened surfaces"—are dissimilar and thus do not provide guidance of what else might be included.[112]  Indeed, the only

---

[108]  O'Kelly Report at 5.

[109]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30832.

[110]  *Id.*

[111]  *Id.*   As explained below, in addition to violating due process, the vague accessory characteristics are arbitrary for the additional reason that they undermine the "purpose" of the proposed rule, which "is to allow individuals or members of the firearms industry to evaluate whether a weapon incorporating a 'stabilizing brace' that they intend to submit to FATD or offer for sale will be considered a 'short-barreled rifle' or 'firearm' under the GCA and NFA."  *Id.* at 30828.

[112]  *Id.*; *Cf. Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  (quoting 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.17 (1991))).

thing these features appear to have in common is that they are counted on other areas of ATF Worksheet 4999,[113] making their inclusion here doubly arbitrary.[114]

Nor do these features suggest shouldering. An adjustment lever allows the user to adjust the brace along the horizontal plane in order to accommodate variations in forearm lengths and body types but, as explained below, does not necessarily make the firearm easier or more difficult to fire from the shoulder.[115] Similarly, a sling mount allows a user to attach a sling, making it easier to carry the gun, but is not helpful in firing a gun from the shoulder.[116] And even if these features did suggest shouldering, courts have rejected similar attempts by ATF to classify devices based upon allegedly common features: "Learning that one object has three characteristics in common with some category may not be very helpful in determining whether the object in question belongs in that category."[117] After all, "a hockey puck is not a 'rubber bullet,' just because it has

---

[113] The presence of "adjustment levers" is captured by the separate "adjustability" factor. The presence of "sling mounts" and "hardened surfaces" is analyzed by the separate "rear surface area" factor. *See* Sections II.B.2, II.B.3, *infra*.

[114] *See BNSF Ry. Co. v. Surface Transp. Bd.*, 604 F.3d 602, 612 (D.C. Cir. 2010) (remanding where agency failed to address contention that under its "two-step approach . . . variable costs are counted twice"); *cf. United States v. Gallegos*, 613 F.3d 1211, 1216 (9th Cir. 2010) ("Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." (citation omitted)); *United States v. Coldren*, 359 F.3d 1253, 1256 (10th Cir. 2004) ("[W]e have endorsed the general rule that double counting is ordinarily impermissible when the same conduct is used to support separate increases under separate enhancement provisions[.]").

[115] Section II.B.3, *infra*.

[116] *See, e.g.*, Rick Cicero, *Adaptive Shooting Techniques: PCCS are a Perfect Fit! Using a Pistol Caliber Carbine to get back on the range*, Tactical J., Summer 2019, at 14–17 (explaining use of sling for adaptive shooting techniques and carrying), *available at* https://www.idpa.com/wp-content/uploads/2019/05/TJ_Summer_2019_WEB.pdf.

[117] *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 26 (D.D.C. 2014).

rounded sides, is made of vulcanized rubber, and is capable of causing injury when launched at high speeds."[118]

The second point analyzed under the accessory design factor is similarly arbitrary. For starters, ATF does not explain when it will determine that a brace is a modified version of a "known shoulder stock design."[119] This is not an identifiable category used by subject matter experts.[120] Does ATF intend it to include only items that were originally manufactured as stocks, but that an end user has converted into a brace? Or does it also include items originally manufactured as braces that, in ATF's opinion, resemble another item originally manufactured as a stock? How does one know what items ATF considers to be stocks, much less what stocks ATF "knows" about? The preamble does not say, and "the fact that the agency does not even have a clear position on what characteristics are common to known [stocks] further undercuts the legitimacy of this method."[121]

Even if the preamble did explain what ATF considers to be a stock, penalizing braces because they are based on stocks commits the genetic fallacy of "confusing something's origins with its nature."[122] Whether a stabilizing brace is derived from a "known shoulder stock design" has nothing to do with whether that brace facilitates shouldering; what matters is the nature of the modifications, not where the brace comes from.

---

[118] *Id.*; *see also* Vasquez Report at ¶ 8(a) ("By this logic, if I use an Allen head universal screw that a stock maker also uses, then my arm brace could be disapproved.").

[119] Stabilizing Braces NPRM, 86 Fed. Reg. at 30832.

[120] *See* Vasquez Report at ¶ 8(b).

[121] *Innovator Enters.*, 28 F. Supp. 3d at 26.

[122] Kevin C. Klement, *When is Genetic Reasoning Not Fallacious?*, 16 Argumentation 383, 384 (2002); *see also* The Federalist No. 14 (James Madison) (warning against being blinded by "names").

In short, the accessory design factor is vague, duplicative, and logically fallacious, and should be eliminated.

        2.    <u>Rear Surface Area</u>

Under the rear surface area factor, ATF would assign one point to a stabilizing brace "with only a minimal rear surface area"; two points to a stabilizing brace "with a rear surface area sufficient to shoulder the firearm, or approximating the rear surface of known shoulder stocks"; and three points to a stabilizing brace with "material clearly designed to increase rear surface area."[123]

The first problem with this factor is that it contains no "metric for classifying" rear surface area.[124]  Instead, the proposal would assign points based on a series of adjectives that describe shouldering area—"minimal," "sufficient," and "increase[d]"—but are not grounded in any measurement.  This vague standard is impossible to comply with and opens the door to enforcement abuse.[125]

Vagueness may in fact be the design.  As the preamble explains, "larger, more substantial 'stabilizing braces' may have more surface area in which to shoulder a firearm."[126]  However, in an apparent attempt to preserve ATF's enforcement discretion, the preamble also states that "smaller, less substantial 'stabilizing brace' designs may have reduced surface area" yet still be

---

[123]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30832.

[124]  *See Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006) (explaining that ATF must define "some metric for classifying materials").

[125]  *See also* Vasquez Report at ¶ 9; O'Kelly Report at 6.

[126]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30832.

appropriate for shouldering.[127]   ATF's refusal to bind itself to any ascertainable standard is arbitrary.

So too is ATF's argument that smaller designs may be less effective as a brace.[128] According to the preamble, "[t]he reduced contact area of the flaps to the shooter's forearm, and the surface area necessary to shoulder the weapon work in tandem to indicate whether the purported 'stabilizing brace' is, in fact, a shouldering device."[129]  But effectiveness as a brace has nothing to do with shouldering, so this analysis is misguided.   And in any event, ATF has absolutely no expertise in determining what design features render a particular product effective as a brace.[130]

To resolve these problems, the Department should revise the rear surface area factor to provide objective metrics.

3.    Adjustability

Under the adjustability factor, firearms that incorporate an adjustable stabilizing brace will accrue two points.[131]  This factor is arbitrary because adjustability does not indicate that a weapon is intended to be fired from the shoulder.

Adjustability, in and of itself, does not facilitate shouldering.   The preamble argues otherwise, stating that adjustability is "a significant indicator that the device is designed and intended to be shouldered."[132]  The only evidence the preamble offers in support of this assertion

---

[127]  *Id.*

[128]  *Id.*

[129]  *Id.*

[130]  *See* nn.156–158 and accompanying text, *infra*.

[131]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30832.

[132]  *Id.*

is the observation that "adjustability is 'a feature commonly associated with butt stocks/shoulder stocks as well as firearms designed and intended to be fired from the shoulder.'"[133]  But, even if that were true, the fact that a brace may share a feature in common with a stock does not indicate that the brace is a stock.[134]

In addition, adjustability is a critical feature of many stabilizing braces.  As the attached orthotist report explains, adjustability permits a stabilizing brace to accommodate different body types.[135]  While not every stabilizing brace includes this feature, ATF has in the past routinely recognized that such adjustable devices are stabilizing braces that do not enable shouldering.[136]  Adjustability, in other words, is just as likely to indicate that a firearm is *not* intended to be shouldered.  Thus, this factor should be eliminated.

