**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| DARREN A. BRITTO, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 2:23-cv-19-Z |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, | |
| *Defendant*. | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND ......................................................................................................................2

I.      Statutory and Regulatory Background.........................................................................2

II.     ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"..................................................................................................4

III.    The Rule ......................................................................................................................8

IV.     This Lawsuit ...............................................................................................................11

LEGAL STANDARDS............................................................................................................11

ARGUMENT............................................................................................................................12

I.      Plaintiffs are unlikely to succeed on the merits of their claims. .................................12

        A.      The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the statutory definition of "rifle."..............................................12

        B.      The Rule is neither arbitrary and capricious nor void for vagueness..................21

        C.      The Rule does not infringe Second Amendment rights ......................................26

                1.      Firearm braces are not bearable arms, so their use is not protected by the Second Amendment..............................................................................26

                2.      Registration of short-barreled rifles does not implicate the Second Amendment .................................................................................................27

                3.      Short-barreled rifles are dangerous and unusual weapons, and their use is not protected by the Second Amendment. ........................................30

                4.      Historical tradition of regulation supports the Rule. ...............................33

        D.      The Rule does not violate the major questions doctrine. ..................................36

        E.      The NFA does not violate the nondelegation doctrine. ....................................38

II.     Plaintiff will not suffer irreparable harm in the absence of an injunction ..................39

III.    The equities and the public interest weigh against a preliminary injunction. .............42

IV.     In all events, any relief should be limited to redress Plaintiffs' alleged injuries .........43

CONCLUSION.........................................................................................................................44

i

## TABLE OF AUTHORITIES

**Cases**

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989) ............................................................12

*Aposhian v. Barr,*
  374 F. Supp. 3d 1145 (D. Utah 2019),
  *aff'd,* 958 F.3d 969 (10th Cir. 2020) ...........................................13

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
  897 F.3d 314 (D.C. Cir. 2018)..........................................................42

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..........................................................................16

*Bezet v. United States,*
  714 F. App'x 336 (5th Cir. 2017)......................................................29

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016)...........................................................................32

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) .............................................................21

*Castro v. City of Grand Prairie,*
  No. 3:21-CV-885-L, 2021 WL 1530303 (N.D. Tex. Apr. 19, 2021) ...........41

*Chacon v. Granata,*
  515 F.2d 922 (5th Cir. 1975) ............................................................39

*Chapman v. United States,*
  500 U.S. 453 (1991) ..........................................................................20

*Coates v. City of Cincinnati,*
  402 U.S. 611 (1971) ..........................................................................24

*Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.,*
  710 F.3d 579 (5th Cir. 2013) ............................................................41

*Dist. of Columbia v. Heller,*
  554 U.S. 570 (2008) ..............................................................26, 27, 30

*Dist. of Columbia v. U.S. Dep't of Agric.,*
  444 F. Supp. 3d 1 (D.D.C. 2020)......................................................11

i

*Duarte v. City of Lewisville,*
  136 F. Supp. 3d 752 (E.D. Tex. 2015) ................................................39

*Elrod v. Burns,*
  427 U.S. 347 (1976) ................................................40

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ................................................22

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ................................................21, 22

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ................................................38

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ................................................43

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ................................................13

*Google, Inc. v. Hood,*
  822 F.3d 212 (5th Cir. 2016) ................................................40

*Guedes v. ATF,*
  356 F. Supp. 3d 109 (D.D.C. 2019),
  *aff'd,* 920 F.3d 1 (D.C. Cir. 2019) ................................................13

*Gun Owners of Am., Inc. v. Garland,*
  19 F.4th 890 (6th Cir. 2021) ................................................15

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ................................................38, 39

*Haynes v. United States,*
  390 U.S. 85 (1968) ................................................20

*Hayward v. U.S. Dep't of Lab.,*
  536 F.3d 376 (5th Cir. 2008) ................................................21

*Holland Am. Ins. Co. v. Succession of Roy,*
  777 F.2d 992 (5th Cir. 1985) ................................................42

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ................................................26, 30, 32, 33

*Huddleston v. United States,*
  415 U.S. 814 (1974) ................................................3

*JetPay Corp. v. IRS,*
   26 F.4th 239 (5th Cir. 2022) ...................................................................................24

*John Doe Co. v. Consumer Fin. Prot. Bureau,*
   849 F.3d 1129 (D.C. Cir. 2017) ...............................................................................40

*Jones v. Cain,*
   600 F.3d 527 (5th Cir. 2010) ...................................................................................42

*Kanarr Corp. v. United States,*
   188 Ct. Cl. 1051 (1969) ....................................................................................17, 20

*Kelly Servs., Inc. v. Creative Harbor, LLC,*
   846 F.3d 857 (6th Cir. 2017) ...................................................................................19

*Kolender v. Lawson,*
   461 U.S. 352 (1983) .........................................................................................23, 25

*Lakedreams v. Taylor,*
   932 F.2d 1103 (5th Cir. 1991) .................................................................................41

*Lambert v. Bd. of Comm'rs of Orleans Levee Dist.,*
   No. 05-5931, 2006 WL 8456316 (E.D. La. Mar. 22, 2006) ......................................41

*Lane v. Holder,*
   703 F.3d 668 (4th Cir. 2012) ...................................................................................29

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ....................................................................................39

*Lomont v. O'Neill,*
   285 F.3d 9 (D.C. Cir. 2002) ......................................................................................2

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.,*
   No. 6:22-cv-01934, 2022 WL 2960031 (W.D. La. July 26, 2022) ............................41

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .........................................................................................15, 28

*Maracich v. Spears,*
   570 U.S. 48 (2013) ..................................................................................................20

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ................................................................................................11

*Memphis A. Philip Randolph Inst. v. Hargett,*
   978 F.3d 378 (6th Cir. 2020) ...................................................................................39

*Mistretta v. United States,*
   488 U.S. 361 (1989) ............................................................................... 38, 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .......................................................................................14

*Muscarello v. United States,*
   524 U.S. 125 (1998) .....................................................................................21

*N.Y. City Transit Auth. v. Beazer,*
   440 U.S. 568 (1979) .....................................................................................12

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) .........................................................................*passim*

*Nat'l Broadcasting Co. v. United States,*
   319 U.S. 190 (1943) .....................................................................................39

*Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy,*
   654 F.3d 496 (4th Cir. 2011) .......................................................................34

*Nat'l Nutritional Foods Ass'n v. Mathews,*
   557 F.2d 325 (2d Cir. 1977) ........................................................................19

*Nat'l Rifle Ass'n v. Brady,*
   914 F.2d 475 (4th Cir. 1990) .......................................................................13

*Nixon v. Mo. Mun. League,*
   541 U.S. 125 (2004) .....................................................................................18

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................... 42, 43

*Opulent Life Church v. City of Holly Springs,*
   697 F.3d 279 (5th Cir. 2012) .......................................................................40

*Or. Firearms Fed'n, Inc. v. Brown,*
   No. 2:22-CV-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ...........29

*Posters 'N' Things, Ltd. v. United States,*
   511 U.S. 513 (1994) .....................................................................................19

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   140 S. Ct. 1492 (2020) .................................................................................20

*Rosa v. McAleenan,*
   583 F. Supp. 3d 850 (S.D. Tex. 2019)..........................................................41

*Sampson v. Murray,*
   415 U.S. 61 (1974) ................................................................................................ 39, 42

*Sheffield v. Bush,*
   604 F. Supp. 3d 586 (S.D. Tex. 2022) ................................................................. 41

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) .......................................................................... 18, 19

*Sipes v. United States,*
   321 F.2d 174 (8th Cir. 1963) ................................................................................ 20

*Tex. Democratic Party v. Abbott,*
   961 F.3d 389 (5th Cir. 2020) ................................................................................ 23

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ................................................................................. 42

*Touby v. United States,*
   500 U.S. 160 (1991) .............................................................................................. 38

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) .......................................................................................... 43

*United States v. Al-Azhari,*
   No. 8:20-CR-206-T-60AEP, 2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ....... 27

*United States v. Brooks,*
   681 F.3d 678 (5th Cir. 2012) ................................................................................ 23

*United States v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ............................................................ 26, 27, 30, 31

*United States v. Edwards,*
   182 F.3d 333 (5th Cir. 1999) ................................................................................ 23

*United States v. Elmowsky,*
   No. 19-cr-175, 2022 WL 138086 (S.D.N.Y. Jan. 14, 2022) ............................... 17

*United States v. Gilbert,*
   286 F. App'x 383 (9th Cir. 2008) ......................................................................... 31

*United States v. Golding,*
   332 F.3d 838 (5th Cir. 2003) ................................................................................ 31

*United States v. Gonzalez,*
   No. 2:10–cr–00967, 2011 WL 5288727 (D. Utah Nov. 2, 2011) ......................... 31

v

*United States v. Hasson,*
    No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) .......................................... 27, 28

*United States v. Hayes,*
    555 U.S. 415 (2009) ......................................................................................................... 18

*United States v. Howard,*
    766 F.3d 414 (5th Cir. 2014) ............................................................................................23

*United States v. Majid,*
    No. 4:10CR303, 2010 WL 5129297 (N.D. Ohio Dec. 10, 2010)......................................31

*United States v. Mazurie,*
    419 U.S. 544 (1975) .........................................................................................................23

*United States v. Rose,*
    695 F.2d 1356 (10th Cir. 1982) .................................................................................. 17, 19

