**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC., STATES OF WEST VIRGINIA, NORTH DAKOTA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MERRICK B. GARLAND, *et al.*, <br><br> Defendants. | <br><br><br><br><br> Civil Action No. 1:23-cv-00024-DLH-CRH |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

      A.    The NFA And GCA Impose Heightened Controls On Specific Firearms. .................................................................................................... 3

      B.    For A Decade, ATF Allows Pistols Equipped With Stabilizing Braces To Be Sold To Millions Of Americans Without NFA Or GCA Controls. ................................................................................................ 4

      C.    ATF Reverses Course And Issues The Rule. ................................................ 5

      D.    ATF Issues Dozens Of Adjudications, Expressly Outlawing Guns Equipped With The Most Popular Stabilizing Braces In The Country. ....................................................................................................... 7

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT .................................................................................................................... 8

    I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ....................... 8

      A.    The Rule Exceeds ATF's Statutory Authority. ............................................ 8

          1.    The Statutes Regulate Rifles With Short Barrels And Weapons Made From Rifles, Not Pistols Equipped With Stabilizing Braces. 8

          2.    The Rule Regulates Pistols Equipped With Stabilizing Braces.... 10

          3.    The Rule Violates The Rule Of Lenity. ........................................ 18

      B.    The Factors Adopted By The Rule Are Otherwise Unlawful. .................. 21

          1.    The Factors Are Holistically Arbitrary. ....................................... 22

          2.    The Factors Are Individually Arbitrary. ....................................... 24

          3.    The Cost-Benefit Analysis Is Arbitrary. ....................................... 30

          4.    The Rule Is Impermissibly Retroactive. ....................................... 32

      C.    The Adjudications Are Unlawful And Confirm The Rule Is Arbitrary. .................................................................................................... 33

          1.    ATF Cannot Simultaneously Issue Adjudications On Specific Firearms Contemporaneously With The Rule. ............................. 33

          2.    The Adjudications Apply A Rule That Is Contrary To The Statutory Text. ........................................................................... 34

          3.    The Adjudications Are Not Reasonably Explained. ..................... 35

          4.    The Adjudications Confirm That The Rule Is Arbitrary. ............. 35

II.      PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN
         INJUNCTION.................................................................................................36

III.     THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR
         GRANTING AN INJUNCTION. .........................................................................39

CONCLUSION.................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
    573 U.S. 169 (2014)........................................................................................7

*Am. Airlines, Inc. v. C. A. B.*,
    359 F.2d 624 (D.C. Cir. 1966)........................................................................34

*Am. Petroleum Inst. v. OSHA*,
    581 F.2d 493 (5th Cir. 1978)..........................................................................32

*ANR Storage Co. v. FERC*,
    904 F.3d 1020 (D.C. Cir. 2018)..........................................................26, 29, 30

*Ass'n of Nat'l Advertisers, Inc. v. FTC*,
    627 F.2d 1151 (D.C. Cir. 1979)......................................................................34

*Avitabile v. Beach*,
    368 F. Supp. 3d 404 (N.D.N.Y. 2019).............................................................21

*Baker Elec. Co-op., Inc. v. Chaske*,
    28 F.3d 1466 (8th Cir. 1994).....................................................................37, 38

*Bezet v. United States*,
    276 F. Supp. 3d 576 (E.D. La.).......................................................................10

*Bostock v. Clayton Cnty., Ga.*,
    140 S. Ct. 1731 (2020)....................................................................................10

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)........................................................................................32

*Bus. Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011)......................................................................32

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018)..........................................................................37

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023).................................................................. *passim*

*Chamber of Commerce v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005)........................................................................32

*Citizens Telecomms. Co. of Minn., LLC v. FCC*,
    901 F.3d 991 (8th Cir. 2018) ......................................................................30, 31

*Cohen v. California*,
    403 U.S. 15 (1971) ...........................................................................................29

*D.M. by Bao Xiong v. Minnesota State High Sch. League*,
    917 F.3d 994 (8th Cir. 2019) ......................................................................39, 40

*Dakotans for Health v. Noem*,
    52 F.4th 381 (8th Cir. 2022) ...............................................................................8

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
    640 F.2d 109 (8th Cir. 1981) ..............................................................................8

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) .....................................................................................35

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...............................................................................31, 35

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .........................................................................................21

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975) .........................................................................................37

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .........................................................................................35

*Forsyth Mem'l Hosp., Inc. v. Sebelius*,
    652 F.3d 42 (D.C. Cir. 2011) ...........................................................................34

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,*
    *LLC*, 140 S. Ct. 1637 (2020) ..............................................................................9

*Ghattas v. United States*,
    40 F.3d 281 (8th Cir. 1994) ..............................................................................33

*Grace Healthcare of Benton v. HHS*,
    603 F.3d 412 (8th Cir. 2009) ..............................................................................8

*Greater Missouri Med. Pro-Care Providers, Inc. v. Perez*,
    812 F.3d 1132 (8th Cir. 2015) ..........................................................................34

*Guedes v. ATF*,
    140 S. Ct. 789 (2020).......................................................................................20

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ..................................................................................10, 16

*Innovator Enters., Inc. v. Jones,*
  28 F. Supp. 3d 14 (D.D.C. 2014) ...........................................................23, 26, 28

*Iowa Utils. Bd. v. FCC,*
  109 F.3d 418 (8th Cir. 1996) ......................................................................37, 38

*Johnson v. Minneapolis Park & Recreation Bd.,*
  729 F.3d 1094 (8th Cir. 2013) ............................................................................39

*Kearney Reg'l Med. Ctr., LLC v. HHS,*
  934 F.3d 812 (8th Cir. 2019) ...........................................................25, 27, 35, 36

*Kroupa v. Nielsen,*
  731 F.3d 813 (8th Cir. 2013) ..............................................................................38

*LeMoyne-Owen Coll. v. NLRB,*
  357 F.3d 55 (D.C. Cir. 2004) ..............................................................................22

*Lomont v. O'Neill,*
  285 F.3d 9 (D.C. Cir. 2002) ..................................................................................8

*Michigan v. EPA,*
  576 U.S. 743 (2015) .............................................................................................30

*MKB Mgmt. Corp. v. Burdick,*
  954 F. Supp. 2d 900 (D.N.D. 2013) ....................................................................39

*Nebraska v. Biden,*
  52 F.4th 1044 (8th Cir. 2022) .............................................................................40

*New York State Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) ........................................................................................21

*Nken v. Holder,*
  556 U.S. 418 (2009) .............................................................................................39

*North Dakota v. EPA,*
  127 F. Supp. 3d 1047 (D.N.D. 2015) .......................................................38, 39, 40

*Ortega-Marroquin v. Holder,*
  640 F.3d 814 (8th Cir. 2011) ..............................................................................33

*Owner-Operator Indep. Drivers Ass'n v. FMCSA,*
  494 F.3d 188 (D.C. Cir. 2007) ............................................................................30

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*,
    558 F.2d 861 (8th Cir. 1977) .................................................................37, 39

*Posters 'N' Things, Ltd. v. United States*,
    511 U.S. 513 (1994)...............................................................................14

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)...............................................................................12

*Ragsdale v. Wolverine Worldwide, Inc.*,
    218 F.3d 933 (8th Cir. 2000) .................................................................18

*Record Head Corp. v. Sachen*,
    682 F.2d 672 (7th Cir. 1982) .............................................................15, 22

*Sekhar v. United States*,
    570 U.S. 729 (2013)...............................................................................20

*Serv. Oil, Inc. v. EPA*,
    590 F.3d 545 (8th Cir. 2009) .................................................................13

*Shazi v. Wilkinson*,
    988 F.3d 441 (8th Cir. 2021) .................................................................34

*Sig Sauer v. Brandon*,
    826 F.3d 958 (1st Cir. 2016)..................................................................16

*Slawson Expl. Co. v. Dep't of Interior*,
    2017 WL 7038795 (D.N.D. Nov. 27, 2017) .........................................37, 39

*Tobacco Accessories & Novelty Craftsmen Merchs. Ass'n of Louisiana v. Treen*,
    681 F.2d 378 (5th Cir. 1982) .................................................................15

*Tripoli Rocketry Ass'n v. ATF*,
    437 F.3d 75 (D.C. Cir. 2006).........................................................25, 26, 27

*U.S. Postal Serv. v. Postal Regul. Comm'n*,
    785 F.3d 740 (D.C. Cir. 2015)...............................................................22

*Union Pac. R.R. Co. v. DHS*,
    738 F.3d 885 (8th Cir. 2013) .................................................................21

*United States v. Amos*,
    501 F.3d 524 (6th Cir. 2007) .................................................................18

*United States v. Biro*,
    143 F.3d 1421 (11th Cir. 1998) .............................................................15

*United States v. Buford,*
   54 F.4th 1066 (8th Cir. 2022) ........................................................18

*United States v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ...........................................10, 17, 18

*United States v. Fix,*
   4 F. App'x 324 (9th Cir. 2001) ....................................................12

*United States v. Harris,*
   959 F.2d 246 (D.C. Cir. 1992) .......................................................3

*United States v. Kwan,*
   300 F. App'x 485 (9th Cir. 2008) ............................................14, 15

*United States v. Lim,*
   444 F.3d 910 (7th Cir. 2006) ......................................................25

*United States v. Marzzarella,*
   614 F.3d 85 (3rd Cir. 2010) ...................................................10, 17

*United States v. McGill,*
   618 F.3d 1273 (11th Cir. 2010) ...................................................11

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) .................................................................22

*United States v. One (1) Colt AR-15 Firearm Serial No. TA03524,*
   349 F. Supp. 2d 1064 (W.D. Tenn. 2004) ......................................11

*United States v. Thompson/Ctr. Arms Co.,*
   504 U.S. 505 (1992) ....................................................2, 7, 8, 14, 15

*United States v. Warren,*
   149 F.3d 825 (8th Cir. 1998) ......................................................19

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) .............................................................13, 14

*Wages & White Lion Invs., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..................................................37, 40

## Statutes and Regulations

5 U.S.C. § 551 ...............................................................................34

5 U.S.C. § 702 ...............................................................................37

5 U.S.C § 706 .................................................................................8

18 U.S.C. § 921 .................................................................................................4, 11, 12, 13

18 U.S.C. § 922 ............................................................................................................3, 4, 33

18 U.S.C. § 924 ....................................................................................................................5

18 U.S.C. § 926 ..................................................................................................................30

26 U.S.C. 5812 ...............................................................................................................3, 4

26 U.S.C. 5822 ...............................................................................................................3, 4

26 U.S.C. 5841 ...............................................................................................................3, 4

26 U.S.C. 5842 .................................................................................................................13

26 U.S.C. 5845 ............................................................................................................ *passim*

26 U.S.C. 5871 ...................................................................................................................5

26 U.S.C. 7805 .................................................................................................................30

27 C.F.R. § 478.39 ............................................................................................................33

## Legislative Materials

H.R. 9066, 73d Cong., 2d Sess. (1934).................................................................................9

H.R. Rep. No. 73-1780 (1934)..............................................................................2, 9, 10, 11

William J. Krouse, Cong. Res. Serv., *Handguns, Stabilizing Braces, and Related
    Components* (Apr. 19, 2021),
    https://crsreports.congress.gov/product/pdf/IF/IF11763...................................16, 17

## Executive Branch Materials

ATF, *Firearm Types Recovered and Traced in the United States and Territories*
    (Sept. 16, 2022), *available at* https://www.atf.gov/resource-center/firearms-
    trace-data-2021# ...........................................................................................................17

ATF, *Frequently Asked Questions For Final Rule 2021-08F* (2023),
    https://www.atf.gov/rules-and-regulations/docs/undefined/faqfinalrule2021r-
    08f-updated12523pdf/download ..................................................................................33

DOJ, *Trends and Patterns in Firearm Violence, 1993–2018* (Apr. 2022),
    https://bjs.ojp.gov/content/pub/pdf/tpfv9318.pdf ........................................................17

President's Remarks on Gun Violence Prevention Efforts,
    2021 Daily Comp. Pres. Doc. 298 (Apr. 8, 2021) ................................1, 13, 18, 24

**Other Authorities**

David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal
 Perspective*, 17 Cumb. L. Rev. 585 (1987)..........................................................8, 9

ix

**INTRODUCTION**

For more than a decade, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") authorized the public to use pistol stabilizing braces, a popular firearms accessory, without federal regulation. During that time, ATF repeatedly issued letter rulings assuring manufacturers and the public that attaching a stabilizing brace would not alter the classification of a pistol or other firearm. As a result, millions of Americans have for years lawfully purchased stabilizing braces and pistols equipped with stabilizing braces from authorized, legitimate manufacturers with ATF's full knowledge and express approval.

