**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

DARREN A. BRITTO, *et al.*,

      *Plaintiffs,*

    v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES, *et al.*,

      *Defendants.*

No. 2:23-cv-19-Z

## DEFENDANTS' OPPOSITION TO PROPOSED INTERVENOR'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION......................................................................................................................1

BACKGROUND.......................................................................................................................2

LEGAL STANDARDS.............................................................................................................4

ARGUMENT............................................................................................................................5

I.      CMMG is unlikely to succeed on the merits of its claims...............................................5

      A.      The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions. ...................................................5

      B.      The Rule is neither arbitrary or capricious...................................................17

              1.      The Rule's factors are reasonable when considered together. .........18

              2.      The factors are individually reasonable...........................................19

               3.      The cost-benefit analysis is not arbitrary.........................................23

      C.      The Commercial and Non-Commercial Guidance issued by ATF are not final agency actions under the APA, and CMMG lacks standing to challenge them *en masse*. ..........................................................................................................24

              1.      The Commercial and Non-Commercial Guidance are not final agency actions under the APA. ...............................................................24

              2.      CMMG's challenge is premature, and it lacks standing to challenge the Commercial and Non-Commercial Guidance *en masse*....................26

              3.      The Commercial and Non-Commercial Guidance do not show that the Rule is arbitrary.............................................................................27

II.     CMMG will not suffer irreparable harm in the absence of an injunction. ...............28

III.    The equities and the public interest weigh against a preliminary injunction. ...........29

IV.    In all events, any relief should be limited to redress CMMG's alleged injuries. .......30

CONCLUSION.......................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Abraham Lincoln Mem'l Hosp. v. Sebelius,*
  698 F.3d 536 (7th Cir. 2012) ............................................................................................. 25

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ............................................................................................... 30

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
  515 U.S. 687 (1995) ............................................................................................................ 17

*Bennett v. Spear,*
  520 U.S. 154 (1997) .............................................................................................................. 6

*Bittner v. United States,*
  598 U.S. ___ , 2023 WL 2247233 (U.S. Feb. 28, 2023) .................................................... 16

*Cal. Cmtys. Against Toxics v. EPA,*
  934 F.3d 627 (D.C. Cir. 2019) ........................................................................................... 25

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ............................................................................................... 16

*Catawba Cnty., N.C. v. E.P.A.,*
  571 F.3d 20 (D.C. Cir. 2009) ............................................................................................. 18

*Chacon v. Granata,*
  515 F.2d 922 (5th Cir. 1975) ............................................................................................. 28

*Chapman v. United States,*
  500 U.S. 453 (1991) ............................................................................................................ 14

*Conf. Grp. v. FCC,*
  720 F.3d 957 (D.C. Cir. 2013) ........................................................................................... 25

*Donnell v. United States,*
  765 F.3d 817 (8th Cir. 2014) ............................................................................................. 14

*Duarte v. City of Lewisville,*
  136 F. Supp. 3d 752 (E.D. Tex. 2015) ............................................................................... 28

*Everett v. United States,*
  158 F.3d 1364 (D.C. Cir. 1998) ......................................................................................... 25

*FCC v. Prometheus Radio Proj.,*
  141 S. Ct. 1150 (2021) ........................................................................................................ 17

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ..................................................................................20

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .............................................................................30

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ...................................................................................6

*Guedes v. ATF,*
    356 F. Supp. 3d 109 (D.D.C. 2019) ...........................................................6

*Gun Owners of Am., Inc. v. Garland,*
    19 F.4th 890 (6th Cir. 2021) ......................................................................8

*Haynes v. United States,*
    390 U.S. 85 (1968) ...................................................................................12

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ......................................................................20

*Indep. Equip. Dealers Ass'n v. EPA,*
    372 F.3d 420 (D.C. Cir. 2004) .................................................................25

*Innovator Enterprises, Inc. v. Jones,*
    28 F. Supp. 3d 14 (D.D.C. 2014) .............................................................18

*Int'l Tel. & Tel. Corp., Comm. Equip. Sys. Div. v. Local 134, IBEW,*
    419 U.S. 428 (1975) .................................................................................25

*Inv. Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013) .................................................................24

*John Doe Co. v. Consumer Fin. Prot. Bureau,*
    849 F.3d 1129 (D.C. Cir. 2017) ...............................................................28

*Kanarr Corp. v. United States,*
    188 Ct. Cl. 1051 (1969) .........................................................................9, 12

*Kelly Servs., Inc. v. Creative Harbor, LLC,*
    846 F.3d 857 (6th Cir. 2017) ...................................................................11

*League of Women Voters of the U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .....................................................................28

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................................27

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ...........................................................................................................4

*Michigan v. EPA,*
  576 U.S. 743 (2015) .........................................................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................................................8, 15

*Muscarello v. United States,*
  524 U.S. 125 (1998) .........................................................................................................14

*Nat'l Multi Hous. Council v. Jackson,*
  539 F. Supp. 2d 425 (D.D.C. 2008) .................................................................................27

*Nat'l Nutritional Foods Ass'n v. Mathews,*
  557 F.2d 325 (2d Cir. 1977) .............................................................................................11

*Nat'l Park Hospitality Ass'n v. Dept. of the Interior,*
  538 U.S. 803 (2003) .........................................................................................................26

*Nat'l Rifle Ass'n v. Brady,*
  914 F.2d 475 (4th Cir. 1990) ..............................................................................................7

*Nken v. Holder,*
  556 U.S. 418 (2009) .........................................................................................................29

*PDK Lab'ys Inc. v. DEA,*
  438 F.3d 1184 (D.C. Cir. 2006) ........................................................................................18

*Posters 'N' Things, Ltd. v. United States,*
  511 U.S. 513 (1994) ............................................................................................10, 11, 22

*Rare Breed Triggers, LLC v. Garland,*
  __ F. Supp. 3d __, 2022 WL 17175089 n.2 (D.N.D. Nov. 4, 2022) .................................26

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  140 S. Ct. 1492 (2020) .................................................................................................12, 13

*S.F. Herring Ass'n v. Dep't of the Interior,*
  946 F.3d 564 (9th Cir. 2019) ............................................................................................24

*Sierra Club v. Peterson,*
  228 F.3d 559 (5th Cir. 2000) ............................................................................................26

*Sig Sauer, Inc. v. Brandon,*
  826 F.3d 598 (1st Cir. 2016) ............................................................................................11

*Sipes v. United States,*
    321 F.2d 174 (8th Cir. 1963) ...................................................................................12

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ...............................................................................................6

*Tex. Indep. Producers & Royalty Owners Ass'n v. United States EPA,*
    413 F.3d 479 (5th Cir. 2005) ...................................................................................26

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ...................................................................................18

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...........................................................................................30

*United States v. Davis,*
    139 S. Ct. 2319 (2019) ...........................................................................................14

*United States v. Fix,*
    4 F. App'x 324 (9th Cir. 2001) ...............................................................................14

*United States v. Hayes,*
    555 U.S. 415 (2009) ...............................................................................................11

*United States v. Rose,*
    695 F.2d 1356 (10th Cir. 1982) ......................................................................... 9, 12

*United States v. Santoro,*
    242 F. App'x 627 (11th Cir. 2007) ...........................................................................9

