# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| WILLIAM T. MOCK, et al., § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | Civil Action No. 4:23-cv-00095-O |
| § | |
| MERRICK GARLAND, et el., § | |
| § | |
| Defendants. § | |

**OPINION & ORDER ON PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR POSTPONEMENT
OF THE EFFECTIVE DATE OF THE FINAL RULE**

Before the Court are Plaintiffs' Motion for Preliminary Injunction Or, in the Alternative, for Postponement of the Effective Date of the Final Rule (ECF No. 33) and Brief in Support (ECF No. 36), filed February 21, 2023; Defendants' Opposition (ECF No. 37), filed March 10, 2023; and Plaintiffs' Reply (ECF No. 38), filed March 17, 2023. Having considered the parties' briefing and applicable law, the Court holds that Plaintiffs have not carried their burden to demonstrate their substantial likelihood of success on the merits of any of their claims and therefore **DENIES** Plaintiffs' motion for preliminary injunctive relief or, in the alternative, for postponement of the Final Rule's effective date.

### I. INTRODUCTION

#### A. Statutory and Regulatory Background

In the first major federal attempt to regulate firearms, Congress enacted the National Firearms Act of 1934 (NFA), 26. U.S.C. §§ 5801–5872, which focused particularly on dangerous and concealable weapons used in organized crime. *See Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002) (internal citations omitted). To that end, the Act identifies eight specific categories of "firearms" that are subject to certain registration and use requirements and associated taxes. 26

U.S.C. §§ 5801–02, 5811–12, 5821–22, 5841, 5845(a). Relevant to this dispute is the category of short-barreled rifles, i.e., "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4). The Act defines a "rifle" as:

> [A] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id.* § 5845(c). Given its focus on particular weapon categories, the NFA does not define every type of firearm, *e.g.*, handguns, and specifically exempts "a pistol or a revolver having a rifled bore" from its statutory purview. *Id.* § 5845(e).

Thirty years later, Congress enacted the Gun Control Act of 1968 (GCA), 18 U.S.C. §§ 921–931, which expanded federal firearms regulation in an effort to address the "widespread traffic in firearms and . . . their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 825–26 (1974) (statutory references omitted). The GCA amended the NFA in some respects, defined additional terms, and reinforced the NFA in others. *See e.g.*, 18 U.S.C. §§ 921–22. Among other terms, the GCA defined "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." *Id.* § 921(a)(30). The GCA's definition of "rifle" is identical to that of the NFA. *Id.* § 921(a)(7).

Authority to administer and enforce the Acts is vested in the Attorney General, 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a), who delegated that responsibility to the Bureau of

Alcohol, Tobacco, Firearms, and Explosives (ATF). 28 C.F.R. § 0.130. ATF has subsequently promulgated rules and regulations in keeping with that delegation of authority, including by classifying particular weapons and devices as subject to or exempt from federal regulation. 27 C.F.R. parts 478, 479; *e.g.*, U.S. ATF, Open Letter on the Redesign of "Stabilizing Braces" (Jan. 6, 2015) (indicating that using a stabilizing brace "as a shoulder stock" transforms a pistol or handgun into "a NFA firearm"); U.S. ATF, Reversal of ATF Open Letter on the Redesign of "Stabilizing Braces" (Mar. 21, 2017) (clarifying that purely "incidental, sporadic, or situational 'use'" of a stabilizing brace would not transform a pistol into an NFA-covered firearm).

