# EXHIBIT A

2023 WL 3692841
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia.

ROBERT M. MILLER, Plaintiff,

v.

MERRICK GARLAND, et al., Defendants.

Civil Action No. 1:23-cv-195 (RDA/JFA)
|
Filed 05/26/2023

### MEMORANDUM OPINION AND ORDER

Rossie D. Alston, Jr. United States District Judge

*1 This matter comes before this Court on Plaintiff's Motion for a Nationwide Temporary Restraining Order ("TRO") (Dkt. 16) and a Preliminary Injunction (Dkt. 17). This matter has been fully briefed and argued and is now ripe for disposition. Considering the Motion, the supporting memoranda (Dkt. Nos. 16; 17), the Defendants' Response (Dkt. 22), Plaintiff's Reply (Dkt. 26), as well as the arguments raised at the hearing held before this Court on April 12, 2023, this Court DENIES Plaintiff's Application for a Nationwide TRO and a Preliminary Injunction (Dkt. Nos. 16;17) for the reasons that follow.

### I. BACKGROUND

#### A. Statutory and Regulatory Background

Congress enacted the National Firearms Act of 1934 ("NFA") in an attempt to regulate firearms in response to the emergence of organized crime. *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002). The NFA focuses on the regulation of weapons such as machine guns, sawed-off shotguns and silencers. *Id.* (internal citations omitted). There are eight specific categories under the NFA that are subject to registration and use requirements. 26 U.S.C. §§ 5801-02, 5811-12, 5821-22, 5841, 5845(a). At issue in this case is the registration requirements for short-barreled rifles. A short-barreled rifle is a rifle that has "a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such a weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. §§ 5845(a)(3), (4). The NFA defines a rifle as:

> [A] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id.* § 5845(c). The Act requires short-barreled rifles to be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. Short-barreled rifles are also subject to certain taxes for ownership as well as transfer. *Id.* §§ 5811, 5812, 5821, 5822.

In 1968, Congress enacted the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921-931, which expanded federal firearms regulation to address the "widespread traffic in firearms and ... their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 825-26 (1974). The GCA built upon the NFA and defined additional terms that were not defined in the NFA, such as "handgun." 18 U.S.C. §§ 921-22. The GCA's definition of rifle, however, remained the same as set forth in the NFA. *Id.* § 921(a)(7).

Congress vested the authority to enforce and administer both statutory schemes in the Attorney General of the United States, who then delegated that authority to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). 28 C.F.R. § 0.130. Since then, consistent with its delegated authority, ATF has promulgated rules classifying whether various weapons and devices qualify as firearms under the NFA. 27 C.F.R. §§ 478, 479; *e.g.*, U.S. ATF, Open Letter on the Redesign of "Stabilizing Braces" (Jan. 6, 2015)

(explaining that use of a stabilizing brace as "as a shoulder stock" modifies a pistol or handgun into "a NFA firearm").

**\*2** In the last decade, there has been a proliferation of weapons equipped with various brace devices. Dkt. 22 at 4. Particularly, in 2012, the ATF received requests to classify a type of brace known as a stabilizing brace, which was originally designed "to assist people with disabilities or limited strength or mobility" in firing heavy pistols single-handedly. *Id.* at 5. However, as new types of stabilizing braces entered the market, the designs began to "include characteristics common to shoulder stocks." *Id.* at 6. ATF soon learned that these braces were being marketed by manufacturers as a means of creating short-barreled rifles that were purportedly "ATF compliant," even though the device had never been submitted for classification. *Id.* Ultimately, ATF became aware that manufacturers were using stabilizing braces as a means to skirt the requirements of the NFA. *Id.*

In response, ATF initiated a proposed rulemaking ("NPRM") in June 2021, which proposed amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the definition of the term "rifle." Dkt. 22 at 8. ATF received over 230,000 public comments and published its final rule on January 31, 2023. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) (the "Final Rule"). As a result, the Final Rule amended the statutory definition of rifle to include "any weapon that is equipped with an accessory, component, or other rearward attachment," such as a stabilizing brace, "that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6,497 (interpreting the definition of "rifle," under both the NFA and GCA). ATF lists six other factors relevant to the determination:

1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

88 Fed. Reg. 6,480. The NPRM also included a proposed table that created a weighted point system; but the Final Rule did not implement the point system. *Id.* at 6,479-80. The Final Rule took immediate effect, but gave individuals already possessing firearms subject to the rule until May 31, 2023 to come into compliance with the NFA. *Id.* at 6,570. Ultimately, the Final Rule makes it such that certain pistols equipped with stabilizing braces are now subject to heightened regulation under the NFA and the GCA.