### 4.   Stabilizing Support

Under the stabilizing support factor, ATF would assign additional points based upon the agency's assessment of whether a stabilizing brace is "effective" as a brace.[137]  That is misguided.

---

[133]  *Id.* (quoting FTISB Letter 303984 at 3 (Nov. 30, 2015)).  In addition, ATF is prohibited from relying on the cited FTISB Letter because it has not been made public as a part of this proceeding.  *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It would appear to be a fairly obvious proposition that [documents] upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment.").  The fact that some parties have obtained a copy of this letter through FOIA or other means does not absolve ATF of its responsibility to ensure that all interested persons are afforded a meaningful opportunity for comment.

[134]  *See Innovator Enters.*, 28 F. Supp. at 26 ("Learning that one object has three characteristics in common with some category may not be very helpful in determining whether the object in question belongs in that category.").

[135]  Hurst Report at 5–7; *accord* Vasquez Report at ¶ 10; Cicero Comments at 2.

[136]  *See, e.g.*, Ex. 4 (FTISB Letter 304679 (Oct. 3, 2016)); Ex. 16 (FTISB Letter 306285 (Oct. 31, 2017)); Ex. 17 (FTISB Letter 307364 (Oct. 31, 2017)); Ex. 18 (FTISB Letter 308618 (July 24, 2018)); Ex. 19 (FTISB Letter 304511 (Jan. 12, 2017)); Ex. 23 (Report from ATF FTCB re Marquez, Ricardo et al. (Aug. 21, 2017)).

[137]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30832.

An *effective* brace might indicate that a weapon to which it is attached does *not* satisfy the statutory criteria (because it provides an affirmative indication that the weapon is intended to be fired without shouldering). But an *ineffective* brace cannot suggest that a weapon *is* intended to be fired from the shoulder, because there is nothing inherent in a poorly functioning brace that suggests that the device would be useful for shouldering.[138]

For the same reason, ATF is mistaken when it suggests that poor function as a brace indicates an intent to "circumvent" the NFA.[139] Again, there is nothing inherent in poor brace design that suggests shouldering. After all, a device that provides only minimal support as a brace may likewise provide only minimal support for shouldering. And to the extent ATF bases its contrary reasoning on a conflation of two-handed fire with shouldering, that is erroneous for the reasons described in Section I.A., *supra*.

With respect to "fin-type" designs, the preamble states that "accessories that do not incorporate an arm strap of suitable length or functionality will accrue 2 points, while those that incorporate an arm strap long enough to secure a person's forearm consistent with the purported intent will not accrue any points (zero)."[140] This factor is vague; it should be modified to state the number of inches that are "long enough" to earn zero points, and to explain whether ATF deems certain commonly used materials (such as nylon) as "suitable."[141]

---

[138] *See Massachusetts*, 549 U.S. at 532–35 (holding arbitrary agency action that "relies on reasoning divorced from the statutory text").

[139] Stabilizing Braces NPRM, 86 Fed. Reg. at 30828; *see also id.* at 30832 ("Stabilizing support is a vital characteristic because it provides evidence to evaluate *the purported purpose of the attached devic*e, which is to provide shooters with forearm support for firing large, heavy handguns." (emphasis added)).

[140] *Id.* at 30833.

[141] *See Tripoli Rocketry Ass'n*, 437 F.3d at 81 (explaining that ATF must define "some metric for classifying materials").

Similarly, with respect to "cuff-type" designs, the point system favors designs that "fully envelop the forearm" but fails to specify the number of inches that ATF deems sufficient.[142] Although the preamble explains that "fin-type" designs will obtain zero points when they are accompanied by a strap, it does not specify whether "cuff-type" designs will be treated similarly. The unreasonableness of that position is compounded by the observation that "cuff-type" features serve no purpose on a stock.[143]   Accordingly, the proposal should be modified to specify the number of inches that "fully envelop the forearm" to avoid vagueness and arbitrariness,[144] and it should state that a strap that fully envelops the forearms will cause the brace to accrue zero points to ensure consistency across brace types.[145]

The stabilizing support factor also purports to identify a species of "cuff-type" designs that ATF calls "split-stock" designs.[146]   According to the preamble, these are "another 'cuff-type' design where the flaps lack arm contouring" because "developers simply used known or existing stocks, added a slot down the center of the stock, or otherwise slightly altered the original shoulder stock."[147]   Under the proposed rule, a firearm equipped with a so-called "split-stock" accrues three points, making the determination nearly dispositive.[148]

---

[142]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[143]  Vasquez Report at ¶ 11(d) ("I am unaware of any stocks with an opening for an arm to be inserted and strapped in. . . . If it is designed to be fit onto an arm and strapped in place, it is an arm brace.").

[144]  *See Tripoli Rocketry Ass'n*, 437 F.3d at 81.

[145]  *See, e.g.*, *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) ("Because FERC's decision is internally inconsistent, it is arbitrary and capricious."); *Sierra Club v. EPA*, 884 F.3d 1185, 1194–96 (D.C. Cir. 2018) (holding internally inconsistent agency action arbitrary).

[146]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[147]  *Id.*

[148]  *Id.*

The preamble does not justify this extreme result.  To the extent the "split-stock" criterion is based on a supposed aesthetic resemblance to a stock, it is arbitrary because it commits the genetic fallacy.[149]  The "split-stock" criterion is also vague because it fails to specify the degree of contouring that supposedly separates it from other "cuff-type" designs.  Furthermore, the agency's decision to penalize certain designs for a supposed lack of contouring is contrary to ATF's past representations to federal courts that non-contoured designs are more easily used as a brace than contoured designs.[150]

The arbitrary nature of the distinction between a so-called "split stock" design and other designs is underscored by the only example of a supposed "split stock" identified in the preamble, the SB FS1913.[151]  As training materials for the SB FS1913 show, that brace can be used as either a cuff or as a fin.[152]  If it were evaluated as a fin, then the SB FS1913 would receive zero points because the strap is clearly long enough to secure a person's forearm.[153]  The fact that the SB FS1913 can also be used as a cuff[154] should, if anything, result in a reduction in points because

---

[149]  *See* n.122, *supra*.

[150]  *See* Firearms Technology Criminal Branch Report of Technical Examination at 4, *United States v. Perez-Herrera*, No. 4:18-cr-0561 (E.D. La.  Oct. 4, 2019), ECF No. 53-3 ("The [brace] has small flaps *with curved ends that make it difficult to place the flaps around a forearm*." (emphasis added)).

[151]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[152]  *FS1913*, SB Tactical, https://www.sb-tactical.com/product/fs1913/ (last visited Sept. 8, 2021). The same training video is also available on YouTube, see *FS1913*, SB Tactical, YouTube (May 16, 2019), https://www.youtube.com/watch?v=M5lE_8_PRmg.

[153]  *See id.* at 0:30–0:51 (showing strap being secured around forearm in fin position and the weapon fired).

[154]  *See id.* at 0:06–0:29 (showing strap being secured around forearm in the cuff position and the weapon fired).

34

it confirms additional utility as a brace.[155]  But, under ATF's arbitrary "split stock" analysis, the opposite occurs and this additional feature causes the accrual of more points.  The category of "split stock" designs should therefore be eliminated from the final rule, and the devices evaluated as either fins or cuffs.

Finally, the stabilizing support factor is arbitrary because it is not "the product of agency expertise."[156]  Because ATF "can claim no expertise in the" disabilities, orthotics, or prosthesis areas, "it may be ill equipped to undertake the difficult task of discerning and applying the 'policies and goals' of those fields,"[157] and a reviewing court will be more likely to find ATF's reasoning inadequate or otherwise arbitrary and capricious.[158]

---

[155] In some cases, a cuff may provide more rear surface area than a fin.  But that difference is already accounted for under the rear surface area factor.