*United States v. Santoro,*
    242 F. App'x 627 (11th Cir. 2007) ...................................................................................16

*United States v. Schumann,*
    963 F.2d 381 (9th Cir. 1992) ...................................................................................... 17, 19

*United States v. Syverson,*
    90 F.3d 227 (7th Cir. 1996) .............................................................................................18

*United States v. Thompson/Center Arms Co.,*
    504 U.S. 505 (1992) ....................................................................................3, 13, 16, 31

*United States v. Williams,*
    553 U.S. 285 (2008) .................................................................................................. 24, 25

*United States v. Zeidman,*
    444 F.2d 1051 (7th Cir. 1971) .........................................................................................16

*Utility Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) .........................................................................................................37

*Valero Energy Corp. v. EPA,*
    927 F.3d 532 (D.C. Cir. 2019)..........................................................................................16

*VanDerStok v. Garland,*
    __ F.3d __ 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022)..................................................41

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) .................................................................................................. 25, 26

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ..............................................................................23

*Washington v. Davis,*
   426 U.S. 229 (1976) ..............................................................................19

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) .....................................................................37, 38

*Westfall v. Miller,*
   77 F.3d 868 (5th Cir. 1996) .............................................................28, 29

*White v. Carlucci,*
   862 F.2d 1209 (5th Cir. 1989) ..............................................................40

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ..............................................................................39

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..................................................................................11

*Wis. Gas. Co. FERC,*
   758 F.2d 669 (D.C. Cir. 1985)...............................................................40

*Wooden v. United States,*
   142 S. Ct. 1063 (2022) ..........................................................................21

**Federal Statutes**

5 U.S.C. § 706(2)(C).................................................................................12

8 U.S.C. § 926(a).....................................................................................37

18 U.S.C. § 921(a)(3)..................................................................................3

18 U.S.C. § 921(a)(7).................................................................1, 5, 13, 14

18 U.S.C. § 921(a)(8).................................................................1, 5, 10, 13

18 U.S.C. § 921(a)(25)..............................................................................27

18 U.S.C. § 921........................................................................................3

18 U.S.C. § 922.....................................................................................3, 4

18 U.S.C. § 926(a)................................................................................4, 12

26 U.S.C. § 5801....................................................................................2, 3

26 U.S.C. § 5811.............................................................................1, 3, 39

26 U.S.C. § 5841 ................................................................................................ 1, 3

26 U.S.C. § 5845(a) .................................................................................................. 3

26 U.S.C. § 5845(a)(1) .......................................................................................... 2, 3

26 U.S.C. § 5845(a)(3) ............................................................................... 5, 10, 13, 15

26 U.S.C. § 5845(a)(7) ............................................................................................ 20

26 U.S.C. § 5845(b) ................................................................................................ 21

26 U.S.C. § 5845(c) .......................................................................................... *passim*

26 U.S.C. § 7422 .................................................................................................... 42

26 U.S.C. § 7801(a)(1) ............................................................................................ 12

26 U.S.C. § 7801(a)(2)(A) ......................................................................................... 4

26 U.S.C. § 7805 .................................................................................................... 13

26 U.S.C. § 7805(a) ................................................................................................ 37

Pub. L. No. 90–351, 82 Stat. 236 (1968) ..................................................................... 3

**State Statutes**

Ala. Code § 13A-11-63(a) ......................................................................................... 33

Alaska Stat. Ann § 11.61.200(c) ................................................................................ 33

Ariz. Rev. Stat. Ann. § 13-3101(B) ........................................................................... 33

Cal. Penal Code § 16590 .......................................................................................... 33

Colo. Rev. Stat. Ann. § 18-12-102(1) ......................................................................... 33

D.C. Code Ann. § 7-2502.02 ..................................................................................... 33

Fla. Stat. Ann. § 790.221(1) ..................................................................................... 33

Ga. Code Ann § 16-11-122 ....................................................................................... 33

Haw. Rev. Stat. Ann. § 134-8 ................................................................................... 33

Iowa Code Ann § 724.1C .......................................................................................... 33

La. Stat. Ann. § 40:1785 .......................................................................................... 33

viii

Md. Code Ann., Pub. Safety § 5-203 ................................................................................................33

Mich. Comp. Laws Ann. § 750.224b ..............................................................................................33

Mo. Ann. Stat. § 571.020 ................................................................................................................33

Mont. Code Ann. § 45-8-340 ...........................................................................................................33

N.C. Gen. Stat. Ann. § 14-288.8 .....................................................................................................33

N.D. Cent. Code Ann. § 62.1-02-03 ................................................................................................33

Neb. Rev. Stat. Ann. § 28-1203 .......................................................................................................33

Nev. Rev. Stat. Ann. § 202.275 .......................................................................................................33

Ohio Rev. Code Ann. § 2923.17 ......................................................................................................33

Okla. Stat. Ann. tit. 21, § 1289.18 ..................................................................................................30

Or. Rev. Stat. Ann. § 166.272(1)-(4) ..............................................................................................33

S.C. Code Ann. § 16-23-250 ...........................................................................................................33

Tex. Penal Code Ann. § 46.05(a)(1)(C) ..........................................................................................33

Va. Code Ann. § 18.2-303.1 ............................................................................................................33

Wash. Rev. Code Ann. § 9.41.190(4) ..............................................................................................33

Wis. Stat. Ann. § 941.28(2)-(4) .......................................................................................................33

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017 ................................. 2, 17

S. Rep. No. 90-1097 (1968) ...............................................................................................................3

S. Rep. No. 90-1501 (1968) .............................................................................................................31

**Regulations**

27 C.F.R. § 478.11 ...................................................................................................................... 9, 14

28 C.F.R. § 0.130 ...............................................................................................................................4

28 C.F.R. § 0.130(a) ................................................................................................................. 12, 37

*Machine Guns and Certain Other Firearms: Miscellaneous Amendments,*
     26 Fed. Reg. 2407 (Mar. 22, 1961) ..........................................................................................13

*Commerce in Firearms and Ammunition*
   33 Fed. Reg. 18555 (Dec. 14, 1968) ...............................................................13

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
   85 Fed. Reg. 82,516 (Dec. 18, 2020) ................................................................9

85 Fed. Reg. 86,948 (Dec. 31, 2020) ...................................................................9

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
   86 Fed. Reg. 30,826 (June 10, 2021) ................................................................9

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
   88 Fed. Reg. 6,478 (Jan. 31, 2023) ..........................................................*passim*

**Other Authorities**

2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822
   (1823) ...............................................................................................................35

15 The Public Records of the Colony of Connecticut 191 (1890) ........................35

1631 Va. Acts 174, Acts of February 24th, 1631, Act LVI..................................35

1759-1776 N.H. Laws 63, An Act About Powder Money...................................36

1775-1776 Mass. Acts...........................................................................................35

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue,
   chap. 25, § 27, pt. 15........................................................................................36

1893 S.C. Acts 426, An Act To Amend An Act Entitled "An Act To Provide For A License
   For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State"................35

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191
   (codified at ARK. CODE ANN. ch. 48 § 1498 (1894)..................................35

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25
   (codified at 1879 Tex. Crim. Stat. 24)..............................................................35

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352.........................................35

Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27..........................................36

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27............................35

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210
   (codified at KAN. GEN. STAT. § 1003 (1901)..............................................35

Act of Mar. 16, 1870, no. 68, § 3, sixth, 1870 La. Acts 126...............................35

x

Act of Mar. 26, 1879, , ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231 ..............................35

Acts of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws ..............................35

"An Act for the better regulating of the Militia of this Province,"
   1747, McCord, *Statutes at Large* ..............................35

"An Act for the regulating, training, and arraying of the Militia,"
   1781, New Jersey Session Laws ..............................35

ATF, *National Firearms Act Handbook* (Apr. 2009),
   https://perma.cc/P3NL-G35G ..............................4

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961) ..............................17

IRS, Rev. Rul. 61-203, 1961-2 C.B. 224, 1961 WL 12793 (Jan. 1. 1961) ..............................17

Lands, and Granting Donations Thereof to the State Page 182, Image 182 (1848)
   available at The Making of Modern Law: Primary Sources..............................36

Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807
   (1807)..............................35

Laws of the State of Maine (1830)..............................35

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor,
   Aldermen, and Commonalty, of the City of New York (1763) ..............................36

Order of the Governor and Council, March 28, 1667, in John Russell Bartlett, ed., *Records of the
   Colony of Rhode Island and Providence Plantations*,
   (Providence: A. Crawford Greene and Brother, 1857) ..............................35

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early
   America: The Legal Context of the Second Amendment,"
   25 Law & Hist. Rev. 139 (2007) ..............................35

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell &
   Henry Flanders comps. 1911) ..............................36

**INTRODUCTION**

For nearly a century, Congress has regulated the possession, manufacture, and distribution of certain types of firearms that it judged especially dangerous, including short-barreled rifles. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel of less than 16 inches in length, it is a "short-barreled rifle" within the meaning of the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls, 26 U.S.C. §§ 5811, 5821.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though "stabilizing braces" are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them so that they may be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a "stabilizing brace" are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a "stabilizing brace" or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a

1

particular weapon configured with a "brace" device is designed, made, and intended to be fired from the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs—three individuals who possess pistols equipped with "stabilizing braces"—seek to preliminarily enjoin the Rule but fail to show any of the prerequisites to obtain that extraordinary relief. First, Plaintiffs are unlikely to succeed on the merits of their claims. Congress empowered and obligated ATF to determine whether and when pistols with "stabilizing braces" become "rifles," as defined under federal law. The Rule comports with the relevant statutory provisions and is reasonably explained. Moreover, the modest registration requirements that federal law impose do not violate the Second Amendment. And in any event, the right to bear arms does not protect the use of specific firearm modifications used to evade federal firearms laws. And the merits aside, Plaintiffs will not suffer irreparable harm absent preliminary relief, and the requested injunction would undermine the public interest. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.     Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see, e.g.*, *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of

less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes.").[1] The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

**2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to comprehensively regulate the manufacture and distribution of firearms and ammunition. Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (citing Pub. L. No. 90-351, § 1201, 82 Stat. 197, 236 (1968); S. Rep. No. 90-1097, at 108 (1968)), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms.[2] *See, e.g.*, 18 U.S.C. §§ 922–923.