Then everything changed. Frustrated with congressional inaction, the President of the United States ordered ATF to abandon a decade of practice under an established statutory framework and "to treat pistols modified with stabilizing braces" as "subject to the National Firearms Act." President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3 (Apr. 8, 2021). This "change," the President said, would require an owner of a pistol equipped with a stabilizing brace to "pay a $200 fee and submit their name and other identifying information to the Justice Department" or face criminal penalties. *Ibid.*

On January 31, 2023, ATF responded with the Rule at issue here. The Rule purports to provide "factoring criteria" to "clarify" how ATF will determine whether any particular gun is subject to heightened regulation. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). In actuality, it vests ATF with unbounded discretion. And ATF has made clear exactly how it intends to exercise that discretion, estimating that, under the Rule, 99% of pistols equipped with stabilizing braces will be deemed subject to National Firearms Act ("NFA") controls. Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis, at 21 (Jan. 2023) ("Regulatory Analysis"), Compl. Ex. B. According to ATF, the "clarification" will result in the destruction or forfeiture of over 750,000 firearms and will cost

1

the private sector somewhere between two and five billion dollars.  *Id.* at 56, 62–67.  It represents an abrupt reversal of ATF's longstanding position that these items are not subject to NFA controls. And it and will require millions of Americans to choose between the loss of their lawful (and lawfully acquired) firearms, the loss of their privacy, and the risk of criminal penalties.

Incredibly, ATF now claims that this result was required all along.  But a plain reading of the statutory language, paired with an understanding of Congress's purposes in enacting it, reveals that a pistol or other firearm equipped with a stabilizing brace is excluded from the applicable definitions set forth in the NFA (as well as the Gun Control Act, or "GCA").  Congress enacted the NFA to regulate "sawed-off guns" favored by criminal "gangster[s]" for concealability and indiscriminate accuracy, and left "without any restriction" "pistols and revolvers and sporting arms."  H.R. Rep. No. 73-1780 (1934).  The Rule, by contrast, regulates pistols and other firearms based on accessories designed as orthotics that make pistols ***less*** concealable, ***more*** accurate, and ***less*** dangerous, thereby undermining public safety.  That approach is unambiguously foreclosed by the text, history, and purpose of the NFA.

If the Court disagrees, then the NFA is at least grievously ambiguous.  *See United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality) (applying rule of lenity to prevent NFA regulation of pistol sold with a shoulder stock and a 21-inch barrel); *id.* at 519 (Scalia, J., concurring); *Cargill v. Garland*, 57 F.4th 447, 469–71 (5th Cir. 2023) (applying rule of lenity to prevent NFA and GCA regulation of bump stocks).  For more than a decade, ATF maintained in repeated letter rulings and in criminal prosecutions around the country that attaching a stabilizing brace would not alter the classification of a pistol or other firearm.  Now, ATF claims that pistols with stabilizing braces have always and unambiguously been covered by the NFA.  If the agency charged with administering the NFA believed ***for years*** that pistols equipped with

stabilizing braces are not subject to NFA controls and now holds the opposite, application of the statute to such braces must at a minimum be grievously ambiguous. Lenity thus demands that the Rule be set aside to protect Plaintiffs—a coalition of businesses, States, and citizens deeply concerned with ATF's unlawful actions—from criminal liability.

Finally, the Rule and the accompanying adjudications are arbitrary and capricious on multiple counts. The Rule provides an incoherent and unworkable standard for shouldering, and the adjudications are unaccompanied by any reasoned explanation.

This Court should set aside ATF's unlawful Rule and adjudications.

## BACKGROUND

### A.   The NFA And GCA Impose Heightened Controls On Specific Firearms.

The NFA and GCA impose heightened regulatory obligations on certain guns. Under the NFA, a "firearm" is subject to making and transfer taxes and must be registered in the National Firearms Registration and Transfer Record. 26 U.S.C. §§ 5812, 5822, 5841, 5845. The NFA defines a "firearm" to include "a rifle having a barrel or barrels of less than 16 inches in length" and "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3), (a)(4). This definition enumerates certain other weapons (such as a "machinegun") but does not apply to non-enumerated weapons commonly used for lawful purposes, such as a long rifle, shotgun, handgun, pistol, or revolver. *See United States v. Harris*, 959 F.2d 246, 261 (D.C. Cir. 1992) (referring to "a gun of some kind but not a firearm within the meaning of the statute"), *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001).

In addition to NFA requirements, the GCA imposes restrictions on the transportation, sale, and delivery of any "short-barreled rifle." 18 U.S.C. § 922(a)(4), (b)(4). Similar to an NFA "firearm," the GCA defines a "short-barreled rifle" as "a rifle having one or more barrels less than

sixteen inches in length" and as "any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches."  18 U.S.C. § 921(a)(8).  Although the GCA regulates the business of importing, manufacturing, or dealing in firearms generally—including firearms that are left unregulated by the NFA—it does not subject most weapons to the heightened restrictions that apply to a "short-barreled rifle," a "short-barreled shotgun," or a "machinegun."  18 U.S.C. § 922.  Both statutes define the subordinate term "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder."  26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

**B.**   **For A Decade, ATF Allows Pistols Equipped With Stabilizing Braces To Be Sold To Millions Of Americans Without NFA Or GCA Controls.**

In 2012, SB Tactical developed the original Pistol Stabilizing Brace® to promote shooting inclusion for service-disabled military veterans.  *See* Rule, 88 Fed. Reg. at 6,479, 6,482–83.  Before bringing the device to market, SB Tactical procured a classification letter from ATF concluding that attaching a stabilizing brace to a pistol "would not alter the classification of a pistol or other firearm" and that "such a firearm *would not be* subject to NFA controls."  *Id.* at 6,479 (quoting Letter from ATF #2013-0172 (Nov. 26, 2012) (emphasis in original letter).  Furthermore, ATF recognized that a stabilizing brace differs from a shoulder stock because a "'brace,' when attached to a firearm, d[oes] 'not convert that weapon to be fired from the shoulder.'"  *Ibid.*

This ruling was highly consequential.  An owner of an NFA "firearm" is required to provide ATF with his fingerprints, 26 U.S.C. § 5812(a)(3); subject himself to registration in a federal database, *id.* § 5841(b); and pay applicable making and transfer taxes, *id.* §§ 5812(a)(2), 5822(b).  Similarly, an owner of a GCA "short-barreled rifle" must obtain a "specific[] authoriz[ation] by the Attorney General" before transferring the gun across state lines, 18 U.S.C. § 922(a)(4), among other things.  It is a felony to violate the NFA or GCA, punishable by up to a decade in prison.

*See* 26 U.S.C. § 5871; 18 U.S.C. §§ 924(a)(1)(B), (D), 3571(c)(3), 3559(a)(5).  By ruling that a brace-equipped pistol did not create a GCA "short-barreled rifle" or NFA "firearm," ATF incentivized more shooters to use braces for safer and more stable shooting.

Following its 2012 classification, ATF issued more than a dozen classification letters opining that various stabilizing braces attached to pistols were not short-barreled rifles.  Rule, 88 Fed. Reg. at 6,502 n.84.  It took the same position in criminal prosecutions, advising federal judges that attaching a stabilizing brace to a pistol does not create a short-barreled rifle.  *See, e.g.*, Sentencing Hr'g Tr. at 38:9–15, *United States v. Kamali*, Case No. 18-cr-288, Dkt. # 110 (Sept. 24, 2019) ("Kamali Transcript"), Compl. Ex. P.  In 2017, ATF reiterated "that stabilizing braces are ***perfectly legal accessories*** for large handguns or pistols."  *See* ATF Letter 5000, at 1 (Mar. 21, 2017) ("2017 Letter"), Compl. Ex. Q (emphasis added).  ATF also clarified that a brace's classification would not change "even if the attached firearm happens to be fired from the shoulder."  *Id.* at 2.  This letter "created a thriving market for these stabilizing braces." *See* Letter from the Honorable Mitch McConnell et al. to the Honorable Merrick Garland, at 2 (June 24, 2021) ("Senate Letter"), Compl. Ex. R; *accord* Rule, 88 Fed. Reg. at 6,560 (acknowledging "demand . . . t[ook] off" in "2017").

### C.     ATF Reverses Course And Issues The Rule.

After millions of Americans purchased stabilizing braces in reasonable reliance on ATF's prior classification decisions, ATF changed its mind.  On June 10, 2021, ATF issued a Notice of Proposed Rulemaking which attempted to reconcile ATF's previous positions by "assign[ing] point values" to "characteristics or features" that it considered probative of intent to shoulder.  *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," Notice of Proposed Rulemaking, 86 Fed. Reg. 30,826, 30,829 (June 10, 2021) ("Notice").  The Notice provided example classifications under the proposed points system, including an AR-type pistol with

Plaintiff SB Tactical's "Mini" brace attached, which ATF found would ***not*** qualify as a short-barreled rifle.

On January 31, 2023, ATF released the Rule, which is effective immediately.  In response to comments demonstrating that the points system was unworkable, ATF invalidated that system and all of its prior stabilizing brace classifications, adopting in their place a multi-factor test that purports to identify shoulder-fired weapons. Rule, 88 Fed. Reg. at 6,480, 6,574–75 (to be codified at 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11).  Although this test is nominally "dependent on the specific configuration of the firearm," *id.* at 6,507, the new definition purports to encompass ***99%*** of all stabilizing braces, Regulatory Analysis at 21, including even the AR-type pistol affixed with an SB-Mini that in the Notice issued 18 months ago ATF ruled was ***not*** a short-barreled rifle.  By ATF's own estimates, millions of Americans have been committing felonies for years, *see* Rule, 88 Fed. Reg. at 6,560—including anyone who bought an SB-Mini—and, as explained below, those estimates significantly understate the scope of criminal liability, *see infra* section I.B.3.