*United States v. Schuhmann,*
    963 F.2d 381 (9th Cir. 1992) ...................................................................................12

*United States v. Spy Factory, Inc.,*
    951 F. Supp. 450 (S.D.N.Y. 1997) ...........................................................................22

*United States v. Syverson,*
    90 F.3d 227 (7th Cir. 1996) .....................................................................................11

*United States v. Thompson/Center Arms Co.,*
    504 U.S. 505 (1992) .........................................................................................7, 9, 12

*United States v. Zeidman,*
    444 F.2d 1051 (7th Cir. 1971) ...................................................................................9

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) .........................................................................................17, 30

*White v. Carlucci,*
    862 F.2d 1209 (5th Cir. 1989) .................................................................................28

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................4, 14, 15

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ...............................................................................28

**Statutes**

5 U.S.C. § 551(13) .................................................................................................25

5 U.S.C. § 704 .......................................................................................................24

5 U.S.C. § 706(2)(A) ..............................................................................................17

5 U.S.C. § 706(2)(C) ................................................................................................5

18 U.S.C. § 921(a)(7) .......................................................................................*passim*

18 U.S.C. § 921(a)(8) ...................................................................................1, 5, 7, 13

18 U.S.C. § 921(a)(25) ..............................................................................................13

18 U.S.C. § 926(a) ..............................................................................................6, 15

26 U.S.C. § 5841 .......................................................................................................1

26 U.S.C. § 5845(a)(3) ................................................................................5, 7, 8, 9

26 U.S.C. § 5845(a)(7) .........................................................................................13, 15

26 U.S.C. § 5845(b) ................................................................................................16

26 U.S.C. § 5845(c) .........................................................................................*passim*

26 U.S.C. § 7801(a)(1) ..............................................................................................6

26 U.S.C. § 7805(a) .................................................................................................7

26 U.S.C. § 7801(a)(2)(A) ........................................................................................15

**Rules**

Federal Rule of Civil Procedure 5(b)(2) ..................................................................32

**Legislative Materials**

H.R. Rep. No. 83-1337 ..............................................................................................9

## Regulations

27 C.F.R. § 478.11 ................................................................................................................ 8

28 C.F.R. § 0.130 ................................................................................................................ 15

28 C.F.R. § 0.130(a) ............................................................................................................ 6

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
 88 Fed. Reg. 6,478 (Jan. 31, 2023) .......................................................................... *passim*

## Other Authorities

Classic Firearms, Manufacturer Review SB Tactical, YouTube (Feb. 14, 2022),
 https://www.youtube.com/watch?v=mC3M8T4lISM ...................................................... 28

*Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles,*
 https://perma.cc/JZB3-9CUY .......................................................................................... 3

*Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles,*
 https://perma.cc/BK6C-BRGQ ........................................................................................ 3

Conklikov, Review: SB tactical TF1913 pistol stabilizing brace for Ak style pistols, YouTube
 (Nov. 10, 2022), https://www.youtube.com/watch?v=gBr1uXkKdew .............................. 28

*Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Jan. 2023),
 https://perma.cc/96PV-KRB9 ......................................................................................... 23

*FINAL RULE 2021R-08F,*
 https://perma.cc/W6ZW-8FUL ....................................................................................... 7

Minimalist Moto Life, AR357 build pt1 blowback 357 Sig AR pistol PDW PCC, YouTube (May
 16, 2020), https://www.youtube.com/watch?v=biELjHkkGCM ...................................... 28

OMB, *Circular A-4,*
 https://perma.cc/F3AR-RKYP .......................................................................................... 24

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and distribution of short-barreled rifles, weapons that it judged especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though "stabilizing braces" are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them so that they may be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a "stabilizing brace" are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a "stabilizing brace" or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired from

the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

CMMG is a federally licensed firearms dealer, and it manufactures heavy pistols sold with stabilizing braces. Reinkemeyer Decl. ¶ 3, ECF No. 18-7. It seeks to intervene in this action and preliminarily enjoin the Rule. Defendants oppose CMMG's intervention in this lawsuit for all the reasons set forth by separate opposition brief. *See* ECF No. 41. But in the event the Court determines CMMG's intervention is appropriate, CMMG has still failed to show any of the prerequisites to obtain the extraordinary relief of a preliminary injunction. First, CMMG is unlikely to succeed on the merits of its claims. Congress empowered and obligated ATF to determine whether and when pistols with "stabilizing braces" become "rifles," as defined under federal law. The Rule comports with the relevant statutory provisions and is reasonably explained. Moreover, the factors adopted by the Rule and the interim classification guidance ATF has issued following the Rule's publication are lawful. And the merits aside, CMMG will not suffer irreparable harm absent preliminary relief, and the requested injunction would undermine the public interest. The Court should therefore deny CMMG's motion.

## BACKGROUND

Defendants recently submitted briefing in this matter that discusses (i) the pertinent statutory and regulatory background of this case, (ii) ATF's pre-Rule classifications of, and guidance regarding, weapons equipped with "stabilizing braces," and (iii) the rulemaking process and the Rule's key provisions. Rather than repeat it here, Defendants respectfully refer the Court to that discussion. *See* Defs.' Opp. to Pls.' Mot. for a Prelim. Inj. ("PI Opp.") at 2–11, ECF No. 39-1.

*Additional background.* Although Plaintiffs and CMMG both assert a facial challenge to the Rule, CMMG also seeks to challenge interim guidance that ATF issued in connection with the Rule. As Defendants have already explained, *see id.* at 9, the Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," 88 Fed. Reg. at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade,

and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors are:

(i)   whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii)  whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv)  whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)   the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)  information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

Although ATF believes possessors of "brace"-equipped firearms can apply these criteria themselves, to provide extra guidance, the Rule stated that ATF would publish "information simultaneously with" the Rule to inform the public of "common weapon platforms" and "examples of commercially available firearms equipped with a 'stabilizing brace' that are short-barreled rifles." 88 Fed. Reg. at 6,481. To that end, and using the Rule's criteria, ATF posted on its website for illustrative purposes photos of a sampling of weapons that it considers short-barreled rifles. *See Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ ("Commercial Guidance"); *Common weapon platforms with attached "stabilizing brace" designs that are*

*short-barreled rifles* ("Non-Commercial Guidance"), https://perma.cc/JZB3-9CUY; Ryan Decl., Ex. A, ¶¶ 7–8. These illustrative examples neither formally classify the weapons in question nor purport to convey ATF's individualized analysis of particular weapons; instead, "ATF's intention was and is to issue formal classification letters to manufacturers explaining its reasoning and analysis behind each classification decision." *Id.* ATF needed additional time to issue these letters, and it is in the process of drafting and reviewing them. *Id.* ¶¶ 8–9. Also, while ATF considers the samples of non-commercial common weapon platforms identified in the guidance to be short-barreled rifles, individuals must submit their firearm to ATF for classification to receive a definitive determination. *Id.* ¶ 11. Because any number of factors can affect weight, length, and other relevant criteria, ATF cannot issue a general classification applicable to all weapons using a specific platform or "brace" device. *Id.*

    *This lawsuit.* On February 17, 2023, CMMG—a firearms manufacturer that appears to be a Missouri corporation—moved to intervene in this action as a plaintiff, whether as of right or, alternatively, with the Court's permission. *See* ECF No. 17. CMMG seeks to challenge the Rule and ATF's interim guidance under the Administrative Procedure Act ("APA"), Compl. ¶¶ 127–57, ECF No. 18, and has filed a motion to preliminarily enjoin ATF from "enforcing" the Rule and its interim classification guidance. Mot. at 25, ECF No. 20. Defendants oppose CMMG's intervention as well as its request for preliminary injunction.