Since 2012, ATF has seen a proliferation of "stabilizing brace" devices, which were originally designed "to assist people with disabilities or limited strength or mobility" to safely and single-handedly fire heavy pistols.[1] With time, the devices began to include characteristics resembling shoulder stocks and ATF soon learned that manufacturers were widely marketing these "braces" to consumers to as a means of creating functional short-barreled rifles without complying with NFA requirements.[2]

In response to this trend, ATF published a notice of proposed rulemaking (NPRM) in June 2021, which proposed amendments to 27 C.F.R. §§ 478.11 and 479.11 and identifying criteria by which ATF would determine whether a weapon was a "rifle" for purposes of the NFA and GCA. 86 Fed. Red. 30,826. After receiving more than 230,000 public comments on the NPRM, ATF published its Final Rule on January 31, 2023. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023). Consequentially, the Final Rule modified ATF's earlier regulations addressing how the agency would determine whether a weapon is a "rifle" for purposes of the NFA and GCA. *Id.* at 6,480. Specifically, the Final Rule indicates that

---

[1] Pls.' Br. 6, ECF No. 36; Defs.' Opp. 4–6, ECF No. 37.
[2] Defs.' Opp 7–8, ECF No. 37.

3

ATF interprets the phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder" to include:

> [A] weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder.

*Id.* (interpreting the identical definition of "rifle," which is defined similarly in both the NFA and GCA, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7)). The other factors relevant to ATF's determination are:

(1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

*Id.* While the NPRM had proposed a table (Worksheet 49999) that allotted points for specific criteria, the Final Rule did not implement the weighted point system. *Id.* at 6,479–80. The Final Rule took immediate effect for newly made or transferred firearms, but gives individuals already possessing subject firearms until May 31, 2023 to come into compliance by registering, permanently modifying, or disposing of them in accordance with ATF instructions. *Id.* at 6,570.

### B. The Parties

Plaintiffs William T. Mock, Christopher Lewis, Maxim Defense Industries, LLC, and Firearms Policy Coalition, Inc. (FPC) have sued Defendants Attorney General Merrick Garland, in his official capacity, the United States Department of Justice, Director of ATF Steven Dettelbach, in his official capacity, and ATF.[3] Individual Plaintiffs Mock and Lewis are Texas residents who own at least one braced pistol and would purchase others in the immediate future but for the Final Rule's additional regulatory requirements.[4] Maxim Defense is a firearms and firearms accessories manufacturer and retailer that specializes in stabilizing braces and braced pistols.[5] The majority of Maxim Defense' revenues are attributable to sales of products now subject to the Final Rule.[6] FPC is a nonprofit organization that exists to defend and promote its members' constitutional rights, advance individual liberty and restore freedom through political and legal advocacy and public education.[7] FPC's membership includes individual gun owners, licensed manufacturers and retailers, gun ranges, firearms trainers and educators, and others.[8] Individual Plaintiffs and Maxim Defense are members of FPC.[9]

Plaintiffs filed this lawsuit the day the Final Rule was announced and moved for a preliminary injunction three weeks later.[10] They challenge the regulation on constitutional and procedural grounds and move the Court for a preliminary injunction or, in the alternative, for postponement of the Final Rule's effective date under 5 U.S.C. § 705.[11] The parties have briefed

---

[3] Am. Comp., ECF No. 13.
[4] *Id.* at 3–4.
[5] *Id.* at 4–5.
[6] *See id.*
[7] *Id.* at 5–6.
[8] *Id.*
[9] *Id.*
[10] Compl., ECF No. 1; Mot. for Prelim. Inj., ECF No. 33. Plaintiffs filed their Amended Complaint on February 7, 2023. Am. Compl., ECF No. 13.
[11] Mot. for Prelim. Inj., ECF No. 33.

the issues and the motion is ripe for review.

## II. LEGAL STANDARD

To obtain a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that issuance of a preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As movant, the party seeking relief bears the burden of proving all four elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). And while the decision to grant or deny injunctive relief is committed to the district court's discretion, such relief is considered an "extraordinary remedy," never awarded as of right. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## III. ANALYSIS

Plaintiffs attack the Final Rule on several grounds: (1) that it infringes on Individual Plaintiffs' and FPC's members' Second Amendment Rights; (2) that it violates the First Amendment by chilling speech; (3) that it runs afoul of the Fifth Amendment's due process guarantee; (4) that it violates the Constitution's structural provisions; (5) that it violates the APA as it was issued in excess of ATF's statutory authority; and (6) that it violates the APA's procedural requirements because it was not a logical outgrowth of the proposed rule.[12] Because it is arguably the most important element for injunctive relief, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005), the Court addresses first whether any of Plaintiffs' claims are substantially likely to

---

[12] *See generally* Pls.' Br. in Supp. of Mot. for Prelim. Inj. (Pls.' Br.), ECF No. 36.