B. Factual and Procedural Background

Plaintiff Robert Miller, a gun owner and firearms seller, is a citizen of Virginia who has sued Defendant Attorney General Merrick Garland, ATF, and the director of ATF, Steven Dettelbach. Plaintiff filed this lawsuit on February 13, 2023 alleging that the regulation is unconstitutional and otherwise violates the Administrative Procedure Act (APA). Dkt. 1. On March 17, 2023, Plaintiff filed an Application for a Nationwide Temporary Restraining Order, Dkt. 16, and an Application for a Preliminary and Permanent Injunction, Dkt. 17. On April 3, 2023, Defendants filed their Opposition, Dkt. 22, and on April 10, 2023, Plaintiff filed his Reply. Dkt. 26. On April 12, this Court held oral argument. On May 2, 2023, Plaintiff filed a Notice of Supplemental Authority, Dkt. 28, and on May 4, 2023, Defendants filed their Response to the Notice, Dkt. 29.

II. STANDARD OF REVIEW

ROBERT M. MILLER, Plaintiff, v. MERRICK GARLAND, et..., --- F.Supp.3d ---- (2023)
2023 WL 3692841
Case 2:23-cv-00019-Z   Document 58   Filed 05/31/23   Page 4 of 12   PageID 1223

**\*3** "A preliminary injunction [or TRO][1] is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Prop. LP*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter*, 555 U.S. at 22, 24 (2008)). And "granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). Courts do not lightly award this extraordinary relief, and preliminary injunctions are therefore "to be granted only sparingly." *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 593 (E.D. Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

In order to be eligible for such relief, a plaintiff "must establish that: (1) [he] is likely to succeed on the merits; (2) [he] is likely to suffer irreparable harm without the preliminary injunction [or TRO]; (3) the balance of the equities tips in [his] favor; and (4) the injunction [or TRO] is in the public interest." *Winter*, 555 U.S. at 20. "The failure to show any one of the relevant factors mandates denial of the preliminary injunction [or TRO]." *Parson v. Alcorn*, 157 F.Supp.3d 479, 491 (E.D. Va. 2016) (citation omitted).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

Plaintiff attacks the Final Rule on several grounds: (1) that the Final Rule exceeds ATF's authority; (2) that the Final Rule violates various Administrative Procedure Act ("APA") procedural requirements, (3) that the Final Rule implicates Major Questions Doctrine; (4) that the Final Rule imposes *ex post facto* criminal liability; (5) that the Final Rule violates the Fifth Amendment as it is void for vagueness; and (6) that the NFA and Final Rule infringe upon Plaintiff's Second Amendment rights. The Court will first address whether any of Plaintiff's claims are likely to succeed on the merits, beginning with the alleged APA violations before turning to the constitutional questions.

#### 1. Plaintiff's Administrative Law Challenges

##### a. ATF's Statutory Jurisdiction or Authority

This Court finds that Plaintiff is not likely to succeed on the merits of his APA claim. Plaintiff contends that the Final Rule violated the APA because ATF exceeded its statutory authority in promulgating the Final Rule because the rule's interpretation essentially "rewrites" the definition of "rifle" in the NFA and CGA. Dkt. 1 ¶ 24. Defendants argue in response that the ATF has the clear authority to "interpret provisions within the NFA and GCA, including terms used within the statutory definition of 'rifle,'" because Congress delegated authority to "enforce and administer the statute to the Attorney General who then delegated said authority to the ATF." Dkt. 22 at 13. Plaintiff responds that the Final Rule conflicts with the statutory definition of "rifle" because pistols equipped with a stabilizing brace are designed to be fired with one-hand and the "mere possibility that a shooter can place a braced pistol against his shoulder does not constitute the making of a[ ] [short-barreled rifle]." Dkt. Nos. 16 at 38-40; 26 at 7.

As an initial matter, the APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). When agencies are given the authority to administer and enforce a statute, they often must interpret relevant provisions to ensure efficient and accurate implementation. *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). It is not for the reviewing court to substitute its view for that of the administrative agency. However, an agency is constrained by the language of the statute it must administer and may not rewrite or redefine terms in a way that contradicts the original statute. *Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007).

**\*4** As courts have consistently recognized, ATF has the authority to interpret the NFA and GCA where there is ambiguity,[2] meaning that it is not likely that Plaintiff will succeed on this claim. *Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 2711630, at \*4 (N.D. Tex. Mar. 30, 2023)[3] (citing *Guedes v. Bureau of Alcohol, Tobacco,*

ROBERT M. MILLER, Plaintiff, v. MERRICK GARLAND, et..., --- F.Supp.3d ---- (2023)
2023 WL 3692841
Case 2:23-cv-00019-Z   Document 58   Filed 05/31/23   Page 5 of 12   PageID 1224