[156] *State Farm*, 463 U.S. at 43; *see Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) ("We do not . . . simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." (quoting *Tripoli Rocketry Ass'n*, 437 F.3d at 77)).

[157] *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646 (1990).

[158] *See, e.g.*, *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 760 (9th Cir. 2020) (enjoining agency action where "DHS claims no expertise in public health, unlike the scores of expert commenters who weighed in against the Rule"), *cert. dismissed* 141 S. Ct. 1292 (2021); *Rosa Pena v. Sessions*, 882 F.3d 284, 287 (1st Cir. 2018) (vacating "the BIA's construction" as it related to an issue where the agency "has no expertise" (citation omitted)); *Wilmot Psychiatric/Medicenter Tucson v. Shalala*, 11 F.3d 1505, 1509 (9th Cir. 1993) ("we would not give deference to the Secretary's opinion in a matter regarding medical necessity where the Secretary possessed no expertise.  In the case at bar, the issue is the reasonableness of complimentary physician meals, an issue which does not involve professional medical judgment." (citation omitted)); *NLRB v. St. Francis Coll.*, 562 F.2d 246, 254–55 (3d Cir. 1977) (holding NLRB "exceeded its authority" where it purported to settle an issue "with which this Board has no special expertise to deal").

### C.    Section III's "Configuration Of Weapon" Factors Are Arbitrary.

Section III of ATF Worksheet 4999 will be used to evaluate "the entire weapon."[159]  The factors in Section III, like those in Section I and Section II, are arbitrary, capricious, and contrary to law.

### 1.    Length of Pull

Length of pull is a measurement that describes the distance "between the trigger and the center of the shoulder stock."[160]  Under the Proposed Rule, "a length of pull that is between 10½ but under 11½ inches will accrue 1 point"; a length of pull that is between "11½ but under 12½ will accrue 2 points"; a length of pull that is between "12½ but under 13½  will accrue 3 points"; and "a length of pull of 13½ inches or more will accrue 4 points."[161]

The preamble offers no support or explanation for these ranges.  It acknowledges that "taller shooters require a longer length of pull and shorter shooters require a shorter length of pull" but makes no effort to link these body types with any specific measurements.[162]  And the preamble fails to explain how its acknowledgement that height affects shouldering can be consistent with its assertion that "length of pull measurements are far less relevant when a pistol is involved because a shooter merely requires a device that reaches from the back of the firearm to the forearm" and that "[f]ar less variation exists between shooters in this way."[163]  If a person's height affects the length of his arm for purposes of shouldering, then it also affects the length of his arm for the purpose of using stabilizing brace.  As the attached orthotics report explains, shooters with

---

[159]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[160]  *Id.*

[161]  *Id.*

[162]  *Id.*

[163]  *Id.*

different body types and with different abilities "require braces of varying lengths to allow the brace to function properly."[164]

Nor does the preamble attempt to explain how ATF's assignment of points is consistent with its prior rulings finding that the average length of pull for a shoulder fired weapon is 13.5 to 14.5 inches.[165]  Such findings plainly cannot support the accrual of points for weapons with a length of pull below 13.5 inches so, if ATF wants to assign points for that range, then it must make new findings.

Here, the record provides no support for the assertion that weapons with any particular length of pull—let alone a length of pull as short as 10.5 inches—are intended to be fired from the shoulder and thus should accrue points.  Indeed, ATF itself has regularly concluded that brace pistols with a length of pull between 12.5 and 13.5 inches are *not* short-barreled rifles or NFA firearms.[166]  And that is not surprising because, as the attached orthotics report shows, a length of pull within this range is fully consistent with use as a brace.[167]

The length of pull factor should be removed.  At a minimum, this factor should be revised so that zero points are assigned to a firearm with a length of pull less than 13.5 inches, consistent with ATF's prior findings.

---

[164]  Hurst Report at 6; *see also* Vasquez Report at ¶ 12(f).

[165]  *See, e.g.*, Ex. 16 (FTISB Letter 306285 (Oct. 31, 2017)); Ex. 17 (FTISB Letter 307364 (Oct. 31, 2017)); Ex. 20 (FTISB Letter 304484 (June 7, 2016)); Ex. 21 (FTISB Letter 304892 (Oct. 3, 2016)).

[166]  *See, e.g.*, Ex. 16 (FTISB Letter 306285 (Oct. 31, 2017)); Ex. 17 (FTISB Letter 307364 (Oct. 31, 2017)); Ex. 20 (FTISB Letter 304484 (June 7, 2016)); Ex. 21 (FTISB Letter 304892 (Oct. 3, 2016)).

[167]  Hurst Report at 6–7.

2.    Attachment Method

The attachment method would assign additional points based upon how a stabilizing brace is connected to a firearm.  According to the preamble, this is because a stabilizing brace's "attachment method often provides critical insight as to how a firearm is intended to be used."[168] But the attachment methods that this factor would analyze are already assigned points under other factors.  Thus, this factor amounts to nothing more than arbitrary repetitive counting.[169]

To begin with, this factor states that "[u]se of an AR-type pistol buffer tube with adjustment notches, an adjustable rifle buffer tube, or an adjustable PDW-type guide rail, will accrue 1 point as each indicates the ability to adjust the 'stabilizing brace.'"[170]  Because adjustability is accounted for in Section II (under both the "adjustability" and "accessory design" factors), it is arbitrary to account for it again in Section III.  In any event, this factor would be arbitrary even if it were not already accounted for because, as explained above, adjustability in and of itself does not demonstrate usefulness for shouldering.

Next, the attachment method factor states that "[a]n extended AR-type pistol buffer tube (greater than 6½ inches), folding adaptors, and the use of 'spacers'" will all result in the accrual of two points because they increase "the 'length of pull.'"[171]  This factor permits arbitrary double counting because Section III already adds points for length of pull.  In addition, it wrongly adds points for *any* relative increase in length of pull regardless of absolute length.  As explained above, under ATF's previous rulings, there should be no points accrued for a length of pull under 13.5

---

[168]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[169]  *See BNSF Ry. Co.*, 604 F.3d at 612 (remanding where agency failed to address contention that under "two-step approach . . . variable costs are counted twice.").

[170]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[171]  *Id.*

inches.  And the preamble itself acknowledges that no points should be accrued for an absolute length of pull under 11.5 inches.

The attachment method factor also states that "a shoulder stock that has been modified to incorporate a 'stabilizing brace'" will accrue a nearly-dispositive three points.[172]  This consideration is arbitrary because, as explained above, attributing points because a brace is based on a stock commits the genetic fallacy.[173]  In addition, this aspect of the attachment method factor is already considered in three other places.  Under Section II, both the "Accessory Design" and "Stabilizing Support" factors add points for braces that are based on a stock design.[174]  And under Section III, the "Modification" factor adds points based on this same concern.  Juicing the score through quadruple counting plainly is arbitrary.

Finally, the attachment method factor adds three points "when the 'stabilizing brace' is attached" in a manner "that results in an unusable aim-point."[175]  This criterion is vague.  It has nothing to do with shouldering.[176]  And it is duplicative of the analysis conducted under the "Peripheral Accessories" factor, discussed in Section II.C.4, *infra*.

Because every basis on which the attachment method factor would assign additional points is covered elsewhere, and because its criteria are otherwise arbitrary, this factor should be eliminated.

---

[172]  *Id.*

[173]  *See* Section II.B.1 & n.122, *supra*.

[174]  *See* Stabilizing Braces NPRM, 86 Fed. Reg. at 30832.

[175]  *Id.* at 30833.

[176]  *See* Figures 2, 3, & 4, and accompanying text, *supra*.