Among these were specific controls on the interstate transport of "short-barreled rifles" and

---

[1] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

[2] The GCA defines the term "firearm" more broadly than the NFA, such that it includes, *inter alia*, "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

the obligation of Federal Firearms Licensees (or "FFLs") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's definition. *See id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *See* ATF, *National Firearms Act Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.  ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *see also, e.g.*, ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ (providing visual

4

examples of weapons configured with common "brace" devices). And though manufacturers have nominally claimed that "brace" devices are meant to attach to or stabilize against a shooter's forearm, "stabilizing braces" often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a "stabilizing brace" falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. *See* 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. *See* Pls' Br. in Supp. of Mot. for Prelim. Inj. ("PI Mot") at 9 n. 5 (citing link to ATF's classification letter). According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. 88 Fed. Reg. at 6,482. Based on its evaluation of the materials submitted, ATF concluded that the particular "brace" device, when configured with a pistol, would not convert that firearm into a weapon designed

or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of "stabilizing braces" of varying designs. 88 Fed. Reg. at 6,479. But unlike the 2012 prototype, these newer "brace" designs began to include characteristics common to shoulder stocks. *Id.* at 6,479; *see also, e.g., id.* at 6,529 (comparing two "stabilizing braces" to similarly designed shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a "stabilizing brace" as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some "stabilizing braces" were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g., id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different "brace" devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a "brace" device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a "brace" device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters, as well as a 2015 Open Letter, suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the "stabilizing brace," as either a device assisting single-handed fire or for shoulder fire. *See, e.g., id.* at 6,484, 6,487–88. ATF also occasionally focused on the "brace" device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several "brace"-equipped firearms as short-barreled rifles after considering, for example,

6

whether the "brace" device served any purpose other than to extend the rearward surface to enable shouldering, *see, e.g.*, *id.* at 6,485, or whether the device, as configured with the firearm, created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel "brace"-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's incidental use of the firearm. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a "brace" device affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the "brace" device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 "brace" device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a "stabilizing brace" as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

7

### III.   The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling "brace" devices as "ATF compliant" without having submitted that particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using "brace" devices to create short-barreled rifles without complying with NFA requirements, *see id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *see supra* at p. 3.

In March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a "stabilizing brace" opened fire at a supermarket in Boulder, Colorado, killing ten people, including an on-duty police officer. *See* CNN, *10 killed in Colorado grocery store shooting* (Mar. 23, 2021), https://perma.cc/HG5S-3NAF. This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual similarly armed with an AR-type pistol equipped with a "stabilizing brace" killed nine people and injured 17 others within approximately 30 seconds from firing the first shot. *See* USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole* (Aug. 6, 2019), https://perma.cc/89XK-SNVR. In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.[3]

**2.** In light of its pre-existing concerns, as well as the real-world violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of weapons equipped with "stabilizing braces."

---

[3] Since 2014, ATF has received 104 classification requests in connection with federal criminal investigations involving firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6,499.

8

*Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to the regulations in 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. *See Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 86 Fed. Reg. 30,826 (June 10, 2021).[4] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with "stabilizing braces" or other similar attachments. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

ATF announced the rule on January 13, 2023, *see* U.S. Dep't of Just., *Justice Department Announces New Rule to Address Stabilizing Braces, Accessories Used to Convert Pistols into Short-Barreled Rifles* (Jan. 13, 2023), https://perma.cc/4SNB-2SSB, and it was published in the Federal Register on January 31, 2023, 88 Fed. Reg. at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–6,569, contains the following key provisions:

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–13—are:

    (i)    whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

---

[4] In December 2020, ATF published a notice of proposed rulemaking entitled *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516 (Dec. 18, 2020), but withdrew the notice two weeks later, *see* 85 Fed. Reg. 86,948 (Dec. 31, 2020).

(ii)  whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii)  whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv)  whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)  the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)  information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with "stabilizing braces," including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. As relevant here, an individual who was an unlicensed possessor of a "brace"-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

(i)  filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

(ii)  removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;

(iii)  turning the firearm into a local ATF office; or

(iv)  destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

10

*Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with "stabilizing braces" prior to the Rule's publication. *Id.* at 6,571. As relevant here, these individual possessors will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of firearms equipped with "stabilizing braces." *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[5]

## IV.    This Lawsuit

Plaintiffs, three individuals who possess pistols with "stabilizing braces," filed this lawsuit on January 31, 2023, claiming that the Rule is unconstitutional and otherwise violates the Administrative Procedure Act ("APA"). Compl. ¶¶ 47–105, ECF No. 1. A week later, they moved to preliminarily enjoin ATF from enforcing the Rule. Pls.' Mot. for Prelim. Inj., ECF No. 14.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Failure to demonstrate any one of these elements requires denial of preliminary relief. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

---

[5] ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with "stabilizing braces" that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

**ARGUMENT**

**I.     Plaintiffs are unlikely to succeed on the merits of their claims.**

    **A.     The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the statutory definition of "rifle."**

       Plaintiffs claim that ATF lacked authority to promulgate the Rule, Compl. ¶ 48 (citing 5 U.S.C. § 706(2)(C)), asserting that the Rule "purports to regulate" weapons not designed, made, or intended to be fired from the shoulder, thus "rewrit[ing]" the statutory definition of "rifle," *id.* ¶¶ 52, 54; *see also* PI Mot. at 22-24. But their arguments on this score rest on bare assertions that, in any event, do not comport with basic principles of statutory construction. On the contrary, the Rule fits comfortably within ATF's delegated authority and correctly construes the relevant statutory provisions.[6]

       **1.** As a threshold matter, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

       Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. *See* 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms contained in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret the enactments Congress has charged them with enforcing and implementing."). The

---

[6] Before reaching Plaintiffs' constitutional challenges to the Rule, the Court should first address their other contentions. *See, e.g., N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979).

agency's interpretive authority is well established. *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret and . . . to define terms included in the [NFA's] statutory definition[s]"), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019); *accord Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1150–51 (D. Utah 2019), *aff'd*, 958 F.3d 969 (10th Cir. 2020). Indeed, ATF has maintained regulations for over half a century that clarify the meaning of statutory terms that Congress did not itself fully define.[7] And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." *See* 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule cannot be gainsaid. *See* 26 U.S.C. § 7805(a); *see also Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) (noting that § 926's delegation "inevitably confers some measure of discretion" to ATF "to determine what regulations are in fact 'necessary'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center Arms*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, among other things, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if these criteria are met.

Then the "stabilizing brace" arrived and quickly proliferated. As explained, *see supra* p. 6, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. As these requests suggest, the need for ATF to determine these weapons'

---

[7] *See, e.g., Machine Guns and Certain Other Firearms: Miscellaneous Amendments*, 26 Fed. Reg. 2407 (Mar. 22, 1961); *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18555 (Dec. 14, 1968); *see also* 88 Fed. Reg. at 6,500 (collecting other examples).

classifications was obvious from the beginning. While "stabilizing braces" are purportedly meant to assist single-handed fire by stabilizing against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a "stabilizing brace," it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *See, e.g., id.* at 6,493–94, 6,529; ATF, *FINAL RULE 2021R-08F: Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various "brace" devices to effectively convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used "braced"-equipped firearms to carry out mass shootings, *supra* p. 8. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations, 27 C.F.R. §§ 478.11 and 479.11, to provide a consistent, predictable analytical framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). As the Rule explains, a weapon equipped with a "stabilizing brace" may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace"

14

device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule thoroughly explains, *id.* at 6,513–43, ATF's firearms expertise and years of experience in classifying "brace"-equipped weapons informs these criteria. *See, e.g.*, *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021) ("ATF unquestionably has abundant experience and expertise in determining which devices" are NFA firearms.).

The Rule therefore rests squarely on the well-established authority delegated to ATF and is consistent with its longstanding practice of promulgating rules to clarify its understanding of the meaning and proper application of statutory terms.