Incredibly, ATF claims that these items were ***always*** and unambiguously unlawful.  That is, ATF contends that the Rule "does not impose any new legal obligations on owners of 'stabilizing braces' at all," and instead "merely conveys more clearly to the public" how to read the NFA and the GCA.  Rule, Fed. Reg. at 6,478.  This even though ATF has read the statutes differently for more than a decade.  Even more bizarre, ATF claims to have "put the public on notice" that certain pistols might be rifles with its 2017 letter, *id.* at 6,555—that is, the letter advising the public "that stabilizing braces are ***perfectly legal accessories***."  *See* 2017 Letter at 1 (emphasis added).  Unsurprisingly, the Rule is deeply unpopular.  Over 217,000 commenters opposed ATF's regulatory retcon.  Rule, 88 Fed. Reg. at 6,497.

The Rule purports to conduct two inquiries to determine whether a brace-equipped pistol

is in fact a GCA "short-barreled rifle" or an NFA "firearm." First, ATF will assess whether the brace "provides surface area that allows the weapon to be fired from the shoulder." *Id.* at 6,575. Second, ATF will assess whether six "other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Ibid.* These six factors include (1) weight and length, (2) length of pull, (3) sights or scope, (4) whether the brace is necessary for the cycle of operations, (5) marketing materials, and (6) information from "the general community." *Ibid.*

ATF's approach departs significantly from the Notice. Instead of assigning points, ATF "consider[s]" whether the factors "indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Id.* at 6,497. As explained below, the precise way ATF will make that determination without a point system is a mystery.

### D.    ATF Issues Dozens Of Adjudications, Expressly Outlawing Guns Equipped With The Most Popular Stabilizing Braces In The Country.

In addition to the Rule, ATF simultaneously issued dozens of adjudications classifying common weapon platforms equipped with braces and commercially available firearms equipped with braces ("the Adjudications"). *See* ATF, Common Weapon Platforms With Attached 'Stabilizing Brace' Designs that are Short-Barreled Rifles ("Platforms Adjudication"), Compl. Ex. C; ATF, Commercially Available Firearms Equipped with a 'Stabilizing Brace' that are Short-Barreled Rifles ("Firearms Adjudication"), Compl. Ex. D. The Adjudications contain no analysis. Each provides only a photograph of a common weapon platform or firearm and labels it a "short-barreled rifle." The Adjudications cover the most popular stabilizing braces in the United States.

### STANDARD OF REVIEW

Federal courts interpret the NFA and the GCA using "the ordinary rules of statutory construction" and "apply[ing] the rule of lenity." *Thompson/Ctr.*, 504 U.S. at 517–18 (plurality); *id.* at 519 (Scalia, J., concurring); *see also Abramski v. United States*, 573 U.S. 169, 191 (2014);

*Cargill*, 57 F.4th at 469–71.

The Administrative Procedure Act ("APA") authorizes courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C § 706(2).  "[U]nder this standard, 'an agency must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Grace Healthcare of Benton v. HHS*, 603 F.3d 412, 422 (8th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

Plaintiffs seek a preliminary injunction.  "To obtain a preliminary injunction, [a plaintiff] must establish: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest."  *Dakotans for Health v. Noem*, 52 F.4th 381, 388 (8th Cir. 2022) (citations and quotations omitted) (alterations accepted); *see Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112 (8th Cir. 1981).  Here, all four factors favor granting an injunction.

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   The Rule Exceeds ATF's Statutory Authority.

#### 1.   The Statutes Regulate Rifles With Short Barrels And Weapons Made From Rifles, Not Pistols Equipped With Stabilizing Braces.

Congress enacted the NFA to regulate "weapons likely to be used for criminal purposes." *Thompson/Ctr.*, 504 U.S. at 517.  Confronted with the emergence of professional "gangsters" in the late 1920s and early 1930s favoring sawed-off weapons for close-quarters combat, Congress determined to regulate these weapons more stringently than other guns.  *See Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002); David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 590–92 (1987).

The NFA comprehends short rifles in two ways.  First, the text encompasses "a rifle having a barrel or barrels of less than 16 inches in length."  26 U.S.C. § 5845(a)(3).  Second, it covers "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length."  26 U.S.C. § 5845(a)(4).  Taken together, these provisions bring within the NFA "rifles" manufactured with short barrels and "rifles" manufactured with long barrels that are subsequently cut down.

Contrary to the approach taken in the Rule, the NFA does not purport to regulate a pistol equipped with a stabilizing brace.  This limitation is clear from the text itself, which says nothing about regulating pistols, accessories, or stabilizing braces.  *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) ("a matter not covered is to be treated as not covered").

In addition to the text, legislative history confirms this statutory limitation.  As initially drafted, the NFA would have regulated "a pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun."  H.R. 9066, 73d Cong., 2d Sess. (1934).  "During committee consideration," however, "pistols and revolvers were omitted, so that the bill applied to machineguns, sawed-off shotguns and rifles, silencers, and concealable firearms *other than* pistols and revolvers."  Hardy, *supra*, 17 Cumb. L. Rev. at 592–93.  These omissions were retained in the enacted text, reflecting Congress's judgment that "there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction."  H.R. Rep. No. 73-1780.  Today, the statute still excludes a rifled "pistol" or "revolver."  26 U.S.C. § 5845(e), (a)(5).

That the NFA does not regulate pistols is also evidenced by Congress's purpose.  In the late 1920s and early 1930s, "the country struggled to control the violence wrought by 'gangsters,

racketeers, and professional criminals.'" *Bezet v. United States*, 276 F. Supp. 3d 576, 611 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017).   Because these lawbreakers favored "machine gun[s]" and "sawed-off guns," H.R. Rep. No. 73-1780, Congress regulated these weapons.

With respect to sawed-off guns, Congress believed that "a long gun with a shortened barrel is both dangerous, because its concealability fosters its use in illicit activity, and unusual, because of its heightened capability to cause damage." *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018) (cleaned up); *accord United States v. Marzzarella*, 614 F.3d 85, 95 (3rd Cir. 2010).   But Congress determined that these dangers were not present with "pistols and revolvers and sporting arms," and found that "limiting the [NFA] to the taxing of sawed-off guns and machine guns" was sufficient to deprive the "[t]he gangster . . . of his most dangerous weapon[s]."   H.R. Rep. No. 73-1780.   Decades later, the GCA followed the NFA and subjected "short-barreled rifles" (but not "handguns") to heightened regulations.

### 2.   The Rule Regulates Pistols Equipped With Stabilizing Braces.

The Rule achieves a more expansive result because it "abandon[s] the statutory text." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1749 (2020).   By overlooking the principal statutory definitions and focusing instead on the subordinate definitions of "rifle," the Rule exceeds the limits Congress imposed.   The Rule also misinterprets the term "rifle," by failing to consider the "text in context, along with purpose and history." *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (plurality).   As a result, the Rule unlawfully subjects braced pistols to heightened regulatory obligations and, by doing so, disfavors firearms Congress determined were safer and less likely to be used for criminal purposes.

### a.   *The Rule Overlooks The Principal Statutory Definitions.*

As explained, the NFA regulates "a rifle having a barrel or barrels of less than 16 inches in length" and "a weapon made from a rifle if such weapon as modified has an overall length of less

than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3), (a)(4); *accord* 18 U.S.C. § 921(a)(8) (GCA). The Rule never addresses these principal provisions, choosing instead to elaborate only the subordinate definition of a "rifle."

The problem with this approach is that it stretches NFA jurisdiction beyond what the operative provisions will allow. Section 5845(a)(4) addresses the specific evil that compelled Congress to enact the NFA—that is, "gangster[s]" using "sawed-off guns" to commit violent crimes. H.R. Rep. No. 73-1780. By addressing weapons "made from a rifle," section 5845(a)(4) effectively regulates a weapon that is manufactured as a rifle and then subsequently shortened below the statutory thresholds.

But this provision has an obvious shortcoming. By covering weapons "made from a rifle"—that is, weapons manufactured as rifles and subsequently shortened—section 5845(a)(4) does not reach weapons that are manufactured as short-barreled rifles. Section 5845(i) makes this implication express, defining "make" to exclude "manufacturing . . . by one qualified to engage in such business under this chapter." 26 U.S.C. § 5845(i); *see United States v. McGill*, 618 F.3d 1273, 1278 n.10 (11th Cir. 2010) (discussing manufacturer qualification). Thus, if the NFA contained only section 5845(a)(4), criminals would be required to register and pay tax on sawed-off rifles but would not be required to register and pay tax on rifles with short barrels produced that way by qualified manufacturers.

Section 5845(a)(3) plugs this gap. By addressing "a rifle having a barrel or barrels of less than 16 inches in length," section 5845(a)(3) effectively reaches a weapon that is produced by an NFA qualified manufacturer as a rifle with a short barrel. *See, e.g.*, *United States v. One (1) Colt AR-15 Firearm Serial No. TA03524*, 349 F. Supp. 2d 1064, 1066 (W.D. Tenn. 2004) (holding "original equipment configuration" Colt model AR-15 satisfies 5845(a)(3)). Section 5845(a)(3)

thus prevents a criminal from circumventing section 5845(a)(4)'s registration and tax requirements by purchasing a mass-produced short-barreled rifle instead of making one himself.  Or put differently, while the NFA covers short-barreled weapons "*made from*" a rifle, it nowhere covers pistols that in ATF's estimation are *made into* a regulated short-barreled firearm by the addition of accessories such as braces.  *See also United States v. Fix*, 4 F. App'x 324, 326 (9th Cir. 2001) (holding modified "pistol" not an NFA firearm because proper classification "does not consider modifications of the weapon by the owner").

The Rule ignores this statutory scheme.  Under the Rule, a weapon that is deemed a "rifle" and has a barrel under 16 inches is assumed to satisfy either section 5845(a)(3) or (a)(4) without regard to how it was made.  *See, e.g.*, Rule, 88 Fed. Reg. at 6,479, 6,501.  By thus abstracting away from the statutory text, the Rule transcends the limitations Congress imposed and purports to expand NFA jurisdiction to "a majority of the existing firearms"—i.e., pistols—"equipped with a 'stabilizing brace.'"  *Id.* at 6,480; *see also* Regulatory Analysis at 21.

But the text matters.  In conflating sections 5845(a)(3) and (a)(4), the Rule "violat[es] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up).  Put differently, if the Rule were correct that any potentially shoulderable short-barreled weapon is subject to NFA regulation, then there would have been no need for Congress to enact separate provisions to encompass sawed-off rifles and rifles produced by a qualified manufacturer.[1]

ATF's strained reading is also inconsistent with the statutory structure.  If lengthening a

---

[1]  These NFA distinctions are reinforced by the GCA, which similarly defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length" and as "any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches."  18 U.S.C. § 921(a)(8).  The GCA does not purport to subject to its heightened regulations any "handgun" or weapon made from a pistol.

pistol with a stabilizing brace created a short-barreled rifle, then every time a consumer temporarily attached a stabilizing brace to a pistol, he would have to permanently engrave the braced gun with identifying information. *See* 26 U.S.C. § 5842(a). Then, when the consumer detached the brace, he would be entitled to remove this information, but, by law, the information "may not be readily removed." *Ibid.* This nonsensical result "contravenes the regulatory scheme enacted by Congress." *Serv. Oil, Inc. v. EPA*, 590 F.3d 545, 551 (8th Cir. 2009) (citation omitted).