**LEGAL STANDARDS**

    "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

4

## ARGUMENT

I. **CMMG is unlikely to succeed on the merits of its claims.**

A. **The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions.**

CMMG claims that ATF lacked authority to promulgate the Rule because it "misinterprets" the statutory definition of "rifle" and "regulates" weapons that are not regulated under the NFA or the GCA. Compl. ¶¶ 128–32 (citing 5 U.S.C. § 706(2)(C)); Mot. at 3–14. But the Rule fits squarely within ATF's delegated authority and correctly construes the relevant statutory provisions. CMMG's arguments, on the other hand, run contrary to basic principles of statutory construction.

**1.** As a threshold matter, a facial APA challenge to the Rule is ill-suited for redressing CMMG's alleged injuries. One would expect CMMG to bring concrete challenges to ATF's actual classifications of the *particular* "brace"-equipped weapons that it manufacturers or possesses. After all, its alleged injuries stem from whether *its* weapons are short-barreled rifles subject to NFA and GCA controls. But CMMG brings no legal claim to have the Court resolve whether its particular weapons are properly classified as "short-barreled rifles" under 26 U.S.C. § 5845(a)(3), (a)(4) or 18 U.S.C. § 921(a)(8). In fact, the record is devoid of any facts that would allow this Court to independently assess the classification of any of CMMG's "brace"-equipped weapons under the terms of the statute. That omission is telling: if the Court were to conclude that CMMG manufactures or possesses a short-barreled rifle within the meaning of the NFA, any purported "injury" to CMMG would not be traceable to the Rule at all, but would instead stem solely from the statute—as the Rule is purely interpretive. Indeed, though CMMG raises abstract challenges to the Rule, it is the statute—not the Rule—that would impose the relevant obligations on CMMG. For purposes of this motion, then, CMMG has failed to demonstrate standing

to facially challenge the Rule. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[A]n injury" must be "fairly traceable to the challenged conduct.").[1]

**2.** But setting that aside, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500. And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

---

[1] It is similarly unclear that a challenge to the Rule in the abstract is a challenge of final agency action under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that final agency action must be one by which "rights or obligations have been determined").

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *see also Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers some measure of discretion" to ATF "to determine what regulations are in fact 'necessary'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, at 517 (1992) (plurality op.). A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having one or more barrels less than [16] inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

Then the "stabilizing brace" arrived and quickly proliferated. As explained, PI Opp. at 6, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices, as the need for ATF to determine these weapons' classifications was obvious to manufacturers from the beginning. While "stabilizing braces" are purportedly meant to assist single-handed fire by stabilizing against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a "stabilizing brace," it is often hard to tell the firearm apart from weapons explicitly marketed as short-barreled rifles. *Id.* at 6,493–94, 6,529; *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various "brace" devices to convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used "brace"-equipped firearms

to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a "stabilizing brace" may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's expertise and years of experience in classifying "brace"-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021). The Rule therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

**3.** CMMG does not dispute that ATF has the statutory authority to interpret the NFA's and the GCA's provisions. Instead, it suggests that ATF lacked authority to promulgate the Rule because these statutes "unambiguously exclude" pistols equipped with "stabilizing braces" from controls applicable to short-barreled rifles. Mot. at 3–14. The Rule reaches a different conclusion, CMMG says, by misinterpreting the NFA's definition of "rifle," 26 U.S.C. § 5845(c), and by "overlooking" the definitions of short-barreled rifles, *id.* at § 5845(a)(3), (4). But CMMG's arguments do not comport

with the statute's text or purpose, prior judicial constructions, or any canon of construction it invokes. The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a "stabilizing brace" can be a "rifle," and thus a short-barreled rifle, within the meaning of the NFA and the GCA.

*"Rifle" under § 5845(c).* Start with the statutory definition of "rifle." *Id.* § 5845(c). Though CMMG contends that a pistol equipped with a "stabilizing brace" can never be a *short-barreled* rifle, Mot. at 4, 6, 12, it does not dispute that a pistol can be modified into a "rifle," as defined by the NFA. Indeed, this interpretation of § 5845(c) is not only supported by the provision's use of the broad and inclusive term "weapon," but it is confirmed by the Supreme Court's decision in *Thompson/Center.* There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (plurality op.) (quoting 26 U.S.C. § 5845(c)); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *See, e.g., United States v. Zeidman,* 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro,* 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as one of the component parts, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[2]

Although CMMG appears to accept this understanding of the statutory definition of "rifle," it nevertheless suggests that the Rule misconstrues that definition in two ways, neither of which have

---

[2] That is why even weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *E.g., Kanarr Corp. v. United States,* 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *United States v. Rose,* 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis). The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is a "rifle." H.R. Rep. No. 83-1337, at A395. Moreover, ATF has long recognized that pistols can be modified into "rifles." *E.g.,* IRS, Rev. Rul. 61–45, 1961 WL 12798 (Jan. 1, 1961).

merit. *First*, CMMG contends that the Rule misinterprets the term "intended," as used in § 5845(c). But it rests this argument on two false premises: that ATF determines the intended use of a weapon based solely on marketing materials and other information "produced by third parties" and by "attribut[ing] third-party intent to" manufacturers. Mot. at 9. The Rule belies both assertions. First, nothing in the Rule suggests that ATF imputes the intent of third parties onto the manufacturer. On the contrary, the Rule makes clear that ATF may consider, *inter alia*, the "*manufacturer's own* marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general community's likely use of a particular weapon, if it evinces the *manufacturer's* intent with regard to that weapon. 88 Fed. Reg. at 6,544. Courts have long relied on this type of evidence to discern intent in numerous contexts. *See, e.g., Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 521 n.11 (1994) (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use").

Moreover, CMMG's suggestion that ATF determines a weapon's intended use by looking solely at third-party marketing materials and information simply ignores a sizeable portion of the Rule. As the Rule explains, to properly apply the statutory definition of "rifle," ATF considers, in addition to a manufacturer's description of the weapon and information indicating its likely use, the weapon's objective design features to determine whether it is designed and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. In this particular context, where the record shows that manufacturers' descriptions of "brace"-equipped weapons are often at odds with the weapons' design features and common use, *id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47, this objective approach is especially sensible. While a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) lead to absurd results, and (iii) permit manufacturers to circumvent the law by nominally describing the intended use one way (as not

a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at 6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g.*, *United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court reasoned, "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.* at 601, as recognized in analogous contexts, *e.g.*, *Posters 'N' Things*, 511 U.S. at 517–22 (adopting an objective construction of the statutory phrase "primarily intended . . . for use" (citation omitted)).[3]