6

succeed on the merits, beginning with the violations of the APA before turning to the constitutional questions. *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582, 582 n.22 (1979).

### A. Whether the Final Rule Exceeds ATF's Statutory Jurisdiction or Authority

The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). When an agency has been given authority to administer and enforce a particular statute, as is the case here, they must often interpret the relevant congressional enactments in carrying out that charge. *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). And "courts have regularly recognized ATF's authority to interpret and apply the statutes that it administers, including the NFA's [statutory] definition[s]." *Guedes v. ATF*, 356 F.Supp.3d 109, 129 (D.D.C. 2019) (citations omitted).[13] Of course, this does not mean ATF may interpret or redefine terms in contravention of the originating statutes. *See Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) ("The authority of administrative agencies is constrained by the language of the statute they administer."); *Vanderstok v. Garland*, --- F.Supp.3d ---, No. 4:22-CV-00691-O, 2022 WL 4009048, at *4 (N.D. Tex. Sept. 2, 2022) ("The Final Rule's redefinition of 'frame or receiver' conflicts with the statute's plain meaning"). Finally, though *Chevron* deference applies to agency interpretations of ambiguous statutes, in the Fifth Circuit such deference is

---

[13] The *Guedes* court held that ATF had the authority to interpret the NFA's definition of "machinegun," which is defined as:

> [A]ny weapon which shoots, is *designed* to shoot, or can be readily restored to shoot, automatically more than one shot, without manually reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part *designed and intended* solely and exclusively, or combination of parts *designed and intended*, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added).

7

inapplicable if the interpreted statute imposes criminal penalties or, as in this case, the agency has not asked the reviewing court to defer. *Cargill v. Garland*, 57 F.4th 447, 465–66 (5th Cir. 2023).

Plaintiffs contend that the Final Rule exceeds ATF's statutory jurisdiction and authority, first, because ATF has not been delegated authority to interpret the statutorily defined and unambiguous term "rifle" and, second, even it could, the Final Rule's interpretation is inconsistent with the statutory term's plain meaning.[14] Given that other courts have recognized ATF's authority to interpret the statutes it has been charged with administering when there is an ambiguity, it is not substantially likely that the Final Rule exceeds the agency's scope of authority on this basis as the statute includes ambiguous terms in its definition of rifle. *Guedes*, 356 F.Supp.3d at 129. The statutory definition of "rifle" uses terms such as "designed," "redesigned," "remade," and "intended," words that necessarily require the enforcing agency—or anyone who would comprehend the statute's meaning—to evaluate objective weapon characteristics, and perhaps conduct, to decide whether a particular firearm is subject to the NFA. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Rules explaining when a brace or stabilizer actually redesigns a firearm or remakes a firearm sufficiently to a short-barreled rifle are therefore permissible. What the Final Rule purports to do is identify the criteria by which enforcers, in their application of the statute, will make that determination. It does not, as Plaintiffs suggest, rewrite the definition itself. In short, it does not appear that the Final Rule so clearly contradicts the statutory definition of "rifle" that preliminary injunctive relief is in order. Thus, Plaintiffs have not carried their burden to show a substantial likelihood of success on the merits of this APA claim.

### B. Whether the Final Rule is Not a Logical Outgrowth of the NPRM

When an agency promulgates a regulation, it must follow certain APA procedural

---

[14] Pls.' Br. 25, ECF No. 36.