*Firearms, and Explosives*, 356 F. Supp. 3d 109, 129 (D.D.C. 2019)) (upholding ATF's interpretation that a bump stock is a machinegun as defined under the NFA). Further, as discussed above, the statutory definition of "rifle" in the GCA and NFA uses terms such as "designed" "redesigned," "remade," and "intended[,]" and Congress did not shed any additional light on the definition of rifle. 26 U.S.C. § 5845(c). As the court held in *Mock*, in order to apply the statutory definition, it is "necessarily require[d]" to "evaluate objective weapon characteristics, and perhaps conduct to decide whether a particular firearm is subject to the NFA." *Mock*, 2023 WL 2711630 at *8. Thus, a rule that clarifies when an accessory, such as a stabilizing brace, remakes or redesigns a firearm to make it into a short-barreled rifle does not exceed ATF's statutory authority. The Final Rule does not "rewrite" the definition of rifle as Plaintiff contends, but rather provides guidance for enforcers to determine when a particular weapon with a stabilizing brace falls under the purview of the NFA. This Court is not convinced that the agency's interpretation contradicts the original meaning of "rifle" such that a preliminary injunction is necessary. Therefore, Plaintiff has not met his burden on this APA claim.

b. ATF's Regulatory Analysis

i. Compliance with EO 12,866 and OMB Circular A-4

Plaintiff raises a series of arguments challenging ATF's regulatory analysis. First, Plaintiff argues that ATF failed to prove the Final Rule was necessary or appropriate as required by the APA. Dkt. 16 at 10. In support, Plaintiff cites Executive Order 12,866 ("EO 12,866") and OMB Circular A-4, which states that every rule must identify a "significant" or "compelling" problem that requires federal regulation, to bolster his claim that the agency did not engage in "good" regulatory analysis. *Id.* Plaintiff argues that Defendants relied on the two recent mass shootings in Colorado and Ohio, where pistol braces were used, to establish a need for rulemaking, which is insufficient to promulgate a rule regulating millions of pistols. *Id.* at 11. Defendants argue Plaintiff's claim must fail because the "APA provides no private right of action to challenge the Rule's compliance with EO 12,866" and circulars such as OMB Circular A-4 are merely guidance. Dkt. 22 at 22-23. Additionally, Defendants argue that even still, the Final Rule "identified a significant problem of federal concern," the proliferation of stabilizing braces, and conducted the proper analysis in compliance with EO 12,866 and Circular A-4. *Id.* at 23.

Indeed, while Defendants' regulatory analysis may have room for improvement, the law does not require perfection. The Court agrees with the Defendants that since "[c]ompliance with [OMB] Circular A-4 is not required by any statute or regulation," including the APA, compliance with the circular is not subject to judicial review. *Louisiana v. Biden*, No. 22-30087, 2022 WL 866282, at *1 (5th Cir. Mar. 16, 2022); *see U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.*, 844 F.2d 1087, 1095 (4th Cir. 1988) (OMB circular "confers no grievable, arbitrable, or justiciable rights on third parties"). Similarly, EO 12,866 provides no private right of action, meaning that non-compliance with the order is also not subject to judicial review. *E.g., Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 (11th Cir. 2021) (holding that EO 12,866 does "not permit judicial review of inconsistent agency action"). Even still, as this Court discussed above, the definition of "rifle" necessarily requires an explanation to determine what firearms constitute rifles, thus the need to clarify the classification of weapons equipped with stabilizing braces is sufficient to support the ATF's rulemaking.

ii. Cost-Benefit Analysis

**\*5** Plaintiff also argues that ATF's analysis was deficient because the agency failed to quantify or monetize the Final Rule's benefits and underestimated its costs. Dkt. 16 at 2. Plaintiff contends that Defendants should have presented more data or statistics and attempted to estimate the value of a statistical life to quantify the benefits of the rule accurately. *Id.* at 14-15. In response, Defendants first argue that where Congress has determined short-barreled rifles pose a particular danger to the public and ATF has been delegated the authority of enforcing the NFA, the requirement of empirical data to enforce the statute would render the statute itself a "nullity." Dkt. 22 at 24 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009)). Defendants next argue the Final Rule appropriately weighs the benefits to public safety because the Final Rule acts in line with Congress's decisions "by reducing the further proliferation and criminal use of firearms with attached 'stabilizing braces.' " 88 Fed. Reg. at 6,481. Defendants

contend that since public safety is difficult to quantify, "it is sufficient for the agency to 'exercise [its] professional judgment' to determine the importance of 'non-quantified benefits ... in the context of the overall analysis.' " Dkt. 22 at 18 (citing OMB, Circular A-4 at 2).

Plaintiff next argues that ATF's analysis is deficient because the agency failed to rely on the Congressional Research Service's ("CRS") report. Dkt. 16 at 16. Defendants argue in response that the agency was aware of the CRS report's estimate but explained why it chose not to use CRS's estimate from an "unsourced, second-hand" and "not detailed" report over its own in the Final Regulatory Impact Analysis. Dkt. 22 at 24.

Finally, Plaintiff argues the analysis was deficient because the proposed rule cited negative externalities, but the Final Rule did not. Dkt. 16 at 15. Defendants contend that final rules are not required to "rely on the same justifications as the proposed rule." Dkt. 22 at 25. In response, Plaintiff argues that by removing negative externalities from the analysis, Defendants "gut[ted]" their analysis of the net benefits of the Final Rule. Dkt. 26 at 14-15.