3.        Modifications / Configuration

Under the "'Stabilizing Brace' Modifications / Configuration" factor, "'[s]tabilizing brace' accessories that have been modified from their original configuration will accrue additional points."[177]  This factor is arbitrary and exceeds ATF's authority because the fact that an accessory has been modified is irrelevant to whether the device is intended to facilitate shouldering (for example, painting a brace would be a modification that does not affect shouldering).  What matters is the substance of the modification, not whether the accessory was modified.

In all events, the specific modifications identified in the preamble are arbitrary.  Under the Proposed Rule, "[a]ny 'cuff-type' or 'fin-type' accessory, which incorporates an arm strap too short to wrap around the shooter's arm or is manufactured from an elastic material (eliminating stabilizing support), will accrue 2 points."[178]  This criterion is vague because it fails to define when a strap is "too short."  In addition, this criterion is duplicative of the "stabilizing support" factor, which also accounts for strap length.

The Proposed Rule would also cause any modification that "reconfigure[s] the device into a shoulder stock" to immediately result in classification as a rifle, including "taping or strapping the arm flaps together on a 'cuff-type' 'stabilizing brace,' or adding shouldering surface to a 'fin-type' 'stabilizing brace.'"[179]  This criterion is arbitrary because it purports to confer on ATF broad discretion to, in essence, assume the conclusion by determining that a modification converts a brace into stock.  This criterion is also vague because its examples are non-exhaustive.  Finally,

---

[177]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[178]  *Id.*

[179]  *Id.*

this criterion is duplicative of several other factors, including "stabilizing support" and "rear surface area."

The arbitrary "Modifications / Configuration" factor should be eliminated.

### 4. Peripheral Accessories

Under the "Peripheral Accessories" factor, a firearm would accrue additional points for accessories ATF believes "indicate the weapon is not designed and intended to be held and fired by a single hand."[180]  Because grip does not determine whether a weapon is shouldered,[181] this factor is contrary to the statute and should be eliminated.  This factor is also impermissibly vague because the list of penalized accessories purports to be non-exhaustive.[182]  And its assignment of a dispositive number of points to any weapon with a secondary grip is contrary to previous rulings finding that weapons with secondary grips are not NFA firearms.[183]

Furthermore, it is unclear why ATF believes that peripherals that are installed on a pistol prior to the addition of a stabilizing brace become indicia that the weapon is intended to be shouldered if a brace is subsequently added.  For example, if a flip-up sight is installed on a pistol when that weapon is configured as a pistol—as illustrated in Figure 7[184] and 8[185]—then there is no

---

[180]  *Id.* at 30834.

[181]  *See* Section I.A.2, *supra*; *see also* Vasquez Report at ¶ 15 (explaining that the peripheral accessories factors are unrelated to shouldering).

[182]  *Compare* Stabilizing Braces NPRM, 86 Fed. Reg. at 30834 ("Such accessories include . . .") *with* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012) ("the word include does not ordinarily introduce an exhaustive list").

[183]  *See, e.g.*, Ex. 24 (Report from ATF FTCB re Gun Grabber (May 16, 2018)).

[184]  Figure 7 depicts a VISM flip-dot sight installed on a Glock MOS pistol.  *See VISM Flip Dot Pistol Sight*, OpticsPlanet.com, https://www.opticsplanet.com/vism-flip-dot-pistol-sight.html (last visited Sept. 8, 2021).

[185]  Figure 8 depicts a Bear Creek Arsenal AR-15 Pistol with flip up sights.  *See Bear Creek Arsenal AR-15 Pistol, 5.56 NATO, 7.5" BBL, 7" Keymod Rail, w/ Flip up Sights and 30 Rd Mag*,

basis to conclude that the addition of a stabilizing brace renders the flip-up sight a component of a rifle.  And ATF makes no effort to justify this conclusion.



Figure 7



Figure 8

    In addition to these flaws, the "Peripheral Accessories" factor imposes an effective cap on weapon weight by automatically classifying "any complete firearm with an installed 'stabilizing brace' that weighs more than 120 ounces (7½ pounds), incorporating end user accessories," as a

Classic    Firearms,    https://www.classicfirearms.com/ar-15-pistol-keymod-556-nato-bca-bear-creek/ (last visited Sept. 8, 2021).

rifle.[186]  Taken in conjunction with the "weapon weight" prerequisite, discussed in Section II.A.1, *supra*, the Proposed Rule effectively imposes a narrow window on weapons that ATF considers appropriate for a brace, without statutory authority.  This effectively excludes many weapons that the evidence shows are appropriate for a brace.[187]  In addition, because the "Peripheral Accessories" factor weighs firearms with accessories installed whereas the "weapon weight" prerequisite weighs firearms without accessories, ATF may game these factors, making the window in practice even narrower than it already appears.

### D.    The Scoring Scales In Section II And Section III Are Arbitrary.

In addition to adopting factors that are individually arbitrary, capricious, or contrary to law, the Proposed Rule adopts scoring scales that compound these problems.  Under these scales, "[a] firearm that accumulates less than 4 points in Section II (Accessory Characteristics), and less than 4 points in Section III (Configuration of Weapon), will generally be determined not to be designed to be fired from the shoulder, unless there is evidence that the manufacturer or maker expressly intended to design the weapon to be fired from the shoulder."[188]  However, "[a] firearm that accumulates 4 points or more in Section II or Section III will be determined to be designed and intended to be fired from the shoulder."[189]

The first problem with this system is the obviously one-sided reservation of discretion. Specifically, the Proposed Rule would *require* ATF to determine that a firearm accumulating four

---

[186]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30834.

[187]  Hurst Report at 2; Vasquez Report at ¶ 6; O'Kelly Report at 3–5.

[188]  Stabilizing Braces NPRM, 86 Fed. Reg.  at 30829; *see also id.* 30830 ("[ATF] reserves the right to preclude classification as a pistol with a 'stabilizing brace' for any firearm that achieves an apparent qualifying score but is an attempt to make a 'short-barreled rifle' and circumvent the GCA or NFA.").

[189]  *Id.* at 30829.

points is intended to be fired from the shoulder and would also *allow* ATF to make that same determination with respect to a firearm accumulating less than four points. That is not a rule, it is an invitation for abuse. Adoption of such a discretionary standard would result in "a heads I win, tails you lose, proposition, which the law would be unlikely to countenance."[190]

The scoring methodology is similarly one-sided and arbitrary. Taken together, Section II and Section III represent a total of 84 assignable points. But it takes just four points—less than five percent of all assignable points—to determine that a firearm is a short-barreled "rifle" subject to onerous NFA and GCA regulation. In other words, the entire purpose of this scoring system appears to be to render pistols with stabilizing braces NFA firearms.

Under Section II, a single firearm can accrue up to 10 points based upon four "Accessory Characteristics."[191] Eight of these 10 points are awarded under "Accessory Characteristics" that, as explained above, are vague and thus afford ATF wide discretion: "Accessory Design," "Rear Surface Area," and "Stabilizing Support." The result is that the Proposed Rule would permit ATF to assign twice the dispositive number of points under Section II based solely upon factors that afford ATF significant interpretive leeway.

Section III is even worse. Section III incorporates at least seven criteria that are individually dispositive including, in addition to length of pull, three brace "modifications" and

---

[190] *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 931 (7th Cir. 2011); *see also Niz-Chavez*, 141 S. Ct. at 1486 ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.").

[191] The design of Section II suggests that each criterion within the four "Accessory Characteristic" factors is mutually exclusive. Thus, even though Section II represents 20 assignable points, an individual weapon can only up to earn 10. For example, a firearm that earns three points for "increase[d]" rear surface area does not also accrue one point for "minimized" rear surface area. *See* Stabilizing Braces NPRM, 86 Fed. Reg. at 30829, 30831 (ATF Worksheet 4999). Section III, by contrast, appears to largely permit cumulative assignment of points for criteria within its four "Configuration of Weapon" factors. *See id.* at 30833.

three "peripheral accessories" that are worth four points each and, in some cases, subject to interpretive discretion.[192]   Furthermore, unlike Section II, Section III appears to employ cumulative scoring within its "Configuration of Weapon" factors,[193] driving up the total number of points that can be earned by a single weapon.