**2.** The nature of Plaintiffs' challenge only provides further support that the Rule falls within ATF's delegated authority. One would expect Plaintiffs to bring concrete challenges to ATF's actual or anticipated classifications of *their particular* firearms; after all, Plaintiffs' alleged injuries stem solely from whether they are required under the statute to register, modify, surrender, or destroy their pistols equipped with a "stabilizing brace." Compl. ¶¶ 44–46. But no Plaintiff brings a legal claim to have the Court resolve whether his particular weapon is properly classified as a "short-barreled rifle" under the NFA. 26 U.S.C. § 5845(a)(3), (4). In fact, the record is devoid of any facts that would allow this Court to independently assess the classification of any Plaintiff's "brace"-equipped weapon under the terms of the statute. That omission is telling: if the Court were to conclude that a Plaintiff was in possession of a "short-barreled rifle" within the meaning of the NFA, any purported "injury" to the Plaintiff would not be traceable to the Rule at all, but would instead stem solely from the statute. For purposes of this motion, then, Plaintiffs have failed even to demonstrate standing, much less irreparable harm. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that an injury must be "fairly traceable

15

to the challenged action" (cleaned up)). Moreover, although Plaintiffs raise abstract challenges to the Rule, it is the statute—not the Rule—that would impose the relevant obligations on Plaintiffs.[8]

**3.** But setting that aside, Plaintiffs do not meaningfully dispute that ATF has the statutory authority to interpret and clarify the NFA's and the GCA's provisions. Instead, they suggest that ATF lacked authority to promulgate the Rule because the Rule "conflicts" with the statutory definition of "rifle." PI Mot. at 22; *see also* Compl. ¶ 54. In Plaintiffs' view, no pistol equipped with a stabilizing brace can meet that definition because these weapons are designed and intended to be fired while stabilized "against [a shooter's] forearm," not a shooter's shoulder. PI Mot. at 7, 21, 24; Compl. ¶¶ 23, 50. But Plaintiffs marshal no evidence or interpretive analysis to support that conclusory, factually incorrect, and categorical assertion. At any rate, Plaintiffs argument does not comport with the statutory text, congressional purpose, prior judicial constructions, or common sense. The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a "stabilizing brace" can be a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs begin by suggesting that, if a "brace"-equipped weapon is created from a *pistol*, it cannot constitute an NFA "rifle." *See, e.g.*, PI Mot. at 6, 13, 21. But that argument not only ignores the statute's use of the broad and inclusive term "weapon," but also conflicts with the Supreme Court's reasoning in *Thompson/Center Arms*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (quoting 26 U.S.C. § 5845(c)). Lower courts have likewise applied that same reasoning. *See, e.g.*, *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007).

---

[8] It is similarly unclear that a challenge to the Rule in the abstract is a challenge of final agency action under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that final agency action must be one by which "rights or obligations have been determined"); *see also Valero Energy Corp. v. EPA*, 927 F.3d 532, 538 (D.C. Cir. 2019) (clarifying that an interpretive document was not final agency action).

16

As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as one of the component parts, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder. That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *See Kanarr Corp. v. United States*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *United States v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks); *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992) (Uzi with a folding stock); *cf. United States v. Elmowsky*, No. 19-cr-175, 2022 WL 138086, at *4–6 (S.D.N.Y. Jan. 14, 2022) (Uzi).[9]

It is therefore beyond reasonable dispute that a pistol equipped with a shoulder stock can be a "rifle" within the plain meaning of the NFA. Plaintiffs' arguments that a pistol equipped with a "stabilizing brace," on the other hand, can *never* be a "rifle" do not withstand scrutiny.

Plaintiffs insist that weapons configured with "stabilizing braces" are categorically designed and intended to be fired while braced against a shooter's forearm, not a shooter's shoulder. PI Mot. at 9, 13, 21, 24; Compl. ¶¶ 23, 50. But the factual record before ATF belies this assertion. *See, e.g.*, 88 Fed. Reg. at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47; *see also, e.g.*, Tactical Life, *4 Pistol Stabilizing Braces for Every American Shooter* (Feb. 28, 2022), https://perma.cc/8W5W-4TLG. In support of their counterfactual view, Plaintiffs appear to look only to a manufacturer's or designer's description of the weapon as determinative of the weapon's design and intended use. *See, e.g.*, PI Mot. at 24 (arguing that

---

[9] The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, the House Committee on Ways and Means report confirmed that the definition was intended to replace any reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." *See* H.R. Rep. No. 83-1337, at A395. Moreover, ATF has long recognized that pistols can be modified in such a way as to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961) (determining that a handgun with an attachable shoulder stock is a short-barreled rifle); IRS, Rev. Rul. 61-203, 1961-2 C.B. 224, 1961 WL 12793 (Jan. 1. 1961) (similar).

a weapon cannot be designed and intended to be fired from the shoulder where a designer "explicitly" says "the opposite"); *id.* at 20 (citing a manufacturer's description of the first "stabilizing brace" prototype and suggesting that all "brace" devices share the same general design and intended use). But a manufacturer's assertion cannot itself be determinative. As the Rule explains and as courts have recognized in analogous contexts, while a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) would lead to absurd results, and (iii) would permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. 88 Fed. Reg. at 6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting a construction of a statute that "would frustrate Congress' manifest purpose" and would have meant that the statute was "'a dead letter' in" many of its applications (citation omitted)); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004) (relying on the principle that a court "will not construe a statute in a manner that leads to absurd" results). If a weapon's classification turned entirely on the manufacturer's description (as Plaintiffs appear to suggest, PI Mot. at 24), any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the buttstock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule carefully explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g.*, *United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying

18

solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court reasoned, "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.*

To avoid these absurd results, and to properly apply and give effect to the statutory definition of "rifle," the Rule explains that ATF considers, in addition to a manufacturer's description of a particular weapon, the objective design features of that weapon in determining whether it is designed and intended to be fired from the shoulder. This objective approach to discerning intent "is a very familiar one in the law." *Id.* at 601; *see also, e.g., Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the statutory phrase "primarily intended . . . for use" (citation omitted)). In fact, "[f]requently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor." *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring).[10]

Moreover, the fact that a particular pistol equipped with a "stabilizing brace" may be designed to *also* allow effective single-handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Indeed, many litigants have argued that the statutory definition of "rifle" should be limited only to weapons designed and intended to be fired *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *See, e.g., Rose*, 695 F.2d at 1357–58; *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992);

---

[10] *See also, e.g., Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977) ("In determining whether an article is a 'drug'" under a statute because of an "intended therapeutic use, the FDA is not bound by the manufacturer's subjective claims of intent but can find actual therapeutic intent on the basis of objective evidence."); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017) (determining under the Lanham Act whether an applicant intends to use a trademark in commerce by looking to "*objective* evidence of intent," noting that Congress did not intend for the issue to turn on whether an applicant simply declares that it "did truly intend to use the mark" (citations omitted)).

*Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963) ("That [the weapon] had no sights or that it could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57.

As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a "stabilizing brace" that it is designed, made, and intended to be fired from the shoulder is an NFA "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. *See* 88 Fed. Reg. at 6,501. The opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is nowhere found in the statutory text. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there."). Moreover, Congress indicated in the very same statutory provision how to impose such a limitation by defining a "silencer" to include "any part *intended only for use* in [the] assembly or fabrication" of a firearm silencer or firearm muffler. 26 U.S.C. § 5845(a)(7) (emphasis added) (cross-referencing 18 U.S.C. § 921(a)(25)); *Romag Fasteners*, 140 S. Ct. at 1495 (noting that the Court is "doubly careful" not to read into statutes words that aren't there when Congress "included the term in question elsewhere in the very same statutory provision"). But Congress chose to define "rifle" to mean any weapon designed, made, and intended to be fired from the shoulder, irrespective of whether the weapon has an alternate use.

**4.** Finally, Plaintiffs' invocation of the rule of lenity is misplaced. *See* PI Mot. at 25–26. That rule of statutory interpretation applies only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (citation omitted); *see also Chapman v. United States*, 500 U.S. 453, 463 (1991) ("The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning

as an overriding consideration of being lenient to wrongdoers." (citation omitted)). But the statutory provisions at issue here contain no grievous ambiguity for the rule of lenity to resolve, and Plaintiffs argue nothing to the contrary. *See Muscarello v. United States*, 524 U.S. 125, 138 (1998) ("[The] simple existence of some statutory ambiguity . . . is not sufficient to warrant application of [the rule of lenity], for most statutes are ambiguous to some degree."); *accord Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring). As already explained, *supra* pp. 16–20, traditional tools of statutory construction firmly support the Rule's application of the statutory definition of "rifle" to weapons equipped with "stabilizing braces" where such weapons are designed, made, and intended to be fired from the shoulder.[11]

*      *      *

In sum, Plaintiffs have failed to demonstrate a likelihood of success on their claim that the Rule conflicts with the NFA and the GCA and was thus promulgated in excess of ATF's authority.

**B.     The Rule is neither arbitrary and capricious nor void for vagueness.**

**1.**   Plaintiffs next argue that the Rule must be set aside as arbitrary and capricious. "The arbitrary and capricious standard is 'highly deferential,' and [courts] must afford the agency's decision 'a presumption of regularity.'" *Hayward v. U.S. Dep't of Lab.*, 536 F.3d 376, 379 (5th Cir. 2008) (citation omitted). When an agency changes its position, it must "provide [a] reasoned explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This "ordinarily demand[s] that [the agency] display awareness that it *is* changing position"; however, the agency "need not

---

[11] Plaintiffs' reliance on *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), does not advance their argument. There, the court determined that the definition of "machinegun" under 26 U.S.C. § 5845(b) was "plain" and "unambiguous," *see id.* at 451, 464, thus obviating any need to resort to the rule of lenity. But the court nonetheless proceeded to discuss how lenity would apply assuming that § 5845(b) was so ambiguous as to "provide [no] meaningful guidance" and to require the court to "'guess' at its definitive meaning." *Id.* at 469 (citation omitted). As already explained, no such grievous ambiguity exists in the statutory provisions relevant to this case. Moreover, and contrary to what Plaintiffs suggest, *see* PI Mot. at 26, nothing in *Cargill* suggests that an agency's change in position on the proper application of a statute is sufficient to trigger the rule of lenity.