ATF overlooked the statutory distinctions because it was focused on the Administration's political objective—that is, to "treat pistols modified with stabilizing braces" as "subject to the National Firearms Act," President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3—and not on the text that Congress enacted. By ignoring the statutory text and examining each weapon in the abstract to see whether it can be shouldered, the Rule reaches weapons beyond those defined in the NFA and the GCA.

### b.   *The Rule Misinterprets "Designed" And "Intended."*

The Rule also misinterprets the statutory definitions of "rifle." NFA section 5845(c) and GCA section 921(a)(7) each provide that a "rifle" is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Although the Rule purports to clarify when a weapon is "designed" and "intended" for shoulder fire, it commits fundamental errors regarding each term.

First, ATF misinterprets "designed." Specifically, ATF excludes from its future classification decisions all evidence showing that a stabilizing brace functions as such because, in the agency's view, "[t]he fact that the 'stabilizing brace' makes firing a standard pistol more accurate or more enjoyable is ***irrelevant***." Rule, 88 Fed. Reg. at 6,557 (emphasis added).

ATF is wrong. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.

489 (1982), the Supreme Court interpreted a statute prohibiting sale of items "designed . . . for use

with illegal cannabis or drugs." *Id.* at 492.  The Court found it "plain" and "clear" that "designed"

includes "an item that is principally used with illegal drugs" but not "items which are principally

used for nondrug purposes."  *Id.* at 501.  Thus, the statute would cover a pipe "typically used to

smoke marihuana" but not "ordinary pipes"; a "roach clip" but not "paper clips sold next to *Rolling*

*Stone* magazine."  *Id.* at 494, 501–02; *see also Posters 'N' Things, Ltd. v. United States*, 511 U.S.

513, 526 (1994) (where "items may be used for legitimate as well as illegitimate purposes . . . a

certain degree of ambiguity necessarily surrounds their classification") (citations and quotations

omitted); *United States v. Kwan*, 300 F. App'x 485, 486 (9th Cir. 2008) ("an aggregation of

weapons parts may not constitute a firearm if the parts have an apparent legal purpose other than

the creation of such a firearm").

Under *Hoffman Estates*, ATF cannot read the term "designed" to exclude all evidence

showing that a stabilizing brace is suitable for use as a brace.  Indeed, ATF agrees that a stabilizing

brace "used on the forearm for single-handed firing" is not NFA regulated (or subject to heightened

GCA regulation).  Rule, 88 Fed. Reg. at 6,479; *see id.* at 6,529–30.[2]  Given that concession,

ignoring brace function is equivalent to Village of Hoffman Estates classifying paperclips as drug

paraphernalia without considering evidence that paperclips are suitable for holding documents.

Indeed, if an item is designed for a non-shouldering function, ATF is **prohibited** from

regulating it.  In *Thompson/Center*, the Supreme Court held that a party did not "make" an NFA

firearm by packaging components that could "be converted not only into a short-barreled rifle,

---

[2]  As FRAC and SB Tactical explained in the rulemaking, ATF's "one-handed" definition of
unshouldered fire is underinclusive because there are also two-handed methods that do not involve
shouldering.  In all events, it violates the statutes for ATF to exclude from its classification
decisions all evidence relating to a practice that it agrees is not covered by the statute.

which is a regulated firearm, but also into a long-barreled rifle, which is not." *Thompson/Ctr*, 504 U.S. at 513 (plurality).  Because the "aggregation of parts" could serve a "useful purpose" other than "the assembly of a firearm," lenity required the Court to find that packaging those components did not "make" "a short-barreled rifle for purposes of the NFA."  *Id.* at 513–18; *see also Kwan*, 300 F. App'x at 486.  Here, as in that case, affixing a brace to a pistol does not "design" a short-barreled rifle so long as the brace serves a "useful purpose" other than shouldering.  The Rule's interpretation of "designed" thus violates the plain language of the statutes.

ATF also misinterprets "intended."  Under the Rule, future ATF classifications will determine a manufacturer's intent based upon "marketing materials" produced by third parties, as well as other third-party "information demonstrating the likely use of the weapon by the general community."  Rule, 88 Fed. Reg. at 6,544.  That interpretation violates the statute because third-party intent is irrelevant to a ***manufacturer's*** intent.

In *Record Head Corp. v. Sachen*, 682 F.2d 672 (7th Cir. 1982), the Seventh Circuit interpreted a drug paraphernalia ordinance that, like the Rule, enumerated factors that supposedly would enable law enforcement to determine whether items for sale were "designed" and "intended" for unlawful use.  *Id.* at 677.  Invalidating the ordinance as unconstitutionally vague, the Seventh Circuit explained that factors requiring law enforcement to examine third-party "advertising" and "opinion" had no "conceivable relevance to the intent of the seller" and thus compounded the constitutional problem.  *Ibid.*; *see also, e.g.*, *United States v. Biro*, 143 F.3d 1421, 1428 (11th Cir. 1998) ("the customer's intended use" has no bearing on "design"); *Tobacco Accessories & Novelty Craftsmen Merchs. Ass'n of Louisiana v. Treen*, 681 F.2d 378, 385 (5th Cir. 1982) ("We are persuaded that the 'designed for use' language of the Louisiana Act similarly applies only to manufacturers, for their own acts of design.").

ATF commits the same error.  Under the Rule, ATF would attribute third-party intent to firearms manufacturers, stabilizing brace manufacturers, commercial retailers and other sellers, and even to individual gun owners.  Like its interpretation of "designed," the Rule's interpretation of "intended" violates the NFA and GCA.[3]

c.   <em>The Rule Undermines The Statutes' Purpose.</em>

The "history and purpose" of the NFA confirm that ATF has exceeded the bounds of the statute.  *Gundy*, 139 S. Ct. at 2126 (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)) (brackets omitted).  As explained, Congress enacted the NFA to address the specific problem of criminals sawing down long guns to make them more useful in committing violent crimes.  And the GCA embraced that reasoning by adopting substantially similar language, subjecting shortened long guns (but not handguns) to its heightened regulations.

The Rule does the opposite.  It is expressly designed to subject braced pistols to burdensome NFA and GCA regulations even though the record confirms that pistols equipped with stabilizing braces are less likely than a pistol alone to be used in the commission of a crime, more difficult to conceal than an unequipped pistol (rendering them less effective for criminal purposes), and generally safer than an unequipped pistol.

The Rule confirms that pistols equipped with stabilizing braces are less likely than unequipped pistols to be used to commit crimes.  There are millions of stabilizing braces in circulation.  *See* Rule, 88 Fed. Reg. at 6,560 (estimating "3 million"); William J. Krouse, Cong. Res. Serv., *Handguns, Stabilizing Braces, and Related Components* (Apr. 19, 2021),

---

[3] Indeed, the principal case relied upon by ATF to support its consideration of extrinsic evidence to ascertain intent—*Sig Sauer v. Brandon*, 826 F.3d 958 (1st Cir. 2016)—in fact held only that ATF could consider "objective evidence" like an object's "design features." *Id.* at 601–02; *accord* Rule, 88 Fed. Reg. at 6,495.  This "familiar" "objective approach," *Sig Sauer*, 826 F.3d at 601, is nothing like ATF's approach of grafting subjective third-party intent onto the maker of a gun.

https://crsreports.congress.gov/product/pdf/IF/IF11763 ("there are between 10 and 40 million stabilizing braces and similar components already in civilian hands").  But ATF reports that only "63 firearms with 'stabilizing braces' have been traced in criminal investigations."  Rule, 88 Fed. Reg. at 6,499.  ATF speculates this figure "may be underreported."  *Id.* at 6,499 n.76.  But even if it were increased by several orders of magnitude, it would still pale in comparison to the more than 376,690 **handguns**—i.e., pistols without braces—ATF traced *in 2021 alone*.  ATF, *Firearm Types Recovered and Traced in the United States and Territories* (Sept. 16, 2022), *available at* https://www.atf.gov/resource-center/firearms-trace-data-2021#.

Common sense explains why.  As Congress found and "many courts have explained," *Cox*, 906 F.3d at 1185, shortening a long gun "fosters its use in illicit activity" because the shortened gun is more easily "concealed," *Marzzarella*, 614 F.3d at 95.  But that is not true when a brace is attached to a pistol because a braced pistol is larger and thus more difficult to conceal.  Unlike a sawed-off rifle—which, Congress found, becomes ***more*** suitable for committing crimes than an unmodified rifle—a braced pistol becomes ***less*** suitable for committing crimes than an unbraced pistol.  Indeed, it is well-documented that easy-to-conceal unbraced handguns are the weapon of choice for criminals.  *See, e.g.*, DOJ, *Trends and Patterns in Firearm Violence, 1993–2018*, at 5, 6 (Apr. 2022), https://bjs.ojp.gov/content/pub/pdf/tpfv9318.pdf (91.8% of nonfatal gun crimes and 64.4% of fatal gun crimes committed with handguns in 2018).

ATF agrees that the NFA and GCA strictly regulate short-barreled rifles because they are more easily concealed than long-barreled rifles.  Rule, 88 Fed. Reg. at 6,495, 6,498–99.  Nevertheless, the Rule acknowledges that its purpose is to compel millions of law-abiding citizens to "[p]ermanently remove and dispose of, or alter, the 'stabilizing brace[s]'" attached to their pistols.  *Id.* at 6,570.  This action will not make the pistol any more or less powerful.  It will,

however, make the firearm easier to conceal and thus, according to Congress—and all available statistical data regarding crimes with unbraced pistols—more suitable for committing a crime. The Rule is thus contrary to a principal objective of the NFA and GCA.

In addition to being more difficult to conceal, a braced pistol is more accurate—as ATF concedes, Rule, 88 Fed. Reg. at 6,557; *see also* President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3 ("pistols modified with stabilizing braces" are "a hell of a lot more accurate")—and thus less dangerous than an unbraced pistol. Congress believed that shortened long guns possess a "somewhat indiscriminate accuracy" that makes them "useful for only violence against another person, rather than, for example, against sport game." *United States v. Amos*, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting); *see Cox*, 906 F.3d at 1185 (explaining Congress believed "a long gun with a shortened barrel is . . . unusual, 'because of its heightened capability to cause damage'" (quoting *Marzzarella*, 614 F.3d at 95)).

In short, the statutes were designed and intended to penalize access to more easily concealable and less accurate rifles. The objective of the Rule is precisely the opposite. By subjecting braced pistols to NFA jurisdiction and heightened GCA regulations, manufacturers and law-abiding citizens will become hesitant to use these braces, even though they make pistols safer and less likely to be used in the commission of a crime. The result will necessarily be an increase in the number of concealable and more dangerous weapons, undermining Congress's "obvious purpose." *See Ragsdale v. Wolverine Worldwide, Inc.*, 218 F.3d 933, 938 (8th Cir. 2000).

### 3. The Rule Violates The Rule Of Lenity.

At a minimum, the rule of lenity requires that the Rule be set aside. In the Eighth Circuit, courts consider the rule of lenity "when, after employing all other tools of construction, 'a grievous ambiguity or uncertainty in the statute' remains," *United States v. Buford*, 54 F.4th 1066, 1068 (8th Cir. 2022), or where the court otherwise has "reasonable doubt" about the "statute's intended

scope," *United States v. Warren*, 149 F.3d 825, 828 (8th Cir. 1998).