---

[3] *See also, e.g.*, *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

*Second*, CMMG argues that the Rule misconstrues the term "designed," as used in § 5845(c). Mot. at 7–8. This argument also embraces a false premise: that ATF "excludes" from consideration "evidence" that a "stabilizing brace" can be used to assist single-handed fire in determining a weapon's classification. But again, nothing in the Rule supports that assertion. As it explains, the fact that a particular "brace"-equipped pistol may be designed to *also* allow effective single-handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Many litigants have argued (like CMMG) that the definition of "rifle" should be limited only to weapons designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57.[4]

As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a "stabilizing brace" that is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. 88 Fed. Reg. at 6,501. The opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is nowhere found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there."). Moreover, Congress indicated in the same provision how to impose such a limitation by defining a "silencer" to include a "part *intended only for use* in [the] assembly

---

[4] CMMG ignores this authority, and instead draws an inapt analogy from *Thompson/Center*. There, the Court held that a manufacturer did not "mak[e]" a short-barreled rifle by packaging a pistol with a kit containing a shoulder stock and 21-inch barrel, because the kit could be used to create either a short-barreled or a long-barreled rifle. 504 U.S. at 509–18. But here, CMMG argues something entirely different: that when a pistol equipped with a "stabilizing brace" can be used for a purpose "other than shouldering," it cannot be a "rifle" under § 5845(c), *even if* the weapon is designed, made, and intended to be fired from the shoulder. Nothing in *Thompson/Center* supports that argument; in fact, the § 5845(c)'s plain language and cases construing it compel the opposite conclusion.

or fabrication" of a firearm silencer or muffler. 26 U.S.C. § 5845(a)(7) (emphasis added) (cross-referencing 18 U.S.C. § 921(a)(25)); *Romag Fasteners*, 140 S. Ct. at 1495 (noting that courts should be "doubly careful" not to read words into statutes when Congress used "the term in question elsewhere in the very same" provision). But Congress chose to define "rifle" to mean a weapon designed, made, and intended to be fired from the shoulder, irrespective of alternate use.

*Short-barreled rifle under § 5845(a)(3), (4).* Because the Rule correctly determined that a pistol equipped with a "stabilizing brace" can be a "rifle" under § 5845(c), there is little question that these weapons can also be short-barreled rifles under the NFA. Section 5845(a)(3) includes within the NFA's definition of "firearm" any "*rifle* having a barrel or barrels of less than 16 inches in length." The GCA includes the same category of weapons within its definition of "short-barreled rifle." 18 U.S.C. § 921(a)(8). The plain language of these provisions compels the conclusion that any weapon meeting the statutory definition of "rifle" with a barrel shorter than 16 inches in length is subject to the NFA's and the GCA's controls for short-barreled rifles.

CMMG suggests that the Rule "overlooked" the statutory definitions under § 5845(a)(3) and (a)(4), and therefore failed to appreciate that neither can encompass a pistol equipped with a "stabilizing brace." Specifically, CMMG claims that § 5845(a)(3) is limited to short-barreled rifles made by "an NFA qualified manufacturer," while § 5845(a)(4) pertains only to long rifles that were "subsequently cut down" to create a short-barreled rifle. Mot. at 6. But nothing in the statutory text supports CMMG's cramped reading of either provision. Indeed, § 5845(a)(3) could not be clearer: any "rifle having a barrel . . . less than 16 inches in length" is an NFA "firearm." CMMG's reading of that provision would inject into the text words—*i.e.*, "made by an NFA qualified manufacturer"—"that aren't there." *See Romag Fasteners*, 140 S. Ct. at 1495. At any rate, contrary to what CMMG suggests, the Rule does not turn on any distinction between § 5845(a)(3) and (a)(4). The Rule clarifies the proper construction of the statutory term "rifle" as applied to weapons equipped with "stabilizing braces."

Determining whether a weapon is (or was made from) a "rifle" is an essential inquiry to determining whether the weapon satisfies either § 5845(a)(3) or (a)(4), and the Rule does not attempt to delineate when a weapon equipped with a "stabilizing brace" will satisfy one or the other provision.[5]

**4.** CMMG next contends that the rule of lenity requires that the Rule be set aside. *See* Mot. at 11–14. The rule of lenity is a principle of statutory construction providing that ambiguities within "a criminal statute should be resolved in the defendant's favor." *U.S. v. Davis*, 139 S. Ct. 2319, 2333 (2019). "To invoke the rule, [a court] must conclude that there is a grievous ambiguity or uncertainty in the statute," and it applies, "only if, after seizing everything from which aid can be derived, [the court] can make no more than a guess as to what Congress intended." *Muscarello v. U.S.*, 524 U.S. 125, 138 (1998). Lenity "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient[.]" *Chapman v. U.S.*, 500 U.S. 453, 463 (1991) (citation omitted). The "simple existence of some statutory ambiguity, however, is not sufficient to warrant the application of [the] rule, for most statutes are ambiguous to some degree." *Muscarello*, 524 U.S. 125, 138.

CMMG takes issue with the NFA and GCA's definition of "rifle"; however, that definition is not so ambiguous as to leave the Court merely guessing what Congress intended. As set forth above, *see supra* pp. 6–13, the NFA and GCA define "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . ." and define a "short-barreled rifle" as a rifle "having one or more barrels less than sixteen inches in length." 88 Fed. Reg. at 6,478–79 (quoting 18 U.S.C. § 921(a)(7), (8); 26 U.S.C. § 5845(c)). From this text, a court can easily surmise that Congress

---

[5] CMMG's reliance on *United States v. Fix*, 4 F. App'x 324 (9th Cir. 2001), for the proposition that the NFA does not permit ATF to consider "modifications of the weapon by the owner," Mot. at 6 (citation omitted), is misplaced. In *Fix*, the court merely rejected the government's argument that a particular weapon satisfied the definition of "any other weapon" under § 5845(e), 4 F. App'x at 326; it never suggested that a possessor's modification of a weapon cannot be considered in determining whether the weapon is a "rifle" under § 5845(c) or a "short-barreled rifle" under § 5845(a)(3) or (a)(4).

intended for weapons with a barrel of less than 16 inches in length and intended to be fired from the shoulder to fall within the NFA's purview. The Rule tracks the statutory definition and merely clarifies *how* ATF will determine whether a "brace" equipped weapon is "intended to be fired from the shoulder." Nothing in this regulatory framework suggests a grievous ambiguity.

CMMG makes much of ATF's change in position. *See* Mot. at 12–13. It contends that for ATF to "fundamentally change its longstanding position demonstrates at the very least that the NFA is ambiguous with respect to whether it covers brace-equipped pistols," and therefore, lenity should invalidate the Rule. *Id.* at 13. But how and why ATF has changed course demonstrates that the NFA is not grievously ambiguous.

To begin, CMMG's argument that ATF has "fundamentally change[d] its longstanding position" misapprehends the relevant regulatory history. *Id.* Contrary to CMMG's suggestion, prior to the Rule, ATF had not uniformly classified "brace"-equipped weapons as outside the NFA's scope. *See* PI Opp. at 4–7. ATF had not adopted a standardized analysis for determining whether a stabilizing brace changes a weapon's classification and had issued varied classification determinations for "brace"-equipped weapons, classifying some as short-barreled rifles and others as not. *See id.* at 6–7. The most significant change the Rule represents, then, is a shift from a system of inconsistent *ad hoc* analysis to a consistent analytical framework. This change pertains solely to how ATF administers and enforces the NFA, which is well within its regulatory prerogative and suggests no grievous statutory ambiguity. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 28 C.F.R. § 0.130.