8

requirements, including issuing a "notice of proposed rule making . . . in the Federal Register" and notifying the public of "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Interested persons must have the opportunity to offer comment on the proposed regulation. *Id.* § 553(c). And at publication, the agency's Final Rule must be a "logical outgrowth" of the proposed rule such that those subject to its regulation are given fair notice of its contents. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). A final regulation satisfies this test if the proposed version "fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989). However, the final regulation need not "specifically identify every precise proposal [the agency might] ultimately adopt as a final rule." *Id.*

Importantly, final rules that are merely "interpretive" are not subject to these same notice-and-comment requirements, therefore do not need to satisfy the logical outgrowth test, and may take immediate effect. 5 U.S.C. § 553(d); *see Texas v. EPA*, 389 F.Supp.3d 497, 504 (S.D. Tex. 2019) (noting that "notice-and-comment requirements" for substantive regulations includes the "logical outgrowth" test). Interpretive rules are those that, as their label indicates, merely "*interpret* existing, substantive law." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023) (emphasis added).

Plaintiffs argue the Final Rule violates the APA's procedural requirements because it not a logical outgrowth of the proposed rule.[15] But Defendants contend that the Final Rule is merely interpretive, not substantive, and thus the logical outgrowth test does not apply.[16] If the Court assumes here for the sake of argument that the Final Rule is substantive, though its discussion above suggests otherwise, the Court finds for purposes of injunctive relief that the Final Rule likely

---

[15] Pls.' Br. 29, ECF No. 36.
[16] Defs.' Opp. 19–21, ECF No. 37.

9

satisfies the logical outgrowth requirement. Plaintiffs' primary argument is that the Final Rule is not a logical outgrowth of its predecessor because the final version abandoned Worksheet 4999, the point system indicating how ATF would classify a firearm as a "rifle" based on objective characteristics, and instead utilizes a "subjective" six-factor test.[17] Though the Final Rule did not incorporate Worksheet 4999 as originally proposed, the NPRM indicated that ATF was considering a rule "to aid the firearms industry and public in understanding the criteria that [the agency] considers when evaluating" the classification of firearms under the NFA and CGA. 86 Fed. Reg. at 30,828. And while it abandoned the point system in response to the public comments criticizing that approach, the Final Rule's six criteria to be used for classifying firearms were "derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6,480. This is enough put the affected public on notice of the subjects and issues the Final Rule would address, and indeed, the very criteria the agency would employ in classifying firearms. Thus, under these circumstances and based on the briefing before it, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on the merits of this claim.

### C. Whether the Final Rule Violates the U.S. Constitution

Plaintiffs contend the Final Rule is violative of the Constitution's structural protections and the First, Second, and Fifth Amendments. Under the Second Amendment, Plaintiffs raise arguments in the alternative. For organizational purposes, the Court addresses the structural, First, and Fifth Amendment claims before turning to the Second Amendment claims.

---

[17] Pls.' Br. 29–33, ECF No. 36. Plaintiffs also suggest that, because the Final Rule's estimated economic impact doubled that of the NPRM, this supports a finding that the former is not a logical outgrowth of the latter. Plaintiffs' cited authority does not clearly support that proposition. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107–08 (D.C. Cir. 2014) (reasoning that an agency's initial estimate that there would be *no* economic impact, followed by a complete reversal of opinion, supported the court's finding that the final rule was not a logical outgrowth of the proposed rule making).

1. *Structural Constitutional Claims*

First, Plaintiffs argue that the Final Rule runs afoul of the Constitution's procedural protections because it "is an unreasonable construction of statutory terms and a clear example of the Agencies unlawfully creating law" and, if an agency has authority to issue legislative rules, "that authority requires 'a *clear delegation*' from Congress."[18] Based on the Court's assessment above that the Final Rule interprets—but does not rewrite—the underlying statutes, the Court finds these arguments unavailing. For this same reason, Plaintiffs' argument regarding the rule of lenity, which requires the Court to interpret an ambiguous statute in favor of a criminal defendant, (assuming it applies) is unpersuasive. In sum, Plaintiffs have not carried their burden to show that they are substantially likely to succeed on the merits of their structural constitutional claims.