Plaintiff's arguments that attention should be paid to cost, and that ATF should have tried to quantify the monetary benefits to public safety before using qualitative methods are well-taken, but any errors by ATF were at worst, harmless. The Court recognizes that benefits to public safety are difficult to quantify, and the "the law does not require agencies to measure the immeasurable." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013); *see also Fox Television Stations, Inc.*, 556 U.S. at 519 (declining to "insist" agencies "obtain[ ] the unobtainable"); *Inv. Co. Inst.*, 720 F.3d at 379 ("Where Congress has required 'rigorous, quantitative economic analysis,' it has made that requirement clear in the agency's statute." Further, ATF's analysis of cost seems reasonable at this stage of the proceedings. The Agency issued a Final Regulatory Impact Analysis that included a 40-page discussion of costs. ATF, *Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Jan. 2023), at 28-67 https://perma.cc/96PV-KRB9 ("RIA"). ATF calculated the anticipated cost of the Final Rule by doubling its initial estimate of pistols outfitted with stabilizing braces, which was based partly on evidence from brace manufacturers, to account for any incorrectly low numbers.[4] RIA at 18-22. ATF also explained it declined to rely on the CRS estimate because "[u]sing the upper end of the range would mean there [were] at least as many 'brace' devices or firearms with an attached 'brace' device as there are pistols that were manufactured in the U.S. between 2013 to 2020 (i.e., 32.4 million pistols)," and applying the lower end of the range "would mean nearly a third of pistols manufactured between 2013 to 2020 [were] equipped with a 'stabilizing brace,' even though braces are only used on a subset of pistols, and not all pistols are types for which a person would attach a brace." RIA at 19-20.

**\*6** The Court is not swayed by Plaintiff's claim that the Final Rule is deficient because it relied on different justifications than the NPRM. As the court in *Mock* found, interpretive rules such as the one at issue are not subject to APA's requirements such as the logical outgrowth test,[5] which seems to be the crux of Plaintiff's claim. *Mock*, 2023 WL 2711630 at \*5. Thus, interpretive rules are not required to use the same justifications for proposed rules and final rules. *Id.* Even assuming the rule is legislative, the Final Rule likely survives this procedural challenge because the negative externality justification was removed in response to public comment, 88 Fed. Reg. at 6,559, and the Final Rule provided an otherwise adequate though not perfect cost-benefit analysis. The Court finds ATF's cost benefit analysis to be reasonable and Plaintiff is unlikely to succeed on the merits of this claim.

iii. Consideration of Regulatory Alternatives

Plaintiff also avers that ATF's analysis was deficient because the agency failed to consider regulatory alternatives. Plaintiff specifically argues Defendants should have considered the "no change" alternative, as the agency has not explained why the regulation would be better than the status quo and that Defendants should not have rejected comments regarding adding a "grandfather clause." Dkt. 16 at 18. Defendants contend that they considered the "no change" alternative within the NPRM, but decided not to adopt it because it would not address the agency's underlying concerns. Dkt. 22 at 26.

As other courts have noted, this Court cannot fault an agency for its decision not to adopt an alternative that the agency deems not viable or does not address the problem it has set out to solve. *TikTok Inc. v Trump*, 507 F. Supp. 3d 92, 112 (D.D.C. 2020); *see Am. Inst. of Certified Pub. Accts. v. IRS*, 746 F. App'x 1, 13 (D.C. Cir. 2018) ("We cannot fault the [agency] for failing to consider an alternative that was not addressed to the problem with which it was concerned."). ATF states that its goal is to alleviate any confusion regarding

the proper classification of "brace"-equipped weapons and to decrease the widespread circumvention of NFA controls that had been achieved through the proliferation of unregistered short-barreled rifles equipped with "brace" devices. 88 Fed. Reg. at 6,556. As the "no change" approach likely would not "resolve [those] concerns," Defendants did not err when they failed to consider that approach. *TikTok Inc.*, 507 F. Supp. 3d at 112; *Am. Inst. of Certified Pub. Accts.*, 746 F. App'x at 13. Plaintiff's argument that ATF should have considered a grandfather clause, or a clause that would excuse current possessors from compliance requirements going forward, similarly fails. ATF considered the grandfather clause option, and reasonably responded that "a prospective, indefinite exercise of its enforcement discretion (as embodied in a grandfathering provision for current possessors)" would allow possessors to continue to circumvent NFA regulations. 88 Fed. Reg. at 6,568. While Plaintiff may disagree with the agency's determination, ATF "need only enable [a reviewing court] to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (cleaned up). Since the record reveals that ATF explained and evaluated the merits of the grandfather clause, finding it would not further the goal of the Final Rule, ATF did not need to consider that alternative. *TikTok Inc.*, 507 F. Supp. 3d at 112.

**\*7** Finally, Plaintiff's contention that ATF should have let Congress or state governments amend the NFA and the GCA fails, as the NFA and GCA are already written to regulate short-barreled rifles, and the ATF has already been tasked with the responsibility of enforcing the statute. 26 U.S.C. § 5845(a)(3); 18 U.S.C. § 921(a)(8).