These lopsided scales are further biased because they include no means to deduct points for features that even ATF acknowledges are evidence that a weapon is *not* intended to be fired from the shoulder.  For example, the preamble acknowledges that an "arm strap of suitable length" shows that a brace is "clearly devised to secure the firearm to the shooter's forearm."[194]  The proper way to reflect that acknowledgement would be for ATF Worksheet 4999 to provide for the deduction of points for an arm strap.  But it does not do so.  Put differently, if factors that undermine use as a brace demonstrate an intent to shoulder, then characteristics which demonstrate effectiveness as a brace demonstrate *no* intent to shoulder, and that must be taken into the analysis.[195]  Instead, ATF does the opposite, leaving open the possibility that even weapons that are effective as a brace and do not achieve a disqualifying score could still be classified as NFA weapons.

---

[192]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30830 (ATF Worksheet 4999).

[193]  *See* n.191, *supra*.

[194]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30833.

[195]  *Cf. United States v. Crooker*, 608 F.3d 94, 96 (1st Cir. 2010) ("The federal statute under which Crooker was charged defines 'firearm' in pertinent part as a weapon that expels a projectile 'by the action of an explosive,' and this self-evidently does not include an air rifle such as that in Crooker's package which operates by compressed air." (citation omitted)).

## E.     The Adjudications Involving The SBA3 And Blade Are Arbitrary.

The Proposed Rule also contains adjudications "[f]or the purpose of explaining how the factoring criteria in Worksheet 4999 would be implemented."[196]   However, rather than help to justify the Proposed Rule or its factoring criteria, these explanatory adjudications reveal the arbitrary and inconsistent manner in which the criteria will be applied.[197]

Start with SB Tactical's SBA3.  The Proposed Rule wrongly determines that "an AR-type firearm [equipped] with the SBA3 accessory" should be "classified as a 'short-barreled rifle' and an NFA 'firearm.'"[198]   In support of that conclusion, ATF contends that "[t]he firearm with attached SBA3 would accrue 1 point in Accessory Design for incorporating known shoulder stock features, such as an adjustment lever, a Quick Detach (QD) sling mount, and incorporation of hardened polymer-type material."[199]   This determination is arbitrary because neither the adjustment lever nor the sling mount facilitate shouldering.[200]   In addition, the polymer used in the SBA3 is no harder than the polymer used in the SB Mini or the Shockwave Blade, and those braces earn zero points under this factor.[201]   In fact, the polymer used in the SBA3 is soft and bendable, as opposed to the Shockwave Blade, which consists of hard polymer.

---

[196]   Stabilizing Braces NPRM, 86 Fed. Reg. at 30834.

[197]   In addition, issuing adjudicatory orders in a rulemaking proceeding constitutes a separate violation of the APA.   The APA defines an "adjudication" as an "agency process for the formulation of an order" and an "order" as "the whole or a part of a final disposition . . . *in a matter other than rule making*."  5 U.S.C. § 551(6), (7) (emphasis added).   Courts have thus recognized that agency attempts to conduct "hybrid" proceedings that purport to combine rulemaking with adjudication "ignore[] the clear scheme of the APA."  *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1160 (D.C. Cir. 1979).

[198]   Stabilizing Braces NPRM, 86 Fed. Reg. at 30840.

[199]   *Id.*

[200]   *See* Section II.B.1, *supra*.

[201]   Stabilizing Braces NPRM, 86 Fed. Reg. at 30835 (SB Mini), 30841 (Shockwave Blade).

Next, ATF asserts that "[i]n Rear Surface Area, the firearm would accrue 3 points, as the SBA3 accessory has additional rear surface material added for use in shouldering."[202]  However, it makes no sense to describe the SBA3 as having "additional" or "added" rear surface material because the Proposed Rule does not establish any baseline from which the SBA3 supposedly deviates, and ATF makes no effort to explain or justify its conclusion in the adjudication. Moreover, comparison of the SBA3 (Figure 9) with the SB Mini (Figure 10) reveals no appreciable difference in rear surface area, calling into further question ATF's determination with respect to the SBA3.  This factor thus illustrates the dangerous amount of discretion the Proposed Rule would afford ATF.



Figure 9

Figure 10

Under the "Adjustability" factor, ATF assigns two more points because the SBA3 is "an adjustable design."[203]  That is in addition to the point ATF already assigned under "Accessory

---

[202]  *Id.* at 30840.

[203]  *Id.*

Design for incorporating . . . an adjustment lever,"[204] proving SB Tactical's contention that this factor enables repeat counting.[205]

Rounding out its application of the Section II "Accessory Characteristics," ATF asserts that "in Stabilizing Support the firearm would accrue 2 point[s], as the flaps on the 'Cuff-type' design fail to wrap around a shooter's forearm."[206]  However, ATF does not account for the strap included with the SBA3 that is long enough to wrap around any forearm.[207]  Furthermore, because the Proposed Rule does not specify the size of a forearm, this factor is completely standardless and affords ATF discretion to reach arbitrary results.

The arbitrariness of this factor is also demonstrated by comparing the SB Mini and SBA3. Figures 9 and 10 illustrate that in comparison to the SB Mini, the SBA3 has additional contouring—a feature that according to the preamble should result in a lower score.[208]  Similarly, Figures 11 and 12 show that the SBA3 wraps around a shooter's forearm at least as well as the SB Mini, yet ATF assigned the SB Mini one point under this factor and the SBA3 two points under this factor,[209] again revealing that its reasoning is arbitrary.

---

[204]  *Id.*

[205]  *See* Sections II.B.1, II.D, *supra*.

[206]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30840.

[207]  *Id.*

[208]  *Id.* at 30833.

[209]  *Compare id.* at 30835 (SB Mini scoresheet), *with id.* at 30838 (SBA3 scoresheet).



Figure 11



Figure 12

ATF's application of the Section III "Configuration of Weapon" factors is equally flawed. ATF asserts that under "Length of Pull" the firearm would accrue three points because it was "determined to possess a length of pull of approximately 12½ inches."[210] But, as explained above, assignment of points for a length of pull of less than 13.5 inches is inconsistent with prior ATF findings, and the record here does not support new findings.[211] Furthermore, ATF does not explain how it measured length of pull given that the SBA3 is adjustable. It appears that ATF measured length of pull with the brace fully extended. However, in light of the evidence showing that adjustability is a key feature of a stabilizing brace,[212] ATF should have measured the brace from its "middle" or "average" position. ATF's choice to fully extend the brace was arbitrary. It also resulted in a third penalty for the SBA3's adjustability, for which the SBA3 had already been assigned points under both the "Adjustability" and "Accessory Design" factors.

---

[210] *Id.* at 30840.

[211] *See* Section II.C.1, *supra*.

[212] Hurst Report at 6; Cicero Comments at 2.

Next, ATF assigns "1 point as the SBA3 accessory utilizes an M4-type rifle buffer tube."[213] But the type of tube to which the brace is attached makes no difference to the usefulness of the brace for shouldering, and ATF offers no explanation for its conclusion that the SBA3 earns one point when the SB Mini earns zero points for being mounted on a similar tube.[214]

Finally, ATF assigns the SBA3-equipped firearm a final point for the inclusion of "rifle-type flip-up sights."[215] But the use of sights is not indicative of shouldering,[216] and flip-up sights are commonly used with pistols.[217] ATF's unexplained assertion to the contrary thus illustrates the arbitrary manner in which the "Peripheral Accessories" factor in Section III may be applied.