21

demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.*; *cf. Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (rule arbitrary and capricious when agency "said almost nothing" with respect to "the 'good reasons for the new policy'" (citation omitted)).

Plaintiffs contend that ATF has failed to acknowledge and provide a reasoned explanation for its change. *See* PI Mot. at 26-27. They are twice wrong.

First, the Rule readily acknowledges it represents a change from ATF's past approach. *See* 88 Fed. Reg. 6,479–81. In response to comments criticizing the proposed rule as "flip flop" by ATF, the Rule explicitly states that the "Department acknowledges that this rule is a change in position from some of ATF's previous classifications or positions." *Id.* at 6,501–02 (emphasis added). The Rule also provides a thorough and reasoned explanation for this change: As ATF explains in multiple places and in multiple ways, "it is necessary for the Department to issue this rule to clarify the statutory definition of 'rifle'" as well as "to inform the public of the best interpretation of the definition" to "guide the proper legal and factual analysis to be conducted in evaluating whether a firearm is designed, made, and intended to be fired from the shoulder." *Id.* at 6,502; *see also id.* ("[T]he intent of this rule is to resolve prior inconsistencies and ensure consistent application of the statutory definition of 'rifle' to firearms equipped with 'stabilizing braces[.]'"); *id.* at 6,481 (describing the benefits of the Rule: it "prevent[s] manufacturers and individuals from violating the requirements of the NFA and GCA" and "enhances public safety by reducing the further proliferation and criminal use of firearms with attached 'stabilizing braces.'").Additionally, ATF's analysis walks through ATF's previous classifications, explains how stabilizing brace designs have changed over the past decade, summarizes the agency's rulemaking process, and responds to public comments, thereby providing a detailed explanation why the Rule is better than the agency's previous approach. *See id.* at 6482–6569; *see Encino*

22

*Motorcars*, 579 U.S. at 221 (agency action not arbitrary and capricious if agency explanation is "clear enough that its path may reasonably be discerned" (citation omitted)). Thus, Plaintiffs' arguments are unfounded, and ATF's 98-page Rule is anything but arbitrary and capricious.

**2.**  Plaintiffs also challenge the Rule as void for vagueness. *See* PI Mot. at 27–29. As an initial matter, "it is also well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." *United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012) (citations omitted); *see also United States v. Mazurie*, 419 U.S. 544, 550 (1975) (same); *United States v. Edwards*, 182 F.3d 333, 335 (5th Cir. 1999). Here, Plaintiffs do not allege that the GCA, NFA, or Rule involve First Amendment freedoms, and instead, they contend the Rule is vague in the abstract, without it having been enforced against them; consequently, Plaintiffs' vagueness challenge fails, if for no other reason, because they have not asserted that the Rule is unconstitutionally vague as applied to the facts of their case. *See, e.g.*, PI Mot. at 28 (challenging the Rule because "Americans must guess" as to how the Rule will function). Outside the First Amendment context, this is insufficient to void the Rule for vagueness.

Regardless, the Rule is not unconstitutionally vague. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Howard*, 766 F.3d 414, 428 (5th Cir. 2014) (quoting same). "A statute is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (citations omitted). However, "perfect clarity and precise guidance have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Plaintiffs take issue with each step of the Rule's two-part analysis, asserting that, at step one,

whether there is "surface area" that "allows the weapon to be fired from the shoulder," is vague because the straightforward term "surface area" is not defined, and at step two, ATF's factoring criteria "look[] at subjective information." PI Mot. at 28. But Plaintiffs' arguments fail because the Rule's two-part framework is sufficiently definite that ordinary people can understand what it requires. First, although the Rule does not define "surface area," that term is commonly used and understood by people of ordinary intelligence. *See, e.g., "Surface Area," Merriam-Webster's Online Dictionary* (2023), https://perma.cc/8XTR-UD2L ("[T]he amount of area covered by the surface of something."). And, when considered in context, it is evident that "surface area" refers to area at the rear end of a weapon that permits it to be shouldered like a traditional rifle. *See* 88 Fed. Reg. 6,529 ("Under the final rule, any device or extension on the rear of the firearm that provides any surface area that allows for shouldering of the weapon is to be considered first[.]"); *see also JetPay Corp. v. IRS*, 26 F.4th 239, 241–42 (5th Cir. 2022) ("[W]ords . . . must be read in their context and with a view to their place in the overall statutory scheme."). The Rule includes dozens of pictures and graphics illustrating the surface area the Rule is concerned with—clarifying any remaining ambiguity. *See* 88 Fed. Reg. 6,523–29 (photos and graphics comparing rear-end surface area of traditional rifles, weapons equipped with stocks, and weapons equipped with stabilizing braces).

Second, the objective design factors considered at step two pose no problem. Courts have clarified that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather, the indeterminacy of precisely what that fact is," and courts have struck down statutes tying criminal culpability to "wholly subjective judgments," such as whether conduct is "annoying" or "indecent." *United States v. Williams*, 553 U.S. 285, 306 (2008); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). Here, the factoring criteria are not indeterminate and instead present "clear questions of fact." *Williams*, 553 U.S. at 306. Unlike whether conduct is "annoying," the objective design factors focus on factual

24

determinations, such as whether a weapon has a weight, length, or length of pull consistent with similarly designed rifles, or is equipped with sights or a scope requiring the weapon to be fired from the shoulder. *See* 88 Fed. Reg. 6,480. And the factors "establish minimal guidelines to govern . . . enforcement" such that they do not encourage arbitrary and discriminatory enforcement. *Kolender*, 461 U.S. at 357–58. "To be sure, it may be difficult in some cases to determine" whether one or more factors support that a firearm is properly classified as a short-barreled rifle; however, courts and juries regularly pass on questions of design and intent, and that there may be close cases does not render the Rule unconstitutionally vague because "[c]lose cases can be imagined under virtually any [enactment]." *Williams*, 553 U.S. at 306. Indeed, Plaintiffs can hardly protest that the Rule is more problematic than the status quo *ex ante*, when ATF's approach to applying the statutory definition was harder to discern.

Additionally, in evaluating a challenge to an enactment, "a federal court must, of course, consider any limiting construction that a[n] . . . enforcement agency has proffered." *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (considering licensing guidelines prepared by village attorney). Even assuming there is any vagueness with respect to the term "surface area" or any of the other factors, ATF has cured that vagueness with additional guidance. ATF has issued commercial and non-commercial guidance identifying specific firearm-brace combinations it considers short-barreled rifles. *See* ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ; *see also* ATF, *Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, https://perma.cc/JZB3-9CUY. Further still, the Rule specifies that "to the extent an individual is unsure about whether a particular firearm with a particular attached 'stabilizing brace' constitutes a rifle, that individual is free to request a classification determination from ATF for additional clarity." 88 Fed. Reg. 6,552; *see also Village of Hoffman Ests.*, 455 U.S. at 498 (law subject to less strict vagueness test when party may "clarify the meaning of the regulation by its own inquiry"). And the Rule provides for a 120-day compliance period for regulated

25

parties to work through any ambiguities and come into compliance. *See id.* 6,480–81.

Therefore, the Rule "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and given the abundance of guidance ATF has provided, the Rule does not present a situation in which a vague law "may trap the innocent by not providing fair warning." *Village of Hoffman Ests.*, 455 U.S. at 498 (citations omitted). The Rule is not void for vagueness.

**C.     The Rule does not infringe Second Amendment rights.**

Plaintiffs likewise fail to demonstrate any likelihood of success on the merits of their Second Amendment claim. The Rule does not implicate the right to bear arms for three independent reasons. First, stabilizing braces do not constitute "bearable arms," meaning that Plaintiffs lack a Second Amendment right to use them. Second, the basic firearm registration requirements set forth in the NFA and manifested in the Rule do not implicate the right to bear arms. Third and finally, short-barreled rifles constitute dangerous and unusual weapons, and the Second Amendment does not reach the use of such weapons. Moreover, even if the Rule somehow touched on Plaintiffs' right to bear arms, a robust history and tradition of firearm regulation supports the Rule.

1.   Firearm braces are not bearable arms, so their use is not protected by the Second Amendment.

Under *District of Columbia v. Heller*, the Second Amendment extends only to "instruments that constitute bearable arms." 554 U.S. 570, 582 (2008); *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (same). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm[ ].'" *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *see also see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

26

Because the Second Amendment protects only the right to use "bearable arms," laws and regulations that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a short-barreled rifle—when making a firearm equipped with a "silencer."[12] Courts have uniformly held that because "[a] silencer is a firearm accessory . . . it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *see also United States v. Al-Azhari*, No. 8:20-CR-206-T-60AEP, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020) (same). Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm[,]" and "a firearm remains an effective weapon without a silencer of any type attached." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4-*5 (D. Md. Sept. 20, 2019). Accordingly, the Second Amendment does not reach the use of silencers as attachments to firearms. *See id.* (collecting cases).