In this case, the statute's text, history, and purpose all point in the same direction. The NFA and GCA cover rifles produced with short barrels and rifles produced with long barrels that are later cut down, not pistols that are equipped with stabilizing braces. *See* section I.A.1.–I.A.2., *supra*. For that reason, the Court should hold that the NFA and GCA unambiguously exclude from heightened regulation pistols that are equipped with stabilizing braces.

If the Court disagrees, then the statutes are at least grievously ambiguous. The Rule's preamble explains why. When ATF first considered the stabilizing braces at issue here, it understood that their attachment to a pistol "would not alter the classification of a pistol or other firearm" and that "such a firearm *would not be* subject to NFA controls." Rule, 88 Fed. Reg. at 6,479 (quoting Letter from ATF #2013-0172 (Nov. 26, 2012) (emphasis in original letter). Furthermore, ATF recognized that a stabilizing brace differs from a stock because a "'brace,' when attached to a firearm, d[oes] 'not convert that weapon to be fired from the shoulder.'" *Ibid.*

ATF maintained this position for over a decade, issuing many interpretation letters stating its position to companies manufacturing braces and to members of the public. *Id.* at 6,502 n.84; *see also* Senate Letter at 2 (explaining ATF's "repeated letter rulings approving stabilizing braces, created a thriving market for these stabilizing braces"). The Department also asserted this position in criminal prosecutions, clarifying to courts that "the type of device placed on the firearm is also dispositive of what type of firearm, whether it's a rifle or whether it is a pistol and so ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA." Kamali Transcript at 38:9–15. And even the Notice took a similar approach, attempting to reconcile these past decisions through a proposed points system. Notice, 86 Fed. Reg. at 30,829–32.

Then, between June 2021—when the Notice was issued—and a few weeks ago, ATF reversed course.  Apparently "realizing" for the first time that pistols with stabilizing braces have always and unambiguously been covered by the NFA, ATF decided to effectively render all brace-equipped pistols short-barreled rifles.  In so doing, ATF determined that the SB-Mini attached to an AR-type pistol—which ATF expressly determined was unregulated by the NFA in the Notice, *id.* at 30,835–37—is unambiguously a short-barreled rifle.  That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).  For ATF to fundamentally change its longstanding position demonstrates at the very least that NFA is ambiguous with respect to whether it covers brace-equipped pistols and that the rule of lenity should apply.

A recent decision by the en banc Fifth Circuit shows why lenity requires the Rule to be set aside.  In that case, the court considered an ATF rulemaking that purported to reinterpret the federal prohibition on machineguns to extend to bump stocks.  The lead opinion found that a bump stock is not a machinegun under "the statute's unambiguous language." *Cargill*, 57 F.4th at 464.  Turning to the rule of lenity, thirteen of the sixteen judges on the Fifth Circuit then held, assuming a "grievous" ambiguity standard, that even if the statute "does not unambiguously exclude non-mechanical bump stocks, its inclusion of [non-mechanical bump stocks] is at the very least ambiguous." *Id.* at 470; *see id.* at 469 ("the Government has construed the same statute in two, inconsistent ways at different points in time").  Because the rule was at least ambiguous, "the rule of lenity demand[ed]" that it be set aside. *Id.* at 471.

The same is true here.  Just like *Cargill*, ATF is reversing its long-held position with respect to a particular firearms accessory.  "The law hasn't changed, only [the] agency's interpretation of it." *Guedes v. ATF*, 140 S. Ct. 789, 790 (2020) (statement of Gorsuch, J.).  And here, just like *Cargill*, the impact of ATF's sudden reversal is to subject to criminal penalties any individuals

20

who continue to obey ATF's previous rulings.  If the agency charged with administering the NFA believed *for years* that pistols equipped with stabilizing braces are not subject to NFA or GCA controls, the application of the statute to such braces must at a minimum be grievously ambiguous. Lenity thus demands that the Rule be set aside.

Principles of constitutional avoidance lead to the same result.  Stabilizing braces are undoubtedly in "common use," *see New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128, 2143 (2022), as ATF's own data indicate.  Rule, 88 Fed. Reg. at 6,560; *see also, e.g.*, *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411 (N.D.N.Y. 2019) (concluding that "at least 300,000 tasers and 4,478,330 stun guns owned by private citizens across the United States" constituted "common use").  Placing onerous restrictions on the possession, use, or carrying of stabilizing braces would therefore implicate core Second Amendment protections in a way that the NFA's plain text—which regulates only "dangerous and unusual weapons," *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)—does not.  And "[c]onstitutional avoidance trumps even *Chevron* deference, and easily outweighs any lesser form of deference we might ordinarily afford an administrative agency."  *Union Pac. R.R. Co. v. DHS*, 738 F.3d 885, 893 (8th Cir. 2013). "When an agency's interpretation of a statute pushes these limits, we 'heed the essence of Mr. Chief Justice Marshall's admonition . . . that the statute ought not be construed to violate the Constitution if any other possible construction remains available.'"  *Ibid.*

### B.     The Factors Adopted By The Rule Are Otherwise Unlawful.

Even if the Rule did not violate the unambiguous language of the statute or the rule of lenity, it should still be struck down.  Because the NFA and GCA are criminal statutes, ATF's interpretations are entitled to no deference.  *Cargill*, 57 F.4th at 466–68.  But regardless of deference, the Rule is arbitrary and capricious for multiple reasons.

21

1.      The Factors Are Holistically Arbitrary.

ATF's factors are arbitrary and capricious when considered holistically.  The Rule first requires ATF to determine whether a weapon "provides surface area" for shouldering.  Rule, 88 Fed. Reg. at 6,575.  If so, ATF "consider[s]" six additional factors to determine "whether the weapon is designed, made, and intended to be fired from the shoulder." *Ibid.*  But ATF refuses to say which are outcome determinative, reserving the prerogative to make a judgment based on "th'ol' 'totality of the circumstances' test"—that is, the test "most feared by [regulated parties] who want to know what to expect." *United States v. Mead Corp.*, 533 U.S. 218, 241 (2001) (Scalia, J., dissenting).  Worse, ATF admits that it will use its self-conferred discretion to ensure that "a majority of the existing firearms equipped with a 'stabilizing brace'" are subjected to NFA regulations.  Rule, 88 Fed. Reg. at 6,480.

The infinitely malleable nature of the Rule is enough to render it arbitrary and capricious. It is well settled that when an agency intends to apply "a multi-factor test through case-by-case adjudication," some explanation is required to provide "predictability and intelligibility" to regulated parties. *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.); *see U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 753–54 (D.C. Cir. 2015).  Otherwise, those seeking to conform their conduct to the regulation cannot know "which factors are significant and which less so, and why." *LeMoyne-Owen Coll.*, 357 F.3d at 61.

Here, in addition to rear surface area, the Rule identifies six factors ATF will apply.  "These factors, which are both general and unweighted, invite inquiry into areas of doubtful relevance rather than make the [regulated] conduct any clearer." *Rec. Head Corp.*, 682 F.2d at 677.  ATF describes its factors as enabling an "objective" assessment of certain "design features common to rifles."  Rule, 88 Fed. Reg. at 6,513; *see id.* at 6,478 ("this rule merely conveys more clearly to the public the objective design features . . . .").  Throughout the preamble, however, ATF undermines

22

that description by stating that its articulated factors "are not themselves determinative," *id.* at 6,518, that ATF "may" elect not to use them in some cases, *id.* at 6,512, 6,531, 6,537, and that its determinations are made "on a case-by-case basis," *id.* at 6,495.  In other words, classification as a short-barreled rifle is ultimately based on agency discretion.

Federal courts have previously invalidated ATF's attempts to devise discretionary, multi-factor tests that would authorize the agency to make NFA classifications without a workable standard.  In *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014), the court held unlawful ATF's attempt to classify a "stabilizer brake" as a "silencer" based upon "six characteristics that are allegedly common to 'known silencers.'" *Id.* at 25.  The agency's six factor test was meaningless, the court said, because ATF had never explained "how many characteristics in common are necessary to be classified as a 'firearm silencer.'" *Ibid.*  Without any guidance on how to weigh the six factors, ATF "le[ft] [the plaintiff] (as well as other regulated parties, and reviewing courts) guessing" at how to apply the agency's purported standard.  *Ibid.*  Therefore, ATF's classification decision under its unworkable standard was "set aside as 'arbitrary and capricious' under the APA." *Id.* at 26.

The similarities between the Rule and the standard rejected by *Innovator Enterprises* are obvious.  Here, just like there, ATF has developed a list of six factors to enable comparisons between the object in question and an NFA-regulated item.  And here, just like there, the agency has failed to explain how many factors must be satisfied to bring the item within the NFA.  The result, as in *Innovator Enterprises*, is that ATF has propounded an amorphous regulation that leaves plaintiffs, "other regulated parties, and reviewing courts[,] guessing." *Id.* at 25.

If the reservation of discretion were not enough, ATF has indicated that it will use its self-conferred discretion not for fair determinations but to accomplish the Administration's political

goal to "treat pistols modified with stabilizing braces" as "subject to the National Firearms Act." President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3. Indeed, ATF's final regulatory impact analysis predicts that future classification decisions under the Rule will result in ATF deeming 99 percent of pistols equipped with stabilizing braces as subject to NFA regulation.  Regulatory Analysis at 21; *see also* Rule, 88 Fed. Reg. at 6,479 ("a majority of" braced guns "fall under the purview of the NFA").

ATF is already making good on its prediction, issuing more than 60 contemporaneous Adjudications that purport to apply the Rule to various weapons and platforms.  The Adjudications find that 100% of examined items are "short-barreled rifles" under the Rule.  *See generally* Platforms Adjudication; Firearms Adjudication.  And they provide no explanation for ATF's conclusions, consisting solely of pictures.  *Ibid.*

These Adjudications are arbitrary for reasons explained in section I.C., *infra*.  But they also reveal two systemic problems.  First, ATF can reach whatever result it likes in any particular case.  Second, ATF intends to use that unbounded discretion to subject virtually every pistol equipped with a stabilizing brace to heightened regulation, contrary to the statutes.  Indeed, the Rule's factors do such little work and, in combination, are so discretionary that ATF apparently feels empowered to issue dozens of simultaneous adjudications without even bothering to explain them under the Rule.  That is not reasoned decisionmaking, it is an invitation for regulatory abuse.  The Court should set aside the Rule because its factors, taken together, are arbitrary and capricious.

2.   The Factors Are Individually Arbitrary.

The factors are likewise arbitrary and capricious when considered individually.

a.   *Rear Surface Area*

The Rule establishes that the term "rifle" "shall include a weapon that is equipped with an accessory, component, or other rearward attachment . . . that provides surface area that allows the

weapon to be fired from the shoulder." Rule, 88 Fed. Reg. at 6,575. Numerous commenters asked the agency to clarify the amount of surface area it deems sufficient. But ATF rejected those pleas, asserting—without explanation—that it is "not . . . necessary to specify a quantifiable metric for what constitutes surface area that allows for shouldering of the weapon." *Id.* at 6,529.