Second, to the extent ATF's position regarding the classification of "brace"-equipped weapons has shifted, this shift in no way reflects that the NFA is a grievously ambiguous statute; instead, it evinces a clear statute ATF has reasonably applied differently to changing circumstances. *See State Farm*, 463 U.S. at 42 ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). ATF's approach to classification, while at

times variable, has always properly focused on the clear statutory command to consider whether the weapon is designed, made, and intended to be fired from the shoulder. As the Rule explains, in 2012, ATF considered the first classification request regarding a forearm brace; the design was modest, and the brace "did not convert [the] weapon to be fired from the shoulder[.]" 88 Fed. Reg. at 6,483. But today, ten years later, stabilizing braces have proliferated in the market, and they look and function very differently from earlier versions. *Id.* at 6,484, 6,494. In recent years, manufacturers have designed and marketed various "brace" devices to convert heavy pistols into shoulder-fired weapons— mimicking stock-equipped weapons or traditional rifles—and individual possessors have widely used these devices for that purpose, *see* PI Opp. at 4–5. Thus, to the extent the Rule's analytical framework classifies more "brace"-equipped weapons as short-barreled rifles within the NFA's purview, this shift is attributable to changing designs, not a grievously ambiguous statute.

CMMG's citation to *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), does not advance its argument. There, the court determined that the definition of "machinegun" under 26 U.S.C. § 5845(b) was "plain" and "unambiguous," *see id.* at 451, 464, thus obviating any need to resort to the rule of lenity. But the court nonetheless proceeded to discuss how lenity would apply assuming that § 5845(b) was so ambiguous as to "provide [no] meaningful guidance" and to require the court to "'guess' at its definitive meaning." *Id.* at 469. As already explained, no such grievous ambiguity exists in the statutory provisions relevant to this case. Moreover, and contrary to CMMG's suggestion, nothing in *Cargill* suggests that an agency's change in position on the proper application of a statute is sufficient to trigger the rule of lenity.

Additionally, as highlighted by Justices Gorsuch and Jackson, one of the principles underlying lenity is to ensure criminal defendants have fair notice of what the law requires. *See Bittner v. United States*, 143 S. Ct. 713, 725 (2023). Here, although CMMG invokes lenity to invalidate the Rule, fair notice is served better by the Rule than by setting it aside. In part, ATF initiated the rulemaking process

because the prior system of individual classification determinations provided insufficient notice to regulated parties. The 98-page Rule thoroughly explains how ATF will approach classification determinations going forward. Moreover, ATF has published interim guidance identifying pistol-brace combinations likely to be considered SBRs under the Rule. *See* Commercial Guidance. ATF is also in the process of drafting and issuing formal classification letters that will be sent directly to manufacturers. *See* Ryan Decl. ¶¶ 8–9. And the Rule expressly provides that "an individual may contact ATF to receive a determination of whether their firearm equipped with a 'stabilizing brace' is a rifle as defined by the GCA and NFA." 88 Fed. Reg. 6,481; *see Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (regulations subject to relaxed scrutiny when a party may "clarify the meaning of the regulation by its own inquiry"). Thus, the Rule, and not lenity, better serves the aim of fair notice.

Because lenity is properly invoked only as a fail-safe, when a criminal defendant might otherwise be convicted under a grievously ambiguous statute, it has no application here, as a first line of attack against a final agency rule. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995) (lenity not standard for "facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement.").[6]

### B.      The Rule is neither arbitrary nor capricious.

CMMG is also unable to show that the Rule is arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A). Judicial review under the APA's arbitrary-and-capricious standard is highly deferential, requiring only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.*, 141 S. Ct. 1150, 1158 (2021).

---

[6] CMMG also suggests the Rule must be invalidated based on principles of "constitutional avoidance," hinting it might "implicate core Second Amendment protections." *See* Mot. at 14. But CMMG asserts no Second Amendment claim and cannot invalidate a final rule by speculating that it implicates a constitutional interest. In any event, ATF explained at length why the Rule does not violate the Second Amendment. *See* PI Opp'n at 26–36.

1.   The Rule's factors are reasonable when considered together.

The Rule describes in detail all factors ATF considers when evaluating whether a particular "brace"-equipped weapon is a "rifle." As outlined above, the agency first considers whether the weapon provides surface area that permits shoulder fire. If it does, the agency then evaluates six relevant criteria to determine whether the weapon is designed, made, and intended to be fired from the shoulder, as required under the statutory definition of "rifle."

CMMG asserts that this analytical framework is too "malleable[,]" and that its criteria are "holistically arbitrary" because they are not weighted and none are "outcome determinative." Mot. at 14-15. Setting aside that the Rule's analysis is *less* malleable than ATF's prior approaches, agencies routinely apply multi-factor tests in applying statutory requirements, where the factors are not weighted. *E.g., Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"). CMMG points to no requirement that an agency's analysis must be tethered to specific weights or quantified requirements, especially when an analysis cannot achieve mathematical precision, like determining whether a firearm is designed and intended to be fired from the shoulder. *See PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties, and we have never hesitated to uphold their decisions when adequately explained.") (citation omitted). Indeed, a multi-factor analysis "must simply define and explain the criteria" applied, *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 39 (D.C. Cir. 2009), which the Rule does in exacting detail.

CMMG's reliance on *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014), Mot. at 16, is misguided. For one thing, that case concerned a challenge to ATF's classification of a specific silencer, not a facial challenge to a rule. Moreover, the court in that case faulted ATF for relying "*solely* on the physical characteristics of the device" to determine its classification. *Innovator Enter., Inc.*, 28 F. Supp. 3d at 25. But here the Rule identifies multiple criteria that ATF evaluates in addition to a

18

weapon's objective design features, like marketing materials and information indicating the likely use of the firearm.

Finally, although CMMG claims the Rule will require possessors to "guess" how ATF's analysis should apply to a particular weapon, Mot. at 16, that fear is speculative and unfounded. Setting aside the fact that the Rule thoroughly explains each of the criteria, ATF also issued interim guidance showing how dozens of weapons will be classified under this analysis, as well as other explanatory materials. *Supra* pp. 3–4. The Rule and its related guidance provide far greater clarity than the status quo ex ante. At bottom, CMMG cannot show that ATF's multi-factor analysis is irrational.

2.   The factors are individually reasonable.

CMMG is no more successful in targeting individual factors that ATF considers in assessing whether a particular weapon with a stabilizing brace is a short-barreled rifle. 88 Fed. Reg. at 6511–12.

<u>*Surface area.*</u> CMMG asserts that the Rule is arbitrary for not specifying the exact amount of "surface area" that permits a weapon to be fired from the shoulder. *See id.* at 6,575. True, the agency considers "whether there is any surface area on the firearm that can be used to shoulder fire the weapon," without reducing the analysis to a simple measuring game. *Id.* at 6,511. But that is a feature, not a bug. As the Rule explains, assessing whether a weapon's rear surface area allows shouldering is necessarily a fact-specific inquiry that does not turn solely on the *amount* of surface area. Other considerations also impact the analysis, like whether a weapon possesses a "design feature that prevents shouldering" (*e.g.*, an "attached protrusion that would dig into a shooter's shoulder"). *Id.* at 6,530. CMMG's argument that ATF should have eschewed a weapon-specific analysis and instead drawn a sharp, arbitrary line at a specific measurement is hardly a reasonable suggestion.