2. *First Amendment Claim*

Plaintiffs argue the Final Rule violates their "First Amendment protected rights by allowing the Agencies to more stringently regulate firearms based on statements made by manufacturers and other third parties, thus chilling speech."[19] The regulation chills speech, they say, "by threatening to reclassify pistols as rifles" based on what manufacturers and others say or write about particular weapons.[20] *See, e.g.*, 88 Fed. Reg. at 6,480 (indicating ATF will consider a "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and "[i]nformation demonstrating the likely use of the weapon in the general community" to classify a firearm for purposes of the NFA). But because the Final Rule affords the agency discretion to apply these criteria, Plaintiffs say this "uncertainty will force [speakers] to be doubly caution with anything they say about protected arms, and even avoid speaking altogether,

---

[18] Pls.' Br. 23, ECF No. 36 (citations omitted).
[19] Pls.' Br. 15, ECF No. 36.
[20] *Id.* at 16.

11

lest the Agencies come after them based on the content of their speech having somehow converted a lawful handgun into a short-barreled rifle."[21]

Plaintiffs' free speech arguments are unavailing. While the First Amendment provides robust speech protections and "generally prohibits the government from proscribing speech [based on its] disapproval of the ideas expressed," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), no speech is being proscribed here. Rather, the Final Rule notifies the public that the government will *listen* to their speech to discern whether a particular weapon falls within the NFA's scope. Plaintiffs and others may continue to speak freely and, if they do, the government is permitted to listen to what they say about the products they manufacturer and purchase. *See, e.g.*, *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282–83 (D.C. Cir. 2019) ("use of a product's marketing and labeling to discern to which regulatory regime a product is subject [is not a First Amendment violation]"). Thus, on this claim, Plaintiffs have not shown that they are substantially likely to succeed on the merits.

3. *Fifth Amendment Claim*

Next Plaintiffs argue the Final Rule is void for vagueness and, as such, violates the Fifth Amendment's guarantee of due process.[22] The regulation is unconstitutionally vague, Plaintiffs argue, because it permits ATF to apply a set of non-dispositive criteria to decide whether a weapon is subject to the NFA.[23] And this discretion-laden process does not provide any useful guidance to regulated parties.[24]

To sustain a void for vagueness challenge, however, "the complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an *imprecise*

---

[21] Pls.' Br. 17, ECF No. 36.
[22] Pls.' Br. 19–22, ECF No. 36.
[23] *Id.* at 20.
[24] *Id.*

12

*but comprehensible* normative standard, but rather in the sense that no standard of conduct is specified at all." *Vill. Of Hoffman Ests. v. Flipside Inc.*, 455 U.S. 489, 495 n.7 (1982) (emphasis added) (internal citations omitted). Though the six criteria by which ATF will make a weapons classification are non-dispositive, and therefore imprecise, they *do* provide a standard—one that tracks the statutory definition regarding whether a weapon is "designed or redesigned, made or remade, and intended to be fired from the shoulder." Hence, while the Final Rule's factoring criteria approach may be imprecise, it is comprehensible enough to put a person of ordinary intelligence on notice that their weapon may be subject to federal firearms laws. Thus, at this stage Plaintiffs have not shown a substantial likelihood of success on the merits of their Fifth Amendment claim.

   4. Second Amendment Claims

Where a regulation implicates the Second Amendment, the government need only demonstrate that the regulation "is consistent with the Nation's historical tradition of firearm regulation" in order to justify its enactment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2002). It does so by pointing to a "well-established and representative historical analogue." *Id.* at 2133.

Plaintiffs raise two Second Amendment claims, one assuming that the Final Rule is unlawful, and the other in the event the Final Rule is upheld. First, Plaintiffs claim the Final Rule "impermissibly infringes on the 'right of the people to keep and bear Arms.'"[25] This is so, they argue, because "when firearms are 'in common use at the [present] time,' they cannot be banned." Pls.' Br. 13, ECF No. 36 (quoting *District of Columbia v. Heller*, 554 U.S. 578, 627 (2008)). And this Second Amendment protection, Plaintiffs assert, "extends not just to braced pistols, but to the

---

[25] Pls.' Br. 11, ECF No. 36 (quoting U.S. CONST. AMEND. II).