### c. The Rule's Effective Date

Plaintiff argues the Final Rule's effective date is unlawful because the Congressional Review Act ("CRA") requires that a "major rule" such as the Final Rule not take effect for 60 days after it is submitted to Congress or published in the Federal Register. Dkt. 16 at 19-21. Plaintiff opines that because the Final Rule is legislative, it cannot take effect until 30 days after publication. *Id.* Defendants respond that the Final Rule does not run afoul of the CRA and Plaintiff misapprehends the CRA requirements because though the Final Rule is effective immediately, it provided that the agency would "wait to initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register." Dkt. 22 at 42 (citing 88 Fed. Reg. at 6,481 (citing 5 U.S.C. § 801(a)(3))). Also, Defendants claim that since the rule is interpretive, it is exempt from the APA's 30-day requirement. Dkt. 22 at 42.

The Court agrees with Defendants that the Final Rule's effective date is lawful. Though the CRA states a "major rule cannot 'take effect' until the later of" 60 days after presentment to Congress or it is published on the Federal Register[,]" courts have held that provision "does not change the date on which the regulation becomes effective." *Liesegang v. Sec'y of Veterans Affs.*, 312 F.3d 1368, 1375 (Fed. Cir. 2002), *amended in part on reh'g*, 65 F. App'x 717 (Fed. Cir. 2003); *accord Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004). The CRA simply creates a "60-day waiting period" for enforcement of a major rule. *Liesegang*, 312 F.3d at 1375. Since ATF implemented a 60-day period for the enforcement of the Final Rule, though it was immediately effective, it does not run afoul of CRA requirements.

Additionally, final rules that are "interpretive" are not subject to the same requirements as legislative rules. For example, interpretive rules may take immediate effect. 5 U.S.C. § 553(d). An interpretive rule is a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). Further, interpretive rules "do not have the force and effect of law." *Id.* (citing *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). As the Court holds above, the Final Rule is merely interpretative as it provides the public with guidance as to ATF's interpretation of definitions in the NFA and the GCA. The Court also finds Plaintiff's argument that the Final Rule is legislative to be unpersuasive as the Final Rule does not impose any new legal obligations and merely attempts to clarify when a weapon is a short-barreled rifle. 88 Fed. Reg. at 6,478; 6,569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). Thus, the Final Rule's immediate effective date is not unlawful.

### d. Arbitrary and Capricious

**\*8** Plaintiff next argues that the Final Rule is arbitrary and capricious for various reasons. First, Plaintiff argues the Final

Rule is arbitrary and capricious because it relies on "factors Congress did not intend for [ATF] to consider" and that the NFA and GCA also don't rely on those factors. Dkt. 16 at 23. Plaintiff also contends the Final Rule is arbitrary and capricious because the individual factors are not objective, and their application is not explained adequately. *Id.* at 22. For example, Plaintiff points to the fact that the agency did not list specific measurements for the required surface area of the firearm and that the agency did not set "upper or lower limits on the weight of the firearm," and thus those factors are not tethered to any specific requirements. *Id.* Plaintiff also takes issue with the agency's inclusion of firearm marketing materials to classify firearms and uses his own guns as examples of why the Final Rule is arbitrary. *Id.* at 24-25. Plaintiff references his own Q Honey Badger pistol, stating that the firearm's objective features, such as its rear surface area, its length, and weight make it close to being considered a short-barreled rifle under the Final Rule, even though he could operate his firearm "using only one hand and the stabilizing brace." *Id.* at 24-26. Defendants respond by noting that the NFA requires the regulation of certain firearms designed to be fired from the shoulder, and the criteria used in the Final Rule are used to serve that statutory inquiry. Dkt. 22 at 30. Defendants further point to assessing certain factors such as surface area to be fired from the shoulder is a fact specific inquiry which is why there are no specific measurements listed. *Id.* at 29. Lastly, Defendants retort that marketing materials are in line with what courts generally consider when evaluating the intended use of an item and that Plaintiff's reference to his own devices "misapprehends the relevant inquiry" which turns on whether the device is intended to be fired from the shoulder not whether it could be operated in other ways. *Id.* at 45.