ATF's application of the factoring criteria to the Shockwave Blade, a design from one of SB Tactical's competitors, also illustrates the arbitrary manner in which the factoring criteria will be applied. For example, even though the Blade does not include "an adjustment lever," ATF nevertheless assigns the Blade two points "[i]n Adjustability" because the Blade "is installed onto

---

[213]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30840.

[214]  *Compare id.* (SBA3), *with id.* at 30837 (SB Mini).

[215]  *Id.* at 30840.

[216]  *See, e.g.*, *NRA Precision Pistol Rules*, Nat'l Rifle Ass'n (rev. May 2018) at Rule 3.1 (explaining that in competition pistol shooting "[a]ny semi-automatic handgun or revolver using any sights, including telescopic, are permitted with the exception of those sights that project an image on the target"),  https://competitions.nra.org/documents/pdf/compete/RuleBooks/Pistol/pistol-book.pdf.; *Introduction to Sights*, Hunter Ed, https://www.hunter-ed.com/national/studyGuide/Introduction-to-Sights/201099_92838/ (last visited Sept. 8, 2021) ("Most handguns have an iron (open) sight, although some specialized handguns have a dot, a laser, or a telescopic sight."); *see also* Figure 2, *supra* (showing use of sights on braced weapon); Section II.C.4, *supra* (explaining that the NPRM mistakenly relies upon grip rather than shouldering in adopting "Peripheral Accessories" factor).

[217]  In addition to the examples at nn.184–185, *supra*, see *SwitchSight Folding Pistol Sights*, KNS Precision, Inc., https://www.knsprecisioninc.com/product/switchsight-folding-pistol-sights/ (last visited Sept. 8, 2021) (explaining the usefulness of flip sights for handguns) and TFB TV, *[SHOT 2018] Dead Air Silencers is Making . . . Sights?* (Jan. 27, 2018) (explaining functionality of flip sights on handguns), *available at* https://www.youtube.com/watch?v=GTdl32mIC9I&t=36s. *Cf.* Ex. 11 (Letter from Capt. Tristan Rizzi, USN, Ret.) ("Accessories like laser sights and red dots only improve the shooters ability to fire safely and put rounds on target.").

a KAK-type tube that incorporates adjustment notches for adjustability" and yet another point "[i]n Attachment Method" because "the Shockwave Blade accessory utilizes a KAK tube with adjustment notches."[218]  This illustrates how the Proposed Rule is designed to permit ATF discretion to ensure that features which pass one aspect of the factoring criteria will fail on another. Thus, rather than help to justify the Proposed Rule or its factoring criteria, the explanatory adjudications reveal the arbitrary manner in which they will be applied.

### III.   The Proposed Rule Relies On A Flawed Economic Justification.

In exercising its rulemaking authority, the Department is required by Executive Order to "assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits" and "reduc[e] costs."[219]  This analysis must be performed competently.  In cases involving the same Executive Orders at issue here, courts have held that "a serious flaw undermining [the cost-benefit] analysis can render the rule unreasonable."[220]  As the attached report of economist Dr. Todd D. Kendall (the "Kendall Report") thoroughly explains, the cost-benefit analysis ATF performed in this proceeding is fundamentally flawed and not appropriately thorough.[221]

---

[218]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30843.

[219]  *Id.* at 30843 (citing Exec. Order No. 12,866 (Regulatory Planning and Review), 58 Fed. Reg. 5735 (1993) and Exec. Order No. 13,563 (Improving Regulation and Regulatory Review), 76 Fed. Reg. 3821 (2011)).

[220]  *Natl. Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–40 (D.C. Cir. 2012) (citing *City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) and *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007)); *see also, e.g.*, *District of Columbia v. USDA*, 496 F. Supp. 3d 213, 253–56 & n.24 (D.D.C. 2020); *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1106 n.18 (N.D. Cal. 2019) *aff'd*, 981 F.3d 742 (9th Cir. 2020); *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 54 n.11 (D.D.C. 2019).

[221]  Ex. 22 (Dr. Todd D. Kendall, Compass Lexecon, *Comment on Notice of Proposed Rulemaking, Docket No. ATF 2021R-08 Factoring Criteria for Firearms with Attached Stabilizing Braces* (Sept. 7, 2021)) (hereinafter "Kendall Report").

To begin with, ATF's analysis fails to provide a sound basis demonstrating that regulation of pistol stabilizing braces can improve upon market processes.  As Dr. Kendall explains, ATF's regulatory impact analysis ("RIA")[222] fails to conform with accepted professional norms for cost-benefit analyses.  This includes failing to demonstrate any externality that affects people directly (as is required by the definition of an externality), and also failing to engage with the academic literature on appropriate responses to externalities (which includes a range of other solutions besides regulation).[223]

Next, ATF's analysis fails to quantify any benefits from the Proposed Rule or even demonstrate that the benefits are expected to be material.  With respect to asserted benefits, ATF fails to provide any evidence that stabilizing braces have been used in any crimes (let alone a statistically significant number) and does not show that the Proposed Rule will reduce crime or evaluate potential criminal adaptation to the Proposed Rule.[224]  Furthermore, ATF "does not attempt to value any alleged reduction in crime in dollars, despite the availability and widespread use by other regulatory bodies of methodologies to value lives saved (or other benefits of reduced crime)."[225]

ATF's analysis likewise fails to include important categories of costs including lost consumer value from stabilizing braces, enforcement costs, and losses in efficiency from increased

---

[222]  ATF 2021R–08 Preliminary Regulatory Analysis and Initial Regulatory Flexibility Analysis at 11 (June 2021), https://www.atf.gov/file/154876.

[223]  Kendall Report at 7–8, 13–16.

[224]  *Id.* at 8, 16–20.

[225]  *Id.* at 8; *see id.* at 16–20; *see also* Cass R. Sunstein, *The Cost-Benefit Revolution* 39 (MIT Press 2018) ("Whether or not regulators say that they are using a [value of a statistical life], they will inevitably be using one.  Any chosen level of stringency depends, at least implicitly, on some judgment about how much money should be spent to save lives.  So there is no avoiding some kind of monetary valuation.  The real issues are what the value should be, what method we use to come up with it, and whether we should be transparent about it.").

government tax revenues. Dr. Kendall explains these deficiencies in detail. *First*, ATF understates losses to owners of stabilizing braces because it assumes, contrary to economic theory, that "they value these items no more than their price, or in other words, that there is no 'consumer surplus.'"[226] ATF similarly undervalues the losses to manufacturers and sellers of stabilizing braces by failing to account for their losses of asset value and displacement of resources,[227] as well as to the general public and to individuals as a result of the reduced employment that the Proposed Rule is likely to cause.[228]

*Second*, ATF "unrealistically assumes zero costs of enforcing the Proposed Rule (despite the apparent availability of evidence on the costs of enforcement of the NFA) and no socially inefficient spending by individuals seeking to avoid detection or taxation."[229] This failure is particularly egregious given that ATF acknowledges that "'[s]ince 2013, ATF has brought 3 actions against manufacturers of firearms with 'stabilizing braces' that do not comply with the intent of the law'" and thus "presumably knows the costs it has incurred in these three actions" and that can be expected in future enforcement.[230]

*Third*, ATF "assigns no social cost to the additional taxes paid by firearm owners under the NFA," thereby "failing to recognize the widely-understood loss in efficiency for government spending relative to private spending."[231] Specifically, as Dr. Kendall explains, ATF's decision

---

[226] Kendall Report at 8; *see id.* at 20–21.

[227] *Id.* at 21.

[228] *Id.* at 21–22.

[229] *Id.* at 8.

[230] *Id.* at 22.