Stabilizing braces fall outside the scope of the Second Amendment for these same reasons. Pistol braces are not themselves weapons or arms, and they serve no useful purpose except as attachments to firearms. And as Plaintiffs admit, their firearms remain effective without any brace attached. For instance, Mr. Kroll avers that he uses a "stabilizing brace because it makes my firearm more accurate and therefore safer when firing from one hand." Declaration of Shawn Kroll, ECF No. 15-1 ¶ 8. But while Plaintiffs may wish to use a brace to "improve the usage of a firearm," the brace itself is not a bearable weapon, nor necessary for the functioning of the firearm to which it is attached, and so the attachment of firearm braces is "not protected by the Second Amendment." *See Hasson*, No. GJH-19-96, 2019 WL 4573424, at *5. Plaintiffs' Second Amendment claim fails for this reason alone.

---

[12] "Silencer" is defined by statute to include "any device for silencing, muffling, or diminishing the report of a portable firearm," as well as "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).

2.   Registration of short-barreled rifles does not implicate the Second Amendment.

The Rule does not ban any firearms; to the contrary, pursuant to the NFA, the Rule explicitly permits possession of short-barreled rifles upon registration with, and approval by, ATF.

Although Plaintiffs aver that their "Second Amendment rights are in peril," PI Mot. at 29, they fail to explain why that is the case. In fact, Plaintiffs concede that they may lawfully maintain possession of their firearms if they simply "register the firearm as an NFA firearm by submitting the ATF Form 1" and receive approval from the ATF. Compl. ¶ 43. Plaintiffs also concede that they are not subject to any tax obligation under the Rule. *Id.* Plaintiffs are thus left to argue, as their sole apparent constitutional injury, that they "do not want to be listed in a national firearms database, as would be required if they registered their pistols with the ATF." *See* Compl. ¶ 45. Despite submitting declarations, Plaintiffs fail to explain why they do not want to be "listed," nor do Plaintiffs squarely allege that inclusion in the National Firearms Registration and Transfer Record, or the requirements to do so, violate the Second Amendment. *Cf.* PI Mot. at 29. And mere subjective opposition to Government action falls far short of Article III injury. *See Westfall v. Miller*, 77 F.3d 868, 872 (5th Cir. 1996) ("Just because Westfall does not like the firearms regulation does not give him standing to complain about its legality."); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 (1992) (holding that a "generally available grievance about government" does not support standing).

Moreover, generously assuming that Plaintiffs intend to argue that the NFA registration process itself constitutes a Second Amendment violation, such an argument would be meritless. Routine firearm registration procedures, such as those required here, do not violate the right to bear arms.[13] As the Fifth Circuit previously explained, requirements which are part and parcel of the NFA,

---

[13] Plaintiffs do not allege that any potential, future application would be denied, and indeed such a speculative allegation would not establish constitutional injury. The Fifth Circuit has repeatedly held that concern regarding future denial of a firearm certification or registration is insufficient to demonstrate Article III standing. *See Westfall*, 77 F.3d at 872 ("[C]ompletion of the statutory procedure

such as being "photographed and fingerprinted" do not harm any a legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens bear as ancillary to living under a government." *Bezet*, 714 F. App'x at 340; *see also Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, distinguishing laws imposing "minor inconveniences" from those amounting to "an absolute deprivation" of the right to bear arms).

Indeed, Justice Kavanaugh reiterated in his *Bruen* concurrence that 43 states employ concealed-carry licensing regimes that may demand "fingerprinting, a background check, a mental health records, check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." 142 S. Ct. at 2162 (Kavanaugh, J., concurring). He explained that these licensing regimes, which used "objective licensing requirements," created no Second Amendment violation. *Id.* And the majority's opinion took pains to note this point. *Id.* at 2138 n. 9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of such licensing regimes). Similarly, the NFA's application procedure uses certain features that posed no constitutional problem in *Bruen*, such as fingerprinting and a background check. If such procedures create no constitutional infirmity when employed by state governments, the same holds true for federal registration. *Accord Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (holding constitutional, under *Bruen*, state firearms permit requirement that includes a "background check, fingerprinting, a mental health check, and training in firearms").

Nor can Plaintiffs show the extraordinary circumstances left open by the *Bruen* Court whereby otherwise constitutional licensing could infringe on the Second Amendment, namely instances where

---

necessary to establish Westfall's injury."); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017) (unpublished) ("A plaintiff wishing to challenge [firearm] certification laws must generally exhaust his certification options before suing in federal court. Otherwise, his 'inaction' caused his own injury." (citation omitted)).

29

registration requires "lengthy wait times" or "exorbitant fees" which effectively "deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n. 9. The specific length of time required for registration here is irrelevant to Plaintiffs' Second Amendment claim, because if Plaintiffs submit their application on or before May 31, 2023, they may properly retain possession of their firearms until receipt of "a response from ATF on [the] application." 88 Fed. Reg. at 6,559. Similarly, the Rule imposes no tax obligations on Plaintiffs at all, if their applications are timely filed. Compl. ¶ 43. In sum, Plaintiffs put forward no argument as to why registration itself constitutes a Second Amendment violation, and any such argument would lack support.

3.   Short-barreled rifles are dangerous and unusual weapons, and their use is not protected by the Second Amendment.

While the Court need not even reach this issue for the reasons set forth above, the Second Amendment is not implicated for the final reason that there is no right to bear dangerous and unusual arms, such as short-barreled rifles. In *Heller* the Supreme Court explained that the "historical understanding" of the Second Amendment does not encompass "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." 554 U.S. at 625.

Plaintiffs attack at length *Cox*, *see* PI Mot. at 16, which squarely found that short-barreled rifles are dangerous and unusual weapons and so are not protected by the Second Amendment, 906 F.3d at 1185; 88 Fed. Reg. at 6,548. While *Cox* remains persuasive and good law, Plaintiffs fail to acknowledge precedent from *this* Circuit on dangerous and unusual weapons. Indeed, the lodestar decision in this Circuit on "dangerous and unusual" weapons is *Hollis*. There, the Court of Appeals held that machine guns are both dangerous and unusual, and as a result "do not receive Second Amendment protection." 827 F.3d at 451. This Court should follow the analytical approach used in *Hollis* and reach the same conclusion with regard to short-barreled rifles.

The *Hollis* court first evaluated dangerousness and found "persuasive to its analysis" precedent holding that unlawful possession of a machine gun constitutes a crime of violence for purposes of a

30

sentence enhancement. *Id.* at 449. That very precedent explains how the same conclusion applies to all firearms specifically identified in the NFA, including short-barreled rifles. *See United States v. Golding*, 332 F.3d 838, 843 (5th Cir. 2003). In addition, *Hollis* relied on decisions from other courts that agreed that machine guns are dangerous and so fall outside the Second Amendment's coverage. 827 F.3d at 448. And just as with the machine guns in *Hollis*, courts have uniformly agreed that the inherent dangerousness of short-barreled rifles places them beyond the ambit of the Second Amendment. *See, e.g., Cox*, 906 F.3d at 1185 (holding that "possession of short-barreled rifles falls outside the Second Amendment's guarantee," given dangerousness of such weapons, because their "concealability fosters [their] use in illicit activity") (citation omitted); *see also Thompson/Center Arms*, 504 U.S. at 517 (observing that a short-barreled rifle is a "concealable weapon" that is "likely to be used for criminal purposes").[14]

The Rule echoes these decisions, noting that "[s]hort-barreled rifles specifically are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy." 88 Fed. Reg. at 6,499. For all the above reasons, under the analysis required by *Hollis*, short-barreled rifles constitute dangerous weapons.

The *Hollis* court found that machineguns are also unusual firearms. Noting that courts have taken different approaches in determining "usualness," *Hollis* looked to Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves,

---

[14] *See also United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (approving jury instructions that an individual does not have a Second Amendment right to possess a short-barreled rifle, and observing that, "[u]nder *Heller*, individuals still do not have the right to possess machineguns or short-barreled rifles"); *United States v. Gonzalez*, No. 2:10–cr–00967, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011) ("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection.'" (quoting S. Rep. No. 90–1501, at 28 (1968))); *United States v. Majid*, No. 4:10CR303, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010) ("[T]he short-barrel AR–15 is not a weapon that is typically possessed by law-abiding citizens for lawful purposes.").

at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50.

Plaintiffs simply stop at the first step, however, arguing only that the number of short-barreled rifles in use precludes their classification as unusual. But even this abbreviated argument is in error. PI Mot. at 18. Even generously assuming that there are now approximately 3.6 million short-barreled rifles in use in the United States (641,000 previously registered short-barreled rifles and 3 million firearms with braces attached), that falls far short of the requisite thresholds referenced by the Fifth Circuit. *See Hollis*, 827 F.3d at 449–50 (comparing numbers of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR and AK-platform semi-automatic rifles"). Here, the number of short-barreled rifles is far below even the lower of the benchmarks cited by the Fifth Circuit.

And the Fifth Circuit also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of firearms at issue. *Id.* at 449. Conservatively estimating that there are approximately 400 million civilian-owned firearms in the United States, the number of short-barreled rifles amounts to less than one percent of this amount (0.9%).[15] Where, as here, the relative number and percentage of firearms at issue is "quite low," *Hollis*, 827 F.3d at 450, there is little question that the weapon at issue is unusual.