That is arbitrary and capricious. In *Tripoli Rocketry Association v. ATF*, 437 F.3d 75 (D.C. Cir. 2006), the D.C. Circuit held unlawful ATF's determination that hobby rocket fuel "deflagrates" because "the agency [had] never define[d] a range of velocities within which materials will be considered to deflagrate." *Id.* at 81. "[A]s a reviewing court," the D.C. Circuit explained, "we require *some* metric for classifying materials not specifically enumerated in the statute, especially when, as here, the agency has not claimed that it is impossible to be more precise in revealing the basis upon which it has made a scientific determination." *Ibid.*; *see Kearney Reg'l Med. Ctr., LLC v. HHS*, 934 F.3d 812, 815–17 (8th Cir. 2019) (finding action arbitrary and capricious where agency "failed to explain how it defined the relevant" standard).

The flaw the D.C. Circuit identified is evident in the Rule. The preamble states "ATF will not attempt to precisely measure or quantify the surface area or make the determination based on the existence of any minimum surface area," Rule, 88 Fed. Reg. at 6,529, but does not say why it will not do so or claim that it would be impossible to provide "a concrete standard," *Tripoli Rocketry*, 437 F.3d at 77; *cf. United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006) (holding NFA regulation of short-barreled shotgun not unconstitutionally vague because the statute "*supplies the specific measurements that will bring a shotgun within the proscribed zone*") (emphasis added). Therefore, the surface area prerequisite is arbitrary.

ATF's refusal to provide a metric also contradicts the reasons the agency gave for abandoning its original proposal. According to the preamble, ATF abandoned its Worksheet 4999

proposal precisely because it "did not provide a particular metric to quantify the rear surface area." Rule, 88 Fed. Reg. at 6,522. "Because [ATF's] decision is internally inconsistent, it is arbitrary and capricious." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

  b.  *Weight and Length.*

The Rule requires ATF to assess whether a weapon "has a weight or length consistent with the weight or length of similarly designed rifles." Rule, 88 Fed. Reg. at 6,575. According to ATF, "the weight and length of a firearm are quantifiable, easily measured metrics." *Id.* at 6,513. As with rear surface area, however, the Rule fails to provide a metric that satisfies this factor or to otherwise meaningfully "articulate[ ] the standards that [will] guide[ ] [ATF's] analysis." *Tripoli Rocketry*, 437 F.3d at 81.

Consider the preamble. ATF says that this factor will assess the "weight and length of the firearm as compared to the length of similarly designed rifles." Rule, 88 Fed. Reg. at 6,552. But ATF's list of comparators is its database of "more than 12,000 firearms." *Id.* at 6,514 n.103. Although the preamble includes a table which purports to provide "examples of weights and lengths consistent with rifles" from the database, *id.* at 6,514, these are not helpful because they encompass broad ranges from 2 pounds to 10 pounds and 18-1/2 inches to 38-1/2 inches, *id.* at 6,514–19. Nowhere does the agency explain what it considers "comparable" to these ranges.

ATF also fails to explain why having a similar "weight or length" to a rifle facilitates shouldering. And simply having "characteristics in common with some category may not be very helpful in determining whether the object in question belongs in that category." *Innovator Enterprises*, 28 F. Supp. 3d at 25–26 ("Bud Light is not 'Single-Malt Scotch,' just because it is frequently served in a glass container, contains alcohol, and is available for purchase at a tavern."). The methodological weakness of merely identifying facial similarities between braced pistols and

rifles—without explaining why the similarity facilitates shouldering—is confirmed by the record. In the Notice, ATF explained that "AR-type pistol[s]" weigh "approximately 5 to 7 pounds" and that a "traditional unloaded 1911-type pistols" weighs "just over 2 pounds." 86 Fed. Reg. at 30831. Thus, weapons that ATF concedes are not designed and intended for shouldering encompass most of the weight range asserted by the Rule, confirming that a facial comparison of "weight" does not distinguish design and intent for shoulder-firing.

c.   *Length of Pull*

The Rule requires ATF to consider whether a "weapon has a length of pull . . . that is consistent with similarly designed rifles." Rule, 88 Fed. Reg. at 6,575.[4]  As with the previous factor, ATF claims that "length of pull is a quantifiable and easily assessed measurement" and purports to provide a list of comparators.  *Id.* at 6,513, 6,535–38.  But also like before, ATF reserves the option to pick and choose other comparators from more than 12,000 other firearms and fails to explain what it means to be "consistent with" a comparator.

ATF offers no reason why it cannot be "more precise," *Tripoli Rocketry*, 437 F.3d at 81, by, for example, quantifying a range of lengths of pull that allow the user to place the gun "against [his] shoulder while also ergonomically allowing the shooter to engage the firearm's trigger," Rule, 88 Fed. Reg. at 6,511–12.  Instead, without explanation, ATF again resorts to its unbounded standard of being "consistent with" some undefined category of benchmark rifles.  Thus, far from propounding a workable metric, length of pull is just another example of ATF conferring unchecked discretion on itself in order to unlawfully avoid having to "explain the standard on which its decision" will be "based."  *Kearney*, 934 F.3d at 816.

---

[4] "Length of pull" refers to the length "from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment."  Rule, 88 Fed. Reg. at 6,575.

Additionally, this factor—like weight and length—uses the faulty logic of identifying "characteristics in common" with rifles without explaining why that commonality matters. *Innovator Enterprises*, 28 F. Supp. 3d at 25–26. And again, record evidence confirms this fallacy because it shows that lengths of pull between 11 inches and 17 inches—the range of example comparators offered by ATF—are consistent with non-shoulder firing with a stabilizing brace. For example, the record contains evidence from a licensed orthotist-prosthetist showing, based on the medical literature, that a length of pull greater than 10.5 inches is not indicative of shouldering. Report of Gabriel Hurst, Certified Prosthetist/Orthotist, at 6–7 (Sept. 7, 2021) ("Hurst Report"), Compl. Ex. K. And the record also contains a report from a certified firearms instructor further evidencing that brace-equipped weapons with a length of pull between 11 inches and 17 are commonly fired without shouldering. *See* Comments of Richard Cicero ("Cicero Comments"), Compl. Ex. F, Figs. 1–7. The agency never engages or even acknowledges this evidence. This factor is arbitrary.

<strong>d.</strong>     <em>Necessity of Function</em>

ATF will assess "[w]hether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations." Rule, 88 Fed. Reg. at 6,575. According to ATF, if an accessory "is required for the cycle of operations," that "may be an indicator that the firearm is not be [sic] designed, made, and intended to be fired from the shoulder." *Id.* at 6,512. This factor thus assesses whether an accessory is designed for a *non*-shouldering function, i.e., facilitating "the cycle of operations." But such an assessment directly contradicts ATF's claim that an accessory's efficacy for non-shouldering functions—e.g., "mak[ing] firing a standard pistol more accurate or more enjoyable"—is "irrelevant." *Id.* at 6,557.

28

Thus, this factor renders the Rule arbitrary and capricious because its reasoning is "internally inconsistent." *ANR Storage Co.*, 904 F.3d at 1028.

e.    *Marketing and Community Information*

The Rule permits ATF to assess "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and "[i]nformation demonstrating the likely use of the weapon in the general community." Rule, 88 Fed. Reg. at 6,575. But it does not explain how ATF will assess this information, permitting the agency to reach arbitrary and capricious results.

Once again, the preamble illustrates the problem. Since its inception, SB Tactical has published countless training and marketing materials instructing users how to properly use its stabilizing braces. SB Tactical has ***never*** said that its braces should be used for shouldering. Yet in the preamble, ATF faults SB Tactical for saying "Stiff Arm the Establishment" in a website banner displayed from 2017 to 2019. Rule, 88 Fed. Reg. at 6,544–45. But a "stiff arm" refers to "the one-handed precision stance" ATF concedes it had deemed NFA compliant during the relevant time periods. *Id.* at 6,479. And to the extent ATF's citation of an old SB Tactical slogan is rooted in dislike for its anti-establishment message, it goes without saying it is protected speech. *See Cohen v. California*, 403 U.S. 15, 25 (1971) (holding "Fuck the Draft" is protected speech). In all events, the heavy weight ATF appears to place on a single, cherry-picked web banner displayed years ago shows that this factor is arbitrary and capricious.

Equally arbitrary is the agency's factor purporting to analyze information "in the general community." Rule, 88 Fed. Reg. at 6,575. Elsewhere, ATF contends "the method in which a 'stabilizing brace' may be used, in isolated circumstances or by a single individual" is not "relevant to examining whether a firearm is designed, made, and intended to be fired from the shoulder."

29

*Id.* at 6,519.  But under this factor, ATF tries to eat its cake too, depicting in the preamble two individuals who appear to be misusing a stabilizing brace and citing this as supposed evidence of "community information."  *Id.* at 6,546.  This "internal[ ] inconsisten[cy]"—which permits ATF to discount evidence of proper use as mere anecdote but then to count evidence of improper use as community information—is "arbitrary and capricious."  *ANR Storage Co.*, 904 F.3d at 1028.

Furthermore, ATF ignores record evidence showing that thousands of wounded warriors and other individuals have been trained or retrained to shoot by properly using a stabilizing brace. *See, e.g.*, Comments of FRAC et al., Docket No. ATF 2021R–08, AG Order No. 5070–2021, at 10–11 (filed Sept. 8, 2021) ("FRAC Comments"), Compl. Ex. E; Cicero Comments; Hurst Report. Many of these individuals are unable to fire a weapon in any other way.  Surely, these examples are relevant as "community information."  ATF's decision to simply ignore this record evidence as examples of the kind of information that would be relevant under a factor that purports to consider a weapon's "likely use in the general community" is further evidence that this factor is arbitrary and capricious.

3.     The Cost-Benefit Analysis Is Arbitrary.

ATF concedes it was required to consider costs and benefits, Rule, 88 Fed. Reg. at 6,571–74, consistent with its statutory requirement to determine whether the Rule was "needful" and "necessary."  26 U.S.C. § 7805(a); 18 U.S.C. § 926(a)); *see Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("the phrase 'appropriate and necessary' requires at least some attention to cost"). Although "an agency need not quantify all costs with rigorous exactitude," "it must consider them all."  *Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1010–11 (8th Cir. 2018) (citations and quotations omitted).  A deficient cost-benefit analysis renders a rule arbitrary and capricious.  *See Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 203–06 (D.C. Cir. 2007).

Here, ATF failed to consider three relevant costs.  *First*, ATF excluded from its assessment without explanation all stabilizing braces sold in 2020, 2021, and 2022.  *See* Regulatory Analysis at 18.  That is odd because ATF acknowledges these are three of the six highest-production years. *See* Rule, 88 Fed. Reg. at 6,560 (reporting brace production "t[ook] off" in 2017).  Plaintiff SB Tactical alone sold more than **2.3 million braces** from 2020 until the publication of the Rule. Declaration of Jeff Creamer, ¶ 15, Compl. Ex. G.  Against ATF's assumption that there are approximately three million braces in circulation, this is a significant oversight.  And it comes despite commenters telling ATF its estimate was too low.  *See, e.g.*, FRAC Comments at 54.

*Second*, ATF failed to consider foregone "consumer surplus."  *Id.* at 53; Report of Todd D. Kendall, Ph.D, Compass Lexicon, at 20–21 (Sept. 7, 2021), Compl. Ex. T.  ATF instead uses the "average" sale price to calculate cost, Regulatory Analysis at 34, 59 n.107, 60–61.  Because ATF "must consider . . . all" costs, *Citizens Telecomms. Co. of Minn.*, 901 F.3d at 1010–11, its unexplained failure to consider foregone surplus is arbitrary.