CMMG's argument again embraces the meritless proposition that a standard must be tied to a precise metric. As explained above, agencies frequently apply standards that do not use specific

19

numeric thresholds.[7] And courts routinely reject arguments (like CMMG's) that a broad standard offends the APA. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 458 (5th Cir. 2021). Rather, the "relevant question" for examining the "rationality" of a given standard is "whether the agency adequately explained why it adopted it." *Id.* Therefore, CMMG's mere preference for a precise metric to evaluate a weapon's surface area does not render the Rule irrational. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) ("A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives.").

*Weight, length, and length of pull.* CMMG's arguments concerning ATF's assessment of a particular weapon's weight, length, and length of pull likewise miss the mark by ignoring most of ATF's analysis and explanation in the Rule.

CMMG criticizes the Rule for including a list of rifles serving as points of comparison that range broadly in weight, length, and length of pull (*e.g.*, "2 points to 10 pounds"), 88 Fed. Reg. at 6,514–18, 6,535–37, without explaining "what it considers 'comparable' to these ranges." Mot. at 18. But that misconstrues how ATF evaluates the weight, length, and length of pull of a particular "brace"-equipped weapon. Contrary to what CMMG suggests, *id.*, ATF does not compare a specific weapon to the entire "range" of rifles in its database or listed in the Rule. Instead, for a weapon "marketed as a pistol that is a variant of a rifle," ATF compares its weight, length, and length of pull "against the original rifle design" (*e.g.*, AR-15-type pistol equipped with a "stabilizing brace" compared to a "similarly designed" AR-15 standard rifle). 88 Fed. Reg. at 6,514, 6,518, 6,535. And "[f]or a firearm that is not a variant of a rifle (*e.g.,* a Glock-type pistol)," ATF compares the weapon's weight and

---

[7] *Tripoli Rocketry*, cited by CMMG, is not to the contrary. That case "involve[d] an agency's failure to explain how a broad standard applied to a particular case," not a "facial" vagueness attack on a rule. *Huawei Techs.*, 2 F.4th at 458 (distinguishing *Tripoli Rocketry*).

length to those "of variants designed, made, and intended to be fired from the shoulder (*e.g.*, a Glock-type pistol with a shoulder stock or installed into a carbine conversion kit)." *Id.*[8]

CMMG is also incorrect to suggest that the agency has failed to explain why the weight, length, and length of pull of a "brace"-equipped weapon is relevant to the analysis. Mot. at 18–19. As the Rule explains, it is reasonable "to compare the characteristics of [a] firearm" equipped with a "stabilizing brace" "to similar firearms that are designed, made, and intended to be fired from the shoulder to determine if the first firearm is a rifle." 88 Fed. Reg. at 6,514. That is because, if "the weight and length of the firearm in question is consistent with the weight or length of similarly designed rifles, then this would be an indicator that shoulder firing the weapon provides stabilization and is beneficial in firing the weapon, and thus that the firearm is designed, made, and intended to be used this way." *Id.* Similarly, regarding length of pull, "[a] shoulder-fired weapon generally will have a length of pull that allows the placement of the firearm's shouldering device against the shooter's shoulder while also ergonomically allowing the shooter to engage the firearm's trigger." *Id.* at 6,511–12.

*Marketing/promotional materials and likely use of the weapons in the general community.* Finally, CMMG takes issue with the remaining two factors: "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and "[i]nformation demonstrating the likely use of the weapon in the general community." *Id.* at 6,575. Once more, CMMG avers that the agency "does not explain how [it] will assess this information," Mot. at 19, without addressing the portions of the Rule which do precisely that.

---

[8] CMMG again suggests that it is unreasonable for ATF to determine whether a particular "brace"-equipped weapon is consistent with the weight, length, and length of pull of a similarly designed rifle rather than "quantifying" precise "metric[s]" that will satisfy these factors. Mot. at 18–19. But ATF's approach accounts for the considerable variations in rifle designs, which cannot be reasonably reduced to a universally applicable "metric" or "range" of weights and lengths. In any event, as already explained, nothing in the APA requires an agency to adopt a metric-based approach. *Supra* pp. 18–20.

As an initial matter, and as already explained, *supra* pp. 10–11, the Rule correctly concluded that, although a manufacturer's stated intent may be relevant in determining a weapon's intended use, relying solely on a manufacturer's statements would frustrate Congress's purpose in enacting the NFA and the GCA and would render federal controls on short-barreled rifles toothless. For that reason, ATF considers not only the manufacturer's marketing materials, but also "indirect marketing and promotional materials" and relevant information indicating the likely use of the "weapon by the general community." 88 Fed. Reg. at 6,544. And again, *supra* pp. 10–11, courts repeatedly evaluate this type of information in determining the intended use of an item. *See*, *e.g.*, *Posters 'N' Things*, 511 U.S. at 521–22 & n.11 (construing a statute to require an objective analysis of whether an item is "primarily intended" for a specific use and assessing the "likely use" of the item by "customers generally" and "the circumstances of [its] display and sale").[9]

Although CMMG suggests that the Rule does not explain how ATF considers a manufacturer's marketing and promotional materials, their only substantive criticism is with ATF's assessment of the use of a specific certain SB Tactical "brace." Mot. at 19–20. But their brief arguments on this score are unpersuasive. Contrary to CMMG's arguments, ATF did not "cherry-pick" "two individuals who appear to be misusing a stabilizing brace," *id.* at 20, but rather ATF examined multiple examples of major publications or advertisements describing or showing the SBA3 brace as useful way to convert an AR-style pistol into a shoulder-fired weapon. 88 Fed. Reg. at 6,546–47. CMMG does not seriously dispute that this information is relevant in determining how the general public uses a particular weapon equipped with a "stabilizing brace," which is a material consideration in evaluating that weapon's design and intended use. *See Posters 'N' Things*, 511 U.S. at 521–22 & n. 11; *supra* p. 10–11 And contrary to what CMMG suggests, Mot. at 20, nowhere does the Rule suggest that ATF

---

[9] *Cf. United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 477 (S.D.N.Y. 1997) (Sotomayor, J.) ("The Supreme Court has noted that the 'primary' use of an item may be discernable in part from where it is sold and how it is marketed.").

"ignores" marketing materials or other information indicating a "brace"-equipped weapon's use for single-handed firing.

### 3.   The cost-benefit analysis is not arbitrary.

CMMG contends that the Rule's cost-benefit analysis is arbitrary. Mot. at 20–21; *see also Michigan v. EPA*, 576 U.S. 743, 752 (2015) (explaining that reasoned decision-making often "requires at least some attention to cost"). Specifically, it argues that ATF failed to (1) consider stabilizing braces sold in 2020–2022 in calculating the relevant costs and reliance interests, (2) consider "foregone 'consumer surplus,'" and (3) quantify the Rule's benefits. Mot. at 20–21. Each argument is meritless.