braces themselves."[26] But Plaintiffs' first argument fails for the simple reason that the Final Rule does not ban stabilizing braces, nor firearms equipped with them. It *does* require regulated individuals and entities to comply with the NFA's statutory requirements (e.g., by registering the weapons with ATF or permanently detaching the brace from the pistol), but banning and regulating a firearm are not always one and the same. *See* 88 Fed. Reg. at 6,570. Nor does the Second Amendment bar the imposition of traditional registration and licensing requirements commonly associated with firearm ownership. *See, e.g.*, *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017); *see also Bruen*, 142 S. Ct. at 2138 n.9 (2022) ("nothing in our analysis should be interpreted to suggest the unconstitutionality [of reasonable licensing regimes]").

And importantly, the Final Rule does not regulate stabilizing braces *on their own* but only regulates the products when they are attached to a firearm.[27] Indeed, the language of the Final Rule and of Plaintiffs' own briefing confirms this. *See, e.g.*, Factoring Criteria for Firearms with *Attached* "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) (emphasis added); *id.* at 6,481 (requiring individuals "to destroy, dispose of, modify, or register existing *braced pistols*") (emphasis added); Pls.' Br. 6, ECF No. 36 (discussing how "the *addition* of [a brace]" would change a "*pistol*'s" or "*weapon*'s classification") (emphasis added); *id.* at 7 (discussing ATF's prior indication that "stabilizing braces are perfectly legal accessories" but when used "*with a firearm*" they may be subject to the NFA). And Plaintiffs do not cite any language in the Final Rule that purports to regulate braces separately. Thus, Plaintiff Maxim Defense may still sell

---

[26] Pls.' Br. 12, ECF No. 36.
[27] *See* Pls.' Br. 14–15, ECF No. 36 (arguing that an individual could be found to be in "constructive possession" of a short-barreled rifle simply by owning a stabilizing brace and a handgun capable of being fitted with a brace).

14

individual braces and Individual Plaintiffs may still purchase them without being affected by the Final Rule.

Second, Plaintiffs argue that there is no "historical practice of regulating gunsmithing," (i.e., a practice that includes equipping pistols with stabilizing braces), thus ATF cannot lawfully regulate it.[28] Finally, and in the alternative, Plaintiffs argue that if the Final Rule is upheld, then the agencies' regulation of braced pistols under the NFA violates the Second Amendment because such weapons are commonly owned and possessed by millions of Americans and are therefore subject to heightened constitutional protections following the Supreme Court's decisions in *Heller* and *Bruen*.[29] Both of these arguments rely on a purported lack of historical evidence of similar government regulations. Given the necessarily condensed briefing offered in support of this motion, the Court cannot—on the minimal historical analysis provided—conclude that Final Rule is substantially likely to violate Plaintiffs' Second Amendment rights. Though the historical record may support such a result at the summary judgment stage, the briefing presently before the Court is not sufficient to justify the extraordinary remedy of preliminary injunctive relief. As such, the Court finds that Plaintiffs are not likely to succeed on the merits of their Second Amendment claims at this juncture.

\* \* \* \*

In sum, Plaintiffs have not shown they are entitled to the extraordinary remedy of preliminary injunctive relief. While Plaintiffs may ultimately prevail on summary judgment, the Court finds that they have not, at this preliminary stage, demonstrated a substantial likelihood of success on the merits of at least one of their claims. Failure to satisfy this element necessarily bars their request for injunctive relief. Therefore, the Court will not address the remaining elements for

---

[28] *Id.*
[29] Pls.' Br. 33, ECF No. 36.

15

a preliminary injunction.

## IV. CONCLUSION

For the reasons discussed, the Court **DENIES** Plaintiffs' request for injunctive relief or, in the alternative, for postponement of the Final Rule's effective date (ECF No. 33).

**SO ORDERED** this **30th day** of **March, 2023**.

_[signature: Reed O'Connor]_
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

Case 2:23-cv-00095-OD Document 40 Filed 03/30/23 Page 17 of 17 PageID 5677