"The APA's arbitrary-and-capricious standard requires that an agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). In evaluating an arbitrary-and-capricious challenge, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Ren v. United States Citizenship & Immigr. Servs.*, 60 F.4th 89, 93 (4th Cir. 2023) (citing *Prometheus Radio Project*, 141 S. Ct. at 1158). Agencies often implement multi-factor balancing tests. *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties[.])" While numeric thresholds may be helpful or increase precision, courts have upheld agencies' use of multifactor tests even where there are none. *Texas v. EPA*, 983 F.3d at 839-40 (5th Cir. 2020). All that is required is that the agency "define and explain the criteria applied." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009). Despite Plaintiff's contention, the Final Rule does just that. For example, the Final Rule explains that for a firearm "marketed as a pistol that is a variant of a firearm," ATF will compare the weight and length to those "of variants designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6,518. Further, consistent with the definition under the NFA and GCA, the inquiry is whether a firearm is designed or intended to be fired from the shoulder, not whether it can be fired with one arm. *Id.* at 6,501. While Plaintiff and other litigants have argued that the definition of a rifle should be limited to devices that are designed to be exclusively fired from the shoulder, many courts have rejected this interpretation of the statute. *United States v. Rose*, 695 F.2d 1356, 1357-58 (10th Cir. 1982); *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963) (explaining the fact that a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition"), *overruled on other grounds by Haynes v. U.S.*, 390 U.S. 85 (1968). In using the six individual factors[6] listed in the Final Rule, though not explicitly relied on by the NFA or GCA or dispositive, this Court finds the ATF has acted within the "zone of reasonableness." *Prometheus Radio Project*, 141 S. Ct. at 1158. Accordingly, Plaintiff has not met his burden that the regulation is arbitrary and capricious.

### 2. Major Questions Doctrine

**\*9** Plaintiff next argues that the Final Rule's impact on society is so great that Congress could not have intended for ATF to have that much authority and relies on the Major Questions Doctrine to invalidate the rule. Dkt. 16 at 35-36. Defendants respond that the doctrine does not apply because interpreting the NFA and GCA with regard to firearms is exactly the type of action the agency was tasked with. Dkt. 22 at 32. The Major Questions Doctrine applies to extraordinary cases where there are "novel" interpretations of "ancillary statutes." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022). Before applying "major questions" principles, the Supreme Court has considered the following: (1) whether

the challenged action is outside the agency's traditional field of expertise, (2) whether it intrudes on matters typically governed by state law, and (3) whether Congress has already expressly considered and rejected the measure. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000). None of those factors are present here. The Final Rule simply attempts to clarify any confusion regarding "stabilizing braces" and ATF firearm classifications, which does not qualify as an expansion of the agency's regulatory authority such that a preliminary injunction is warranted. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

### 2. Plaintiff's Constitutional Challenges

#### a. *Ex-Post Facto* Liability

Plaintiff asserts that the Final Rule subjected him to "*ex post facto* criminal liability." Dkt. 16 at 41. Defendants argue this is not so. Dkt. 22 at 47. In support, Defendants argue that the Final Rule itself does not criminalize any conduct because it is interpretive, and that all liability stems from the NFA. *Id.* Defendants also cite to the specific language of the regulation, which states: "[ATF] has determined that any criminal liability for failure to take the necessary action to comply with Federal law for weapons that have already been made will result only for conduct occurring after the time period to register ends." Dkt. 22 at 33 (citing 88 Fed. Reg. at 6,554).

"To fall within the *ex post facto* prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997). Courts have frequently held that continued or future possession of a firearm does not run afoul with the *ex post facto* prohibition. *United States v. Mitchell*, 209 F.3d 319, 323 (4th Cir. 2000); *Benedetto v. Sessions*, No. CV CCB-17-0058, 2017 WL 4310089, at *4 (D. Md. Sept. 27, 2017). Even if the Court considered the Final Rule to be legislative, it regulates continued possession of short-barreled rifles, which similar to *Mitchell* does not offend the *ex post facto* clause. *Mitchell*, 209 F.3d at 323. Therefore, Plaintiff is not likely to be successful on the merits of his *ex post facto* claim.

#### b. Fifth Amendment and Rule of Lenity

Plaintiff argues that the Final Rule violates the Fifth Amendment because it is unconstitutionally vague and that the rule of lenity requires the Court "rule favorably for the party allegedly violating the law." Dkt. 16 at 36-39. Plaintiff criticizes the criteria ATF uses to determine whether a weapon is a "rifle," because, in his view, the Final Rule relies on various subjective factors such as manufacturer marketing materials and the likely use of the weapon in the general community. *Id.* Plaintiff asserts that this reliance on subjective factors, makes it difficult for him and other regulated parties to discern how the factors operate in conjunction with one another; and thus the rule is void for vagueness. *Id.* at 39. Defendants respond that the rule is not unconstitutionally vague because the criteria are primarily objective and that the agency is not required to provide the "granular" specificity that Plaintiff demands. Dkt. 22 at 35. A law is unconstitutionally vague if it does not "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *United States v. Brewer*, 533 F. App'x 234, 238 (4th Cir. 2013). "To sustain such a challenge, the complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.7 (1982) (internal citations omitted). Therefore, courts have frequently struck down statutes that "tied criminal culpability to ... wholly subjective judgments." *United States v. Williams*, 553 U.S. 285, 306 (2008). While Plaintiff's argument that ATF could have used clearer and more precise language has some merit, the law does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). The six factors considered by ATF provide a cognizable standard by which a person can conform their conduct that aligns with the statutory definition regarding whether a weapon is "designed, redesigned, made or remade and intended to be fire from the shoulder," which is sufficient to survive a void for vagueness challenge. *See Mock*, 2023 WL 2711630, at *7 (holding Plaintiffs did not meet their burden to show ATF's pistol brace rule was void for vagueness because it was comprehensible enough to put a person on notice that their weapon may be

subject to federal laws). Thus, Plaintiff has failed to meet his burden on his void for vagueness claim.