[231] *Id.* at 8.

to exclude tax payments as a cost under the Proposed Rule contradicts the practice of other government agencies and disregards the fundamentals of tax policy analysis.[232]

In addition to these problems, ATF's cost calculations rely on a series of unsupported assumptions that are contrary to available evidence and thus provide a separate and independent basis for finding the cost-benefit analysis arbitrary.  *First*, ATF assumes, without clear basis, that only 3 million stabilizing braces have been sold with accounting for credible estimates cited by the Congressional Research Service indicating that between 10 and 40 million braces are in civilian use.[233]  As Dr. Kendall explains, this means that even under ATF's own flawed methodology the agency may be undervaluing the cost of the Proposed Rule by more than $10 billion based upon this input alone.[234]

*Second*, ATF "does not explain or support its assumptions that 63%, 10%, and 26% shares of stabilizing brace owners will remove their braces, convert their weapons into long-barrel rifles, and register their weapons under the NFA, respectively."[235]  As Dr. Kendall explains, "[t]hese assumptions are important in determining the total cost of the Proposed Rule because the RIA assumes significantly different costs for each of the three options."[236]  Despite this importance, the RIA provides no factual support for its assumptions about the percentage of stabilizing brace

---

[232] *Id.* at 23.

[233] *Id.* at 24; *see also* Krouse, *supra* n.4.

[234] Kendall Report at 24–25 (explaining that agency "high" cost estimate assuming 3 million braces is $2.4 billion and that the "high" cost estimate using the same methodology and assuming 40 million braces is $13 billion).

[235] *Id.* at 9.

[236] *Id.* at 25.

owners that select each outcome.[237]  This is a critical failure because under different assumptions, the per-firearm cost of the Proposed Rule would increase by 521%.[238]

Furthermore, ATF's assumption that 63% of brace owners will remove their braces appears inconsistent with the Proposed Rule's qualification that permanent removal is a means of compliance only "as long as it [the firearm] was originally configured without a stock and as a pistol."[239]  "Approximately 57% of SB Tactical's pistol stabilizing braces are sold to firearms manufacturers who install them to sell as a complete unit."[240]  For these firearms, it is not clear whether ATF would consider it legal for their owners to remove the braces.  But "[i]f removal were not legal," Dr. Kendall explains, "then for these 57% of SB Tactical's sales, the only relevant options under the RIA would be conversion to a long-barrel rifle or registration under the NFA."[241]  Thus, ATF's assumption that 63% of brace owners will elect to remove the brace appears not only unsupported, but contradicted by available evidence.

*Third*, ATF "provides no evidence to support its assumption that, even absent the Proposed Rule, future sales of pistol stabilizing braces would be significantly reduced due to the ATF's enforcement actions."[242]  This is contrary to evidence showing significant increases in sales of stabilizing braces over the past several years,[243] and as a result underestimates the costs of the Proposed Rule by more than 25%.[244]  *Fourth*, ATF "provides no factual basis for its assumption

---

[237]  *Id.* at 25–26.

[238]  *Id.* at 25.

[239]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30843.

[240]  Kendall Report at 26.

[241]  *Id.*

[242]  *Id.* at 8.

[243]  *Id.* at 26; *accord* McConnell Letter at 2.

[244]  Kendall Report at 26–27.

that ownership of pistol stabilizing braces can be estimated based on divestitures of bump stocks, a different product used for a different purpose that was banned for a different reason."[245]

Finally, in addition to the problems detailed in the Kendall Report, ATF's analysis fails to account for the increased costs the Proposed Rule will impose on state, local, and tribal governments. Expanding NFA obligations increases costs for these entities because the NFA does not exempt state and local governments from its registration requirements and does not exempt tribal governments from either its registration or its tax requirements.[246] In addition, it is the practice in some jurisdictions to allow for the use of personally owned firearms on duty by local and/or state law enforcement officials,[247] and these firearms also may not be exempt from NFA regulation.[248]

Because the Proposed Rule will expand the number of firearms subject to the NFA, the Proposed Rule undoubtedly will increase tax and compliance costs for these entities. Despite these obvious costs and the fact that millions of firearms will be potentially affected,[249] the preamble

---

[245] *Id.* at 9; *see id.* at 27.

[246] *Compare* 26 U.S.C. § 5841(a) (exempting federal government from registration requirements) *and id.* § 5852(a)–(b) (exempting federal government from tax requirements), *with id.* § 5853(a)–(c) (exempting state and local governments from tax requirements only) *and* ATF letter *re* NFA Transfers to Tribal Police (Aug. 14, 2006), *available at* https://www.atf.gov/rules-and-regulations/nfa-transfers-tribal-police-departments (establishing that only Tribal Police Departments with officers that are cross-sworn as *federal* BIA agents may receive NFA firearms under the governmental exemption).

[247] *See, e.g.*, Fort Lauderdale Police Department, Policy 114: Firearms (Approvals/Qualifications/Loaners) (allowing personally owned firearms to be used on duty and in their official capacity in various instances and circumstances), https://www.flpd.org/home/showpublisheddocument/4059/637631710813373912 (July 2021); Sonoma County Sheriff's Office, Office-Wide Policy and Procedure Manual, April 7, 2016 ed., https://sonomacounty.ca.gov/WorkArea/DownloadAsset.aspx?id=2147539232 (April 7, 2016).

[248] *See* 26 U.S.C. § 5853.

[249] *See* Krouse, *supra* n.4.

and RIA assert—without any supporting analysis—that the costs to state, local, and tribal governments will not be "significant."[250]  This failure to properly account for obvious costs present yet another serious shortcoming in ATF's cost-benefit analysis.

In addition, this same failure reflects an apparent disregard for the dignity of the tribes as recognized in Executive Order 13,175 which requires, *inter alia*, that federal agencies consult with tribal governments and provide certain economic offsets prior to taking actions that could have substantial effects on them.[251]  In this proceeding, ATF appears to have made no effort to determine whether any tribal governments would be at risk of having the firearms of their duly-sworn law enforcement agencies confiscated as a result of the Proposed Rule, suggesting that ATF is not "striv[ing] to meet the responsibilities that arise from the unique legal relationship between the Federal Government and Indian tribal governments."[252]

## IV.    The Proposed Rule Raises Serious Constitutional Concerns.

In addition to violating the NFA, GCA, and APA, the Proposed Rule presents serious constitutional problems.  Courts routinely are skeptical of any "administrative interpretation of a statute [that] invokes the outer limits of Congress's power."[253]  And courts have set aside statutory

---

[250]  ATF 2021R–08 Preliminary Regulatory Analysis and Initial Regulatory Flexibility Analysis at 11 (June 2021), https://www.atf.gov/file/154876; *see* Stabilizing Braces NPRM, 86 Fed. Reg. at 30849 ("This proposed rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments.").

[251]  Exec. Order No. 13,175 (Consultation and Coordination with Indian Tribal Governments), 65 Fed. Reg. 67249 (2000).

[252]  65 Fed. Reg. at 67250.

[253]  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001); *see also id.* at 172–73 ("This requirement stems from our prudential desire not to needlessly reach constitutional issues and our assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority.").  The presumption that Congress does not push the constitutional limits is particularly strong in the criminal context, making it especially appropriate to "[a]pply[ ] constitutional avoidance to narrow a criminal

interpretations that raise doubts under the Due Process Clause,[254] and the Takings Clause.[255]  Thus, "[c]onsistent with the hallowed rules of constitutional avoidance,"[256] ATF should decline to interpret the NFA and GCA in a manner that raises the due process and takings concerns here.