Moreover, *Hollis* explicitly rejected the argument that the "absolute number [of firearms] by itself was sufficient" in *Caetano* to determine usualness. *Id.* Rather, the Fifth Circuit looked also to the

---

[15] *See* Christopher Ingraham, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, The Washington Post, (June 19, 2018 at 10:31am EDT) https://perma.cc/LNE7-8TZQ (citing 2018 study estimating 393 million civilian-owned firearms in the United States). Total current firearm ownership is likely far higher than 400 million, as consumers have purchased nearly twenty million firearms *per year* in recent years. *See* Joe Walsh, *U.S. Bought Almost 20 Million Guns Last Year — Second-Highest Year On Record*, Forbes (Apr. 14, 2022 at 2:05pm EDT) https://perma.cc/TVS8-NNVW (citing estimates that 19.9 million firearms were purchased in 2021 and 22.8 million were purchased in 2020).

number of states where machine guns could be "lawfully possessed." *Id.* Specifically, the Court added together states in which machine guns were "entirely ban[ned]," and states where machine guns are banned "unless the weapon is legal under federal law." *Id.* Concluding that 34 states "prohibit possessing machineguns," the Fifth Circuit found this to be further support that machine guns are unusual. *Id.* There are a similar number of prohibitory laws concerning short-barreled rifles; at least four states ban short-barreled rifles entirely, and 24 states ban short-barreled rifles unless properly registered under the NFA.[16] Given that possession of short-barreled rifles is prohibited by state law to an extent similar to that of machine guns, such stringent regulation further supports a finding that such firearms are unusual. In sum, short-barreled rifles are dangerous and unusual weapons, which fall outside the Second Amendment.

    4.   Historical tradition of regulation supports the Rule.

While the Rule does not implicate the Second Amendment, even if the right to bear arms was affected here, the Rule and the Acts are constitutional because they rest upon centuries of similar taxation and registration requirements.

Plaintiffs critique the Rule for not providing a fulsome recounting of the "[n]ation's historical tradition of firearm regulation," PI Mot. at 16, but agencies are not required to anticipate regulatory challenges and provide all possible responses thereto. But regardless, ATF explained in the preamble in detail that the Rule did not violate the Second Amendment, and Defendant expands on and amplifies such arguments here. 88 Fed. Reg. at 6,548, 6,554; *see also Nat'l Elec. Mfrs. Ass'n v. Dep't of*

---

[16] *See* Cal. Penal Code § 16590; D.C. Code Ann. § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8.; Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann §§ 16-11-122, 16-11-121(4); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

*Energy*, 654 F.3d 496, 514–15 (4th Cir. 2011) (noting that agencies may make "more sophisticated legal arguments" in litigation beyond the reasoning the agency used to justify its decision).

Where a regulation affects the Second Amendment, the Government may justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Government may do so by pointing to "a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar," meaning that they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132-33. This historical analysis can be "nuanced," particularly in "cases implicating unprecedented societal concerns or dramatic technological changes," where it is especially important to account for the fact that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Indeed, colonial and early state governments regularly sought to gather information regarding firearm ownership in their jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition."[17] Likewise, door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[18] In a similar vein, militia members in Massachusetts (1775) were required to have their

---

[17] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts ~~174, Acts of February 24th, 1631, Act LVI~~175.
[18] *See* ~~Order of the Governor and Council, March 28, 1667, in John Russell Bartlett, ed.,~~ *Records of the Colony of Rhode Island and Providence Plantations* ~~(~~*, In New England*, 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857~~, 2:196~~));; "An Act for the better regulating

**Formatted:** Footnote Text

firearms inspected, with an official record documenting all such inspections, and New York (1778) imposed similar requirements, with the required inspections performed at the owner's expense.[19] [20] In 1805 Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to insure their safe condition, as did and Maine enacted similar requirements in 1821.[21] Licenses or inspection were also required in certain states to transport export or sell gunpowder (akin to modern ammunition), such as in Massachusetts (1651, 1823 1809), Connecticut (1775), and New Hampshire (1830 1820).[22] South Carolina authorized the issuance of licenses for the sale of pistols (1893 1890).[23]

---

of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:645; "An 647; Act for the regulating, training, and arraying of the Militia," Jan. 8, 1781, New Jersey Session ch. XII, § 13, 1781 N.J. Laws, ch. XIII, § 1 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).

[19] 1775-1776 Mass. Acts at 18; Acts of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws at 62.

[20] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.

[21] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259-61 (1807); Laws of the State of Maine 546 (1830).

[22] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 15 The Public Records of the Colony of Connecticut 191 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823)); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

[23] 1893 S.C. Acts 426; An Act To Amend An Act Entitled "An Act To to Provide For A a License For The for the Sale Of of Pistols Or or Pistol Cartridges Within The within the Limits Of This of this State", § 2. Also, multiple states, § 1, 1890 S.C. Acts 653. Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)). Other states, including Texas (1871), Kansas (1872), Wyoming (1875), and Tennessee (1879), and Arkansas (1881) enacted prohibitions or other restrictions on the carrying of pistols. *See* Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231; Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)).

And personal firearm licenses for sporting purposes were required in Hawaii (1870) and Wyoming (1899).[24]

Further, while Plaintiffs are exempt from the NFA's tax here, the tax is supported by multiple historical statutes. ~~In 1759~~ New Hampshire ~~imposed~~required that certain ships pay a tax ~~on the importation~~ of money or gunpowder ~~in 1759,[25] and New York City enacted a similar gunpowder tax in 1763.[26]~~[27] Taxes on firearms specifically were common through the 19th century. Indeed, taxes were specifically levied on pistols, and in some instances certain other firearms, in Alabama (~~1837~~1867), Mississippi (1844, 1867), North Carolina (~~1856, 1858~~1857), and Georgia (1866).[28]

Taken together, the above laws illuminate an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *See Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the modern NFA and its corresponding regulations seek to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Accordingly, any modest burden imposed by the NFA's taxation and registration is certainly "comparable" and "comparably justified"

---

[24] An Act to License the Carrying of ~~Mar. 16~~Fowling Pieces and other Fire-Arms, 1870, ~~no. 68, § 3, sixth, 1870 La. Acts 126, 127~~ Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

[25] ~~1759-1776 N.H. Laws 63, An Act About Powder Money.~~

[26] ~~Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Page 18-19 (1763). Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).~~

[27] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[28] ~~Lands, and Granting Donations Thereof to the State Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources; 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15; Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27, 27-28;~~ Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

to the numerous historical laws listed above. Given this history and tradition, there is no constitutional violation and Plaintiffs' claim necessarily fails.

**D.      The Rule does not violate the major questions doctrine.**

Plaintiffs argue that the Rule violates the separation of powers because it "re-writes" rather than interprets the statutory definition of "rifle" and runs afoul of the "major questions doctrine." PI Mot. at 19–21. As an initial matter, this "constitutional" claim is nothing more than Plaintiffs' statutory objections dressed up in constitutional garb, and thus fails for the same reasons. *See supra* pp. 12–21. ATF's straightforward determination whether weapons are governed by the NFA and GCA is an executive function clearly mandated by Congress, and one ATF has performed for decades. Nothing about this undertaking even hints at implicating the separation of powers.

In any event, Plaintiffs' reliance on the "major questions doctrine," *see* PI Mot. at 12–20, is misplaced for several reasons. *First*, this doctrine applies only "in certain extraordinary cases" that involve "decisions of vast economic and political significance," assertions of "extravagant statutory power over the national economy," or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022). ATF's Rule interpreting the statutory definition of "rifle" as it relates to firearms classifications under the NFA—its bread and butter—bears none of these features, either as a matter of reach or impact.

*Second*, Plaintiffs fail to acknowledge that the major questions principles are relevant only when an administrative action involves a "novel" or "unprecedented" interpretation of regulatory authority involving "ancillary" statutory provisions. *See id.* at 2605; *accord Utility Air Regul. Grp.*, 573 U.S. at 324 (2014) (considering whether an agency action represents an "enormous and transformative expansion in [the agency's] regulatory authority"). But nothing of the sort happened here. ATF has for over half a century exercised clear delegated authority in issuing rules interpreting and clarifying statutory terms

within the NFA and the GCA. Consistent with that longstanding practice, the Rule simply amends existing regulations to clarify for the regulated community ATF's understanding of the proper application of one specific statutory phrase. The delegations permitting ATF to do so are not modest, vague, or subtle. 8 U.S.C. § 926(a); 26 U.S.C. § 7805(a); 28 C.F.R. § 0.130(a). Thus, interpreting these statutory definitions can hardly be described as an "enormous and transformative expansion [in the agency's] regulatory authority," *see Utility Air Regul. Grp.*, 573 U.S. at 324, resting on an "ancillary provision," *see West Virginia*, 142 S. Ct. at 2605.

*Third*, before applying "major questions" principles, the Supreme Court has considered whether the challenged action is within the agency's traditional field of expertise, *see id.* at 2612–13, whether it intrudes on matters typically governed by state law, *id.* at 2606, and whether Congress has expressly considered and rejected the measure in the past, *Brown & Williamson*, 529 U.S. at 159–60. None of these factors is present here, and Plaintiffs argue nothing to the contrary. For these reasons, the Rule does not violate the major questions doctrine.

### E.       The NFA does not violate the nondelegation doctrine.

Plaintiffs argue that the NFA violates the Constitution's nondelegation doctrine if the statute authorizes the Executive Branch to promulgate the Rule. PI Mot. at 21–22. As an initial matter, their argument again rests on the assertion that the Rule "re-write[s]" the statutory definition of "rifle"—something it plainly does not do. *See supra* pp. 12–21. Because the Rule merely clarifies the meaning of a statutory term—and is not an exercise of legislative rulemaking authority—there cannot be a delegation concern at issue here. *See Touby v. United States*, 500 U.S. 160, 164–65 (1991) (explaining that the nondelegation doctrine is a constitutional limitation on the delegation of "legislative power").