*Third*, ATF failed to "carefully consider[] possible reliance interests."  Rule, 88 Fed. Reg. at 6,508.  Although the agency claims to have done so, *ibid.*, that cannot be true because, again, ATF excluded from consideration all individuals who purchased at least 2.3 million braces since 2020.  ATF's failure to account for such reliance interests "was arbitrary and capricious in violation of the APA."  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–15 (2020).

In addition to omitting known costs, ATF made no effort to quantify purported benefits. At most, ATF points to trace data showing that "NFA weapons are less likely to be used" by criminals, Regulatory Analysis at 68, but this observation makes no effort to establish a causal link between the Rule and any observed or predicted decrease in gun-related violence.  The correlation identified by ATF could just as easily be explained by the possibility that law-abiding citizens are

more likely to purchase NFA-regulated weapons or more likely to comply with federal rules. And even if ATF had established that traceability reduces gun-related crimes, it still would have had an obligation to determine whether any incremental benefit would justify the loss to millions of law-abiding citizens, including wounded veterans, of braces used to shoot more safely and accurately.

In sum, ATF had a duty to fully consider the "economic consequences of a proposed regulation," *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005), not merely to tally up the enormous costs that its Rule would impose on regulated parties. At no point did ATF analyze "whether the benefits expected from the standard bear a reasonable relationship to the costs imposed." *Am. Petroleum Inst. v. OSHA*, 581 F.2d 493, 503 (5th Cir. 1978), *aff'd sub nom. Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607 (1980). "[T]his type of reasoning, which fails to view a cost at the margin, is illogical and, in an economic analysis, unacceptable." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011). ATF's failure to demonstrate the Rule will yield any benefits, let alone benefits that justify the "cost[s] at the margin," is reversible error.

4.      The Rule Is Impermissibly Retroactive.

"Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Ibid.* (citation omitted). Plaintiffs flagged these fundamental limitations on ATF's rulemaking authority in comments before the agency. FRAC Comments at 18. And while ATF found that it had express statutory authority to engage in retroactive rulemaking under the NFA, Rule, 88 Fed. Reg. at 6,553 n.149, 6,571, it identified no such authority under *the GCA*. Absent such express authority, ATF "has no authority to promulgate retroactive" regulations under the GCA. *Bowen*, 488 U.S. at 215.

This prohibition dooms the Rule. The GCA makes it unlawful "for any person to assemble

32

from imported parts any semiautomatic rifle," 18 U.S.C. § 922(r), which ATF has interpreted as requiring assembly with more than 10 enumerated imported parts, *see* 27 C.F.R. § 478.39.  Anyone who previously assembled a firearm from covered imported parts that includes a stabilizing brace—and which under the Rule would now be deemed a "rifle"—would have unknowingly committed a crime.  Indeed, ATF admits in the Rule that there is no way for people who previously assembled such firearms to "cure the 922(r) violation because the 'assembly' has already occurred."  Rule, 88 Fed. Reg. at 6,564; *see also* ATF, *Frequently Asked Questions For Final Rule 2021-08F*, at 4–5 (2023) (same), https://www.atf.gov/rules-and-regulations/docs/undefined/faqfinalrule2021r-08f-updated12523pdf/download.   ATF's attempt to impose new criminal consequences on past actions is unlawful.

Further, ATF did not even consider this limitation on its GCA rulemaking authority, despite purporting to apply a new definition of "rifle" to preexisting weapons under that statute.  Rule, 88 Fed. Reg. at 6,568, 6,574.  ATF limited its consideration of 922(r) to whether gun owners would have to incur costs under the Rule, *id.* at 6,564, completely ignoring the fact that it was retroactively criminalizing the prior assembly of such firearms.  Because ATF "entirely failed to consider an important aspect of the problem," its "rule is arbitrary and capricious."  *Ghattas v. United States*, 40 F.3d 281, 286 (8th Cir. 1994) (quoting *State Farm*, 463 U.S. at 43); *accord Ortega-Marroquin v. Holder*, 640 F.3d 814, 819–21 (8th Cir. 2011) (vacating agency action that failed to consider whether policy conflicted with statute).

### C.   The Adjudications Are Unlawful And Confirm The Rule Is Arbitrary.

1.   <u>ATF Cannot Simultaneously Issue Adjudications On Specific Firearms Contemporaneously With The Rule.</u>

ATF also acted contrary to law by issuing dozens of unreasoned Adjudications that purport to apply its newly-minted standard to preexisting popular commercial firearms at the same time

and in the same proceeding that it issued the Rule.

The APA defines an "adjudication" as an "agency process for the formulation of an order" and an "order" as "the whole or a part of a final disposition . . . *in a matter other than rule making*." 5 U.S.C. § 551(6), (7) (emphasis added).  Courts have thus recognized that agency attempts to conduct "hybrid" proceedings that purport to combine rulemaking with adjudication "ignore[ ] the clear scheme of the APA." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1160 (D.C. Cir. 1979).  It undermines basic principles of due process—fair notice and an opportunity to respond— for an agency to adopt a new rule and then immediately apply it to an existing set of facts, without allowing regulated parties to present evidence on why they are not liable.  *See, e.g.*, *Am. Airlines, Inc. v. C. A. B.*, 359 F.2d 624, 631 (D.C. Cir. 1966) (criticizing agency action that "is couched as [a] rule making, general in scope and prospective in operation, but in substance and effect is individual in impact and condemnatory in purpose"); *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 652 F.3d 42, 43 (D.C. Cir. 2011) (Brown, J., dissenting from denial of rehearing en banc) (criticizing "a hybrid proceeding in which adjudication served as a Trojan horse for retroactive rules").

ATF's use of a "hybrid" proceeding here is especially prejudicial, where ATF adopted a Rule that differs substantially from the points-based "worksheet" it initially proposed—so much so that it reversed its position on the SB-Mini—and then proceeded to classify firearms under its new totality-of-the-circumstances approach using little more than pictures.  This mode of proceeding is contrary to the APA and the Rule should be vacated for that reason alone.

> 2.   The Adjudications Apply A Rule That Is Contrary To The Statutory Text.

The Adjudications also apply provisions in the Rule that conflict with the statutory text. Thus, like the Rule, the Adjudications are "inconsistent with the plain language and structure of" the NFA and GCA and, for that reason, "arbitrary [and] capricious."  *Greater Missouri Med. Pro-Care Providers, Inc. v. Perez*, 812 F.3d 1132, 1136, 1138 (8th Cir. 2015); *see Shazi v. Wilkinson*,

34

988 F.3d 441, 446–50 (8th Cir. 2021) (vacating agency adjudication based on impermissible construction of statute).

### 3.   The Adjudications Are Not Reasonably Explained.

None of the Adjudications satisfy the APA's "requirement that [ATF] provide a reasoned explanation for its action." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916.  Each Adjudication simply presents a picture of a brace-affixed weapon and then labels it a short-barreled rifle.  These "conclusory statements" "do not suffice," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016), because the agency has not offered "reasons that can be scrutinized by courts and the interested public," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019).

Nor can ATF save the Adjudications by pointing to the Rule.  Even if the Rule is upheld, it must be reasonably applied.  As explained above, the factors are not self-explanatory and there is doubt about how ATF will determine, for example, whether a length of pull is "consistent with" rifles or whether "community information" evinces an intent to shoulder.  Because ATF has not shown how it "applied the relevant legal standards," the Adjudications are arbitrary and capricious. *Kearney*, 934 F.3d at 817.

### 4.   The Adjudications Confirm That The Rule Is Arbitrary.

ATF's Adjudications confirm what is obvious from the Rule:  the agency's "factoring criteria" are window dressing that allow ATF to reach whatever result it wants.  ATF's treatment of the SB-Mini brace demonstrates this clearly.  ATF has twice before issued preliminary decisions opining that pistols affixed with the SB-Mini are ***not*** short-barreled rifles.  *See* Rule, 88 Fed. Reg. at 6,492 (citing preliminary classification letter issued in 2020), 6,496 (citing example classification issued in 2021 Notice).[5]  Now, ATF—with no analysis—has taken the opposite

---

[5] The "SB-Mini" is "sometimes referred to as the SBL-Mini."  Notice, 86 Fed. Reg. at 30,837.

position and classified an "AR-type Firearm with SB-Mini Attached" as a "Short-barreled Rifle." Platforms Adjudication at 8.

ATF's conclusory treatment of the SB-Mini Adjudication confirms that its Rule is standardless. Indeed, most of the factors cut against ATF's conclusion. For example, an SB-Mini-equipped AR-type pistol has a length of pull of 11-3/8 inches, Notice, 86 Fed. Reg. at 30,837, which is shorter than both the average length of pull for rifles (13-1/2 to 14-1/2 inches) and ATF's example AR-15 length of pull (13 inches), Rule, 88 Fed. Reg. at 6,535. Its overall length of 25-1/8 inches, Notice, 86 Fed. Reg. at 30,837, is nearly eight inches shorter than ATF's example AR-15 length (33 inches), Rule, 88 Fed. Reg. at 6,516. The SB-Mini equipped pistol in the agency's photograph lacks sights or a scope that only facilitate shoulder-firing, and SB Tactical has always marketed the SB-Mini as a "Pistol Stabilizing Brace" that is neither designed nor intended to be fired from the shoulder.[6] But despite at least four of the six factors cutting against shouldering— and having twice before concluded that an SB-Mini-equipped AR-type pistol was not a rifle— ATF apparently considered itself so unconstrained by its own legal test that it did not even have to bother explaining its contrary result. If that is how the Rule works, then it plainly "does not adequately explain the standard on which [ATF's] decision[s]" will be "based." *Kearney*, 934 F.3d at 816.

* * *

Because the Rule and the Adjudications are arbitrary, capricious, and contrary to law, Plaintiffs are likely to succeed on the merits.

## II.   PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION.

Absent preliminary relief, Plaintiffs SB Tactical and B&T USA will suffer irreparable

---

[6] https://www.sb-tactical.com/product/sb-mini/.

economic harm.  The Rule and Adjudications reclassify dozens of weapons equipped with SB Tactical's products.  SB Tactical's sales plummeted from approximately 92,000 braces per month before ATF issued its Notice to fewer than 20,000 braces in January, the month the Rule became public.  Creamer Decl. ¶ 41.  SB Tactical has laid off 61% of its workforce, expects to imminently lay off half of its remaining employees, and may go out of business within months.  *Id.* ¶¶ 43–45.  B&T—which makes pistols specially designed to be used with stabilizing braces—has not been able to sell a single specialized pistol since the Rule became public.  Declaration of Irving Luce, ¶ 15 ("Luce Decl."), Compl. Ex. H.  This loss is staggering because B&T derives 73% of its revenues from these products.  *Id.* ¶ 6.  Under any standard, these "adverse effect[s] on [Plaintiffs'] business[es], coupled with the incalculable loss of revenue, provide[] a basis for finding irreparable injury."  *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 866–67 (8th Cir. 1977); *see Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32 (1975) (threat of "bankruptcy" "sufficient[]" to show "irreparable injury"); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("financial injury" that "threatens the very existence of [a party's] business" "suffices to show irreparable injury") (citations and quotations omitted).