As an initial matter, ATF's cost-benefit analysis is reasonable: in addition to the Rule's discussion of cost and benefits, *e.g.*, 88 Fed. Reg. at 6,571–73, ATF also issued a Final Regulatory Impact Analysis. ATF, *Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Jan. 2023), https://perma.cc/96PV-KRB9 ("RIA"). The RIA includes a 40-page discussion of costs, *id.* at 28–67, and explains in detail how ATF determined the number of stabilizing braces in circulation, *id.* at 18–22. Based on its best estimate and relying largely in part on evidence from brace manufacturers, ATF estimated there were 3 million braces in circulation. *Id.* at 18. Still, ATF calculated anticipated costs using an estimate of 7 million braces in circulation—over 2x its actual estimate—to be sure "to account for uncertainty regarding the full cost of the rule." *Id.* This number, which CMMG ignores, Mot. at 20–21, more than accounts for additional braces in circulation attributable to 2020–2022 sales.

Next, CMMG critiques ATF for failing to consider "foregone 'consumer surplus.'" *Id.* at 20. But ATF's analysis relies on average market price, which accounts for both producer and consumer surplus, and thus, ATF did not fail to consider it. RIA at 59 ("This lost value would be equal to the consumer and producer surplus from these forgone sales . . . . Lacking data on producers' costs, this might be proxied with an estimate of the expected reduction in future sales revenues[.]").

The Rule and regulatory analysis also address the Rule's benefits to public safety. *See* 88 Fed. Reg. at 6,481 ("This rule enhances public safety by reducing the further proliferation and criminal use of firearms with attached 'stabilizing braces.'"). By properly classifying "brace"-equipped weapons as short-barreled rifles subject to the NFA, the Rule makes them "less attractive for criminals to obtain and use," and therefore, they are "less likely to be used in criminal activit[y]." RIA at 68. Benefit to public safety is difficult to quantify, and thus, it is sufficient for the agency to "exercise [its] professional judgment" to determine the importance of "non-quantified benefits . . . in the context of the overall analysis," as it did here. OMB, *Circular A-4*, at 2, https://perma.cc/F3AR-RKYP. "[T]he law does not require agencies to measure the immeasurable," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013).

### C.   The Commercial and Non-Commercial Guidance issued by ATF are not final agency actions under the APA, and CMMG lacks standing to challenge them *en masse.*

Separately, CMMG challenges under the APA what it describes as "dozens of unreasoned adjudications" issued in conjunction with the Rule. Mot. at 22 (capitalization omitted). The "adjudications" that CMMG describes are two slideshows, released following the Rule, that provide guidance on "how ATF will apply the definition of 'rifle' to firearms that are equipped with a 'stabilizing brace.'" Commercial Guidance; Non-Commercial Guidance; 88 Fed. Reg. at 6,481. But the Commercial and Non-Commercial Guidance are not final agency actions and are thus not reviewable under the APA. In addition, CMMG's claims are not ripe, nor does it have standing to challenge the guidance *en masse.*

#### 1.   The Commercial and Non-Commercial Guidance are not final agency actions under the APA.

Section 704 of the APA only permits judicial review of "final agency action." 5 U.S.C. § 704. This analysis focuses on two elements: first, whether the act in question qualifies as an agency "action" under the APA; and second, whether that action is final. *See, e.g., S.F. Herring Ass'n v. Dep't of the Interior*,

946 F.3d 564, 575–78 (9th Cir. 2019). ATF's guidance satisfies neither element.

Agency action under the APA is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "Order" is defined as "the whole or a part of a final disposition." *Id.* § 551(6). And an adjudication is an "agency process for the formulation of an order." *Id.* § 551(7). An "order" must have "some determinate consequences for the party to the proceeding." *Int'l Tel. & Tel. Corp., Comm. Equip. Sys. Div. v. Local 134, IBEW*, 419 U.S. 428, 443 (1975). While these definitions are broad, they are "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (quotation omitted). Examples of adjudications include licenses, permits, and procurement decisions. *See, e.g., Everett v. United States*, 158 F.3d 1364, 1368 (D.C. Cir. 1998).

CMMG challenges ATF's guidance as "adjudications" under the APA. But these documents were not released as part of any "proceeding." There were no "parties" to them, nor do they have any legally determinative consequences. *See Conf. Grp. v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013); *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 559 (7th Cir. 2012). Rather, ATF issued them for illustrative purposes to give members of the public further guidance in advance of the 120-day compliance deadline, pending ATF's issuance of final classification letters. Ryan Decl. ¶¶ 7–8. Accordingly, they are not "adjudications" (or any other type of "agency action") under the APA.

In any event, ATF's Commercial and Non-Commercial Guidance are not "final" for APA purposes. These documents are "*representative*" of how ATF "*will apply* the definition of 'rifle' to firearms that are equipped with a 'stabilizing brace,'" Commercial Guidance; Non-Commercial Guidance (emphasis added), and thus merely forecast ATF's classification of particular weapons configurations. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019) (finding no final agency action where agency memo merely "forecasted" a "definitive" statutory interpretation but

"had no direct and appreciable legal consequence"). Indeed, ATF intends to take further action with regard to some of the weapons addressed in these documents. Ryan Decl. ¶¶ 8, 11. The culmination of ATF's decision-making process regarding each commercially available weapon identified in the guidance will be encompassed in a classification letter, which may ultimately be challenged. Ryan Decl. ¶¶ 8, 11; *see also, e.g.*, *Rare Breed Triggers, LLC v. Garland*, __ F. Supp. 3d __, 2022 WL 17175089, at 1 n.2 (D.N.D. Nov. 4, 2022) (describing classification process). Because the Commercial and Non-Commercial Guidance are not the culmination of ATF's decision-making process regarding any particular configuration, they are not final agency actions and the Court lacks jurisdiction to review them. *See Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000).

> 2. CMMG's challenge is premature, and it lacks standing to challenge the Commercial and Non-Commercial Guidance *en masse.*

CMMG's challenge to ATF's Commercial and Non-Commercial Guidance also are not ripe for review, and CMMG lacks standing to challenge them. Ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [] protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Tex. Indep. Producers & Royalty Owners Ass'n v. United States EPA*, 413 F.3d 479, 482 (5th Cir. 2005) (citing *Nat'l Park Hospitality Ass'n v. Dept. of the Interior*, 538 U.S. 803, 807 (2003)). ATF has not issued any classification letters to CMMG and thus has not yet had the opportunity to formalize its determinations or provide its reasoning for any of classifications forecasted in the guidance. The dispute would therefore benefit from further factual development, and CMMG's claims are unripe. *See id.*

Beyond ripeness, CMMG also lacks standing, which requires it to have (1) suffered an injury in-fact (2) that is fairly traceable to Defendants' challenged action (3) that a favorable ruling would

26

redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). *First*, CMMG has not shown any injury traceable to ATF's guidance. While their motion addresses one of 67 configurations referenced in the guidance—the SB-mini attached to an AR-style pistol—CMMG fails to identify even one configuration covered by the guidance that CMMG manufactures or sells. *See* Reinkemeyer Decl. ¶ 10, ECF No. 18-7. It addresses no other configuration. CMMG does not establish that it produces AR-style pistols equipped with SB-minis, nor does it show that any of its weapons are improperly classified as short-barreled rifles under the NFA.