**\*10** Based on the Court's assessment that the final rule is interpretive, and not legislative, Plaintiff's argument regarding the rule of lenity is similarly unavailing. *See Mock*, 2023 WL 2711630, at \*6 (holding Plaintiffs did not satisfy their burden to show likelihood of success on the merits with regard to lenity where the ATF's pistol brace rule merely interprets the NFA and GCA). Therefore, similar to the Plaintiffs in *Mock*, Plaintiff has not shown he is substantially likely to succeed on either his void for vagueness or rule of lenity claims.

### c. Second Amendment

#### i. The Final Rule

Plaintiff brings a facial challenge to the constitutionality of the Final Rule and the NFA in light of the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Plaintiff argues that the Final Rule violated the Second Amendment because it "regulate[s] bearable arms that have been in common use for lawful purposes long before the ratification of that amendment, and Defendants can show no historical analogues of regulating these guns prior to the NFA and GCA." Dkt. 16 at 3. Plaintiff also argues that for the Second Amendment to have meaning, it must extend to firearm accessories such as the stabilizing braces. Dkt. 26 at 16-17. Defendants argue in response that the Final Rule does not implicate the Second Amendment because a stabilizing brace is not a bearable arm, the Final Rule does not ban any firearms, and short-barreled rifles are dangerous and unusual weapons not subject to protection. Dkt. 22 at 48-49.

A rule implicates the Second Amendment when the instrument at issue "constitute[s] [a] bearable arm." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). The instrument "need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm.' " *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *Bruen*, 142 S. Ct. at 2132. Courts have held that "arm" typically covers "[w]eapons of offence or armour of defence," or "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller* 554 U.S. at 581. If a stabilizing brace is not encompassed by "Arms," it thus falls outside the protection of the Second Amendment. Where a rule does implicate a bearable arm, and thus the Second Amendment, the government must show that the rule "is consistent with the Nation's historical tradition of firearm regulation," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2002), by showing there is a "well-established and representative historical analogue." *Id.* at 2133.

Plaintiff has not met his burden of showing that the Final Rule implicates the Second Amendment. First, laws that regulate the use of firearm accessories or attachments do not generally implicate the Second Amendment. *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding a silencer is not a weapon on its own but rather a firearm accessory and thus is not a bearable arm protected by the Second Amendment); *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at \*11 n. 9 (W.D.N.C. Mar. 2, 2023). In the context of silencers, courts have routinely held that a silencer is not a firearm because a silencer cannot cause harm on its own, it is "not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at \*4-5 (D. Md. Sept. 20, 2019) (collecting cases). Like a silencer, a stabilizing brace cannot cause harm on its own, is not useful independent of its attachment to a firearm, and a firearm remains an effective weapon without a brace.[7]

**\*11** Assuming *arguendo* that the Final Rule does implicate the Second Amendment, Plaintiff's argument fails because as the court noted in *Mock*, "the Final Rule does not ban stabilizing braces, nor firearms equipped with them" but rather "requires individuals and entities to comply with the NFA's statutory requirements (e.g., by registering the weapons with ATF or permanently detaching the brace from the pistol)." *Mock*, 2023 WL 2711630 at \*14. The Second Amendment does not prohibit the imposition of reasonable licensing regimes commonly associated with firearm ownership. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017); *see also Bruen*, 142 S. Ct. at 2138 n.9 (2022) ("[N]othing in our analysis should be interpreted

to suggest the unconstitutionality [of reasonable licensing regimes][.]"). Requirements such as those at issue here, fingerprinting and background checks, do not offend the right to bear arms. *Bezet*, 714 F. App'x at 340; *accord Lane v. Holder*, 703 F.3d 668, 672-73 (4th Cir. 2012) (finding plaintiffs did not suffer injury from "additional costs and logistical hurdles" in purchasing firearms, and explaining that laws imposing "minor inconveniences" are distinct from those effecting "an absolute deprivation" of the right to bear arms); *see, e.g., Saleem*, 2023 WL 2334417 at *11 (W.D.N.C. Mar. 2, 2023) (explaining that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"). Plaintiff does not cite any language in the Final Rule that purports to ban any of his pistols that are outfitted with stabilizing braces. Ultimately, under the Final Rule, Plaintiff may still possess and sell his firearms that are equipped with stabilizing braces upon registration with, and approval by, ATF.