### A.   The Proposed Rule Violates Due Process Because It Fails To Provide Persons With Fair Notice.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."[257]  "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."[258]

The Proposed Rule would violate due process in two discrete but connected ways.  *First*, several of its factoring criteria are so vague that it will be impossible for regulated parties to calculate for themselves whether ATF will classify their weapons as NFA firearms or GCA short-barreled rifles.  As detailed above, several heavily weighted or even dispositive factors are so amorphous that it is unclear whether a particular weapon will be assigned enough points to trigger NFA obligations.  For this reason, the Proposed Rule fails to give enough guidance so that "regulated parties should know what is required of them so they may act accordingly."[259]

*Second*, the vagueness inherent in many of the factors imbues ATF with overbroad enforcement discretion.  The Supreme Court has advised that "precision" is "necessary so that

---

statute, as th[e Supreme] Court has historically done."  *United States v. Davis*, 139 S. Ct. 2319, 2333 (2019).

[254] *Union Pac. R.R. Co. v. DHS*, 738 F.3d 885, 893–94 (8th Cir. 2013).

[255] *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445 (D.C. Cir. 1994).

[256] *Union Pac. R.R. Co.*, 738 F.3d at 893–94.

[257] *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

[258] *Id.*

[259] *Id.*

those enforcing the law do not act in an arbitrary or discriminatory way."[260]  The vague factors the Proposed Rule would incorporate open the door to arbitrary enforcement in violation of this due process principle, an issue that FRAC and SB Tactical have described more fully elsewhere.[261] And ATF's history of flip flops with respect to stabilizing braces confirms the difficulty ATF will have in applying its factors in a consistent manner.[262]

The risk that enforcement discretion may be abused is especially acute given the recent increase in firearms "[s]ales to women and people of color."[263]  According to the Supreme Court, systemic racism historically has "infringed blacks' constitutional right to keep and bear arms."[264]

---

[260]  *Id.*

[261]  Comments of FRAC, SB Tactical, and Silencer Shop, Docket Nos. ATF 2021R–05, ATF2021R–08 (filed Aug. 19, 2021).

[262]  *See* nn.6–13, *supra*, and accompanying text.

[263]  Marc Fisher et al., *'Fear on top of fear': Why anti-gun Americans joined the wave of new gun owners*, The Wash. Post (July 10, 2021), https://www.washingtonpost.com/nation/interactive/2021/anti-gun-gun-owners/; *see also id.* ("Firearms industry data shows sales jumping 50 percent among Black customers, 47 percent among Hispanics and 43 percent among Asian Americans[.]"); Jim Curcuruto, *NSSF Survey Reveals Broad Demographic Appeal for Firearm Purchases During Sales Surge of 2020*, Nat'l Shooting Sports Found. (July 21, 2020), https://www.nssf.org/articles/nssf-survey-reveals-broad-demographic-appeal-for-firearm-purchases-during-sales-surge-of-2020/ ("The highest overall firearm sales increase comes from Black men and women who show a 58.2 percent increase in purchases during the first six months of 2020 versus the same period last year.").

[264]  *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008); *see also id.* ("Blacks were routinely disarmed by Southern States after the Civil War."); *McDonald v. City of Chi., Ill.*, 561 U.S. 742, 771–72 (2010) ("After the Civil War, many of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks. . . . Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves."); *id.* at 808–09 (Thomas, J., concurring) (explaining that "the [Supreme] Court [in 1876] held that members of a white militia who had brutally murdered as many as 165 black Louisianians congregating outside a courthouse had not deprived the victims of their privileges as American citizens to peaceably assemble or to keep and bear arms").  In more recent years, some jurisdictions' discretionary permitting regimes have caused other minorities to be deprived of their constitutional right to bear arms.  *See, e.g.*, *Wrenn v. District of Columbia*, 864 F.3d 650, 656 (D.C.

That history of institutionalized racism with respect to the possession of firearms further cautions against a regime that would place the exercise of an important constitutional right at the mercy of "unbridled discretion in a government official."[265]

### B. The Proposed Rule Violates The Takings Clause Because It Dispossesses Owners Of Braced Firearms Without Compensation.

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'"[266] "[T]he 'classic taking [is one] in which the government directly appropriates private property for its own use.'"[267] Accordingly, it is well settled that "any permanent physical occupation is a taking,"[268] as is any regulatory burden that "absolutely dispossess the owner of his rights to use" his property.[269]

The gravamen of the Proposed Rule is a physical intrusion on private property. Specifically, the Proposed Rule effectuates a physical dispossession and occupation by requiring the owner of a braced firearm that ATF labels a short-barreled rifle to either (1) permanently remove or alter the stabilizing brace such that it cannot be reattached; (2) remove the short barrel

---

Cir. 2017) (invaliding D.C.'s "good reason" requirement in litigation brought by "the Pink Pistols," an organization that "champion[s] the right of sexual minorities to carry guns for self-defense").

[265] *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992); *see also, e.g.*, *Fox TV Stations*, 567 U.S. at 253 ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained . . . 'is so standardless that it authorizes or encourages seriously discriminatory enforcement'" (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008))); *Jenkins v. McKeithen*, 395 U.S. 411, 429 (1969) ("the fair hearing required by the Due Process Clause . . .  should not be left to the unfettered discretion of the Commission").

[266] *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (quoting U.S. Const. amend. V).

[267] *Horne v. USDA*, 576 U.S. 350, 357–58 (2015) (quoting *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Plan. Agency*, 535 U.S. 302, 324 (2002)).

[268] *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982) (emphasis removed).

[269] *Loretto*, 458 U.S. at 435 n.12; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1017 (1992) ("total deprivation of beneficial use is . . . the equivalent of a physical appropriation").

60

and attach a 16-inch or longer barrel to the firearm; (3) destroy the firearm; (4) surrender the firearm; or (5) pay a $200 tax and submit to registration in the National Firearms Registration and Transfer Record.[270]  Whatever expectations people may have regarding property regulations, they "do not expect their property, real or personal, to be actually occupied or taken away."[271]  Because the Proposed Rule would violate that expectation with no provision for compensating owners, the Proposed Rule violates the Takings Clause.

It makes no difference that the owners of braced firearms can avoid dispossession or occupation of their property through payment of a tax and submission to a federal database.  In *Horne v. USDA*, the Supreme Court reaffirmed that the Government may not avoid the requirements of the Takings Clause by recharacterizing a Government mandate as a "voluntary" choice.[272]  There, the Court rejected the argument that the Government's appropriation of raisins was not a physical taking because the grower could avoid the Government's action by converting its grapes into wine instead of raisins.[273]  The Court found that "'[l]et them sell wine' is probably not much more comforting to the raisin growers than similar retorts have been to others throughout history" and emphasized that, under the Constitution, "property rights 'cannot be so easily manipulated.'"[274]

---

[270]  Stabilizing Braces NPRM, 86 Fed. Reg. at 30843.

[271]  *Horne*, 576 U.S. at 532; *see also, e.g.*, *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1185 (S.D. Cal. 2019) (holding California gun regulation violated Takings Clause where it gave owners of high-capacity magazines a choice between physical dispossession or removal from California), *aff'd on other grounds*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated on other grounds*, 988 F.3d 1209 (9th Cir. 2021).

[272]  576 U.S. at 365–66.

[273]  *Id.* at 365.

[274]  *Id.* (quoting *Loretto*, 458 U.S. at 439 n.17).

**CONCLUSION**

The Department should withdraw the Proposed Rule or amend it as set forth in these comments.

Respectfully submitted,

September 8, 2021                    By:  /s/ Stephen J. Obermeier
                                    Stephen J. Obermeier
                                    Megan L. Brown
                                    Thomas M. Johnson, Jr.
                                    Michael D. Faucette
                                    Jeremy J. Broggi
                                    **WILEY REIN LLP**
                                    1776 K St. N.W.
                                    Washington, DC 20006
                                    (202) 719-7000
                                    SObermeier@wiley.law
                                    MBrown@wiley.law
                                    TMJohnson@wiley.law
                                    MFaucette@wiley.law
                                    JBroggi@wiley.law

                                    *Counsel for SB Tactical and the*
                                    *Firearms Regulatory Accountability*
                                    *Coalition, Inc.*