At any rate, the NFA's delegation of authority fits comfortably within the bounds of constitutionally permissible delegations. Congress may lawfully delegate decision-making authority if it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to

38

exercise the delegated authority is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Id.* at 372–73 (citation omitted). This standard is so deferential that the Supreme Court has struck down congressional delegations only twice—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (citation omitted). Since then, the Supreme Court has upheld, "without deviation, Congress' ability to delegate power under broad standards." *Mistretta*, 488 U.S. at 373; *Gundy*, 139 S. Ct. at 2129 (collecting cases).

In light of this longstanding precedent, the statute at issue here reflects an intelligible principle that falls well within permissible bounds. As explained, the NFA sets forth a policy: the enforcement of specific federal controls (*e.g.*, registration; taxation) for eight categories of highly dangerous and concealable weapons to curtail their criminal misuse. *See, e.g.*, 26 U.S.C. §§ 5811–12, 5821–22, 5841, 5845(a). The statute authorizes the Attorney General to issue rules and regulations to ensure those controls are enforced in that narrow, definable context. *Id.* at § 7805(a). By delineating the type of weapons that are subject to its specific requirements, the NFA establishes a clear boundary for the Executive Branch's actions and compares favorably to other congressional delegations that have been sustained against challenges under the nondelegation doctrine. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (listing cases).

Given that the Supreme Court has "over and over upheld even very broad delegations," like ones requiring an agency merely "to regulate in the 'public interest,'" the NFA unquestionably passes the "intelligible principle" test, and has for decades. *See Gundy*, 139 S. Ct. at 2129 (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943)). Plaintiffs provide no basis to conclude otherwise.

**II.    Plaintiffs will not suffer irreparable harm in the absence of an injunction.**

Plaintiffs have also failed to show that they are likely to suffer irreparable harm, an "'indispensable' requirement for a preliminary injunction." *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted); *accord Sampson v. Murray*, 415 U.S. 61, 88 (1974). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (citation omitted), and must be "so imminent that there is a clear and present need for equitable relief to prevent" it. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must substantiate any claim or irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). In addition, a plaintiff "must show that the alleged harm will directly result from the action which [he] seeks to enjoin."* Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Here, Plaintiffs argue that their "Second Amendment rights are in peril, and they certainly meet the criteria for issuance of the preliminary injunction." PI Mot. at 29. They offer no further evidence of irreparable harm outside of these allegations.

Defendant agrees with the general proposition that if a plaintiff demonstrates a constitutional violation, no further irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). But here, Plaintiffs have shown no likelihood of success on the merits of their constitutional claim, and this baseless claim cannot give rise to a cognizable injury. *See supra* pp. 26–36. As the Fifth Circuit held in *Google, Inc. v. Hood*, a preliminary injunction is inappropriate "unless the party seeking it can demonstrate that '[constitutional] interests are either threatened or in fact being impaired at the time relief is sought.'" 822 F.3d 212, 227–28 (5th Cir. 2016) (citation omitted). The mere "invocation of

40

the [Constitution] cannot substitute for" a plaintiff's obligation to show "the presence of an imminent, non-speculative irreparable injury" that will occur absent preliminary relief. *Id.* at 228.

Although the Fifth Circuit held in *Opulent Life Church v. City of Holly Springs* that allegations of *First Amendment* violations were sufficient to show irreparable harm where a likelihood of success on the merits was shown on a separate claim, the Fifth Circuit has not extended this holding outside of the First Amendment to apply more broadly to all allegations of a constitutional violation. 697 F.3d 279, 294–97 (5th Cir. 2012). And since then, a number of courts have expressly declined to find that the irreparable-harm requirement is automatically satisfied by a plaintiff's allegation that his constitutional rights have been violated. *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 884 (S.D. Tex. 2019) ("As Petitioners have not established a violation of their constitutional or statutory rights, they fail to demonstrate an irreparable injury."); *Castro v. City of Grand Prairie*, No. 3:21-CV-885-L, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021) (holding that a plaintiff's allegations that he had "suffered irreparable harm, including the loss of his constitutional rights," was "conclusory and insufficient to satisfy his burden as the movant" to show irreparable harm); *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022) (declining to assume the presence of irreparable harm where the court was "not yet convinced" that a constitutional violation had been shown).

*VanDerStok v. Garland*, --- F. Supp. 3d ---, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) and *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, No. 6:22-cv-01934, 2022 WL 2960031 (W.D. La. July 26, 2022), cited by Plaintiffs, do not show otherwise. Importantly, neither court found that an alleged constitutional violation was sufficient to show irreparable harm. Rather, both courts found irreparable harm based on some additional showing. *VanDerStok*, 2022 WL 4809376, at *5 (fear of criminal prosecution); *Horseracing Integrity & Safety Auth. Inc.*, 2022 WL 2960031, at *13 (insufficient time for public comments). Because Plaintiffs have not established a likelihood of success on the merits of their constitutional claim, and they make no argument for irreparable harm outside of these

41

alleged constitutional injuries, these cases, to the extent they are otherwise persuasive, are not analogous.

Moreover, allowing Plaintiffs' allegations to categorically satisfy their showing of irreparable harm would violate well-established principles that mere speculation and conclusory allegations are insufficient to show irreparable harm. *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013); *accord Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991); *Lambert v. Bd. of Comm'rs of Orleans Levee Dist.*, No. 05-5931, 2006 WL 8456316, at *7 (E.D. La. Mar. 22, 2006) ("such a categorical approach to the irreparable harm question is inappropriate"); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that, to show irreparable harm based on loss of constitutional rights, a movant must show likely success on the merits). The speculative and conclusory nature of Plaintiffs' alleged injury should the Rule remain in effect is further confirmed by the fact that each of the NFA's consequences for the possession of a short-barreled rifle are provided by statute—not the Rule itself. *See supra* pp. 15–16.

Because Plaintiffs have not established a likelihood of success on the merits of their Second Amendment claims, the conclusory allegation that their constitutional rights are in peril is insufficient to establish an irreparable injury, and no injunction should issue.[29]

**III.    The equities and the public interest weigh against a preliminary injunction.**

---

[29] Plaintiffs do not assert that any taxes due under the NFA or fear of criminal prosecution for possession of an unregistered short-barreled rifle are causing them irreparable harm. *See* PI Mot. at Part II. Were they do to so, the arguments would be untimely. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."). Regardless, any taxes Plaintiffs may owe under the NFA do not constitute irreparable harm because Plaintiffs can request and/or sue for a refund if the Rule was later invalidated or it otherwise determined that the tax was not properly owed. 26 U.S.C. § 7422. This "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90. Nor would the fear of criminal prosecution constitute irreparable harm because such fears are not well-founded, and the cost of complying with the NFA is *de minimis. Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam).

As Plaintiffs acknowledge, the third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decidedly against the issuance of a preliminary injunction here.

In particular, leaving the Rule in place benefits public safety. Congress passed the NFA for the express purpose of regulating specific firearms, like short-barreled rifles, which Congress determined posed a greater risk to public safety, as "gangster type" weapons of an especially unusual and dangerous nature. 88 Fed. Reg. at 6,566. The Rule makes clear ATF's understanding that a firearm cannot evade the short-barreled rifle classification under the NFA if it has objective design features that indicate (or if there are marketing materials or other information demonstrating likely use in the general community that indicate) it is designed, made, and intended to be fired from the shoulder and has a barrel length of less than 16 inches. *See id.* at 6556. The risk posed to public safety by these weapons was identified by Congress, and this Rule functions to prevent the circumvention of the NFA. *Id.* The Rule thus enhances public safety supporting the enforcement of the laws passed by Congress to address these risks. Plaintiffs' request to enjoin the Rule would, conversely, decrease public safety and facilitate the circumvention of the NFA. Any harm to Plaintiffs in complying with the NFA's registration requirements is, by comparison, minimal.

For these reasons, the balance of harms and public interest weigh against granting an injunction in this case.

## IV.    In all events, any relief should be limited to redress Plaintiffs' alleged injuries.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs' alleged injuries. Thus, at most, any preliminary injunction must be limited to prohibiting ATF from enforcing the relevant requirements against Plaintiffs. But Plaintiffs ask the Court to enter a preliminary injunction "prohibiting Defendant from implementing

43

and enforcing" the Rule, with no apparent limitation. Pls.' Mot. for Prelim. Inj., ECF No. 14. No such relief is warranted, however. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (citation omitted). Nationwide injunctions, on the other hand, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). Furthermore, the Rule has been challenged in numerous other cases, underscoring why this Court should not attempt to decide its legality for all parties. *See Firearms Regulatory Accountability Coalition, Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Mock v. Garland*, No. 3:23-cv-232 (N.D. Tex.); *Second Amendment Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (N.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary relief.

Dated: February 28, 2023    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Michael Drezner*
MICHAEL DREZNER (VA Bar No. 83836)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
FAITH E. LOWRY (TX Bar No. 24099560)

44

TAYLOR PITZ (CA Bar No. 332080)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-4505
Email: Michael.L.Drezner@usdoj.gov

*Attorneys for Defendant*

45

**CERTIFICATE OF SERVICE**

On February 28, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Michael Drezner*

Trial Attorney
U.S. Department of Justice

46