Compounding the harm, Plaintiffs SB Tactical and B&T cannot recover "money damages" from ATF.  5 U.S.C. § 702; *see Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (holding damages unrecoverable due to sovereign immunity irreparable); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (same).  "The threat of unrecoverable economic loss," the Eighth Circuit has held, "qualif[ies] as irreparable harm."  *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *see Slawson Expl. Co. v. Dep't of Interior*, 2017 WL 7038795, at *9–*10 (D.N.D. Nov. 27, 2017) (Hovland, J.).

Absent an injunction, SB Tactical and B&T will also suffer irreparable reputational

damage.  SB Tactical and B&T's customers purchased their products with the understanding that braces were "perfectly legal accessories for large handguns or pistols."  *See* 2017 Letter at 1.  Even if ATF allows these parties to turn in or modify their weapons, ATF's regulatory about-face will cause SB Tactical and B&T to suffer an immeasurable "loss of consumer goodwill," which "qualifies as irreparable harm."  *Iowa Utils. Bd.*, 109 F.3d at 426.  SB Tactical will further suffer reputational harm because ATF—in the Rule's preamble—accuses SB Tactical of "dishonest, unethical conduct."  *See Kroupa v. Nielsen*, 731 F.3d 813, 820, 821 (8th Cir. 2013) ("Because damage to one's reputation is a harm that cannot be remedied by a later award of money damages, the threat of reputational harm may form the basis for preliminary injunctive relief.") (citing *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)); *accord* Creamer Decl. ¶¶ 35–37, 46.  Each day the Rule and Adjudications are able to place a cloud of legal doubt on these companies' business practices will result in further irreparable harm.

The States, too, will suffer irreparable harm.  Compliance costs from surveying existing law enforcement inventories and removing or registering affected firearms and accessories is unrecoverable financial harm.  *See, e.g., Chaske*, 28 F.3d at 1473; *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (Erickson, C.J.) ("In addition to the loss of sovereignty, the States assert an irreparable harm in the form of unrecoverable monetary harm.").  The Rule also invades the States' power to police crime.  States' discretion in this area—particularly when the Rule threatens safe and timely law-enforcement responses—is a "traditional power," the deprivation of which is irreparable.  *North Dakota*, 127 F. Supp. 3d at 1059.

Plaintiff Richard Cicero will also suffer irreparable harm.  Mr. Cicero lost two limbs while serving his country in Afghanistan.  Declaration of Richard Cicero ¶ 4, Compl. Ex. J.  Because of his injuries, Mr. Cicero cannot fire certain pistols without a stabilizing brace.  *Id.* ¶ 5.  Mr. Cicero

38

will thus be prevented from using his firearms unless and until he is able to comply with the Rule. Even if he is eventually able to do so, "[t]hese sorts of injuries, i.e., deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019).

The injury is compounded because the Rule "interfere[s] with the exercise of [Mr. Cicero's] constitutional rights" and of those whom he trains. *Planned Parenthood*, 558 F.2d at 867. Mr. Cicero's firearms are not short-barreled rifles and are fully protected by the Second Amendment. "It is well-established that the inability to exercise a constitutional right constitutes irreparable harm." *MKB Mgmt. Corp. v. Burdick*, 954 F. Supp. 2d 900, 912 (D.N.D. 2013) (Hovland, J.); *accord Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1102 (8th Cir. 2013); *D.M. by Bao Xiong*, 917 F.3d at 1003. Plaintiffs have thus shown irreparable injury.

## III.   THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR GRANTING AN INJUNCTION.

The balance-of-harm and public-interest "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "balance of harm factor" concerns "the harm to all parties to the dispute and other interested parties, including the public." *Slawson Expl. Co.*, 2017 WL 7038795, at \*10 (citing *Dataphase*, 640 F.2d at 114 and *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991)). Here, "delaying the Rule will cause the Agencies no appreciable harm." *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1060 (D.N.D. 2015) (Erickson, C.J.). But allowing ATF to enforce its unlawful Rule and Adjudications will cause significant harm to Plaintiffs and to the public by subjecting millions of law-abiding Americans to extensive regulation under threat of felony gun charges.

Granting an injunction would also serve the public interest by "preserv[ing] the status quo"—that has existed for more than a decade—"pending the outcome" of this suit. *Nebraska v.*

*Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (citations and quotations omitted); *see also D.M. by Bao Xiong*, 917 F.3d at 1004 ("The public is served by the preservation of constitutional rights." (citation omitted)).  Plaintiffs' likelihood of success on the merits also establishes a strong showing under this factor because "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1143 (citations and quotations omitted).  Thus, to the extent a "percentage of the public" would benefit from the rule—though, as noted above, ATF's own research shows that crimes committed with braced pistols are thousands of times less common than crimes with other guns—"[a] far broader segment of the public would benefit from the preliminary injunction because it would ensure that federal agencies do not extend their power beyond the express delegation from Congress." *North Dakota*, 127 F. Supp. at 1060.

## CONCLUSION

Because Plaintiffs have established that they will succeed on the merits and that the other three factors favor preliminary relief, this Court should preliminarily enjoin ATF from enforcing the Rule and the Adjudications.

February 10, 2023

/s/ Stephen J. Obermeier
Stephen J. Obermeier
Thomas M. Johnson, Jr.
Michael D. Faucette
Jeremy J. Broggi
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Tel: 202.719.7000
Fax: 202.719.7049
SObermeier@wiley.law
TMJohnson@wiley.law
MFaucette@wiley.law
JBroggi@wiley.law
BGarriott@wiley.law

Benjamin J. Sand (ND ID #07981)
**CROWLEY FLECK PLLP**
100 W Broadway Ave
Bismarck, ND 58501
Tel: 701.223.6585
Fax: 701.222.4853
bsand@crowleyfleck.com

*Counsel for Plaintiffs FRAC, SB Tactical, B&T, and Richard Cicero*

/s/ *Lindsay See*
PATRICK MORRISEY
Attorney General
LINDSAY SEE
Solicitor General
MICHAEL R. WILLIAMS
Senior Deputy Solicitor General

Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for Plaintiff State of West Virginia*

DREW H. WRIGLEY
Attorney General
JAMES E. NICOLAI
Interim Solicitor General

North Dakota Attorney General's Office
600 E Boulevard Avenue, Dept. 125
Bismarck, ND 58505
(701) 328-3644
ctitus@nd.gov

*Counsel for Plaintiff State of North Dakota*

STEVE MARSHALL
Attorney General
EDMUND G. LACOUR JR.*
Solicitor General

Alabama Attorney General's Office
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

TREG TAYLOR
Attorney General
CHARLES E. BRASINGTON*
Assistant Attorney General

Alaska Attorney General's Office
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Phone: (907) 269-6612
charles.brasington@alaska.gov

*Counsel for Plaintiff State of Alaska*

TIM GRIFFIN
Attorney General
NICHOLAS J. BRONNI*
Solicitor General
DYLAN L. JACOBS*
Deputy Solicitor General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

ASHLEY MOODY
Attorney General
NATALIE P. CHRISTMAS* (Fla. Bar 1019180)
Assistant Attorney General of Legal Policy

Florida Attorney General's Office
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

CHRISTOPHER M. CARR
Attorney General
STEPHEN J. PETRANY*
Solicitor General

Georgia's Attorney General's Office
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Attorney General
DAVID M.S. DEWHIRST*
Chief Deputy Attorney General

Idaho Attorney General's Office
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
david.dewhirst@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

THEODORE E. ROKITA
Attorney General
BETSY M. DENARDI*
Director of Complex Litigation

Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6231
Betsy.DeNardi@atg.in.gov

*Counsel for Plaintiff State of Indiana*

BRENNA BIRD
Attorney General
ERIC H. WESSAN*
Solicitor General

Iowa Attorney General's Office
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

KRIS KOBACH
Attorney General
JESSE A. BURRIS*
Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

DANIEL CAMERON
Attorney General
AARON J. SILLETTO*
Assistant Attorney General

Kentucky Attorney General's Office
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Aaron.Silletto@ky.gov

*Counsel for Plaintiff Commonwealth of
Kentucky*

ELIZABETH B. MURRILL*
Solicitor General
J. SCOTT ST. JOHN*
Deputy Solicitor General
TRACY SHORT*
Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

LYNN FITCH
Attorney General
JUSTIN L. MATHENY*
Deputy Solicitor General

Mississippi Attorney General's Office
550 High Street, Suite 1200
Jackson, MS 39201
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

*Counsel for Plaintiff State of Louisiana*

ANDREW BAILEY
Attorney General
JOSHUA M. DIVINE*
Solicitor General
JEFF P. JOHNSON*
Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
josh.divine@ago.mo.gov
jeff.johnson@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Attorney General
ERIC J. HAMILTON*
Deputy Solicitor General

Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Eric.Hamilton@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

GENTNER F. DRUMMOND
Attorney General
GARRY M. GASKINS, II*
Solicitor General
AUDREY A. WEAVER*
Assistant Solicitor General

Oklahoma Attorney General's Office
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105

AUSTIN KNUDSEN
Attorney General
CHRISTIAN B. CORRIGAN*
Solicitor General

Montana Attorney General's Office
215 N Sanders St
Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov

*Counsel for Plaintiff State of Montana*

JOHN M. FORMELLA
Attorney General
ANTHONY J. GALDIERI*
Solicitor General
SAMUEL R.V. GARLAND*
Senior Assistant Attorney General

New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
samuel.rv.garland@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

ALAN WILSON
Attorney General
J. EMORY SMITH, JR.*
Deputy Solicitor General

South Carolina Attorney General's Office
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3680
Fax: (803) 734-3677
Email:   ESmith@scag.gov

(405) 521-3921
Garry.Gaskins@oag.ok.gov
Audrey.Weaver@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*


MARTY J. JACKLEY
Attorney General

South Dakota Attorney General's Office
1302 E. Highway 4, Suite 1
Pierre, SD 57501
605-773-3215

*Counsel for Plaintiff State of South Dakota*


SEAN REYES
Attorney General
MELISSA HOLYOAK*
Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*


BRIDGET HILL
Attorney General
RYAN SCHELHAAS*

*Counsel for Plaintiff State of South Carolina*


JONATHAN SKRMETTI
Attorney General and Reporter
ANDRÉE S. BLUMSTEIN*
Solicitor General
CLARK L. HILDABRAND*
Assistant Solicitor General

Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*


JASON MIYARARES
Attorney General
ANDREW N. FERGUSON*
Solicitor General
KEVIN M. GALLAGHER*
Deputy Solicitor General
M. JORDAN MINOT*
Assistant Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

Chief Deputy Attorney General

Wyoming Attorney General's Office
Counsel for the State of Wyoming
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov


*Counsel for Plaintiff State of Wyoming*

*\*pro hac vice or admission application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2023, I electronically filed the above paper with the

Clerk of Court using the ECF system, and I hereby certify that the above paper will be served via

certified mail with the Summons and Complaint to the following:

**Merrick B. Garland**
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Office of the United States Attorney for the District of North Dakota**
Civil Process Clerk
William L. Guy Federal Building
220 East Rosser Ave, Room 372
Bismarck, ND 58502-0699

**The Bureau of Alcohol, Tobacco, Firearms and Explosives**
99 New York Avenue, NE
Washington, DC 20226

**Steven M. Dettelbach**
Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue, NE
Washington, DC 20226

Dated: February 10, 2023                    /s/ Stephen J. Obermeier
                                            Stephen J. Obermeier