*Second*, CMMG cannot show that the relief it seeks—vacatur of the guidance, Mot. at 22–23—would redress any of its alleged injuries. Indeed, "vacating" the Commercial and Non-Commercial Guidance would provide CMMG with no legal benefit. Rather, the unregistered possession or making of a short-barreled rifle configured of a heavy pistol with an attached stabilizing brace outside of any relevant compliance period puts CMMG at risk of an enforcement action under the NFA "with or without the guidance." *Nat'l Multi Hous. Council v. Jackson*, 539 F. Supp. 2d 425, 432 (D.D.C. 2008).

       3.   The Commercial and Non-Commercial Guidance do not show that the Rule is arbitrary.

Lastly, as part of their premature "adjudications" challenge, CMMG argues that the Commercial and Non-Commercial Guidance "confirm that the Rule is arbitrary." Mot. at 23. But again, it addresses only one configuration: an AR-style pistol equipped with an SB-mini stabilizing brace, that it does not even claim to manufacture.[10] CMMG does not even attempt to address any of

---

[10] CMMG argues that "ATF's conclusory treatment of the SB-Mini Adjudication confirms that its Rule is standardless." Mot. at 23. As explained above, the inclusion of the SB-Mini and AR-pistol configuration in Commercial Guidance is not an adjudication. If and when a particular configuration is submitted to ATF for classification, ATF will apply the statutory definition, as interpreted by the Rule, to determine whether the configuration is a short-barreled rifle. At that time, ATF will fully explain its classification. Defendants note, however, that at the time of filing, information exists in the community suggesting that SB-Tactical braces, including the SB-mini, are made and intended to be fired from the shoulder. *See, e.g.*, Minimalist Moto Life, AR357 build pt1 blowback 357 Sig AR pistol

the others of dozens of configurations contained in the guidance. As explained, *supra* Part I.B, the

Rule is not arbitrary and capricious, and the Court should reject this cursory attempt to discredit it.

## II.    CMMG will not suffer irreparable harm in the absence of an injunction.

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical,"

*Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (citation omitted), and must be

"so imminent that there is a clear and present need for equitable relief to prevent" it. *League of Women*

*Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*,

515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot make this showing with "unsubstantiated and

conclusory assertions," *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017),

but must substantiate any claim or irreparable injury with "independent proof, or no injunction may

issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). In addition, a plaintiff "must show that

the alleged harm will directly result from the action which [he] seeks to enjoin.*" Wis. Gas. Co. v. FERC*,

758 F.2d 669, 674 (D.C. Cir. 1985).

Although CMMG argues that the Rule is costing them 85% of their revenues, the evidence

used to support these allegations is insufficient to carry CMMG's burden to demonstrate concrete,

imminent harm is likely to occur in the absence of an injunction. First, although CMMG argues that

"since the announcement of the Rule last month, CMMG's sales of brace guns … have ceased

entirely," they fail to clarify whether the cessation of sales was attributable to a drop in customer

demand, as opposed to a voluntary decision to stop selling braced guns. To the extent CMMG

voluntarily stopped selling braced weapons rather than complying with the NFA's requirements, its

---

PDW PCC, YouTube (May 16, 2020), https://perma.cc/T8QK-A9D5 (firing from the shoulder at
1:27 using what is described as an "SB mini brace"); Classic Firearms, Manufacturer Review SB
Tactical, YouTube (Feb. 14, 2022), https://perma.cc/3GGF-W8L4 (firing from the shoulder at 2:00,
3:21, 4:08, 5:00, 5:45 using various SB Tactical braces); Conklikov, Review: SB tactical TF1913 pistol
stabilizing brace for Ak style pistols, YouTube (Nov. 10, 2022), https://perma.cc/K8ZD-TCPG (at
5:55, stating that an SB Tactical brace "does work well for its intended purpose ... also it works well
for other purposes … in terms of shouldering...").

drop in revenue is self-inflicted and cannot support the issuance of an injunction. Similarly, CMMG does not explain why any consumer antipathy would be directed toward it, as opposed to ATF for "ATF's regulatory about-face." Mot. at 24–25. It is speculative to conclude otherwise. And finally, because the NFA's registration requirements are mandated by statute—not the Rule—an injunction against the Rule should not alleviate CMMG's, or its customers', concerns about NFA compliance. For these reasons, CMMG fails to show that it will suffer irreparable harm if the Rule is not enjoined.

## III.    The equities and the public interest weigh against a preliminary injunction.

As CMMG acknowledges, the third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decidedly against the issuance of a preliminary injunction here.

Leaving the Rule in place benefits public safety. Congress passed the NFA for the express purpose of regulating specific firearms, like short-barreled rifles, which Congress determined posed a greater risk to public safety, as "gangster type" weapons of an especially unusual and dangerous nature. 88 Fed. Reg. at 6,566. The risk posed to public safety by these weapons was identified by Congress, and this Rule enhances public safety by preventing circumvention of the NFA. *Id.* CMMG's request to enjoin the Rule would, conversely, decrease public safety and facilitate the circumvention of the NFA. Any harm to CMMG or other affected individuals in complying with the NFA's modest regulatory registration requirements is, by comparison, minimal.

In addition, the Rule serves the public interest by providing greater clarity on how ATF interprets and applies the statutory definitions in the NFA. In part, ATF initiated the rulemaking process because the prior system of individual classification determinations resulted at times in inconsistent classifications of pistols equipped with stabilizing braces. The 98-page Rule thoroughly explains how ATF will approach classification determinations. Moreover, ATF has published interim

guidance identifying pistol-brace combinations likely to be considered SBRs under the Rule. *See* Commercial Guidance. ATF is also in the process of drafting and issuing formal classification letters that will be sent directly to manufacturers. *See* Ryan Decl. ¶¶ 8–9. And the Rule expressly provides that "an individual may contact ATF to receive a determination of whether their firearm equipped with a 'stabilizing brace' is a rifle as defined by the GCA and NFA." 88 Fed. Reg. 6,481; *see Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (regulations subject to relaxed scrutiny when a party may "clarify the meaning of the regulation by its own inquiry"). The public interest is better served by the Rule than the absence of guidance on ATF's interpretation.

## IV.     In all events, any relief should be limited to redress CMMG's alleged injuries.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress CMMG's alleged, cognizable injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). Nationwide injunctions, on the other hand, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). Further, the Rule has been challenged in several other cases, underscoring why this Court should not attempt to decide its legality for all parties.[11] *See Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022).

## CONCLUSION

For the foregoing reasons, the Court should deny CMMG's motion for preliminary relief.

---

[11] *See Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Mock v. Garland*, No. 4:23-cv-95 (N.D. Tex.); *Second Amendment Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

Dated: March 10, 2023                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         BRIGHAM J. BOWEN
                                         Assistant Branch Director

                                         */s/ Michael Drezner*
                                         MICHAEL DREZNER (VA Bar No. 83836)
                                         JODY D. LOWENSTEIN (MT Bar No. 55816869)
                                         TAYLOR PITZ (CA Bar No. 332080)
                                         FAITH E. LOWRY (TX Bar No. 24099560)
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street NW
                                         Washington, DC 20005
                                         Phone: (202) 305-5200
                                         Email: Michael.l.drezner@usdoj.gov

                                         *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On March 10, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Michael Drezner*
Trial Attorney
U.S. Department of Justice