### ii. Regulation of Short-Barreled Rifles Generally

Finally, Plaintiff argues that the NFA and Final Rule are unlawful because short-barreled shotguns and short-barreled rifles are commonly owned and not unusually dangerous, and thus protected by the Second Amendment. Dkt. 16 at 30-31. Plaintiff further argues that there is no historical analogue for the regulation of short-barreled rifles. *Id.* at 29. Defendants argue that the Second Amendment does not protect the possession of short-barreled rifles or shotguns because they are dangerous and unusual weapons which fall outside the protection of the Second Amendment. Dkt. 22 at 37-40. Defendants also argue that even if short-barreled rifles were covered by the Second Amendment, there is historical evidence of regulating firearms through taxation, registration, and licensing that can be traced to colonial times. *Id.* at 41.

Many cases pre-*Bruen* have held that short-barreled shotguns are not subject to the Second Amendment. *Heller*, 554 U.S. at 625 (holding that the Second Amendment does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns"); *see also United States v. Chester*, 628 F.3d 673, 678-79 (4th Cir. 2010) ("[A] citizen's right to carry or keep sawed-off shotguns, for instance, would not come within the ambit of the Second Amendment."). Courts have also extended this analysis to short-barreled rifles envisioning no constitutional distinction between short-barreled rifles and short barreled shotguns. *United States v. Gilbert*, 286 Fed. App'x. 383, 386 (9th Cir. 2008); *United States v. Cox*, 235 F. Supp. 3d 1221, 1227 (D. Kan. 2017); *United States v. Gonzales*, No. 2:10-cr-00967, 2011 WL 5288727, at *6 (D. Utah Nov. 2, 2011). Since *Bruen*, lower courts have held that short-barreled rifles are not protected under the Second Amendment because like short-barreled shotguns, they are dangerous and unusual weapons. *See United States v. Royce*, No. 1:22-CR-130, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023) (holding that short-barreled rifles and shotguns are " 'dangerous and unusual' weapons that are easily concealable and thus not protected by the Second Amendment"); *United States v. Rush*, No. 22-cr-40008-JPG, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023) (similar).

This Court finds the analysis in the above-cited cases persuasive and, based on the limited historical analysis provided at this stage of litigation, this Court cannot conclude that the NFA and Final Rule are substantially likely to violate Plaintiff's Second Amendment rights. Therefore, the Court finds Plaintiff is not likely to succeed on the merits of his Second Amendment claim based on the current record before the Court.

**\*12** As failure to demonstrate likelihood of success on the merits as to at least one claim bars a TRO or preliminary injunction, the Court declines to analyze the other preliminary injunction factors at this stage. *Alcorn*, 157 F. Supp. 3d at 491.

### IV. Conclusion

In short, Plaintiff has not shown he is entitled to preliminary relief. While there may have been some missteps by ATF in effectuation of the interpretive rule, any of those errors were harmless. Thus, though Plaintiff makes sound arguments regarding the potential procedural violations of the APA, none of those arguments necessitate the extraordinary remedy of a Temporary Restraining Order or Preliminary Injunction. Accordingly, it is ORDERED that Plaintiff's Application for a Nationwide TRO and Injunction (Dkt. Nos. 16 and 17) is DENIED.

The Clerk is directed to send a copy of this Order to counsel of record and to Plaintiff who is very effectively proceeding *pro se*.

Alexandria, Virginia

**All Citations**

--- F.Supp.3d ----, 2023 WL 3692841

## Footnotes

1      A grant of temporary injunctive relief requires the movant to establish the same four factors that govern preliminary injunctions. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 20 (2008).

2      Plaintiff argues that Defendants are not entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) because of the procedural defects in the Final Rule. Dkt. 16 at 39. However, neither the agency nor the government relies on *Chevron* deference, so the Court declines to address whether deference may be applicable to this regulation. Dkt. 22 at 15 n.8; *see HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021) ("[T]he government is not invoking Chevron. We therefore decline to consider whether any deference might be due its regulation.").

3      The Court is aware that the Fifth Circuit issued an order in *Mock v. Garland*, No. 23-10319 (5th Cir. May 23, 2023).

4      ATF initially estimated there were 3 million braces in circulation, but calculated anticipated costs based on 7 million braces. RIA at 18.

5      A final regulation satisfies the logical outgrowth test if the changes in the proposed version "are in character with the original scheme," and "the final rule is a 'logical outgrowth' of the notice and comments already given." *Mayor & City Council of Baltimore v. Azar*, 439 F. Supp. 3d 591, 610 (D. Md. 2020), *aff'd sub nom. Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020).

6      Plaintiff also briefly takes issue with the fact that the factors in the Final Rule represent a change of position on the part of ATF. Dkt. 16 at 24. However, as required by the APA, ATF explained that the rule constituted a change of position and why it was preferable to the status quo. *Fox Television Stations, Inc.*, 556 U.S. at 515-16. Further the Supreme Court has held "an agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.' " *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 42 (1983).

7      Plaintiff appears to concede that braces do not serve a purpose independent of their attachment to a firearm. Dkt. 26 at 14 ("By this statement, Defendants admit their Rule renders braces useless for any conceivable purpose and destroying their value—a cost Defendants did not include in their analysis.").

---

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.